

# Iran Sanctions

Updated April 14, 2020

**Congressional Research Service**

https://crsreports.congress.gov

RS20871

**CRS REPORT**
Prepared for Members and
Committees of Congress

**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

RS20871

April 14, 2020

**Kenneth Katzman**
Specialist in Middle
Eastern Affairs

# Iran Sanctions

Successive Administrations have used economic sanctions to try to change Iran's behavior. U.S. sanctions on Iran, which are primarily "secondary sanctions" on firms that conduct certain transactions with Iran, have adversely affected Iran's economy. The sanctions arguably have not, to date, altered Iran's pursuit of core strategic objectives including its support for regional armed factions and its development of missiles. Arguably, sanctions did contribute to Iran's decision to enter into a 2015 agreement that put limits on its nuclear program.

During 2011-2015, the global community pressured Iran economically, and Iran's economy shrank as its crude oil exports fell by more than 50%, and Iran was rendered unable to access its foreign exchange assets abroad. Iran accepted the 2015 multilateral nuclear accord (Joint Comprehensive Plan of Action, JCPOA) in part because the agreement brought broad sanctions relief. The Obama Administration waived relevant sanctions and revoked relevant executive orders (E.O.s). United Nations and European Union sanctions were lifted as well. Remaining in place were U.S. sanctions on: U.S. trade with Iran, Iran's support for regional armed factions, its human rights abuses, its efforts to acquire missile and advanced conventional weapons technology, and the Islamic Revolutionary Guard Corps (IRGC). U.N. Security Council Resolution 2231, which endorsed the JCPOA, provided for a non-binding restriction on Iran's development of nuclear-capable ballistic missiles and kept in place an existing ban on its importation or exportation of arms. The latter ban expires on October 18, 2020. The sanctions relief enabled Iran to increase its oil exports to nearly pre-sanctions levels, regain access to its foreign exchange funds, and order some new passenger aircraft.

On May 8, 2018, President Trump announced that the United States would no longer participate in the JCPOA. All U.S. secondary sanctions were re-imposed as of November 6, 2018. Sanctions have since been at the core of Trump Administration policy to apply "maximum pressure" on Iran, with the stated purpose of compelling Iran to negotiate a revised JCPOA that takes into account U.S. concerns beyond Iran's nuclear program. The policy has caused major companies to exit the Iran market, and Iran's economy fell into severe recession. Iran's oil exports decreased dramatically, particularly after the Administration in May 2019 ended sanctions exceptions for the purchase of Iranian oil. The Administration has also sanctioned several senior Iranian officials. Iran has continued to develop its missile force and to provide arms and support to a broad array of armed factions operating throughout the region, while refusing, to date, to begin talks with the United States on a revised JCPOA.

The European Union and other countries have sought to keep the economic benefits of the JCPOA flowing to Iran in order to persuade Iran to remain in the nuclear accord. In early 2019, the European countries created a mechanism to facilitate trade with Iran but the vehicle only completed one transaction in its first year of operations. Since mid-2019, Iran has responded to the increasing sanctions by decreasing its compliance with some of the nuclear commitments of the JCPOA and by conducting provocations in the Persian Gulf and in Iraq.

The COVID-19 pandemic has prompted international criticism that U.S. sanctions on Iran might be hindering Iran's response to the outbreak. Iran has reported more cases and more deaths from the illness than any other country in the region. Numerous accounts indicate that sanctions have hindered Iran's ability to finance the purchase of medical equipment, even though U.S. sanctions do not apply to humanitarian transactions. In March 2020, the Administration revised public sanctions guidance to prompt foreign companies to proceed with sales of humanitarian items to Iran. The Administration has also offered assistance to help Iran deal with COVID-19, but Iran has refused the U.S. aid. Iran has applied to the International Monetary Fund (IMF) for a $5 billion loan.

See also CRS Report R43333, *Iran Nuclear Agreement and U.S. Exit*, by Paul K. Kerr and Kenneth Katzman; and CRS Report R43311, *Iran: U.S. Economic Sanctions and the Authority to Lift Restrictions*, by Dianne E. Rennack.

# Contents

Overview ............................................................................................................................... 1

Blocked Iranian Property and Assets.................................................................................... 1
   Executive Order 13599 Impounding Iran-Owned Assets........................................... 3

Sanctions for Iran's Support for Armed Factions and Terrorist Groups................................ 4
   Sanctions Triggered by Terrorism List Designation.................................................. 4
      Exception for U.S. Humanitarian Aid.............................................................. 5
   Sanctions on States "Not Cooperating" Against Terrorism ....................................... 5
   Executive Order 13224 Sanctioning Terrorism-Supporting Entities........................... 5
      Implementation of E.O. 13224........................................................................ 6
   Foreign Terrorist Organization (FTO) Designations ................................................ 6
   Other Sanctions on Iran's "Malign" Regional Activities ........................................... 7
      Executive Order 13438 on Threats to Iraq's Stability ...................................... 7
      Executive Order 13572 on Repression of the Syrian People. ............................ 7
      The Hizballah International Financing Prevention Act (P.L. 114-102) and
         Hizballah International Financing Prevention Amendments Act of 2018 (P.L.
         115-272). .................................................................................................. 7

Ban on U.S. Trade and Investment with Iran ...................................................................... 8
      JCPOA-Related Easing and Subsequent Reversal............................................ 8
   What U.S.-Iran Trade Is Allowed or Prohibited? ..................................................... 8
   Application to Foreign Subsidiaries of U.S. Firms ..................................................11

Sanctions on Iran's Energy Sector..................................................................................... 12
   The Iran Sanctions Act...................................................................................... 12
      Key Sanctions "Triggers" Under ISA ........................................................... 12
      Mandate and Time Frame to Investigate ISA Violations ................................. 16
      Interpretations of ISA and Related Laws ....................................................... 17
      Implementation of Energy-Related Iran Sanctions ......................................... 19
   Iran Oil Export Sanctions: Section 1245 of the FY2012 NDAA Sanctioning
     Transactions with Iran's Central Bank................................................................ 20
      Implementation/SREs Issued and Ended ...................................................... 21
      Waiver and Termination .............................................................................. 22
   Iran Foreign Account "Restriction" Provision ...................................................... 22

Sanctions on Weapons of Mass Destruction, Missiles, and Conventional Arms Transfers........... 23
   Iran-Iraq Arms Nonproliferation Act and Iraq Sanctions Act ................................. 24
      Implementation ........................................................................................... 24
      Waiver ....................................................................................................... 25
   Banning Aid to Countries that Aid or Arm Terrorism List States: Anti-Terrorism and
     Effective Death Penalty Act of 1996................................................................. 25
      Implementation ........................................................................................... 25
   Proliferation-Related Provision of the Iran Sanctions Act ...................................... 25
   Iran-North Korea-Syria Nonproliferation Act........................................................ 25
      Implementation ........................................................................................... 26
      Waiver and Termination .............................................................................. 26
   Executive Order 13382 on Proliferation-Supporting Entities .................................. 26
      Implementation ........................................................................................... 26
   Arms Transfer and Missile Sanctions: The Countering America's Adversaries through
     Sanctions Act (CAATSA, P.L. 115-44)............................................................. 26

Implementation ............................................................................................ 27
Foreign Aid Restrictions for Named Suppliers of Iran ................................................ 27
Sanctions on "Countries of Diversion Concern" ....................................................... 27
    Implementation ............................................................................................ 27
    Waiver and Termination ................................................................................. 27
Financial/Banking Sanctions ................................................................................... 28
    Targeted Financial Measures ............................................................................. 29
    Ban on Iranian Access to the U.S. Financial System/Use of Dollars ..................... 29
        Punishments/Fines Implemented against Some Banks. ..................................... 29
    CISADA: Sanctioning Foreign Banks That Conduct Transactions with Sanctioned
    Iranian Entities ............................................................................................... 30
        Implementation ............................................................................................ 31
        Waiver and Termination ................................................................................. 31
    Iran Designated a Money-Laundering Jurisdiction/FATF ...................................... 32
        FATF ......................................................................................................... 32
    Use of the SWIFT System ................................................................................... 33
Sanctions on Iran's Non-Oil Industries and Sectors .................................................. 33
    The Iran Freedom and Counter-Proliferation Act (IFCA) ..................................... 33
        Implementation ............................................................................................ 34
        Waiver and Termination ................................................................................. 34
    Executive Order 13645/13846: Iran's Automotive Sector, *Rial* Trading, and Precious
    Stones ............................................................................................................. 34
    Executive Order 13871 on Iran's Minerals and Metals Sectors (May 8, 2019) ......... 35
    Executive Order 13902 on the Construction, Mining, Manufacturing, and Textiles
    Sector (January 10. 2020) ................................................................................. 35
    Executive Order 13608 on Sanctions Evasion ..................................................... 36
Sanctions on Cyber and Criminal Activities .............................................................. 36
    Executive Order 13694 ....................................................................................... 36
    Executive Order 13581 ....................................................................................... 37
        Implementation of E.O. 13694 and 13581 ....................................................... 37
Divestment/State-Level Sanctions ........................................................................... 37
Sanctions Supporting Democracy/Human Rights ....................................................... 37
    Expanding Internet and Communications Freedoms ............................................. 37
        Countering Censorship of the Internet: CISADA, E.O. 13606, and E.O. 13628 ...... 38
        Laws and Actions to Promote Internet Communications by Iranians ................... 38
    Measures to Sanction Human Rights Abuses/Promote Civil Society ....................... 39
    Non-Iran Specific Human Rights Laws ................................................................ 40
    Sanctions on Iran's Leadership .......................................................................... 41
        Executive Order 13876 ................................................................................. 41
U.N. Sanctions ....................................................................................................... 41
    Resolution 2231 and U.N. Sanctions Eased ........................................................ 42
Sanctions Application under Nuclear Agreements ...................................................... 43
    Sanctions Eased by the JPA ............................................................................... 44
    Sanctions Easing under the JCPOA and U.S. Reimposition ................................... 44
        U.S. Laws and Executive Orders Affected by the JCPOA ................................... 45
        U.S. Sanctions that Remained in Place despite the JCPOA ................................ 46
International Implementation and Compliance ............................................................ 47

European Union (EU) ........................................................................................................ 48
   EU Divestment in Concert with Reimposition of U.S. Sanctions..................................... 48
   European Special Purpose Vehicle/INSTEX and Credit Line Proposal ........................... 49
   EU Antiterrorism and Anti-proliferation Actions............................................................. 50
   SWIFT Electronic Payments System ................................................................................ 51
China and Russia.............................................................................................................. 51
   Russia................................................................................................................................ 51
   China ................................................................................................................................. 51
Japan/Korean Peninsula/Other East Asia ....................................................................... 52
   North Korea ...................................................................................................................... 53
   Taiwan and Singapore....................................................................................................... 53
South Asia ........................................................................................................................ 54
   India .................................................................................................................................. 54
   Pakistan ............................................................................................................................ 54
Turkey/South Caucasus .................................................................................................... 55
   Turkey ............................................................................................................................... 55
   Caucasus and Caspian Sea ................................................................................................ 55
Persian Gulf States and Iraq ........................................................................................... 56
   Iraq ................................................................................................................................... 56
Syria and Lebanon............................................................................................................ 57
International Financial Institutions/World Bank/IMF and WTO ...................................... 57
   WTO Accession ................................................................................................................ 58

Effectiveness of Sanctions...................................................................................................... 58
  Effect on Iran's Nuclear Program and Strategic Capabilities ............................................. 58
  Effects on Iran's Regional Influence................................................................................... 59
  Internal Political Effects...................................................................................................... 60
  Economic Effects ................................................................................................................ 60
   Iran's Economic Coping Strategies .................................................................................. 62
  Effect on Energy Sector Development ................................................................................. 63
  Human Rights-Related Effects............................................................................................. 64
  Humanitarian Effects........................................................................................................... 64
   U.S. COVID Response ..................................................................................................... 65
   Air Safety ......................................................................................................................... 66

Recent Sanctions Legislation ................................................................................................. 66
  Key Legislation in the 114th Congress ............................................................................... 66
   Iran Nuclear Agreement Review Act (P.L. 114-17) ......................................................... 66
   Visa Restriction................................................................................................................. 67
   Iran Sanctions Act Extension ........................................................................................... 67
   Reporting Requirement on Iran Missile Launches ........................................................... 68
   114th Congress Legislation not Enacted........................................................................... 68
  The Trump Administration and Major Iran Sanctions Legislation........................................ 69
   The Countering America's Adversaries through Sanctions Act of 2017 (CAATSA,
    P.L. 115-44)................................................................................................................... 69
   Legislation in the 115th Congress Not Enacted ............................................................... 69
   116th Congress.................................................................................................................. 70
  Other Possible U.S. and International Sanctions................................................................... 70

# Figures

Figure 1. Economic Indicators ................................................................................................ 63

# Tables

Table 1. Iran Crude Oil Sales .................................................................................................. 23
Table 2. Major Settlements/Fines Paid by Banks for Violations .................................................... 30
Table 3. Summary of Provisions of U.N. Resolutions on Iran Nuclear Program (1737,
    1747, 1803, 1929, and 2231)............................................................................................. 43

Table D-1. Entities Designated Under U.S. Executive Order 13382 (Proliferation)...................... 81
Table D-2. Iran-Related Entities Sanctioned Under Executive Order 13224  (Terrorism
    Entities) .......................................................................................................................... 86
Table D-3. Determinations and Sanctions under the Iran Sanctions Act........................................ 89
Table D-4. Entities Sanctioned Under the Iran North Korea Syria Nonproliferation Act or
    Executive Order 12938 for Iran-Specific Violations.............................................................. 90
Table D-5. Entities Designated under the Iran-Iraq Arms Non-Proliferation Act of 1992 ............ 92
Table D-6. Entities Designated as Threats to Iraqi Stability under Executive Order 13438
    (July 17, 2007)................................................................................................................. 92
Table D-7. Iranians Designated Under Executive Order 13553 on Human Rights Abusers
    (September 29, 2010) ........................................................................................................ 93
Table D-8. Iranian Entities Sanctioned Under Executive Order 13572 for Repression of
    the Syrian People  (April 29, 2011)...................................................................................... 94
Table D-9. Iranian Entities Sanctioned Under Executive Order 13606 (GHRAVITY, April
    23, 2012)) ....................................................................................................................... 94
Table D-10. Entities Sanctioned Under Executive Order 13608 Targeting Sanctions
    Evaders (May 1, 2012)...................................................................................................... 94
Table D-11. Entities Named as Iranian Government Entities Under Executive Order
    13599 (February 5, 2012).................................................................................................. 94
Table D-12. Entities Sanctioned Under Executive Order 13622 for Oil and Petrochemical
    Purchases from Iran and Precious Metal Transactions with Iran (July 30, 2012) ...................... 96
Table D-13. Entities Sanctioned under the Iran Freedom and Counter-Proliferation Act
    (IFCA, P.L. 112-239)........................................................................................................ 96
Table D-14. Entities Designated as Human Rights Abusers or Limiting Free Expression
    under Executive Order 13628 (October 9, 2012, E.O pursuant to Iran Threat Reduction
    and Syria Human Rights Act).............................................................................................. 96
Table D-15. Entities Designated under E.O. I3645 on Auto production, *Rial* Trading,
    Precious Stones, and Support to NITC (June 3, 2013).......................................................... 97
Table D-16. Entities Designated under Executive Order 13581 on Transnational Criminal
    Organizations (July 24, 2011) ............................................................................................ 97
Table D-17. Entities Designated under Executive Order 13694 on Malicious Cyber
    Activities (April 1, 2015) ................................................................................................... 98
Table D-18. Entities Designated under Executive Order 13846 Reimposing Sanctions
    (August 6, 2018)............................................................................................................... 98

Table D-19. Executive Order 13871 on Metals and Minerals (May 8, 2019) ............................... 99
Table D-20. Entities Designated as Gross Human Rights Violators under Section 7031(c) of Foreign Aid Appropriations ................................................................................... 99
Table D-21. Entities Designated under E.O. 13876 on the Supreme Leader and his Office (June 24, 2019)............................................................................................................. 99
Table D-22. Executive Order 13818 Implementing the Global Magnitsky Act (December 20, 2017)................................................................................................................... 100

# Appendixes

Appendix A. U.S., U.N., EU and Allied Country Sanctions ........................................................ 71
Appendix B. Post-1999 Major Investments in Iran's Energy Sector ........................................... 74
Appendix C. Entities Sanctioned Under U.N. Resolutions and EU Decisions ............................ 78
Appendix D. Entities Sanctioned under U.S. Laws and Executive Orders ................................... 81

# Contacts

Author Information................................................................................................................ 100

# Overview

Sanctions have been a significant component of U.S. Iran policy since Iran's 1979 Islamic Revolution that toppled the Shah of Iran, a U.S. ally. In the 1980s and 1990s, U.S. sanctions were intended to try to compel Iran to cease supporting acts of terrorism and to limit Iran's strategic power in the Middle East more generally. After the mid-2000s, U.S. and international sanctions focused largely on trying to persuade Iran to agree to limits to its nuclear program. Still, sanctions have had multiple objectives and sought to address multiple threats from Iran simultaneously.

This report analyzes U.S. and international sanctions against Iran. CRS cannot independently corroborate whether any individual or other entity might be in violation of U.S. or international sanctions against Iran. The report tracks implementation of the various U.S. laws and executive orders, some of which require the blocking of U.S.-based property of sanctioned entities. No information has been released from the executive branch indicating the extent, if any, to which any such property is currently blocked.

The sections below are grouped by function, in the chronological order in which these themes have emerged.

# Blocked Iranian Property and Assets

### Post-JCPOA Status: Iranian Assets Still Frozen, but Some Issues Resolved

U.S. sanctions on Iran were first imposed during the U.S.-Iran hostage crisis of 1979-1981, in the form of executive orders issued by President Jimmy Carter blocking nearly all Iranian assets held in the United States. These included E.O. 12170 of November 14, 1979, blocking all Iranian government property in the United States, and E.O 12205 (April 7, 1980) and E.O. 12211 (April 17, 1980) banning virtually all U.S. trade with Iran. The latter two orders were issued just prior to the failed April 24-25, 1980, U.S. effort to rescue the U.S. Embassy hostages held by Iran. President Jimmy Carter also broke diplomatic relations with Iran on April 7, 1980. The trade-related orders (12205 and 12211) were revoked by Executive Order 12282 of January 19, 1981, following the "Algiers Accords" (hereafter: "Accords") that resolved the U.S.-Iran hostage crisis.

### U.S.-Iran Claims Tribunal

The Accords established a "U.S.-Iran Claims Tribunal" at the Hague that continues to arbitrate government-to-government cases resulting from the 1980 break in relations and freezing of some of Iran's assets. All of the 4,700 private U.S. claims against Iran were resolved in the first 20 years of the Tribunal, resulting in $2.5 billion in awards to U.S. nationals and firms.

The major government-to-government cases involve Iranian claims for compensation for hundreds of foreign military sales (FMS) cases that were halted in concert with the rift in U.S.-Iran relations when the Shah's government fell in 1979. In 1991, the George H. W. Bush Administration paid $278 million from the Treasury Department Judgment Fund to settle FMS cases involving weapons Iran had received but which were in the United States undergoing repair when the Shah fell and were then impounded.

On January 17, 2016 (the day after the JCPOA took effect), the United States announced it had settled with Iran on additional FMS cases that were frozen when the Shah's government fell. Iran had been depositing its FMS payments into a DoD-managed "Iran FMS Trust Fund," and, after 1990, the Fund had a balance of about $400 million. In 1990, $200 million was paid from the

Fund to Iran to settle some FMS cases. Under the 2016 settlement, the United States sent Iran the $400 million balance in the Fund, plus $1.3 billion in accrued interest, paid from the Department of the Treasury's "Judgment Fund." In order not to violate U.S. regulations barring direct U.S. dollar transfers to Iranian banks, the funds were remitted to Iran by early February 2016 in foreign hard currency from the central banks of the Netherlands and of Switzerland. Some remaining claims involving the FMS program with Iran remain under arbitration.

### Other Iranian Assets Frozen

Iranian assets in the United States remain blocked under several provisions, including Executive Order 13599 of February 2010. The JCPOA did not commit the United States to release any of these assets.

- About $1.9 billion in blocked Iranian assets are bonds belonging to Iran's Central Bank, in a Citibank account in New York belonging to Clearstream, a Luxembourg-based securities firm. In 2008, Clearstream allegedly improperly allowed those funds to access the U.S. financial system. Clearstream transferred $1.67 billion in principal and interest payments to its accounts in Luxembourg and those proceeds have been deemed by Luxembourg courts as outside U.S. jurisdiction.

- About $50 million of Iran's assets frozen in the United States consists of Iranian diplomatic property and accounts, including the former Iranian embassy in Washington, DC, and 10 other properties in several states, and related accounts.[1]

- Among other frozen Iranian assets are real estate holdings of the Assa Company, a UK-chartered entity, which allegedly was maintaining the interests of Iran's Bank Melli in a 36-story office building in New York City and several other properties around the United States (in Texas, California, Virginia, Maryland, and other parts of New York City). An Iranian foundation, the Alavi Foundation, allegedly is an investor in the properties. The U.S. Attorney for the Southern District of New York blocked these properties in 2009. The Department of the Treasury report avoids valuing real estate holdings. In June 2017, the United States won control over the New York City office building through litigation.

### Use of Iranian Assets to Compensate U.S. Victims of Iranian Terrorism[2]

Nearly $50 billion in court awards have been made to victims of Iranian terrorism. These include the families of the 241 U.S. soldiers killed in the October 23, 1983, bombing of the U.S. Marine barracks in Beirut. U.S. funds equivalent to the $400 million balance in the DOD account (see above) have been used to pay a small portion of these judgments. The Algiers Accords apparently precluded compensation for the 52 U.S. diplomats held hostage by Iran from November 1979 until January 1981. The FY2016 Consolidated Appropriation (Section 404 of P.L. 114-113) set up a mechanism for paying damages to the U.S. embassy hostages and other victims of Iranian

---

[1] http://www.treasury.gov/resource-center/sanctions/Documents/tar2010.pdf.

[2] For details on these issues, see CRS In Focus IF10341, *Justice for United States Victims of State Sponsored Terrorism Act: Eligibility and Funding*, by Jennifer K. Elsea; CRS Report RL31258, *Suits Against Terrorist States by Victims of Terrorism*, by Jennifer K. Elsea; CRS Legal Sidebar LSB10104, *It Belongs in a Museum: Sovereign Immunity Shields Iranian Antiquities Even When It Does Not Protect Iran*, by Stephen P. Mulligan; and CRS Legal Sidebar LSB10140, *Iran's Central Bank Asks Supreme Court to Consider Whether the Bank's Assets Abroad are Immune from Attachment to Satisfy Terror Judgments*, by Jennifer K. Elsea.

terrorism using settlement payments paid by various banks for concealing Iran-related transactions, and proceeds from other Iranian frozen assets.

Other past financial disputes include the errant U.S. shoot-down on July 3, 1988, of an Iranian Airbus passenger jet (Iran Air flight 655), for which the United States paid Iran $61.8 million in compensation ($300,000 per wage-earning victim, $150,000 per non-wage earner) for the 248 Iranians killed. The United States did not compensate Iran for the airplane itself, although officials involved in the negotiations told CRS in November 2012 that the United States later arranged to provide a substitute used aircraft to Iran.

## Executive Order 13599 Impounding Iran-Owned Assets

### *Post-JCPOA Status: Still in Effect*

Executive Order 13599, issued by President Obama on February 5, 2012, directs the blocking of U.S.-based assets of entities determined to be "owned or controlled by the Iranian government." The order was issued to implement Section 1245 of the FY2012 National Defense Authorization Act (P.L. 112-81) that imposed secondary U.S. sanctions on Iran's Central Bank. The order requires that U.S. banks block any U.S.-based assets of the Central Bank of Iran, or of any Iranian government-controlled entity. The order goes beyond the regulations issued pursuant to the 1995 imposition of the U.S. trade ban with Iran, in which U.S. banks are required to refuse such transactions but to return funds to Iran. Even before the issuance of the order, and in order to implement the ban on U.S. trade with Iran (see below) successive Administrations had designated many entities as "owned or controlled by the Government of Iran."

Numerous designations have been made under Executive Order 13599, including the June 4, 2013, naming of 38 entities (mostly oil, petrochemical, and investment companies) that are components of an Iranian entity called the "Execution of Imam Khomeini's Order" (EIKO).[3] The Department of the Treasury characterizes EIKO as an Iranian leadership entity that controls "massive off-the-books investments."

**Implementation of the JCPOA and U.S. Withdrawal from the JCPOA.** To implement the JCPOA, many 13599-designated entities (in JCPOA "Attachment 3") were "delisted" from U.S. secondary sanctions (no longer considered "Specially Designated Nationals," SDNs), and referred to as "designees blocked solely pursuant to E.O 13599."[4] That characterization permitted foreign entities to conduct transactions with the listed entities without U.S. sanctions penalty but continued to bar U.S. persons (or foreign entities owned or controlled by a U.S. person) from conducting transactions with these entities. In concert with the U.S. withdrawal from the JCPOA, virtually all of the 13599-designated entities that were delisted as SDNs were relisted as SDNs on November 5, 2018.[5]

*Civilian Nuclear Entity Exception*. When the Trump Administration reinstated sanctions, the Atomic Energy Organization of Iran (AEOI), and 23 of its subsidiaries, were relisted under E.O. 13599. However, the Administration did not relist these entities as subject to secondary sanctions (SDNs) under E.O. 13382, in order to facilitate continued IAEA and international involvement

---

[3] Department of Treasury. Treasury Targets Assets of Iranian Leadership. June 4, 2013.

[4] See https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20181105_names.aspx.

[5] For a full list of entities designated under E.O. 13599, go to the following link: https://www.treasury.gov/ofac/downloads/13599/13599list.pdf.

with Iran's civilian nuclear program permitted under the JCPOA.[6] The May 2019 ending of some waivers for nuclear technical assistance to Iran prohibits work with some AEOI entities.

# Sanctions for Iran's Support for Armed Factions and Terrorist Groups

After about five years during which no U.S. sanctions were imposed on Iran, the United States imposed sanctions for Iran's support for regional groups committing acts of terrorism. The Secretary of State designated Iran a "state sponsor of terrorism" on January 23, 1984, following the October 23, 1983, bombing of the U.S. Marine barracks in Lebanon by elements that later established Lebanese Hezbollah. This designation triggers substantial sanctions. None of the laws or executive orders in this section were waived or revoked to implement the JCPOA, and no entities discussed in this section were "delisted" from sanctions.

## Sanctions Triggered by Terrorism List Designation

The U.S. naming of Iran as a "state sponsor of terrorism"—commonly referred to as Iran's inclusion on the U.S. "terrorism list"—triggers several sanctions. The designation is made under the authority of Section 6(j) of the Export Administration Act of 1979 (P.L. 96-72, as amended), sanctioning countries determined to have provided repeated support for acts of international terrorism. The sanctions triggered by the designation are as follows:

- *Restrictions on sales of U.S. dual use items*. The Export Administration Act, as superseded by the Export Control Reform Act of 2018 (in P.L. 115-232), requires a presumption of denial of any license applications to sell dual use items to Iran. The restrictions are enforced through Export Administration Regulations (EARs) administered by the Bureau of Industry and Security (BIS) of the Commerce Department.

- *Ban on direct U.S. financial assistance and arms sales to Iran*. Section 620A of the Foreign Assistance Act, FAA (P.L. 87-95) and Section 40 of the Arms Export Control Act (P.L. 95-92, as amended), respectively, bar any U.S. foreign assistance (U.S. government loans, credits, credit guarantees, and Ex-Im Bank loan guarantees) to terrorism list countries. Successive foreign aid appropriations laws since the late 1980s have banned direct assistance to Iran, and with no waiver provisions. The FY2012 foreign operations appropriation (Section 7041(c)(2) of P.L. 112-74) banned the Ex-Im Bank from using funds appropriated in that act to finance any entity sanctioned under the Iran Sanctions Act.

- *Requirement to oppose multilateral lending*. U.S. officials are required to use the country's "voice and vote" to oppose multilateral lending to any terrorism list country by Section 1621 of the International Financial Institutions Act (P.L. 95-118, as amended [added by Section 327 of the Anti-Terrorism and Effective Death Penalty Act of 1996 (P.L. 104-132)]). The law provides waiver authority, for example to support an international loan to Iran in humanitarian circumstances.

- *Withholding of U.S. foreign assistance to countries that assist or sell arms to terrorism list countries*. Under Sections 620G and 620H of the Foreign

---

[6] U.S. diplomatic "non-paper" provided to CRS.

Assistance Act (FAA), as added by Sections 325 and 326 of the Anti-Terrorism and Effective Death Penalty Act of 1996 (P.L. 104-132), the President is required to withhold foreign aid from any country that aids or sells arms to a terrorism list country. Waiver authority is provided. Section 321 of P.L. 104-132 makes it a crime for a U.S. person to conduct transactions with terrorism list governments.

- *Withholding of U.S. Aid to Organizations That Assist Iran*. Section 307 of the FAA (added in 1985) names Iran as unable to benefit from U.S. contributions to international organizations, and require proportionate cuts if these institutions work in Iran. For example, if an international organization spends 3% of its budget for programs in Iran, then the United States is required to withhold 3% of its contribution to that international organization. No waiver option is provided.

### Exception for U.S. Humanitarian Aid

The terrorism list designation, and other U.S. sanctions laws barring assistance to Iran, do not bar U.S. disaster aid. The United States donated $125,000, through relief agencies, to help victims of two earthquakes in Iran in 1997; $350,000 worth of aid to the victims of a June 2002, earthquake; and $5.7 million in assistance for victims of the December 2003 earthquake in Bam, Iran, which killed 40,000. The U.S. military flew 68,000 kilograms of supplies to Bam. The Trump Administration has offered Iran assistance, via the World Health Organization, to help it battle the COVID-19 outbreak in early 2020, but, as of mid-April 2020, Iran has refused the aid.

---

**Requirements for Removal from Terrorism List**

Terminating the sanctions triggered by Iran's terrorism list designation would require Iran's removal from the terrorism list. The Arms Export Control Act spells out two different requirements for a President to remove a country from the list, depending on whether the country's regime has changed.

*If the country's regime has changed:* the President can remove a country from the list immediately by certifying that regime change in a report to Congress.

*If the country's regime has not changed:* the President must report to Congress 45 days in advance of the effective date of removal. The President must certify that (1) the country has not supported international terrorism within the preceding six months, and (2) the country has provided assurances it will not do so in the future. In this latter circumstance, Congress has the opportunity to block the removal by enacting a joint resolution to that effect. The President has the option of vetoing the joint resolution, and blocking the removal then requires a veto override.

---

## Sanctions on States "Not Cooperating" Against Terrorism

Section 40A to the Arms Export Control Act (added by Section 330 of the Anti-Terrorism and Effective Death Penalty Act (P.L. 104-132)) prohibits the sale or licensing of U.S. defense articles and services to any country designated (by each May 15) as "not cooperating fully with U.S. anti-terrorism efforts." The President can waive the provision upon determining that a defense sale is "important to the national interests" of the United States.

Every year since enactment, Iran has been designated as a country that is "not fully cooperating" with U.S. antiterrorism efforts. However, the provision is largely redundant with other laws that prohibit U.S. defense sales to Iran.

## Executive Order 13224 Sanctioning Terrorism-Supporting Entities

Executive Order 13324 (September 23, 2001) mandates the freezing of the U.S.-based assets of, and a ban on U.S. transactions with, entities determined by the Administration to be supporting international terrorism. The order was issued two weeks after the September 11, 2001, attacks on

the United States, under the authority of the IEEPA, the National Emergencies Act, the U.N. Participation Act of 1945, and Section 301 of the U.S. Code, initially targeting Al Qaeda. On September 10, 2019, the Administration amended E.O. 13224 to authorize barring from the U.S. financial system any foreign bank determined to have "conducted or facilitated any significant transaction" with any person or entity designated under the order.[7]

### *Application by CAATSA of E.O. 13224 to the Revolutionary Guard*

Section 105 of the Countering America's Adversaries through Sanctions Act (CAATSA, P.L. 115-44, August 2, 2017), mandates the imposition of E.O. 13324 penalties on the IRGC and its officials, agents, and affiliates by October 30, 2017 (90 days after enactment). The Treasury Department made the designation of the IRGC as a terrorism-supporting entity under E.O. 13224 on October 13, 2017.

### Implementation of E.O. 13224

E.O. 13224 is not specific to Iran. Successive Administrations have used the Order extensively to sanction persons or entities that are involved in Iranian weapons shipments. Numerous Iran-related entities, including members of Iran-allied organizations such as Lebanese Hezbollah and several Iraqi Shia militias, have been designated under E.O. 13224, as shown in the tables later in the report. Some persons and entities that have been sanctioned for such activity have been cited for supporting groups which are not named as terrorist groups by the United States, such as the Afghan Taliban organization and the Houthi rebels in Yemen. The Trump Administration has used the Order to sanction Iranian economic entities that furnish funds for the Islamic Revolutionary Guard Corps (IRGC) and its regional activities. No entities designated under E.O. 13224 were delisted to implement the JCPOA.

## Foreign Terrorist Organization (FTO) Designations

Sanctions similar to those of E.O. 13224 are imposed on Iranian and Iran-linked entities through the State Department authority under Section 219 of the Immigration and Nationality Act (8.U.S.C. 1189) to designate an entity as a Foreign Terrorist Organization (FTO). In addition to the sanctions of E.O. 13224, any U.S. person (or person under U.S. jurisdiction) who "knowingly provides material support or resources to an FTO, or attempts or conspires to do so" is subject to fine or up to 20 years in prison. A bank that commits such a violation is subject to fines.

Implementation: The following organizations have been designated as FTOs for acts of terrorism on behalf of Iran or are organizations assessed as funded and supported by Iran:

- **Islamic Revolutionary Guard Corps (IRGC).** Designated April 8, 2019. On April 22, 2019, the State Department issued guidelines for implementing the IRGC FTO designation, indicating that it would not penalize routine diplomatic or humanitarian-related dealings with the IRGC by U.S. partner countries or nongovernmental entities.[8] See CRS Insight IN11093, *Iran's Revolutionary Guard Named a Terrorist Organization*, by Kenneth Katzman.

- **Lebanese Hezbollah**.

- **Kata'ib Hezbollah (KAH)**. Iran-backed Iraqi Shi'a militia.

---

[7] For text of the amendments to the Order, see https://www.whitehouse.gov/presidential-actions/executive-order-modernizing-sanctions-combat-terrorism/

[8] "Exclusive: U.S. Carves out Exceptions for Foreigners Dealing with Revolutionary Guards." *Reuters*, April 21, 2019.

- **Asa'ib Ahl Al Haq (AAH).** Iran-backed Iraqi Shi'a militia (designated Jan. 3, 2020)
- **Hamas**. Sunni, Islamist Palestinian organization that essentially controls the Gaza Strip.
- **Palestine Islamic Jihad**. Small Sunni Islamist Palestinian militant group.
- **Al Aqsa Martyr's Brigade**. Secular Palestinian militant group.
- **Popular Front for the Liberation of Palestine-General Command** (PFLP-GC). Leftwing secular Palestinian group based mainly in Syria.
- **Al Ashtar Brigades**. Bahrain militant opposition group.

## Other Sanctions on Iran's "Malign" Regional Activities

Some sanctions have been imposed to try to curtail Iran's destabilizing influence in the region.

### Executive Order 13438 on Threats to Iraq's Stability

- Issued on July 7, 2007, the order blocks U.S.-based property of persons who are determined by the Administration to "have committed, or pose a significant risk of committing" acts of violence that threaten the peace and stability of Iraq, or undermine efforts to promote economic reconstruction or political reform in Iraq. The order extends to persons designated as materially assisting such designees. The order was clearly directed at Iran for its provision of arms or funds to Shiite militias there. Persons sanctioned under the order include IRGC-Qods Force officers, Iraqi Shiite militia-linked figures, and other entities. Some of these sanctioned entities worked to defeat the Islamic State in Iraq and are in prominent roles in Iraq's parliament and political structure.

### Executive Order 13572 on Repression of the Syrian People.

- Issued on April 29, 2011, the order blocks the U.S.-based property of persons determined to be responsible for human rights abuses and repression of the Syrian people. The IRGC-Qods Force (IRGC-QF), IRGC-QF commanders, and others are sanctioned under this order.

### The Hizballah International Financing Prevention Act (P.L. 114-102) and Hizballah International Financing Prevention Amendments Act of 2018 (P.L. 115-272).

- The latter act was signed by President Trump on October 23, 2018—the 25th anniversary of the Marine barracks bombing in Beirut. The original law, modeled on the 2010 Comprehensive Iran Sanctions, Accountability, and Divestment Act ("CISADA," see below), excludes from the U.S. financial system any bank that conducts transactions with Hezbollah or its affiliates or partners. The 2018 amendments expand also authorize the blocking of U.S.-based property of and U.S. transactions with any "agency or instrumentality of a foreign state" that conducts joint operations with or provides financing or arms to Lebanese Hezbollah. These latter provisions clearly refer to Iran, but are largely redundant with other sanctions on Iran.

# Ban on U.S. Trade and Investment with Iran

### *Status: Trade ban eased for JCPOA, but back in full effect on August 6, 2018*

In 1995, the Clinton Administration expanded U.S. sanctions against Iran by issuing Executive Order 12959 (May 6, 1995) banning U.S. trade with and investment in Iran. The order was issued primarily under the authority of the International Emergency Economic Powers Act (IEEPA, 50 U.S.C. 1701 et seq.),[9] which gives the President wide powers to regulate commerce with a foreign country when a "state of emergency" is declared in relations with that country. E.O. 12959 superseded and broadened Executive Order 12957, which was issued two months earlier (March 15, 1995) and barred U.S. investment in Iran's energy sector. The March 1995 order accompanied President Clinton's declaration of a "state of emergency" with respect to Iran. Subsequently, E.O 13059 (August 19, 1997) added a prohibition on U.S. companies' knowingly exporting goods to a third country for incorporation into products destined for Iran. Each March since 1995, the Administration in power has renewed the "state of emergency" with respect to Iran. IEEPA gives the President the authority to alter regulations to license transactions with Iran—regulations enumerated in Section 560 of the Code of Federal Regulations (Iranian Transactions Regulations, ITRs).

Section 103 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA, P.L. 111-195) codified the trade ban and reinstated the full ban on imports that had earlier been relaxed by April 2000 regulations. That relaxation allowed importation into the United States of Iranian nuts, fruit products (such as pomegranate juice), carpets, and caviar. U.S. imports from Iran after that time were negligible.[10]

Section 101 of the Iran Freedom Support Act (P.L. 109-293) separately codified the ban on U.S. investment in Iran, but gives the President the authority to terminate this sanction with presidential notification to Congress of such a decision 15 days in advance (or 3 days in advance if there are "exigent circumstances").

## JCPOA-Related Easing and Subsequent Reversal

In accordance with U.S. commitments under the JCPOA, the ITRs were relaxed to allow U.S. importation of the Iranian luxury goods discussed above (carpets, caviar, nuts, etc.), but not to permit general U.S.-Iran trade. U.S. regulations were also altered to permit the sale of commercial aircraft to non-sanctioned Iranian airlines.[11] In concert with the May 8, 2018, U.S. withdrawal from the JCPOA, the easing of the regulations to allow for importation of Iranian carpets and other luxury goods was reversed on August 6, 2018.

## What U.S.-Iran Trade Is Allowed or Prohibited?

The following provisions apply to the U.S. trade ban on Iran as specified in regulations (Iran Transaction Regulations, ITRs) formulated pursuant to the executive orders and laws discussed

---

[9] The executive order was issued not only under the authority of IEEPA but also the National Emergencies Act (50 U.S.C. 1601 et seq.; §505 of the International Security and Development Cooperation Act of 1985 (22 U.S.C. 2349aa-9) and §301 of Title 3, *United States Code*.

[10] Imports were mainly of artwork for exhibitions around the United States, which are counted as imports even though the works return to Iran after the exhibitions conclude.

[11] The text of the guidance is at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/ implement_guide_jcpoa.pdf.

above. The regulations are administered by the Office of Foreign Assets Control (OFAC) of the Department of the Treasury.

- *Oil Transactions*. U.S. transactions with Iran in energy products are banned. The 1995 trade ban (E.O. 12959) expanded a 1987 ban on imports from Iran that was imposed by Executive Order 12613 of October 29, 1987. The earlier import ban, authorized by Section 505 of the International Security and Development Cooperation Act of 1985 (22 U.S.C. 2349aa-9), barred the importation of Iranian oil into the United States but did not ban the trading of Iranian oil overseas. The 1995 ban prohibits that activity explicitly, but provides for U.S. companies to apply for licenses to conduct "swaps" of Caspian Sea oil with Iran. These swaps have been prohibited in practice; a Mobil Corporation application to do so was denied in April 1999, and no applications have been submitted since. However: the regulations *do not ban the importation, from foreign refiners, of gasoline or other energy products in which Iranian oil is mixed with oil from other producers, because such refined oil is considered to be a product of the country where it is refined.*

- *Transshipment and Brokering*. The ITRs prohibit U.S. transshipment of prohibited goods across Iran, and ban any activities by U.S. persons to broker commercial transactions involving Iran.

- *Iranian Luxury Goods*. Pursuant to the JCPOA, Iranian luxury goods, such as carpets and caviar, could be imported into the United States after January 2016. But, this prohibition went back into effect on August 6, 2018.

- *Shipping Insurance*. Obtaining external shipping insurance facilitates Iran's exports. A pool of 13 major insurance organizations, called the International Group of P & I (Property and Indemnity) Clubs, dominates the shipping insurance industry and is based in New York. The U.S. location of this pool renders it subject to the U.S. trade ban, thus complicating Iran's ability to obtain reinsurance for Iran's shipping after the January 16, 2016 start of JCPOA implementation ("Implementation Day"). During the U.S. implementation of the JCPOA, waivers of Sections 212 and 213 of the Iran Threat Reduction and Syria Human Rights Act (ITRSHRA) were issued to enable numerous insurers to give Iranian ships insurance.[12] This waiver ended on August 6, 2018.

- *Civilian Airline Sales*. The ITRs have always permitted the licensing of goods related to the safe operation of civilian aircraft for sale to Iran (§560.528 of Title 31, C.F.R.), and spare parts sales have always been licensed periodically. However, from June 2011 until JCPOA implementation, Iran's largest state-owned airline, Iran Air, was sanctioned under Executive Order 13382, rendering licensing of parts or repairs for that airline impermissible, and several other Iranian airlines were sanctioned under that order and Executive Order 13224. In accordance with the JCPOA, the United States relaxed restrictions to allow for

---

[12] Shipping insurers granted the waiver included Assuranceforeningen Skuld, Skuld Mutual Protection and Indemnity Association, Ltd. (Bermuda), Gard P and I Ltd. (Bermuda), Assuranceforeningen Gard, the Britannia Steam Ship Insurance Association Limited, The North of England Protecting and Indemnity Association Ltd., the Shipowners' Mutual Protection and Indemnity Association (Luxembourg), the Standard Club Ltd., the Standard Club Europe Ltd., The Standard Club Asia, the Steamship Mutual Underwriting Association Ltd. (Bermuda), the Swedish Club, United Kingdom Mutual Steam Ship Assurance Association Ltd. (Bermuda), United Kingdom Mutual Steam Ship Association Ltd. (Europe), and the West of England Ship Owners Mutual Insurance Association (Luxembourg).

the sale to Iran of finished commercial aircraft, including to Iran Air, which was "delisted" from sanctions.[13] A March 2016 general license was issued to permit those sales, and Boeing and Airbus, as well as other manufacturers, subsequently concluded major sales to Iranian airlines. Pre-existing licensing restrictions went back into effect on August 6, 2018, and the Boeing and Airbus licenses to sell aircraft to Iran were revoked. Sales of some aircraft spare parts ("dual use items") to Iran also require a waiver of the relevant provision of the Iran-Iraq Arms Non-Proliferation Act, discussed below. In April 2019, OFAC granted a license for Franco-Italian aircraft maker ATR to supply spare parts (with U.S. content) to the ATR aircraft used by Iran.[14]

- *Personal Communications, Remittances, and Publishing*. The ITRs permit personal communications (phone calls, emails) between the United States and Iran, personal remittances to Iran, and Americans to engage in publishing activities with entities in Iran (and Cuba and Sudan).

- *Information Technology Equipment*. CISADA exempts from the U.S. ban on exports to Iran information technology to support personal communications among the Iranian people and goods for supporting democracy in Iran. In May 2013, OFAC issued a general license for the exportation to Iran of goods (such as cell phones) and services, on a fee basis, that enhance the ability of the Iranian people to access communication technology.

- *Food and Medical Exports*. Since April 1999, sales to Iran by U.S. firms of food and medical products have been permitted, subject to OFAC stipulations. In October 2012, OFAC permitted the sale to Iran of specified medical products, such as scalpels, prosthetics, canes, burn dressings, and other products, that could be sold to Iran under "general license" (no specific license application required). This list of general license items list was expanded in 2013 and 2016[15] to include more sophisticated medical diagnostic machines and other medical equipment. Licenses for exports of medical products not on the general license list are routinely expedited for sale to Iran, according to OFAC. The regulations have a specific definition of "food" that can be licensed for sale to Iran (which excludes alcohol, cigarettes, gum, or fertilizer).[16]

- *Humanitarian and Related Services*. Donations by U.S. residents directly to Iranians (such as packages of food, toys, clothes, etc.) are not prohibited. However, U.S. relief organizations operating in Iran require those organizations to obtain a specific OFAC license to do so. On September 10, 2013, General License E was issued that allows relief organizations to conduct activities (up to a value of $500,000 in one year) without a specific licensing requirement, including (1) providing Iran services for health projects, disaster relief, wildlife conservation; (2) conducting human rights projects there; or (3) undertaking activities related to sports matches and events. The amended policy also allowed importation from Iran of services related to sporting activities, including sponsorship of players, coaching, referees, and training. In some cases, such as the earthquake in Bam in 2003 and the 2012 earthquake in northwestern Iran,

---

[13] *Reuters*, February 21, 2014; "Exclusive: Boeing Says Gets U.S. License to Sell Spare Parts to Iran," *Reuters*, April 4, 2014.

[14] Tasnim news agency. August 14, 2019.

[15] https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20161222.aspx?platform=hootsuite.

[16] https://www.treasury.gov/resource-center/sanctions/Programs/Documents/gl_food_exports.pdf.

OFAC has issued blanket temporary general licensing for relief organizations to work in Iran.

- *Payment Methods, Trade Financing, and Financing Guarantees*. U.S. importers are allowed to pay Iranian exporters, but the payment cannot go directly to Iranian banks, and must instead pass through third-country banks. Regulations proved for transactions that are *incidental* to an approved transaction are allowed, meaning that financing ("letter of credit") for approved transactions are normally approved (as long as there is no involvement of an Iranian bank). Title IX of the Trade Sanctions Reform and Export Enhancement Act of 2000 (P.L. 106-387) bans the use of official credit guarantees (such as the Ex-Im Bank) for food and medical sales to Iran and other countries on the U.S. terrorism list, except Cuba, although allowing for a presidential waiver to permit such credit guarantees. The Ex-Im Bank is prohibited from guaranteeing any loans to Iran because of Iran's presence on the terrorism list. The JCPOA did not commit the United States to provide credit guarantees for Iran.

## Application to Foreign Subsidiaries of U.S. Firms

The ITRs do not ban subsidiaries of U.S. firms from dealing with Iran, as long as the subsidiary is not "controlled" by the parent company. Most foreign subsidiaries are legally considered foreign persons subject to the laws of the country in which the subsidiaries are incorporated. Section 218 of the Iran Threat Reduction and Syrian Human Rights Act (ITRSHRA, P.L. 112-158) holds "controlled" foreign subsidiaries of U.S. companies to the same standards as U.S. parent firms, defining a controlled subsidiary as (1) one that is more than 50% owned by the U.S. parent; (2) one in which the parent firm holds a majority on the Board of Directors of the subsidiary; or (3) one in which the parent firm directs the operations of the subsidiary. There is no waiver provision.

**JCPOA Regulations and Reversal.** To implement the JCPOA, the United States licensed "controlled" foreign subsidiaries to conduct transactions with Iran that are permissible under JCPOA (almost all forms of civilian trade). The implementation was accomplished in the Treasury Department's issuance of "General License H: Authorizing Certain Transactions Relating to Foreign Entities Owned or Controlled by a United States Person."[17] The Obama Administration asserted that the President has authority under IEEPA to license transactions with Iran, the ITRSHRA notwithstanding. The Trump Administration revoked that general license and restore the pre-JCPOA licensing policy ("Statement of Licensing Policy," SLP) on November 6, 2018.

---

[17] The text of General License H can be found at Treasury Department: Archive of Revoked and Expired General Licenses. https://www.treasury.gov/resource-center/sanctions/Pages/general_license_archive.aspx#iran

---

**Trade Ban Easing and Termination**

**Termination:** Section 401 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA, P.L. 111-195) provides for the President to terminate the trade ban if the Administration certifies to Congress that Iran no longer satisfies the requirements to be designated as a state sponsor of terrorism and that Iran has ceased pursuing and has dismantled its nuclear, biological, and chemical weapons and ballistic missiles and related launch technology. Alternatively, the trade ban provision in CISADA could be repealed by congressional action.

**Waiver Authority:** Section 103(b)(vi) of CISADA allows the President to license exports to Iran if he determines that doing so is in the national interest of the United States. There is no similar provision in CISADA to ease the ban on U.S. imports from Iran.

# Sanctions on Iran's Energy Sector[18]

*Status: Energy sanctions waived for JCPOA, back in effect November 6, 2018*

In 1996, Congress and the executive branch began a long process of pressuring Iran's vital energy sector, with the stated aim of denying Iran the financial resources to support terrorist organizations and other armed factions or to further its nuclear and WMD programs. Iran's oil sector is as old as the petroleum industry itself (early 20th century), and Iran's onshore oil fields are in need of substantial investment. Iran has 136.3 billion barrels of proven oil reserves, the third largest after Saudi Arabia and Canada, and in November 2019 it announced discovery of the Namavaran oilfield with an estimated 53 billion barrels of crude oil. Iran has large natural gas resources (940 trillion cubic feet), exceeded only by Russia. However, Iran's gas export sector is still rudimentary and most of Iran's gas is injected into its oil fields to boost their production. Iran has, since 2011, reduced its dependence on oil and gas sales, but, prior to the re-imposition of U.S. sanctions, the energy sector was still generating about 20% of Iran's GDP and as much as 30% of government revenue.

## The Iran Sanctions Act

*This sections includes sanctions triggers under the Act that were added by subsequent laws.*

The Iran Sanctions Act (ISA) has been a pivotal component of U.S. sanctions against Iran's energy sector. Since its enactment in 1996, ISA's provisions have been expanded and extended to other Iranian industries. ISA sought to thwart Iran's 1995 opening of the sector to foreign investment in late 1995 through a "buy-back" program in which foreign firms gradually recoup their investments as oil and gas is produced. It was first enacted as the Iran and Libya Sanctions Act (ILSA, P.L. 104-172, signed on August 5, 1996) but was later retitled the Iran Sanctions Act after it terminated with respect to Libya in 2006. ISA was the first major "extra-territorial sanction" on Iran—a sanction that authorizes U.S. penalties against third country firms.

### Key Sanctions "Triggers" Under ISA

ISA consists of a number of "triggers"—transactions with Iran that would be considered violations of ISA and could cause a firm or entity to be sanctioned under ISA's provisions. (All

---

[18] The *Federal Register* (Volume 77, Number 219) "Policy Guidance" defines what products and chemicals constitute "petroleum," "petroleum products," and "petrochemical products" that are used in the laws and executive orders discussed throughout the report. See http://www.gpo.gov/fdsys/pkg/FR-2012-11-13/pdf/2012-27642.pdf.

triggers were waived during JCPOA implementation and reinstated in 2018, unless specified below.)

### Trigger 1 (Original Trigger): "Investment" To Develop Iran's Oil and Gas Fields

The core trigger of ISA when it was first enacted was a requirement that the President sanction companies (entities, persons) that make an "investment"[19] of more than $20 million[20] in one year in Iran's energy sector.[21] The definition of "investment" in ISA (§14 [9]) includes not only equity and royalty arrangements but any contract that includes "responsibility for the development of petroleum resources" of Iran. The definition includes additions to existing investment (added by P.L. 107-24) and pipelines to or through Iran and contracts to lead the construction, upgrading, or expansions of energy projects (added by CISADA).

### Trigger 2: Sales of WMD and Related Technologies, Advanced Conventional Weaponry, and Participation in Uranium Mining Ventures

*This provision of ISA was not waived under the JCPOA.*

The Iran Freedom Support Act (P.L. 109-293, signed September 30, 2006) added *Section 5(b)(1)* of ISA, subjecting to ISA sanctions firms or persons determined to have sold to Iran (1) "chemical, biological, or nuclear weapons or related technologies" or (2) "destabilizing numbers and types" of advanced conventional weapons. Sanctions can be applied if the exporter knew (or had cause to know) that the end-user of the item was Iran. The definitions do not specifically include ballistic or cruise missiles, but those weapons could be considered "related technologies" or a "destabilizing type" of advanced conventional weapon.

The Iran Threat Reduction and Syria Human Rights Act (ITRSHRA, P.L. 112-158, signed August 10, 2012) created *Section 5(b)(2)* of ISA subjecting to sanctions entities determined by the Administration to participate in a joint venture with Iran relating to the mining, production, or transportation of uranium.

*Implementation:* No ISA sanctions have been imposed on any entities under this provision.

### Trigger 3: Sales of Gasoline to Iran

Section 102(a) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA, P.L. 111-195, signed July 1, 2010) amended Section 5 of ISA to exploit Iran's dependency on imported gasoline (40% dependency at that time). It followed legislation such as P.L. 111-85 that prohibited the use of U.S. funds to fill the Strategic Petroleum Reserve with products from firms that sell gasoline to Iran; and P.L. 111-117 that denied Ex-Im Bank credits to any firm that sold gasoline or related equipment to Iran. The section sanctions:

---

[19] As amended by CISADA (P.L. 111-195), these definitions include pipelines to or through Iran, as well as contracts to lead the construction, upgrading, or expansions of energy projects. CISADA also changes the definition of investment to eliminate the exemption from sanctions for sales of energy-related equipment to Iran, if such sales are structured as investments or ongoing profit-earning ventures.

[20] Under §4(d) of the original act, for Iran, the threshold dropped to $20 million, from $40 million, one year after enactment, when U.S. allies did not join a multilateral sanctions regime against Iran. P.L. 111-195 explicitly sets the threshold investment level at $20 million. For Libya, the threshold was $40 million, and transactions subject to sanctions included export to Libya of technology banned by Pan Am 103-related Security Council Resolutions 748 (March 31, 1992) and 883 (November 11, 1993).

[21] The original ISA definition of energy sector included oil and natural gas, and CISADA added to that definition liquefied natural gas (LNG), oil or LNG tankers, and products to make or transport pipelines that transport oil or LNG.

- Sales to Iran of over $1 million worth in a single transaction (or $5 million in multiple transactions a one-year period) of gasoline and related aviation and other fuels. (Fuel oil, a petroleum by-product, is not included in the definition of refined petroleum.)
- Sales to Iran of equipment or services (same dollar threshold as above) which would help Iran make or import gasoline. Examples include equipment and services for Iran's oil refineries or port operations.

### Trigger 4: Provision of Equipment or Services for Oil, Gas, and Petrochemicals Production

Section 201 of the Iran Threat Reduction and Syria Human Rights Act of 2012 (ITRSHA, P.L. 112-158, signed August 10, 2012) codified an Executive Order, 13590 (November 21, 2011), by adding Section 5(a)(5 and 6) to ISA sanctioning firms that:

- Provide to Iran $1 million or more in a single transaction (or a total of $5 million in multiple transactions in a one-year period) worth of goods or services that Iran could use to maintain or enhance its oil and gas sector. This subjects to sanctions, for example, transactions with Iran by global oil services firms and the sale to Iran of energy industry equipment such as drills, pumps, vacuums, oil rigs, and like equipment.
- provide to Iran $250,000 in a single transaction (or $1 million in multiple transactions in a one-year period) worth of goods or services that Iran could use to maintain or expand its production of petrochemical products.[22] *This provision was not altered by the JPA.*

### Trigger 5: Transporting Iranian Crude Oil

Section 201 of the ITRSHRA amends ISA by sanctioning entities the Administration determines to have

- owned a vessel that was used to transport Iranian crude oil. The section also *authorizes but does not require* the President, subject to regulations, to prohibit a ship from putting to port in the United States for two years, if it is owned by a person sanctioned under this provision *(adds Section 5[a][7] to ISA)*. This sanction does not apply in cases of transporting oil to countries that have received exemptions under P.L. 112-81 (discussed below).
- participated in a joint oil and gas development venture with Iran, outside Iran, if that venture was established after January 1, 2002. The effective date exempts energy ventures in the Caspian Sea, such as the Shah Deniz oil field *(adds Section 5[a][4] to ISA)*.

---

[22] A definition of chemicals and products considered "petrochemical products" is found in a Policy Guidance statement. See *Federal Register*, November 13, 2012, http://www.gpo.gov/fdsys/pkg/FR-2012-11-13/pdf/2012-27642.pdf.

### Iran Threat Reduction and Syria Human Rights Act (ITRSHRA): ISA sanctions on shipping insurance, Iranian bonds, and dealings with the IRGC

Separate provisions of the ITRSHR Act—*which do not amend and were not formally incorporated into ISA*—require the application of ISA sanctions (five out of the 12 sanctions on the ISA menu) on any entity that

- provides insurance or reinsurance for the National Iranian Oil Company (NIOC) or the National Iranian Tanker Company (NITC) (Section 212).

- purchases or facilitates the issuance of sovereign debt of the government of Iran, including Iranian government bonds (Section 213).

- assists or engages in a significant transaction with the IRGC or any of its sanctioned entities or affiliates. (Section 302). *This section was not waived to implement the JCPOA.*

*Implementation.* Section 312 of ITRSHRA required an Administration determination, within 45 days of enactment (by September 24, 2012) whether NIOC and NITC are IRGC agents or affiliates. The determination would subject financial transactions with NIOC and NITC to sanctions under CISADA (prohibition on opening U.S.-based accounts). On September 24, 2012, the Department of the Treasury determined that NIOC and NITC are affiliates of the IRGC. On November 8, 2012, the Department of the Treasury named NIOC as a proliferation entity under Executive Order 13382—a designation that, in accordance with Section 104 of CISADA, bars any foreign bank determined to have dealt directly with NIOC (including with a NIOC bank account in a foreign country) from opening or maintaining a U.S.-based account.

Sanctions on dealings with NIOC and NITC were waived in accordance with the interim nuclear agreement of late 2013. Their designations under Executive Order 13382 were rescinded in accordance with the JCPOA, but they were "relisted" on November 5, 2018.

### Executive Order 13622/13846: Sanctions on the Purchase of Iranian Crude Oil and Petrochemical Products, and Dealings in Iranian Bank Notes

*Status: 13622 (July 30, 2012) revoked (by E.O. 13716, January 2016) but was put back into effect by E.O. 13846 of August 6, 2018*

Executive Order 13622 (July 30, 2012) imposed specified sanctions on the ISA sanctions menu, and bars banks from the U.S. financial system, for the following activities:

- the purchase of oil, other petroleum, or petrochemical products from Iran.[23]

- transactions with the National Iranian Oil Company (NIOC) or Naftiran Intertrade Company (NICO).

E.O. 13622 also blocked U.S.-based property of entities determined to have

- assisted or provided goods or services to NIOC, NICO, the Central Bank of Iran. This sanction was reinstated as of November 6, 2018.

- assisted the government of Iran in the purchase of U.S. bank notes or precious metals, precious stones, or jewels. (The provision for precious

---

[23] A definition of what chemicals and products are considered "petroleum products" for the purposes of the order are in the policy guidance issued November 13, 2012, http://www.gpo.gov/fdsys/pkg/FR-2012-11-13/pdf/2012-27642.pdf.

stones or jewels was added to this order by E.O. 16345 below.) This sanction was reinstated by E.O. 13846, effective as of August 7, 2018.

E.O. 13622 sanctions do not apply if the parent country of the entity has received an oil importation exception under Section 1245 of P.L. 112-81, discussed below. An exception also is provided for projects that bring gas from Azerbaijan to Europe and Turkey, if such project was initiated prior to the issuance of the order.

### Mandate and Time Frame to Investigate ISA Violations

In the original version of ISA, there was no firm requirement, and no time limit, for the Administration to investigate potential violations and determine that a firm has violated ISA's provisions. The Iran Freedom Support Act (P.L. 109-293, signed September 30, 2006) added a provision recommending, *but not requiring*, a 180-day time limit for a violation determination.[24] CISADA (Section 102[g][5]) mandated that the Administration begin an investigation of potential ISA violations when there is "credible information" about a potential violation, and made mandatory the 180-day time limit for a determination of violation.

ITRSHRA defines "credible information" needed to begin an investigation of a violation to include a corporate announcement or corporate filing to its shareholders that it has undertaken transactions with Iran that are potentially sanctionable under ISA. It also says the President *may* use as credible information reports from the Government Accountability Office and the Congressional Research Service. In addition, Section 219 of ITRSHRA requires that an investigation of an ISA violation begin if a company reports in its filings to the Securities and Exchange Commission (SEC) that it has knowingly engaged in activities that would violate ISA (or Section 104 of CISADA or transactions with entities designated under E.O 13224 or 13382, see below).

### *Oversight*

ITRSHRA added several mechanisms for Congress to oversee whether the Administration is investigating ISA violations. Section 223 of that law required a Government Accountability Office report, within 120 days of enactment, and another such report a year later, on companies that have undertaken specified activities with Iran that might constitute violations of ISA. Section 224 amended a reporting requirement in Section 110(b) of CISADA by requiring an Administration report to Congress every 180 days on investment in Iran's energy sector, joint ventures with Iran, and estimates of Iran's imports and exports of petroleum products.

---

[24] Other ISA amendments under that law included recommending against U.S. nuclear agreements with countries that supply nuclear technology to Iran and expanding provisions of the USA Patriot Act (P.L. 107-56) to curb money-laundering for use to further WMD programs.

**ISA Sanctions Menu**

For companies that the President determines violated ISA, the original version of ISA required the imposition of *two* of a menu of six sanctions on that firm. The Iran Freedom Support Act added three new possible sanctions and required the imposition of at least three out of the nine against violators. CISADA added three more sanctions to the ISA menu and required imposition of at least *5 out of the 12* sanctions. Executive Orders 13590 and 13622 provide for exactly the same penalties as those in ISA. The 12 available sanctions against the sanctioned entity, from which the Secretary of State or the Treasury can select, are as follows:

1. denial of Export-Import Bank loans, credits, or credit guarantees for U.S. exports to the sanctioned entity (original ISA)

2. denial of licenses for the U.S. export of military or militarily useful technology to the entity (original ISA)

3. denial of U.S. bank loans exceeding $10 million in one year to the entity (original ISA)

4. if the entity is a financial institution, a prohibition on its service as a primary dealer in U.S. government bonds; and/or a prohibition on its serving as a repository for U.S. government funds (each counts as one sanction) (original ISA)

5. prohibition on U.S. government procurement from the entity (original ISA)

6. prohibition on transactions in foreign exchange by the entity (added by CISADA)

7. prohibition on any credit or payments between the entity and any U.S. financial institution (added by CISADA)

8. prohibition of the sanctioned entity from acquiring, holding, using, or trading any U.S.-based property which the sanctioned entity has a (financial) interest in (added by CISADA)

9. restriction on imports from the sanctioned entity, in accordance with the International Emergency Economic Powers Act (IEEPA; 50 U.S.C. 1701) (original ISA)

10. a ban on a U.S. person from investing in or purchasing significant amounts of equity or debt instruments of a sanctioned person (added by ITRSHRA)

11. exclusion from the United States of corporate officers or controlling shareholders of a sanctioned firm (added by ITRSHRA)

12. imposition of any of the ISA sanctions on principal offices of a sanctioned firm (added by ITRSHRA).

Mandatory Sanction: Prohibition on Contracts with the U.S. Government CISADA (§102[b]) added a requirement in ISA that companies, as a condition of obtaining a U.S. government contract, certify to the relevant U.S. government agency that the firm—*and any companies it owns or controls*—are not violating ISA. Regulations to implement this requirement were issued on September 29, 2010.

**Executive Order 13574 of May 23, 2011 and E.O. 13628 of October 9, 2012, specify which sanctions are to be imposed.** E.O. 13574 stipulated that, when an entity is sanctioned under Section 5 of ISA, the penalties to be imposed are numbers 3, 6, 7, 8, and 9, above. E.O. 13628 updated that specification to also include ISA sanctions numbers 11 and 12. The orders also clarify that it is the responsibility of the Department of the Treasury to implement those ISA sanctions that involve the financial sectors. E.O. 13574 and 13628 were r*evoked by E.O. 13716 on Implementation Day, in accordance with the JCPOA.* They were reinstated, and superseded, by E.O. 13846 of August 6, 2018, which mandated that, when ISA sanctions are to be imposed, that the sanctions include ISA sanctions numbers 3, 6, 7, 8, 9, 10, and 12.

## Interpretations of ISA and Related Laws

The sections below provide information on how some key ISA provisions have been interpreted and implemented.

### *Application to Energy Pipelines*

ISA's definition of "investment" that is subject to sanctions has been consistently interpreted by successive Administrations to include construction of energy pipelines to or through Iran. Such pipelines are deemed to help Iran develop its petroleum (oil and natural gas) sector. Amendments to ISA in CISADA specifically included in the definition of petroleum resources "products used to construct or maintain pipelines used to transport oil or liquefied natural gas." In March 2012,

then-Secretary of State Clinton clarified that the Obama Administration interpreted the provision to be applicable from the beginning of pipeline construction.[25]

### Application to Crude Oil Purchases/Shipments

ISA does not sanction purchasing crude oil from Iran, but other laws, such as the Iran Freedom and Counterproliferation Act (IFCA, discussed below) and executive orders, do. No U.S. sanction requires any country or person to actually seize, intercept, inspect on the high seas, or impound any Iranian ship suspected of carrying oil or other cargo subject to sanctions.

However, as discussed further below, in August 2019, the Trump Administration began using various terrorism-related provisions to sanction some Iranian oil shipments. The Administration has argued that the shipments were organized by and for the benefit of Iran's Islamic Revolutionary Guard Corps (IRGC). On September 4, 2019, the Treasury Department's Office of Foreign Assets Control (OFAC) updated its sanctions guidance to state that "bunkering services" (port operational support) for Iranian oil shipments could subject firms and individuals involved in such support to U.S. sanctions.

### Application to Purchases from Iran of Natural Gas

ISA and other laws, such as IFCA, exclude from sanction purchases of natural gas from Iran or natural gas transactions with Iran. However, construction of gas *pipelines* involving Iran is subject to ISA sanctions. Moreover, sanctions on financial transactions with Iran (see throughout) can impede implementation of purchase agreements for Iranian gas.

### Exception for Shah Deniz and other Gas Export Projects

The effective dates of U.S. sanctions laws and orders exclude long-standing joint natural gas projects that involve some Iranian firms—particularly the Shah Deniz natural gas field and related pipelines in the Caspian Sea. Iran's Naftiran Intertrade Company (NICO) holds a passive 10% share in Shah Deniz, which also includes BP, Azerbaijan's natural gas firm SOCAR, Russia's Lukoil, and other firms. NICO is a sanctioned entity under ISA and other provisions, but an OFAC factsheet of November 28, 2012, stated that the Shah Deniz consortium, as a whole, is not determined to be "a person owned or controlled by" the government of Iran and transactions with the consortium are permissible.

### Application to Iranian Liquefied Natural Gas Development

The original version of ISA did not apply to the development by Iran of a liquefied natural gas (LNG) export capability. Iran has not developed an LNG export capability to date. CISADA specifically included LNG in the ISA definition of petroleum resources and therefore made subject to sanctions LNG investment in Iran and supply of LNG tankers to Iran.

### Application to Private Financing but Not Official Credit Guarantee Agencies

The definitions of investment and other activity that can be sanctioned under ISA include financing for investment in Iran's energy sector, or for sales of gasoline and refinery-related equipment and services. However, the definitions of financial institutions are interpreted not to apply to official credit guarantee agencies, such as France's COFACE and Germany's Hermes.

---

[25] Tough US warning on Iran gas pipeline. Dawn, March 1, 2012.

These credit guarantee agencies are arms of their parent governments, and ISA does not provide for sanctioning governments or their agencies.

## Implementation of Energy-Related Iran Sanctions

Entities sanctioned under the executive orders or laws cited in this section are listed in the tables at the end of this report. As noted, some of the orders cited provide for blocking U.S.-based assets of the entities designated for sanctions. OFAC has not announced the blocking of any U.S.-based property of the sanctioned entities, likely indicating that those entities sanctioned do not have a presence in the United States.

---

### ISA Waiver, Exemptions, and Sunset Provisions

The President can waive ISA sanctions in several ways—general, country-specific, or company-specific.

*General Waiver*. Under Section 4(c)(1)(a), the President can waive (for six months at a time) the requirement to investigate violations. To implement the JCPOA, this waiver was exercised by the Obama Administration (the latest on January 18, 2017), and was last renewed by the Trump Administration on January 12, 2018.

*Country-Specific Waiver*. Under Section 4(c)(1)(B), the President can waive ISA sanctions (for 12 months at a time) of all companies whose governments are determined to be "closely cooperating with the United States in multilateral efforts to prevent Iran from" acquiring WMD or acquiring advanced conventional weapons. The President must also certify that the waiver is vital to the national security interests of the United States.

*Company-Specific Waiver*. Under Section 9(c), the President can waive ISA sanctions (for one year at a time) on any company for which the President determines that the waiver is "essential to the national security interests of the United States." This waiver was used in 1998 to avoid penalizing Total, Gazprom, and Petronas for an Iran investment.

ISA (§5[f]) also contains several exceptions such as that the President is not required to impose sanctions that prevent procurement of defense articles and services under existing contracts, in cases where a firm is the sole source supplier of a particular defense article or service. The President is not required to prevent procurement of essential spare parts or component parts.

**"Special Rule" Exempting Firms That End Their Business with Iran**

Under a provision added by CISADA (§102[g][5]), ISA provides a means—a so-called "special rule"—for firms to avoid ISA sanctions by pledging to verifiably end their business with Iran and such business with Iran in the future. Under the special rule, which has been invoked on several occasions, as discussed below, the Administration is not required to impose sanctions against a firm that makes such pledges. Firms are allowed several years, in some cases, to wind down existing business in Iran, in part because the buy-back program used by Iran pays energy firms back their investment over time, making it highly costly for them to suddenly end operations in Iran.

**Administration Termination Process and Requirements**

The Administration can immediately terminate all ISA provisions if it certifies that Iran:

(1) has ceased its efforts to acquire WMD; (2) has been removed from the U.S. list of state sponsors of terrorism; *and* (3) no longer "poses a significant threat" to U.S. national security and U.S. allies.[26]

This termination provision, like the sunset provision discussed below, *does not apply to those laws that apply ISA sanctions without specifically amending ISA*. The executive orders and laws that apply ISA sanctions to specified violators *but without amending ISA itself* can be revoked by a superseding executive order or congressional action that amends or repeals the provisions involved.

**Sunset and Other Expiration Provisions**

ISA was scheduled to sunset on December 31, 2016, as provided for by CISADA. This followed prior sunset extensions to December 31, 2011 (by P.L. 109-293); December 31, 2006 (P.L. 107-24, August 3, 2001); and August 5, 2001 (original law). In December 2016, P.L. 114-277 extended the law, as is, until December 31, 2026.

P.L. 107-24 also required an Administration report on ISA's effectiveness within 24 to 30 months of enactment, with the report to include an administration recommendation on whether ISA should be repealed. That report was submitted to Congress in January 2004, and did not recommend that ISA be repealed.

---

[26] This termination requirement added by P.L. 109-293 formally removed Libya from the act. Application of the act to Libya terminated on April 23, 2004, with a determination that Libya had fulfilled U.N. requirements.

# Iran Oil Export Sanctions: Section 1245 of the FY2012 NDAA Sanctioning Transactions with Iran's Central Bank

*Status: Back into effect November 5, 2018 and exceptions ended in May 2019*

In 2011, Congress sought to reduce Iran's exportation of oil by imposing sanctions on financial transactions with Iran's Central Bank, which receives Iran's oil payments worldwide. President Obama, in his signing statement on the bill, indicated he would implement the provision so as not to damage U.S. relations with U.S. partner countries, many of whom were purchasers of Iranian oil. Section 1245 of the FY2012 National Defense Authorization Act (NDAA, P.L. 112-81, signed on December 31, 2011):

- Requires the President to prevent a foreign bank from opening an account in the United States—or impose strict limitations on existing U.S. accounts—if that bank is determined to have conducted a "significant financial transaction" with Iran's Central Bank *or with any sanctioned Iranian bank*.

- The provision applies to a foreign *central bank* only if the transaction with Iran's Central Bank is to pay for oil purchases.

- *Significant Reduction Exception (SRE):* The law provides incentive for Iran's oil buyers to reduce purchases of Iranian oil by providing for an exception (exemption) for the banks of any country determined to have "*significantly reduced*" its purchases of oil from Iran. To maintain the SRE, countries are required to reduce their oil buys from Iran relative to the previous 180-day period. (ITRSHRA amended Section 1245 such that any country that completely ceased purchasing oil from Iran entirely would retain an exception.) The law lacks a precise definition of "significant reduction" of oil purchases, but the Obama Administration adopted a standard set in a January 2012 letter by several Senators to then-Treasury Secretary Geithner setting that definition at an 18% purchase reduction based on total paid for the Iranian oil (not just volume reduction).[27] **The banks of countries that are given an SRE may continue to conduct any transactions with the Central Bank (not just for oil) or with any sanctioned Iranian bank.**

- Sanctions on transactions for oil apply only if the President certifies to Congress every 90 days, based on a report by the Energy Information Administration, that the oil market *is* adequately supplied, and, an Administration determination every 180 days that there is a sufficient supply of oil worldwide to permit countries to reduce purchases from Iran. The required EIA reports and Administration determinations have been issued at the prescribed intervals, even during the period when the law was waived.

- **Humanitarian Exception**. Paragraph (2) of Section 1245 exempts transactions with Iran's Central Bank that are for "the sale of agricultural commodities, food, medicine, or medical devices to Iran" from sanctions. However: the Central Bank's designation as a terrorist entity under E.O. 13224 on September 20, 2019, voided that exception. In late February 2020, as the COVID-19 pandemic affected Iran to a greater degree than elsewhere in the region, the Treasury

---

[27] Text of letter from Senators Mark Kirk and Robert Menendez to Secretary Geithner, January 19, 2012.

Department restored the exemption by issuing a General License to permit transactions with Iran's Central Bank for the purchase of humanitarian items.[28]

## Implementation/SREs Issued and Ended

The Obama Administration used the FY2012 NDAA to pressure Iran without causing economic difficulty to U.S. allies, other Iran policy partners, or the global oil market. The table below on major Iranian oil customers indicates cuts made by major customers compared to 2011.

- In March 20, 2012, Japan received an SRE.

- In September 2012, following a July 2012 EU Iran oil embargo, 10 EU countries (Belgium, Czech Republic, France, Germany, Greece, Italy, the Netherlands, Poland, Spain, and Britain) received the SRE because they ended purchases pursuant to the EU ban on Iran oil purchases of July 1, 2012. Seventeen EU countries were not granted the SRE because they were not buying Iran's oil and could not "significantly reduce" buys from Iran.

- In December 2012, the following countries/jurisdictions received the SRE: China, India, Malaysia, South Africa, South Korea, Singapore, Sri Lanka, Turkey, and Taiwan.

### *Reactivation on November 5, 2018, Exceptions Ended in May 2019 and Results*

The January 2016 waivers issued to implement the JCPOA suspended the requirement for a country to cut oil purchases from Iran in order to maintain their exceptions, and Iran's historic oil customers quickly resumed buying Iranian oil. The provision went back into effect on November 5, 2018.[29]

- On November 5, 2018, the following eight countries received the first SRE grants available under reimposed U.S. sanctions,: China, India, Italy, Greece, Japan, South Korea, Taiwan, and Turkey. The SREs expired on May 2, 2019.

- On April 22, 2019, the State Department announced that no more SREs would be granted after their expiration at 12:00 AM on May 2, 2019. The Administration indicated that the decision would "apply maximum pressure on the Iranian regime until its leaders change their destructive behavior, respect the rights of the Iranian people, and return to the negotiating table."[30]Senior U.S. officials added that the move sought to drive Iran's oil exports as close to zero as possible. See CRS Insight IN11108, *Iran Oil Sanctions Exceptions Ended*, by Kenneth Katzman.

- With Iran still exporting at least some oil, in early 2020 U.S. officials have continued to designate individuals and entities that are trading Iranian oil and oil products. Entities designated are in the tables at the end of this report. In March 2020, Treasury Department officials warned oil traders of U.S. penalties if they

---

[28] Treasury Issues General License No. 8 Regarding Certain Permitted Humanitarian Trade Transactions Involving the Central Bank of Iran. JDSupra. March 12, 2020.

[29] Department of State. Background Briefing on President Trump's Decision to Withdraw from the JCPOA. May 8, 2018.

[30] Secretary of State Michael Pompeo. Decision on Imports of Iranian Oil. April 22, 2019.

continued to conduct "ship-to-ship" transfers and use other mechanisms to conceal their trading in Iranian oil and oil products.[31]

### Waiver and Termination

The law provides for the President to waive the sanctions for 120 days, renewable for successive 120-day periods, if the President determines that doing so is in the national security interest. Outright repeal or amendment of this law would require congressional action.

This provision was waived to implement the JPoA (to allow Iran's oil customers to maintain purchases level at 1.1 million barrels per day) and again (Section 1245(d)(5)) on January 18, 2017, just before the Obama Administration left office. The Trump Administration renewed the waiver on May 18, 2017, on September 14, 2017, and on January 12, 2018. The law went back into effect on November 5, 2018 (180-day wind-down period).

## Iran Foreign Account "Restriction" Provision

### *Status: Back in Effect on November 5, 2018*

The ability of Iran to repatriate hard currency to its Central Bank, including U.S. dollars that are the primary form of payment for oil, was impeded by Section 504 of the ITRSHRA which went into effect on February 6, 2013. The provision amended Section 1245 of the FY2012 NDAA (adding "clause ii" to Paragraph D[1]) to require that any funds paid to Iran as a result of exempted transactions (oil purchases, for example) be credited to an account located in the country with primary jurisdiction over the foreign bank making the transaction.

Most of Iran's funds held abroad are in banks located in Iran's main oil customers, and the provision largely compels Iran to buy the products of the oil customer countries. Because of the September 25, 2019, designation of the Central Bank as a terrorist entity under E.O. 13224, Iran's ability to draw down its Central Bank accounts abroad to pay for imports of humanitarian items was been impeded because the 13224 designation does not carry a humanitarian exception. The Administration sought to counteract that effect with the February 27, 2020 General License that Iran's Central Bank accounts could be used for humanitarian transactions, as discussed above.

### *Waiver*

The waiver provision that applies to the sanctions imposed under the FY2012 NDAA (P.L. 112-81) applies to this Iran foreign bank account restriction provision. A waiver period of six months is permitted.

To implement the JPoA, a waiver was issued under P.L. 112-81 (Section 212 and 213) to allow Iran to receive some hard currency from ongoing oil sales in eight installments during the JPA period. Iran remained unable under the JPA to remove hard currency from existing accounts abroad. During the JPOA, Sections 212(d)(10 and 2134(b)(1) of ITRSHRA were waived - enabling Iran to gain access to hard currency from ongoing purchases of its oil. The waiver was last renewed on January 12, 2018. Its provisions went back into effect on November 5, 2018.

---

[31] U.S. to warn shippers against storing Iranian oil: State Department official. Reuters, March 9, 2020.

**Table 1. Iran Crude Oil Sales**

(average daily volumes, in barrels per day)

| Country/Bloc | 2011 | JPA period average (2014-2016) | At U.S. JCPOA Exit (May '18) | At SRE Determination (Oct. '18) | March 2020 (post-SRE termination) |
|---|---|---|---|---|---|
| European Union (particularly Italy, Spain, Greece) | 600,000 | negligible | 520,000 + | 100,000 | 0 |
| China | 550,000 | 410,000 | 700,000 | 838,000 | 64,000 |
| Japan | 325,000 | 190,000 | 133,000 | 0 | 0 |
| India | 320,000 | 190,000 | 620,000 | 354,000 | 0 |
| South Korea | 230,000 | 130,000 | 100,000 | 0 | 0 |
| Turkey | 200,000 | 120,000 | 200,000 | 161,000 | 0 |
| South Africa | 80,000 | negligible | negligible | 0 | 0 |
| Other Asia (Malaysia, Sri Lanka, Indonesia) | 90,000 | negligible | negligible | | 0 |
| Taiwan | 35,000 | 10,000 | 67,000 | 0 | 0 |
| Singapore | 20,000 | negligible | negligible | 33,000 | 0 |
| Syria | 0 | negligible | 33,000 | 96.000 | 150,000 |
| Other/Unknown (Iraq and UAE swaps, other) | 55,000 | negligible | 100,000 | 21,000 | 129,000 |
| **Total (mbd)** | **2.5** | **1.06** | **2.45** | **1.60** | **0.343** |

**Sources:** Bloomberg News, Reuters, and other press articles. Information on actual Iranian exports is often preliminary, incomplete, and inaccurate, and this table therefore contains figures from at least one month prior. Figures might not reflect actual deliveries due to reported activities by Iran and various oil customers to conceal purchases or avoid tracking of oil tankers. Figures do not include purchases of condensates, which are light petroleum liquids that are associated with oil and natural gas production. South Korea was a large customer for Iranian condensates and, as of August 2018, it ended its purchases of that product from Iran to zero.

**Note:** mbd = million barrels per day.

# Sanctions on Weapons of Mass Destruction, Missiles, and Conventional Arms Transfers

*Status: No sanctions in this section were eased to implement JCPOA*

Several laws and executive orders seek to bar Iran from obtaining U.S. or other technology that can be used for weapons of mass destruction (WMD) programs. Sanctions on Iran's exportation of arms are discussed in the sections above on sanctions for Iran's support for terrorist groups.

## Iran-Iraq Arms Nonproliferation Act and Iraq Sanctions Act

The Iran-Iraq Arms Nonproliferation Act (Title XIV of the FY1993 National Defense Authorization Act, P.L. 102-484, signed in October 1992) imposes a number of sanctions on foreign entities that supply Iran with WMD technology or "destabilizing numbers and types of advanced conventional weapons."[32]

*Advanced conventional weapons* are defined as:

(1) such long-range precision-guided munitions, fuel air explosives, cruise missiles, low observability aircraft, other radar evading aircraft, advanced military aircraft, military satellites, electromagnetic weapons, and laser weapons as the President determines destabilize the military balance or enhance the offensive capabilities in destabilizing ways;

(2) such advanced command, control, and communications systems, electronic warfare systems, or intelligence collections systems as the President determines destabilize the military balance or enhance offensive capabilities in destabilizing ways; and

(3) such other items or systems as the President may, by regulation, determine necessary for the purposes of this title.

The definition is generally understood to include technology used to develop ballistic missiles.

*Sanctions to be imposed*: Sanctions imposed on violating entities include

- a ban, for two years, on U.S. government procurement from the entity;
- a ban, for two years, on licensing U.S. exports to that entity;
- authority, but not a requirement, to ban U.S. imports from the entity.

If the violator is determined to be a foreign country, sanctions to be imposed are

- a one-year ban on U.S. assistance to that country;
- a one-year requirement of a U.S. vote against international loans to it;
- a one-year suspension of U.S. coproduction agreements with the country;
- a one-year suspension of technical exchanges with the country in military or dual use technology;
- a one-year ban on sales of U.S. arms to the country;
- an authorization to deny the country most-favored-nation trade status; and to ban U.S. trade with the country.

Section 1603 of the act amended an earlier law, the Iraq Sanctions Act of 1990 (Section 586G(a) of P.L. 101-513), to provide for a "presumption of denial" for all dual use exports to Iran.

### Implementation

A number of entities were sanctioned under the act in the 1990s, as shown in the tables at the end of this paper. None of the designations remain active, because the sanctions have limited duration.

---

[32] The act originally only applied to advanced conventional weapons. The extension to WMD, defined as chemical, biological, or nuclear weapons-related technology was added by the FY1996 National Defense Authorization Act (P.L. 104-106).

### Waiver

Section 1606 of the act provides a presidential waiver for its provisions, and for sanctions imposed pursuant to the Iraq Sanctions Act of 1990, if the President determines that it is "essential to the national interest."

## Banning Aid to Countries that Aid or Arm Terrorism List States: Anti-Terrorism and Effective Death Penalty Act of 1996

Another law reinforces the authority of the President to sanction governments that provide aid or sell arms to Iran (and other terrorism list countries). Under Sections 620G and 620H of the Foreign Assistance Act, as added by the Anti-Terrorism and Effective Death Penalty Act of 1996 (Sections 325 and 326 of P.L. 104-132), the President is required to withhold foreign aid from any country that provides to a terrorism list country financial assistance or arms. Waiver authority is provided.

Section 321 of the Anti-Terrorism and Effective Death Penalty Act also makes it a criminal offense for U.S. persons to conduct financial transactions with terrorism list governments.

### Implementation

No foreign assistance cuts or other penalties under this law have been announced.

## Proliferation-Related Provision of the Iran Sanctions Act

As noted above, *Section 5(b)(1)* of ISA subjects to ISA sanctions firms or persons determined to have sold to Iran (1) technology useful for weapons of mass destruction (WMD) or (2) "destabilizing numbers and types" of advanced conventional weapons. *This, and Section 5(b)(2) pertaining to joint ventures to mine uranium, are the only provisions of ISA that were not waived to implement the JCPOA.*

*Implementation.* As noted earlier, no sanctions under this section have been imposed.

## Iran-North Korea-Syria Nonproliferation Act

The Iran Nonproliferation Act (P.L. 106-178, signed in March 2000) became the Iran-North Korea-Syria Nonproliferation Act (INKSNA) after the enactment of laws expanding its provisions to North Korea and to Syria. INKSNA authorizes sanctions—for two years unless renewed—on foreign *persons* (individuals or companies, not governments) that are determined in a report by the Administration to have assisted Iran's WMD programs. Sanctions imposed include (1) a prohibition on U.S. exportation of arms and dual use items to the sanctioned entity; and (2) a ban on U.S. government procurement and of imports to the United States from the sanctioned entity under Executive Order 12938 (of November 14, 1994). INKSNA also banned U.S. extraordinary payments to the Russian Aviation and Space Agency in connection with the international space station unless the President certified that the agency had not transferred any WMD or missile technology to Iran within the year prior.[33]

---

[33] The provision contains certain exceptions to ensure the safety of astronauts, but it nonetheless threatened to limit U.S. access to the international space station after April 2006, when Russia started charging the United States for transportation on its Soyuz spacecraft. Legislation in the 109th Congress (S. 1713, P.L. 109-112) amended the provision to facilitate continued U.S. access and extended INA sanctions provisions to Syria.

## Implementation

Entities that have been sanctioned under this law are listed in the tables at the end of the report. Designations more than two years old are no longer active. The JCPOA required the United States to suspend INKSNA sanctions against "the acquisition of nuclear-related commodities and services for nuclear activities contemplated in the JCPOA," but no INKSNA sanctions were waived during that time.

## Waiver and Termination

Section 4 gives the President the authority to not impose sanctions if the President justifies that decision to Congress. Section 5 provides for exemptions from sanctions if certain conditions are met, particularly that the government with jurisdiction over the entity cooperating to stop future such transfers to Iran. Termination of this law would require congressional action; there is no automatic sunset or expiration, or stipulated conditions under which an Administration could terminate its application.

# Executive Order 13382 on Proliferation-Supporting Entities

### *Status: Order Remained in Force, but Numerous Entities "Delisted"*

Executive Order 13382 (June 28, 2005) allows the President to block the assets of proliferators of weapons of mass destruction (WMD) and their supporters under the authority granted by the International Emergency Economic Powers Act (IEEPA; 50 U.S.C. 1701 et seq.), the National Emergencies Act (50 U.S.C. 1601 et seq.), and Section 301 of Title 3, *United States Code*.

## Implementation

The numerous Iranian or Iran-related entities sanctioned under the order for are listed in the tables at the end of this report. Entities delisted and which were to be delisted in accordance with the JCPOA (in October 2023) are in italics and boldface type, respectively. Virtually all entities delisted to implement the JCPOA were relisted on November 5, 2018.

# Arms Transfer and Missile Sanctions: The Countering America's Adversaries through Sanctions Act (CAATSA, P.L. 115-44)

CAATSA (August 2, 2017) mandates sanctions on arms sales to Iran and on entities that "materially contribute" to Iran's ballistic missile program.

- Section 104 references E.O. 13382 (see above) and mandates that the same sanctions as in E.O. 13382 be imposed on entities determined by the Administration to be assisting Iran's ballistic missile program or any system capable of delivering WMD. The section also requires an Administration report every 180 days on persons (beginning on January 29, 2018) contributing to Iran's ballistic missile program in the preceding 180 days.
- Section 107 mandates sanctions (the same sanctions as those contained in E.O. 13382) on any person that the President determines has sold or transferred to or from Iran, or for the use in or benefit of Iran: the weapons systems specified as banned for transfer to or from Iran in U.N. Security Council Resolution 2231. These include most major combat systems such as tanks, armored vehicles,

warships, missiles, combat aircraft, and attack helicopters. The provision is more specific that other laws that mandate sanctions on sales to Iran of "destabilizing numbers and types of advanced conventional weapons." The imposition of sanctions is not required if the President certifies that a weapons transfer is in the national security of the United States; that Iran no longer poses a significant threat to the United States or U.S. allies; and that the Iranian government no longer satisfies the requirements for designation as a state sponsor of terrorism.

### Implementation

The CAATSA provisions have been implemented through additional designations for sanctions (SDNs) under the executive orders referenced in CAATSA, primarily E.O. 13382.

## Foreign Aid Restrictions for Named Suppliers of Iran

Some past foreign aid appropriations have withheld U.S. assistance to the Russian Federation unless it terminates technical assistance to Iran's nuclear and ballistic missiles programs. The provision applied to the fiscal year for which foreign aid is appropriated. Because U.S. aid to Russia generally has not gone to the Russian government, little or no funding was withheld as a result of the provision. The JCPOA makes no reference to any U.S. commitments to waive this sanction or to request that Congress not enact such a provision.

## Sanctions on "Countries of Diversion Concern"

Title III of CISADA established authorities to sanction countries that allow U.S. technology that Iran could use in its nuclear and WMD programs to be reexported or diverted to Iran. Section 303 of CISADA authorizes the President to designate a country as a "Destination of Diversion Concern" if that country allows substantial diversion of goods, services, or technologies characterized in Section 302 of that law to Iranian end-users or Iranian intermediaries. The technologies specified include any goods that could contribute to Iran's nuclear or WMD programs, as well as goods listed on various U.S. controlled-technology lists such as the Commerce Control List or Munitions List. For any country designated as a country of diversion concern, there would be prohibition of denial for licenses of U.S. exports to that country of the goods that were being reexported or diverted to Iran.

### Implementation

To date, no country has been designated a "Country of Diversion Concern." Some countries, for example, the UAE, have adopted or enforced anti-proliferation laws apparently to avoid designation.

### Waiver and Termination

Waiver: The President may waive sanctions on countries designated as of Diversion Concern for 12 months, and additional 12-month periods, pursuant to certification that the country is taking steps to prevent diversions and reexports.

Termination: The designation terminates on the date the President certifies to Congress that the country has adequately strengthened its export controls to prevent such diversion and reexports to Iran in the future. The JCPOA makes no reference to waiving or terminating this sanction.

### Summary of Sanctions on the Islamic Revolutionary Guard Corps (IRGC)

Numerous sanctions target Iran's Islamic Revolutionary Guard Corps (IRGC), and none was waived or terminated to implement the JCPOA. The IRGC plays a role in both internal and external defense, supports pro-Iranian movements in the region, and owns or controls economic entities in Iran that account for as much as 20% of Iran's economic output. Many of the IRGC's subordinate units, such as the IRGC Qods Force and the Basij militia, have been designated for sanctions under various Executive Orders, as have corporate entities owned or controlled by the IRGC, such as the large engineering firm Khatam ol-Anbia.

- The IRGC has been named as a proliferation-supporting entity under Executive Order 13382, a human rights abuser under E.O. 13553 and, in accordance with the Countering America's Adversaries through Sanctions Act (P.L. 115-44), it was named a terrorism-supporter under E.O. 13224 (October 13, 2017). The IRGC-Qods Force (IRGC-QF), the unit of the IRGC that assists pro-Iranian movements abroad, is named as a terrorism-supporting entity under Executive Order 13324 and a repressor of the Syrian people under E.O. 13572. Hundreds of IRGC-linked entities—companies, facilitators and financial partners, and commanders—are designated for sanctions under those and other orders, as noted in the tables at the end of this report.

- IFCA (Section 1244) mandates that any entity that knowingly conducts transactions with a designated Iranian entity is subject to having its U.S.-based assets blocked.

- ITRSHRA (Section 302) imposes at least 5 out of 12 ISA sanctions on persons that materially assist, with financing or technology, the IRGC, or assist or engage in "significant" transactions with any of its affiliates that are sanctioned under Executive Order 13382, 13224, or similar executive orders—or which are determined to be affiliates of the IRGC. *Section 302 did not amend ISA.*

- ITRSHRA (Section 311) requires a certification by a contractor to the U.S. government that it is not knowingly engaging in a significant transaction with the IRGC, or any of its agents or affiliates that have been sanctioned under several executive orders discussed below. A contract may be terminated if it is determined that the company's certification of compliance was false.

- ITRSHRA (Section 301) requires the President to identify "officials, agents, or affiliates" of the IRGC and to impose sanctions in accordance with Executive Order 13382 or 13224. Some of these designations, including of National Iranian Oil Company (NIOC), were made by the Treasury Department on November 8, 2012.

- ITRSHRA (Section 303) requires the imposition of sanctions on agencies of foreign governments that provide technical or financial support, or goods and services to sanctioned (under U.S. executive orders or U.N. resolutions) members or affiliates of the IRGC. Sanctions include a ban on U.S. assistance or credits for that foreign government agency, a ban on defense sales to it, a ban on U.S. arms sales to it, and a ban on exports to it of controlled U.S. technology.

- Section 104 of CISADA sanctions foreign banks that conduct significant transactions with the IRGC or any of its agents or affiliates that are sanctioned under any executive order. It also sanctions any entity that assists Iran's Central Bank efforts to help the IRGC acquire WMD or support international terrorism.

- In October 2018, 20 economic entities, including a steel company and acid and zinc mining firms, were sanctioned under E.O 13224 for providing revenue to the Basij militia, an arm of the IRGC.

- On April 8, 2019, the Trump Administration named the IRGC as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act (8 U.S.C. 819). In addition to the sanctions above, the FTO designation provides for criminal penalties for U.S. persons or any bank that knowingly provides "material support" to an FTO (ex. donations, facilitation of its activities).

- On September 4, 2019, U.S. officials announced that they are using the State Department's "Rewards for Justice" program that provides reward money for information about potential terrorist plots for Iran. The reward monies are to be used to disrupt Iran's oil shipments and obtain information on the IRGC's financial operations. The basis for the Administration use of that program, as well as related sanctions designations in August and September 2019, was an asserted linkage between the IRGC and Iran's oil exportation.

# Financial/Banking Sanctions

U.S. efforts to shut Iran out of the international banking system were a key component of the 2010-2016 international sanctions regime.

## Targeted Financial Measures

### *Status: Superseded by sanctions statutes and orders*

During 2006-2016, the Department of the Treasury conducted a campaign to persuade foreign banks to cease dealing with Iran by briefing them on Iran's use of the international financial system to fund terrorist groups and acquire weapons-related technology. According to a GAO report of February 2013, the Department of the Treasury made overtures to 145 banks in 60 countries, including several visits to banks and officials in the UAE, and convinced at least 80 foreign banks to cease handling financial transactions with Iranian banks. During the period of U.S. implementation of the JCPOA, the Treasury Department instead sought to encourage foreign banks to conduct normal transactions with Iran.

## Ban on Iranian Access to the U.S. Financial System/Use of Dollars

### *Status: Remains in Force*

There is no blanket ban on foreign banks or persons paying Iran for goods using U.S. dollars. But, U.S. regulations (ITRs, C.F.R. Section 560.516) ban Iran from direct access to the U.S. financial system. The regulations allow U.S. banks to send funds (including U.S. dollars) to Iran for allowed (licensed) transactions, but U.S. dollars cannot be directly transferred to an Iranian bank, but must instead be channeled through an intermediary financial institution. Section 560.510 specifically allows for U.S. payments to Iran to settle or pay judgments to Iran, such as those reached in connection with the U.S.-Iran Claims Tribunal, discussed above, but the prohibition on dealing directly with Iranian banks applies.

On November 6, 2008, the Department of the Treasury broadened restrictions on Iran's access to the U.S. financial system by barring U.S. banks from handling any transactions with foreign banks that are handling transactions on behalf of an Iranian bank ("U-turn transactions").[34] This means a foreign bank or person that pays Iran for goods in U.S. dollars cannot access the U.S. financial system (through a U.S. correspondent account, which most foreign banks have) to acquire dollars for any transaction involving Iran. This ban remained in effect during JCPOA implementation, and Iran argued that these U.S. restrictions deterred European and other banks from reentering the Iran market.

In 2016, the Obama Administration considered licensing transactions by foreign (non-Iranian) clearinghouses to acquire dollars that might facilitate transactions with Iran, without providing Iran with dollars directly.[35] However, the Administration did not take that step. The Trump Administration's reimposition of U.S. sanctions has further reduced the willingness and ability of foreign firms to use dollars in transactions with Iran.

### Punishments/Fines Implemented against Some Banks.

The Department of the Treasury and other U.S. authorities have announced financial settlements with various banks that violated U.S. regulations in transactions related to Iran (and other

---

[34] For text of the OFAC ruling barring U-Turn transactions, see https://www.treasury.gov/resource-center/sanctions/Documents/fr73_66541.pdf.

[35] See Katherine Bauer. "Potential U.S. Clarification of Financial Sanctions Regulations." April 5, 2016. http://www.washingtoninstitute.org/policy-analysis/view/potential-u.s.-clarification-of-financial-sanctions-regulations.

countries such as Sudan, Syria, and Cuba). The amounts were reportedly determined, at least in part, by the value, number, and duration of illicit transactions conducted, and the strength of the evidence collected by U.S. regulators.[36] (As noted above, the FY2016 Consolidated Appropriation, P.L. 114-113, provided for use of the proceeds of the settlements above to pay compensation to victims of Iranian terrorism.)

**Table 2. Major Settlements/Fines Paid by Banks for Violations**

| Bank | Date | Amount Paid | Violation |
|---|---|---|---|
| UBS (Switzerland) | 2004 | $100 million | Unauthorized movement of U.S. dollars to Iran and others |
| ABN Amro (Netherlands) | December 2005 | $80 million | Failing to fully report financial transactions involving Bank Melli |
| Credit Suisse (Switzerland) | December 2009 | $536 million | Illicitly processing Iranian transactions with U.S. banks |
| ING (Netherlands) | June 2012 | $619 million | Concealing movement of billions of dollars through the U.S. financial system for Iranian and Cuban clients. |
| Standard Chartered (UK) | August 2012 | $340 million | Settlement paid to New York State for processing transactions on behalf of Iran |
| Clearstream (Luxembourg) | January 2014 | $152 million | Helping Iran evade U.S. banking restrictions |
| Bank of Moscow (Russia) | January 2014 | $9.5 million | Illicitly allowing Bank Melli to access the U.S. financial system |
| BNP Paribas | June 2014 | $9 billion | Amount forfeited for helping Iran (and Sudan and Cuba) violate U.S. sanction. |
| Standard Chartered (UK) | April 2019 | $639 million | Dubai branch of Standard Chartered processed Iran-related transactions to or through Standard Chartered - New York. |
| Unicredit AG (Germany, Austria, Italy) | April 2019 | $1.3 billion | For illicitly processing transactions through the U.S. financial system on behalf of Islamic Republic of Iran Shipping Lines (IRISL) |
| Halkbank | October 2019 | N/A | Justice Department filed charges against Halkbank for allegedly helping Iran evade U.S. sanctions |

**Source:** Various press reports.

# CISADA: Sanctioning Foreign Banks That Conduct Transactions with Sanctioned Iranian Entities

*Status: Remained in force during JCPOA, but Iranian banks "delisted." Delisted banks "relisted" as of November 5, 2018.*

The Comprehensive Iran Sanctions, Accountability, and Divestment Act (CISADA) was a key piece of legislation intended to limit Iran's access to the international financial system and to reduce the ability of Iran's import-export community (referred to in Iran as the "bazaar

---

[36] Analyst conversations with U.S. banking and sanctions experts. 2010-2015.

merchants" or "*bazaaris*") from obtaining "letters of credit" (trade financing) to buy or sell goods. The Department of the Treasury determines what is a "significant" financial transaction.

CISADA's key provision—Section 104—requires the Secretary of the Treasury to forbid U.S. banks from opening new "correspondent accounts" or "payable-through accounts" (or force the cancellation of existing such accounts) for[37]

- any foreign bank that transactions business with an entity that is sanctioned by Executive Order 13224 or 13382 (terrorism and proliferation activities, respectively). No humanitarian exception is provided for. These orders are discussed above. A full list of such entities is at the end of this report, and entities "delisted" are in italics.
- any foreign bank determined to have facilitated Iran's efforts to acquire WMD or delivery systems or provide support to groups named as Foreign Terrorist Organizations (FTOs) by the United States.
- any foreign bank that facilitates "the activities of" an entity designated under by U.N. Security Council resolutions that sanction Iran.
- any foreign bank that transacts business with the IRGC or any of its affiliates designated under any U.S. Iran-related executive order.

In addition, Section 1244(d) of the Iran Freedom and Counter-proliferation Act, IFCA, applies the CISADA sanctions to any foreign bank that does business with Iran's energy, shipping, and shipbuilding sectors, including with NIOC, NITC, and IRISL. The provision was not an amendment to CISADA itself. The IFCA provision was waived to implement the JCPOA, but was reinstated as of November 5, 2018.

## Implementation

Some sanctions have been imposed under Section 104 of CISADA. On July 31, 2012, the United States sanctioned the Bank of Kunlun in China and the Elaf Islamic Bank in Iraq under Section 104 of CISADA. On May 17, 2013, the Department of the Treasury lifted sanctions on Elaf Islamic Bank in Iraq, asserting that the bank had reduced its exposure to the Iranian financial sector and stopped providing services to the Export Development Bank of Iran.

Section 104 was not waived to implement the JCPOA, but many entities with which transactions would have triggered sanctions under Section 104 were "delisted" as Specially Designated Nationals (SDNs), in accordance with the JCPOA. These entities were relisted and therefore again made subject to secondary sanctions on November 5, 2018.

## Waiver and Termination

Under Section 401(a) of CISADA, the Section 104 sanctions provisions would terminate 30 days after the President certifies to Congress that Iran (1) has met the requirements for removal from the terrorism list, AND (2) has ceased pursuit, acquisition, or development of, and verifiably dismantled its nuclear weapons and other WMD programs.

The Secretary of the Treasury may waive sanctions under Section 104, with the waiver taking effect 30 days after the Secretary determines that a waiver is necessary to the national interest and submits a report to Congress describing the reason for that determination.

---

[37] Foreign banks that do not have operations in the United States typically establish correspondent accounts or payable-through accounts with U.S. banks as a means of accessing the U.S. financial system.

# Iran Designated a Money-Laundering Jurisdiction/FATF

## *Status: Central Bank Remained Designated Under this Section during JCPOA*

On November 21, 2011, the Obama Administration identified Iran as a "jurisdiction of primary money laundering concern"[38] under Section 311 of the USA Patriot Act (31 U.S.C. 5318A), based on a determination that Iran's financial system, including the Central Bank, constitutes a threat to governments or financial institutions that do business with Iran's banks. The designation imposed additional requirements on U.S. banks to ensure against improper Iranian access to the U.S. financial system. On October 25, 2019, the Treasury Department's Financial Crimes Enforcement Network (FinCEN) issued a final rule barring the U.S. financial system from any transactions with Iranian banks or foreign banks acting on behalf of Iranian banks.[39]

In October 2018, the Treasury Department Financial Crimes Enforcement Network (FINCEN) issued a warning to U.S. banks to guard against likely Iranian efforts to evade U.S. financial sanctions. Earlier, in January 1, 2013, OFAC issued an Advisory to highlight Iran's use of *hawalas* (traditional informal banking and money exchanges) in the Middle East and South Asia region to circumvent U.S. financial sanctions. Because the involvement of an Iranian client is often opaque, banks have sometimes inadvertently processed *hawala* transactions for Iranians.

## FATF

In 2016, the Financial Action Task Force (FATF) named Iran a "High Risk Jurisdiction" for anti-money laundering and combating the financing of terrorism (AML/CFT). On June 24, 2016, the FATF welcomed an "Action Plan" filed by Iran to address its strategic AML/CFT deficiencies and suspended "countermeasures"—mostly voluntary recommendations of increased due diligence with respect to Iran transactions—pending an assessment of Iran's implementation of its Action Plan. The FATF continued the suspension of countermeasures in 2017 and February 2018.

On October 19, 2018, the FATF stated that Iran had not completed legislation to adopt international standards. In June 2019, the FATF stated that Iran still had not adequately criminalized terrorist financing, including by removing the exemption for designated groups "attempting to end foreign occupation, colonialism and racism;" identified and frozen terrorist assets in line with the relevant United Nations Security Council resolutions; or ensured an adequate and enforceable customer due diligence regime. The FATF continued the suspension of countermeasures, but called on members to require increased supervisory examination for branches and subsidiaries of financial institutions based in Iran, in line with a February 2019 ultimatum to do so.[40] In October 2019, the FATF said that Iran would fully impose countermeasures if, by February 2020, Iran does not enact the Palermo and Terrorist Financing Conventions.[41] On February 21, 2020, the FATF stated that: "given Iran's failure to enact the Palermo and Terrorist Financing Conventions in line with the FATF Standards, the FATF fully lifts the suspension of counter-measures and calls on its members and urges all jurisdictions to apply effective counter-measures, in line with Recommendation 19" – a determination that subjects Iran's financial system to increased scrutiny by banks around the world.

---

[38] http://www.treasury.gov/press-center/press-releases/Pages/tg1367.aspx.

[39] Treasury and State Announce New Humanitarian Mechanism to Increase Transparency of Permissible Trade Supporting the Iranian People. October 25, 2019.

[40] June 2019 FATF statement is at http://www.fatf-gafi.org/countries/d-i/iran/documents/public-statement-june-2019.html.

[41] FATF Public Statement. October 2019.

## Use of the SWIFT System

Section 220 of the ITRSHRA required reports on electronic payments systems, such as the Brussels-based SWIFT (Society of Worldwide Interbank Financial Telecommunications), that do business with Iran. That law also authorizes—but neither it nor any other U.S. law or executive order mandates—sanctions against SWIFT or against electronic payments systems. Still, many transactions with Iran are subject to U.S. sanctions, no matter the payment mechanism.

# Sanctions on Iran's Non-Oil Industries and Sectors

Successive Administrations and Congresses have expanded sanctions on several significant non-oil industries and sectors of Iran's economy. The targeted sectors include Iran's automotive production sector, which is Iran's second-largest industry (after energy), its mineral exports, which account for about 10% of Iran's export earnings, and various light manufacturing sectors.

## The Iran Freedom and Counter-Proliferation Act (IFCA)

### Status: Waived to implement JCPOA; back into effect in 2018

The Iran Freedom and Counterproliferation Act began a trend in U.S. Iran sanctions policy in which several economic sectors were sanctioned simultaneously. The National Defense Authorization Act for FY2013 (H.R. 4310, P.L. 112-239, January 2, 2013)—Subtitle D, The Iran Freedom and Counter-Proliferation Act (IFCA), sanctions several different sectors of Iran's economy. Its provisions on Iran's human rights practices are discussed in the section on "Measures to Sanction Human Rights Abuses/Promote Civil Society."

- Section 1244 of IFCA mandates the blocking of U.S.-based property of any entity (Iranian or non-Iranian) that provides goods, services, or other support to any Iranian entity designated by the Treasury Department as a "specially designated national" (SDN). The tables at the end of this report show that hundreds of Iranian entities are designated as SDNs under various executive orders. The Iranian entities designated for civilian economic activity were "delisted" to implement the JCPOA, but were relisted on November 5, 2018.

- Section 1247 of IFCA prohibits from operating in the United States any bank that knowingly facilitates a financial transaction on behalf of an Iranian SDN. The section also specifically sanctions foreign banks that facilitate payment to Iran for natural gas unless the funds owed to Iran for the gas are placed in a local account. The section provides for a waiver for a period of 180 days.

Several sections of IFCA impose ISA sanctions on entities determined to have engaged in specified transactions below. (*The provisions apply ISA sanctions but do not amend ISA.*)

- *Energy, Shipbuilding, and Shipping Sector, and Iranian Port Operations.* Section 1244 (1) blocks the U.S.-based assets; *and* (2) mandates the imposition of 5 out of 12 ISA sanctions on entities that provide financial, material, technological, or other support, or provide goods or services to Iran's energy, shipbuilding, and shipping sectors, or port operations in Iran. *The sanctions do not apply when such transactions involved purchases of Iranian oil by countries that have exemptions under P.L. 112-81, or to the purchase of natural gas from Iran.* This section went back into effect as of November 5, 2018). The blocking of U.S.-based assets is implemented by E.O. 13846 of August 6, 2018.

- *Dealings in Precious Metals or Materials for Iran's Missile, Nuclear, or Military Programs.* Section 1245 imposes five out of the 12 sanctions on the ISA menu on entities that provide precious metals to Iran (including gold) or semi-finished metals or software for integrating industrial processes. The section affected foreign firms that transferred these items or other precious metals to Iran in exchange for oil or any other product. Section 1245 also applies those sanctions to the supply to Iran of any material determined to be used in connection with Iran's nuclear, missile, or military programs. The section mandates the exclusion from the United States of any foreign bank that facilitates any stipulated transaction. *There is no exception to this sanction for countries that receive the SRE under P.L. 112-81.* This section went back into effect on August 7, 2018.

- *Insurance for Related Activities.* Section 1246 imposes 5 out of 12 sanctions on the ISA menu on entities that provide underwriting services, insurance, or reinsurance for any transactions sanctioned under any executive order on Iran, ISA, CISADA, the Iran Threat Reduction Act, INKSNA, other IFCA provisions, or any other Iran sanction, as well as to any Iranian SDN. (*There is no exception for countries exempted under P.L. 112-81.*) This provision went back into effect after a 180-day wind-down period (by November 4, 2018).

- *Exception for Afghanistan Reconstruction.* Section 1244(f) of IFCA provides a sanctions exemption for transactions that provide reconstruction assistance for or further the economic development of Afghanistan. See JCPOA waivers below.

## Implementation

The entities designated for sanctions under E.O. 13224, 13382, and other Orders – which are listed in the tables at the end of the report - trigger additional sanctions under IFCA for any entity that conducts transactions with those entities. In addition, sanctions have been imposed on entities that conduct transactions with the Iranian sectors stipulated in IFCA: for example, in August 29, 2014, the State Department sanctioned UAE-based Goldentex FZE providing support to Iran's shipping sector.

## Waiver and Termination

Sections 1244 and 1245 of IFCA provide for a waiver of sanctions for 180 days, renewable for 180-day periods, if such a waiver is determined to be vital to U.S. national security. These sections were waived in order to implement the JPA. In addition, Section 5(a)(7) of ISA was waived to allow for certain transactions with NIOC and NITC. Sections 1244(i), 1245(g), 1246(e), and 1247(f) of IFCA were waived to implement the JCPOA on January 18, 2017, and that waiver was last renewed on January 12, 2018. IFCA went back into effect as specified above.

# Executive Order 13645/13846: Iran's Automotive Sector, *Rial* Trading, and Precious Stones

*JCPOA Status: Revoked (by E.O 13716) but most provisions below went back into effect under E.O. 13846 of August 6, 2018.*

Executive Order 13645 of June 3, 2013, as superseded by 13846 of August 6, 2018:

- Imposes ISA sanctions on firms that supply goods or services to Iran's automotive (cars, trucks, buses, motorcycles, and related parts) sector, and blocks

foreign banks from the U.S. market if they finance transactions with Iran's automotive sector.

- Blocks U.S.-based property and prohibits U.S. bank accounts for foreign banks that conduct transactions in Iran's currency, the *rial*, or hold *rial* accounts. This provision mostly affected banks in countries bordering or near Iran. The order applies also to "a derivative, swap, future, forward, or other similar contract whose value is based on the exchange rate of the Iranian *rial*." If Iran implements plans to develop a digital currency, or cryptocurrency, backed by or tied to *rials*, it would appear that the order also applies to that digital currency.

- Expands the application of Executive Order 13622 (above) to helping Iran acquire precious stones or jewels (see above).

- Blocks U.S.-based property of a person that conducts transactions with an Iranian entity listed as a Specially Designated National (SDN) or Blocked Person. SDNs were "relisted" on November 5, 2018.

## Executive Order 13871 on Iran's Minerals and Metals Sectors (May 8, 2019)

On May 8, 2019, President Trump issued Executive Order 13871 sanctioning transactions involving Iran's minerals and industrial commodities. The announcement stated that Iran earns 10% of its total export revenues from sales of the minerals and metals sanctioned under the order.[42] The order does the following:

- blocks U.S.-based property of any entity that conducts a significant transaction for the "sale, supply, or transfer to Iran" of goods or services, or the transport or marketing, of the iron, steel, aluminum, and copper sectors of Iran;

- authorizes the Secretary of the Treasury to bar from the U.S. financial system any foreign bank that conducts or facilitates a financial transaction for steel, steel products, copper, or copper products from Iran;

- bars the entry into the United States of any person sanctioned under the order.

## Executive Order 13902 on the Construction, Mining, Manufacturing, and Textiles Sector (January 10. 2020)

On January 10, 2020, as a stated response to the Iranian missile strikes on an Iraqi air base used by U.S. forces several days earlier (Iran's response to the U.S. killing of IRGC-QF commander Qasem Soleimani), President Trump issued Executive Order 13902 expanding the Iranian economic sectors subject to specific U.S. sanctions. The order

- blocks U.S. based property of persons determined by the Administration to "operate in" or to have knowingly engaged in a "significant transaction" with the construction, mining, manufacturing, or textiles sectors of Iran's economy, "or any other sector of the Iranian economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State."

---

[42] https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-regarding-imposing-sanctions-respect-iron-steel-aluminum-copper-sectors-iran/.

- blocks U.S. property of persons determined to have assisted (financed, supplied technology) persons sanctioned under the order.
- bars from the U.S. financial system any foreign bank that conducts transactions with these Iranian economic sectors or with persons that supplied goods or services to those sectors.
- persons sanctioned under the order are banned from travel to the United States.

The order appears to build on E.O. 13871 in sanctioned specific non-oil sectors of Iran's economy. Sanctioning the textile sector would appear to affect Iran's vibrant carpet industry. However, the sectors sanctioned in the 2020 order generally serve markets in Iran's immediate neighborhood and transactions in the goods manufactured are likely not conducted in hard currency, and the Order might have marginal further effect on Iran's economy.

The Order followed an October 31, 2019, determination by the State and Treasury Departments that the construction sector of Iran is controlled by the IRGC and that, therefore, the supply of raw or semi-finished metals, graphite, coal, and industrial software to Iran are sanctionable under Section 1245 of IFCA (see above). The two agencies also determined that the sale to Iran of the following are sanctionable as useful to Iran's nuclear, missile, and military programs: stainless steel 304L tubes; MN40 manganese brazing foil; and stainless steel CrNi60WTI ESR + VAR (chromium, nickel, 60% tungsten, titanium, electro-slag remelting, and vacuum remelting).[43]

## Executive Order 13608 on Sanctions Evasion

Executive Order 13608 of May 1, 2012, gives the Department of the Treasury the ability to identify and sanction (cutting them off from the U.S. market) foreign persons who help Iran (or Syria) evade U.S. and multilateral sanctions.

Several persons and entities have been designated for sanctions, as shown in the tables at the end.

# Sanctions on Cyber and Criminal Activities

### *Status: All in Force, including during JCPOA Period*

The Trump Administration appears to be making increasing use of executive orders issued during the Obama Administration to sanction Iranian entities determined to be engaged in malicious cyberactivities or in transnational crime. Iranian entities have attacked, or attempted to attack, using cyberactivity, infrastructure in the United States, Saudi Arabia, and elsewhere. Separately, the Justice Department has prosecuted Iranian entities for such activity.

## Executive Order 13694

Executive Order 13694 (April 1, 2015) blocks U.S.-based property of foreign entities determined to have engaged in cyber-enabled activities that (1) harm or compromise the provision of services by computers or computer networks supporting in the critical infrastructure sector; (2) compromise critical infrastructure; (3) disrupt computers or computer networks; or (4) cause misappropriation of funds, trade secrets, personal identifiers, or financial information for financial advantage or gain.

---

[43] Dept. of State. Findings Pursuant to the Iran Freedom and Counter-Proliferation Act (IFCA) of 2012. October 31, 2019.

## Executive Order 13581

Executive Order 13581 (July 25, 2011) blocks the U.S.-based property of entities determined (1) to be a foreign person that constitutes a significant transnational criminal organization; (2) to have materially assisted any person sanctioned under this order; or (3) to be owned or controlled by or to have acted on behalf of a person sanctioned under the order.

### Implementation of E.O. 13694 and 13581

Iran-related entities sanctioned under the orders are listed in the tables at the end of this report.

# Divestment/State-Level Sanctions

Some U.S. laws require or call for divestment of shares of firms that conduct certain transactions with Iran. A divestment-promotion provision was contained in CISADA, providing a "safe harbor" for investment managers who sell shares of firms that invest in Iran's energy sector at levels that would trigger U.S. sanctions under the Iran Sanctions Act. As noted above, Section 219 of the ITRSHRA of 2012 requires companies to reports to the Securities and Exchange Commission whether they or any corporate affiliate has engaged in any transactions with Iran that could trigger sanctions under ISA, CISADA, and E.O 13382 and 13224.

Numerous states have adopted laws, regulations, and policies to divest from—or avoid state government business with—foreign companies that conduct certain transactions with Iran. The JCPOA required the United States to work with state and local governments to ensure that state-level sanctions did not conflict with JCPOA sanctions relief provided by the federal government.

# Sanctions Supporting Democracy/Human Rights

*Status: Virtually all sanctions in this section remained in effect during JCPOA*

A trend in U.S. policy and legislation since the June 12, 2009, election-related uprising in Iran has been to support the ability of the domestic opposition in Iran to communicate and to sanction Iranian officials that commit human rights abuses or corruption. Sanctions on the IRGC represent one facet of that trend because the IRGC is a key suppressive instrument. Individuals and entities designated under the executive orders and provisions discussed below are listed in the tables at the end of this report. For those provisions that ban visas to enter the United States, the State Department interprets the provisions to apply to all members of the designated entity.[44]

## Expanding Internet and Communications Freedoms

Some laws and Administration action focus on expanding Internet freedom in Iran or preventing the Iranian government from using the Internet to identify opponents. Subtitle D of the FY2010 Defense Authorization Act (P.L. 111-84), called the "VOICE" (Victims of Iranian Censorship) Act, contained several provisions to increase U.S. broadcasting to Iran and to identify to Congress companies that are selling Iran technology equipment that it can use to suppress or monitor the Internet usage by Iranians. The Act authorized funds to document Iranian human rights abuses

---

[44] U.S. Department of the Treasury, Office of Public Affairs, *Treasury Sanctions Iranian Security Forces for Human Rights Abuses*, June 9, 2011.

since the June 2009 Iranian presidential election. Section 1241 required an Administration report on U.S. enforcement of sanctions against Iran and the effect of those sanctions on Iran.

## Countering Censorship of the Internet: CISADA, E.O. 13606, and E.O. 13628

- Section 106 of CISADA prohibits U.S. government contracts with foreign companies that sell technology that Iran could use to monitor or control Iranian usage of the internet. The provisions were directed, in part, against Nokia (Finland) and Siemens (Germany) for reportedly selling internet monitoring and censorship technology to Iran in 2008.[45] The provision was derived from the Reduce Iranian Cyber-Suppression Act (111th Congress, S. 1475 and H.R. 3284).

- On April 23, 2012, President Obama issued an executive order (13606) sanctioning persons who commit "Grave Human Rights Abuses by the Governments of Iran and Syria via Information Technology (GHRAVITY)." The order blocks the U.S.-based property and essentially bars U.S. entry and bans any U.S. trade with persons and entities listed in an Annex and persons or entities subsequently determined to be (1) operating any technology that allows the Iranian (or Syrian) government to disrupt, monitor, or track computer usage by citizens of those countries or assisting the two governments in such disruptions or monitoring; or (2) selling to Iran (or Syria) any technology that enables those governments to carry out such actions.

- Section 403 of the ITRSHRA sanctions (visa ban, U.S.-based property blocked) persons/firms determined to have engaged in censorship in Iran, limited access to media, or—for example, a foreign satellite service provider—supported Iranian government jamming or frequency manipulation. On October 9, 2012, the President issued Executive Order 13628 implementing Section 403 by blocking the property of persons/firms determined to have committed the censorship, limited free expression, or assisted in jamming communications. The order also specifies the sanctions authorities of the Department of State and of the Treasury.

## Laws and Actions to Promote Internet Communications by Iranians

- On March 8, 2010, OFAC amended the Iran Transactions Regulations to allow for a general license for providing free mass market software to Iranians. The ruling incorporated major features of the Iran Digital Empowerment Act (H.R. 4301 in the 111th Congress). The OFAC determination required a waiver of the provision of the Iran-Iraq Arms Nonproliferation Act (Section 1606 waiver provision) discussed above.

- Section 103(b)(2) of CISADA exempts from the U.S. export ban on Iran equipment to help Iranians communicate and use the internet.

- On March 20, 2012, the Department of the Treasury amended U.S.-Iran trade regulations to permit several additional types of software and information technology products to be exported to Iran under general license, provided the products were available at no cost to the user.[46] The items included personal

---

[45] Christopher Rhoads, "Iran's Web Spying Aided by Western Technology," *Wall Street Journal*, June 22, 2009.

[46] *Fact Sheet: Treasury Issues Interpretive Guidance and Statement of Licensing Policy on Internet Freedom in Iran*, March 20, 2012.

communications, personal data storage, browsers, plug-ins, document readers, and free mobile applications related to personal communications.

- On May 30, 2013, the Department of the Treasury amended the trade regulations further to allow for the sale, *on a cash basis* (no financing), to Iran of equipment that Iranians can use to communicate (e.g., cellphones, laptops, satellite internet, website hosting, and related products and services).

## Measures to Sanction Human Rights Abuses/Promote Civil Society

Some Iran-specific legislation and administrative action has sought to sanction regime officials involved in suppressing the domestic opposition in Iran or in human rights abuses more generally. Much of this legislation centers on amendments to Section 105 of CISADA.

- Section 105 of CISADA bans travel and freezes the U.S.-based assets of those Iranians determined to be human rights abusers. On September 29, 2010, pursuant to Section 105, President Obama issued Executive Order 13553 providing for CISADA sanctions against Iranians determined to be responsible for or complicit in post-2009 Iran election human rights abuses. Section 105 terminates if the President certifies to Congress that Iran has (1) unconditionally released all political prisoners detained in the aftermath of the June 2009 uprising; (2) ceased its practices of violence, unlawful detention, torture, and abuse of citizens who were engaged in peaceful protest; (3) fully investigated abuses of political activists that occurred after the uprising; and (4) committed to and is making progress toward establishing an independent judiciary and respecting human rights.

- *CAATSA (P.L. 115-44)* expanded Section 105 of CISADA by authorizing (but not mandating) sanctions on Iranian human rights abuses generally—not limited to those connected to the June 2009 uprising. The CAATSA provisions defines as sanctionable extrajudicial killings, torture, or other gross violations of internationally recognized human rights against Iranians who seek to expose illegal activity by officials or to defend or promote human rights and freedoms in Iran. The persons to be sanctioned are those named in a report provided 90 days after CAATSA enactment (by October 31, 2017) and annually thereafter. Additional Iranian human rights abusers were designated under E.O. 13533 by an October 31, 2017, CAATSA deadline.

- *Sanctions against Iranian Profiteers*. Section 1249 of IFCA amended Section 105 by imposing sanctions on any person determined to have engaged in corruption or to have diverted or misappropriated humanitarian goods or funds for such goods for the Iranian people. The measure targets Iranian profiteers who are, for example, using official connections to corner the market for vital medicines. This provision essentially codified a similar provision of Executive Order 13645.

- *Sanctions against Iranian Government Broadcasters/IRIB.* Section 1248 of IFCA (Subtitle D of P.L. 112-239) mandates inclusion of the Islamic Republic of Iran Broadcasting (IRIB), the state broadcasting umbrella group, as a human rights abuser. IRIB was designated as an SDN on February 6, 2013, under E.O. 13628 for limiting free expression in Iran. On February 14, 2014, the State Department waived IFCA sanctions under Sections 1244, 1246, or 1247, on any entity that provides satellite services to IRIB. The waiver has been renewed each year since.

- *Human Rights and Corruption Provisions of Executive Order 13846 (August 6, 2018).* The Executive Order that reimposed JCPOA U.S. sanctions on Iran contained provisions sanctioning Iranian human rights abusers and corrupt officials—even though no sanctions imposed for such behaviors were suspended to implement the JCPOA. Section 7 of the order blocks the U.S.-based property of persons that (1) engaged after January 2, 2013 in corrupt diversion of goods intended for the Iranian people; (2) sold (after August 10, 2012) Iran goods or technologies or provided services used by the Iranian government to commit serious human rights abuses; (3) engaged in censorship or limited free expression in Iran (after June 12, 2009); or (4) provided goods or services to any person sanctioned under the order.

- *Sanctions on Sales of Anti-Riot Equipment.* Section 402 of the ITRSHRA amended Section 105 by adding provisions that sanction (visa ban, U.S. property blocked) any person or company that sells the Iranian government goods or technologies that it can use to commit human rights abuses against its people. Such goods include firearms, rubber bullets, police batons, chemical or pepper sprays, stun grenades, tear gas, water cannons, and like goods. In addition, ISA sanctions are to be imposed on any person determined have sold such equipment to the IRGC.

- *Separate Visa Bans.* On July 8, 2011, the State Department imposed visa restrictions on 50 Iranian officials for participating in political repression in Iran, but it did not name those banned on the grounds that visa records are confidential. The action was taken under the authorities of Section 212(a)(3)(C) of the Immigration and Nationality Act, which renders inadmissible to the United States a foreign person whose activities could have serious consequences for the United States. On May 30, 2013, the State Department announced it had imposed visa restrictions on an additional 60 Iranian officials on similar grounds.[47] On September 25, 2019, President Trump issued a proclamation denying entry into the United States of senior Iranian officials and immediate family members.[48]

- *High Level Iranian Visits to the United Nations.* There are certain exemptions in the case of high level Iranian visits to attend U.N. meetings in New York. Under the U.N. Participation Act (P.L. 79-264), because the United States hosts the United Nations headquarters in New York, visas are issued to heads of state and their aides attending these meetings. In some cases, for example in September 2012, the State Department has refused visas for Iranian officials on the grounds that they were involved in past acts of terrorism or human rights abuses.

## Non-Iran Specific Human Rights Laws

The Trump Administration has utilized global human rights related laws to sanction Iranian violators.

- *Global Magnitsky Act.* The Global Magnitsky Human Rights Accountability Act, enacted at the close of the 114th Congress as part of the National Defense Authorization Act for Fiscal Year 2017 (NDAA 2017; P.L. 114-328; enacted December 23, 2016), authorizes the President to impose economic sanctions and

---

[47] http://www.state.gov/r/pa/prs/ps/2013/05/210102.htm.

[48] Proclamation on the Suspension of Entry as Immigrants and Nonimmigrants of Senior Officials of the Government of Iran. September 25, 2019.

deny entry into the United States to any foreign person he identifies as engaging in human rights abuse or corruption. Executive Order 13818, providing for sanctions on persons determined to have engaged in the activity outlined in the Global Magnitsky Act, was issued on December 20, 2017.

- *Section 7031(c) of the State Department and Foreign Operations Appropriation.* For the last few years, successive foreign aid appropriations laws have contained a section (7031c) that makes persons determined to have committed gross violations of human rights ineligible for entry to the United States. For FY2020, this provision is in: P.L. 116-94, division G (HR1865)

## Sanctions on Iran's Leadership

The Trump Administration has imposed sanctions on some members of Iran's civilian leadership. The Administration has named some Iranian officials as SDNs under various executive orders, as shown in the table at the end of the report. As noted throughout, any Iranian official that is named an SDN is subject to a freezing of their U.S.-based property and there are secondary sanctions (noted throughout) on third parties that deal with those entities. Section 103(b)(3) of CISADA also provides for the freezing of assets of any "family member or associate acting for on behalf of the person" that is named as an SDN.

### Executive Order 13876

On June 24, 2019, in the context of heightened U.S.-Iran tensions, President Trump issued Executive Order 13876, imposing sanctions on the assets of Supreme Leader Ali Khamene'i and his top associates. Still, the degree to which Khamene'i's or his associates' assets intersect with the global financial or commercial community is likely modest, making the effect of the order probably limited. The order

- Blocks the U.S.-based property or assets of the Supreme Leader and his office, any Iranian appointed by him to an official position, or any person that materially assists the Supreme Leader or his office.
- Bars from the U.S. financial system any bank determined to have conducted or facilitated a financial transaction with a Supreme Leader-related or Supreme Leader-appointed official.

*Implementation:* Supreme Leader Khamene'i and his office are sanctioned by the order itself. Subsequently, Iran's Foreign Minister Mohammad Javad Zarif and other senior Iranian officials and commanders were designated under the order, as shown in the tables at the end of the report.

# U.N. Sanctions

U.N. sanctions on Iran, enacted by the Security Council under Article 41 of Chapter VII of the U.N. Charter,[49] applied to all U.N. member states. During 2006-2008, three U.N. Security Council resolutions—1737, 1747, and 1803—imposed sanctions on Iran's nuclear program and weapons of mass destruction (WMD) infrastructure. Resolution 1929 (June 9, 2010) asserted that major sectors of the Iranian economy support Iran's nuclear program and authorized U.N.

---

[49] Security Council resolutions that reference Chapter VII of the U.N. Charter represent actions taken with respect to threats to international peace and acts of aggression. Article 41 of that Chapter, in general, provides for enforcement of the resolution in question through economic and diplomatic sanctions, but not through military action.

member states to sanction civilian sectors of Iran's economy. It also imposed binding limitations on Iran's development of nuclear-capable ballistic missiles and imports and exports of arms.

## Resolution 2231 and U.N. Sanctions Eased

U.N. Security Council Resolution 2231 of July 20, 2015 contained the provisions below. The U.S. withdrawal from the JCPOA did not change the status of Resolution 2231. The resolution

- endorsed the JCPOA and superseded all prior Iran-related resolutions as of Implementation Day (January 16, 2016).
- lifted all U.N. sanctions discussed above and discontinued the mandate of the "the panel of experts."
- "called on" Iran not to develop ballistic missiles "designed to be capable" of delivering a nuclear weapon for a maximum of eight years from Adoption Day (October 18, 2015). The restriction expires on October 18, 2023. No specific sanctions are mandated if Iran or a supplier of missile technology to Iran violates the resolution. The JCPOA itself did not impose specific missile restrictions.
- requires Security Council approval for Iran to export arms or to purchase any arms (major combat systems named in the resolution) for a maximum of five years from Adoption Day (October 18, 2020). The JCPOA did not impose arms restrictions. For information on this restriction, see CRS In Focus IF11429, *U.N. Ban on Iran Arms Transfers*, by Kenneth Katzman.

### Iran Compliance Status

Until August 2019, U.N. and International Atomic Energy Agency reports after the JCPOA began implementation stated that Iran was complying with its nuclear obligations under the JCPOA. That assessment was corroborated by U.S. intelligence leaders in January 29, 2019, testimony before the Senate Select Committee on Intelligence.[50] Since mid-2019, Iran has begun to decrease its compliance with the nuclear restrictions of the JCPOA on the grounds that the U.S. pullout from the JCPOA has caused U.S. secondary sanctions to be reimposed.

U.N. reports on Iranian compliance with Resolution 2231[51] have noted assertions by several U.N. Security Council members, including the United States, that Iranian missile tests have been inconsistent with the resolution. U.S. officials have called some of Iran's space and medium-range missile launches as violations of the resolution. Iran's compliance with the arms transfer restrictions are analyzed in CRS Insight IN11429, cited above.

### U.N. List of Sanctioned Entities

Under Paragraph 6(c) of Annex B of Resolution 2231, entities sanctioned under Resolutions 1737 (and subsequent resolutions) and named in an attachment to the Annex were immediately "delisted" on Implementation Day. These were—mostly persons and entities connected to permitted aspects of Iran's nuclear program and its civilian economy. Those not listed on the attachment would continue to be sanctioned until Transition Day (October 2023—eight years

---

[50] https://www.dni.gov/index.php/newsroom/congressional-testimonies/item/1947-statement-for-the-record-worldwide-threat-assessment-of-the-us-intelligence-community.

[51] The report is reprinted in, Iran Watch, at http://www.iranwatch.org/library/multilateral-organizations/united-nations/un-secretary-general/third-report-secretary-general-implementation-security-council-resolution-2231.

from Adoption Day). One notable person for whom U.N. sanctions was to end on Transition Day is IRGC-QF commander Qasem Soleimani. Soleimani's death at the hands of a U.S. strike in January 2020 renders this listing moot. Bank Sepah and Bank Sepah International PLC, also were delisted on Implementation Day by separate Security Council action.[52] Paragraph 6(c) provides for the Security Council to be able to delist or list any entity at any time.

### Table 3. Summary of Provisions of U.N. Resolutions on Iran Nuclear Program (1737, 1747, 1803, 1929, and 2231)

Resolution 2231 superseded all the previous Iran resolutions

Resolution 1737 required Iran to suspend uranium enrichment, to suspend construction of the heavy-water reactor at Arak, ratify the "Additional Protocol" to Iran's IAEA Safeguards Agreement. (1737)

Assets frozen of Iranian persons and entities named in annexes to the resolutions, and countries required to ban the travel of named Iranians. (Initial list in Resolution 1737, and additional designations in subsequent resolutions).

Transfer to Iran of nuclear, missile, and dual use items to Iran prohibited, except for use in light-water reactors (1737 and 1747). Resolution 2231 delegates to a Joint Commission the authority to approve Iran's applications to purchase dual-use items.

Resolution 1747 prohibited Iran from exporting arms. Resolution 2231 requires Iran to obtain Security Council approval to export arms for a maximum of five years.

Resolution 1929 prohibited Iran from investing abroad in uranium mining, related nuclear technologies or nuclear capable ballistic missile technology, and prohibits Iran from developing/testing, nuclear-capable ballistic missiles.

1929 mandated that countries not export major combat systems to Iran, but did not bar sales of missiles that are not on the U.N. Registry of Conventional Arms. Resolution 2231 makes arms sales to Iran and exportation of arms from Iran subject to approval by the U.N. Security Council, for a maximum of five years from Adoption Day (until October 2020).

1929 called for restraint on transactions with Iranian banks, particularly Bank Melli and Bank Saderat.

Resolution called for "Vigilance" (but not a ban) on making international lending to Iran and providing trade credits and other financing.

Resolution 1929 called on countries to inspect cargoes carried by Iran Air Cargo and Islamic Republic of Iran Shipping Lines—or by any ships in national or international waters—if there are indications they carry cargo banned for carriage to Iran. Searches in international waters would require concurrence of the country where the ship is registered. Resolution 2231 requires continued enforcement of remaining restrictions.

Prior to JCPOA implementation, a Sanctions Committee, composed of the 15 members of the Security Council, monitored implementation of all Iran sanctions and collected and disseminated information on Iranian violations and other entities involved in banned activities. A "panel of experts" was empowered by Resolution 1929 to assist the U.N. sanctions committee in implementing the resolution and previous Iran resolutions, and to suggest ways to be more effective.

**Source:** Text of U.N. Security Council resolutions 1737, 1747, 1803, 1929, and 2231. http://www.un.org.

# Sanctions Application under Nuclear Agreements

The following sections discuss sanctions relief provided under the November 2013 interim nuclear agreement (Joint Plan of Action, JPoA) and the JCPOA.

---

[52] http://www.wsj.com/articles/u-s-signed-secret-document-to-lift-u-n-sanctions-on-iranian-banks-1475193723.

## Sanctions Eased by the JPA

U.S. officials said that the JPoA provided "limited, temporary, targeted, and reversible" easing of international sanctions. Under the JPoA (in effect January 20, 2014-January 16, 2016):[53]

- Iran's oil customers were not required to further reduce their oil purchases from Iran because SREs (see above) were issued for Iran's oil customers and waivers of Section 1244c(1) of IFCA, ITRSHRA, and ISA were provided which allowed oil transactions with Iran, including with NIOC. The European Union amended its regulations to allow shipping insurance for ships carrying oil from Iran.[54]

- A waiver of Section 1245(d)(1) of IFCA allowed Iran to receive directly $700 million per month in hard currency from oil sales and $65 million per month to make tuition payments for Iranian students abroad (paid directly to the schools).

- Executive Orders 13622 and 13645 and several provisions of U.S.-Iran trade regulations were suspended. Several sections of IFCA were waived to enable Iran to sell petrochemicals and trade in gold and other precious metals, and to conduct transactions with foreign firms involved in Iran's automotive manufacturing.

- Executive Order 13382 and certain U.S.-Iran trade regulations were suspended to allow for U.S. aircraft and spare parts sales to Iran Air.

- The JPA required that the P5+1 "not impose new nuclear-related sanctions."[55]

## Sanctions Easing under the JCPOA and U.S. Reimposition

In accordance with the JCPOA, international sanctions relief occurred at Implementation Day (January 16, 2016), following IAEA certification that Iran had completed stipulated core nuclear tasks. U.S. secondary sanctions were waived or terminated, but most sanctions on direct U.S.-Iran trade remained. The secondary sanctions eased during JCPOA implementation included[56] (1) sanctions that limited Iran's exportation of oil and sanction foreign sales to Iran of gasoline and energy sector equipment, and which limit foreign investment in Iran's energy sector; (2) financial sector sanctions; and (3) sanctions on Iran's auto sector and trading in the *rial.* The EU lifted its ban on purchases of oil and gas from Iran; and Iranian banks were readmitted to the SWIFT electronic payments system. All U.N. sanctions were lifted.

All of the U.S. sanctions that were eased went back into effect by November 5, 2018, in accordance with the U.S. withdrawal from the JCPOA. The Administration stated that the purpose of reimposing the sanctions is to deny Iran the revenue with which to conduct regional malign activities and advance its missile, nuclear, and conventional weapons programs.

The sanctions that went back into effect on August 7, 2018 (90-day wind-down period), were on

- the purchase or acquisition of U.S. bank notes by Iran; Iran's trade in gold and other precious metals; transactions in the Iranian *rial;* activities relating to Iran's issuing of sovereign debt; and transactions with Iran in graphite, aluminum, steel, coal, and industrial software.

---

[53] The Administration sanctions suspensions and waivers are detailed at http://www.state.gov/p/nea/rls/220049.htm.

[54] Daniel Fineren, "Iran Nuclear Deal Shipping Insurance Element May Help Oil Sales," *Reuters*, November 24, 2013.

[55] White House Office of the Press Secretary. "Fact Sheet: First Step Understandings Regarding the Islamic Republic of Iran's Nuclear Program," November 23, 2013.

[56] http://iranmatters.belfercenter.org/blog/translation-iranian-factsheet-nuclear-negotiations; and author conversations with a wide range of Administration officials, think tank, and other experts, in Washington, DC, 2015.

- importation of Iranian luxury goods to the United States.
- the sale to Iran of passenger aircraft (and aircraft with substantial U.S. content).

The sanctions that went back into effect on November 5, 2018, were on

- petroleum-related transactions with Iran; and port operators and energy, shipping, and shipbuilding sectors; and
- transactions by foreign banks with Iran's Central Banks (including the provision that restricts Iran's access to hard currency held in banks abroad).

## U.S. Laws and Executive Orders Affected by the JCPOA[57]

The laws below were waived to implement the JCPOA. All provisions that were waived during the JCPOA implementation were revoked by the Trump Administration by November 5, 2018, and all entities and individuals "de-listed" from U.S. sanctions were re-listed (with some exceptions noted below).

- *Iran Sanctions Act.* The energy/economic-related provisions of ISA. The one WMD-related provision of ISA was not waived.
- *FY2012 NDAA.* Section 1245(d) of the National Defense Authorization Act for FY2012 (P.L. 112-81) imposing sanctions on foreign banks of countries that do not reduce Iran oil imports.
- *Iran Threat Reduction and Syria Human Rights Act* (P.L. 112-158). Sections 212 and 213—the economy-related provisions of the act. Human rights-related provisions were not waived.
- *Iran Freedom and Counter-proliferation Act.* Sections 1244, 1245, 1246, and 1247 of the Act (Subtitle D of P.L. 112-239) sanctioning transactions with SDNs and with named sectors of Iran's economy.
- *Executive Orders:* 13574, 13590, 13622, 13645, and Sections 5-7 and 15 of Executive Order 13628 were revoked outright by Executive Order 13716.[58] The orders were reimposed and superseded on August 6, 2018, by Executive Order 13846.
- The core provision of CISADA (P.L. 111-195) that sanctions foreign banks was not waived to implement the JCPOA, but most listed Iranian banks were "delisted" to implement the JCPOA, thereby mooting this sanction.
- The United States delisted the specified Iranian economic entities and personalities listed in Attachment III of the JCPOA, including the National Iranian Oil Company (NIOC), various Iranian banks, and many energy and shipping-related institutions. That step enabled foreign companies/banks to resume transactions with those entities without risking being penalized by the United States. The tables at the end of the report depict in italics those entities delisted. Entities that were to be delisted on "Transition Day" (October 2023) are in bold type. The Administration relisted these entities for secondary sanctions, with selected exceptions (such as the AEOI and 23 subsidiaries), on November 5,

---

[57] http://www.politico.com/story/2015/07/full-text-iran-deal-120080.html.

[58] For more information on these Executive Orders and their provisions, see CRS Report RS20871, *Iran Sanctions*, by Kenneth Katzman; and CRS Report R43311, *Iran: U.S. Economic Sanctions and the Authority to Lift Restrictions*, by Dianne E. Rennack.

2018. The continued de-listing of the nuclear entities was in order to allow European and other U.S. partners to continue providing civilian nuclear assistance to Iran as permitted under the JCPOA.

- The JCPOA required the U.S. Administration, by "Transition Day," to request that Congress lift virtually all of the sanctions that were suspended under the JCPOA. No outcome of such a request is mandated. Mooted by U.S. withdrawal.

- The JCPOA requires U.N. sanctions on persons and entities still designated for U.N. sanctions to terminate on Transition Day (October 2023, eight years after Adoption Day). All U.N. sanctions are to terminate by "Termination Day" (October 2025, ten years after Adoption Day).

### Exceptions and Waivers Provided by the Trump Administration

Even though it has reimposed all U.S. sanctions on Iran, the Trump Administration has issued some exceptions that are provided for under the various U.S. sanctions laws:

- As noted above, on November 5, 2018, eight countries were given the SRE to enable them to continue transactions with Iran's Central Bank and to purchase Iranian oil. On May 2, 2019, the SREs were terminated.

- During 2019, the Administration ended five out of seven waivers under IFCA that enabled foreign entities to remove Iran's LEU that exceeds the 300kg allowed stockpile, to buy Iran's heavy water, and expand the Bushehr civilian nuclear power reactor. Two other waivers that enable work with the JCPOA-permitted aspects of Iran's nuclear program have been extended.

- The Administration has continued to waive Section 1247(e) of IFCA to enable Iraq to continue paying for purchases of natural gas from Iran. The waiver term can be as long as 180 days, but the Administration has been providing waivers for shorter periods.

- The Administration has issued the permitted IFCA exception for Afghan reconstruction to enable India to continue work at Iran's Chahbahar Port. A U.S. State Department official told Afghan leaders in mid-May 2019 that the exception would continue.

- The Administration has renewed the licenses of certain firms to enable them to continue developing the Rhum gas field in the North Sea that Iran partly owns.

### U.S. Sanctions that Remained in Place despite the JCPOA

The JCPOA did not commit the United States to suspend U.S. sanctions related to terrorism, proliferation, arms transfer, or human rights abuses, or suspend the ban on U.S.-Iran direct trade (with the selected exceptions discussed above). The sanctions below remained in place during JCPOA implementation:

- E.O. 12959, the ban on U.S. trade with and investment in Iran;

- E.O. 13224 sanctioning terrorism entities, any sanctions related to Iran's designation as a state sponsor or terrorism, and any other terrorism-related sanctions. The JCPOA did not commit the United States to revoke Iran's placement on the terrorism list;

- E.O. 13382 on proliferation;

- the Iran-Iraq Arms Non-Proliferation Act;

- the Iran-North Korea-Syria Non-Proliferation Act (INKSNA);[59]
- the section of ISA that sanctions WMD- and arms-related transactions with Iran;
- E.O. 13438 on Iran's interference in Iraq and E.O. 13572 on repression in Syria;
- Executive Orders (E.O. 13606 and E.O. 13628) and the provisions of CISADA, ITRSHRA, and IFCA that pertain to human rights or democratic change in Iran;
- all sanctions on the IRGC, military, proliferation-related, and human rights- and terrorism-related entities, which were not "delisted" from sanctions;
- regulations barring Iran from access to the U.S. financial system.

### Other Mechanisms to "Snap-Back" Sanctions on Iran

Sanctions might have been reimposed by congressional action in accordance with President Trump's withholding of certification of Iranian compliance with the JCPOA, under the Iran Nuclear Agreement Review Act (INARA, P.L. 114-17). Certification was withheld in October 2017 and January and April of 2018, but Congress did not reimpose sanctions.[60]

The JCPOA (paragraph 36 and 37) and Resolution 2231 (paragraphs 10-13) contain a mechanism for the "snap back" of U.N. sanctions if Iran does not satisfactorily resolve a compliance dispute. According to the JCPOA (and Resolution 2231), the United States (or any veto-wielding member of the U.N. Security Council) would have been able to block a U.N. Security Council resolution that would continue the lifting of U.N. sanctions despite Iran's refusal to resolve the dispute. In that case "... the provisions of the old U.N. Security Council resolutions would be reimposed, unless the U.N. Security Council decides otherwise."

The snap-back mechanisms of the JCPOA can be formally initiated by current participants through the Joint Commission, on which the United States no longer sits. The State Department reportedly has determined that, for purposes of Resolution 2231, the United States can also trigger the snap-back because it remains legally a participant.[61] The Security Council never enacted an amendment to 2231 removing the United States from the nuclear agreement. Still, a U.S. triggering of the snap-back without agreement from the other participants might be difficult. The European parties to the JCPOA triggered the JCPOA dispute resolution mechanism (DRM) in January 2020 but they stated that the move was intended to try to bring Iran back into full JCPOA compliance, and not to snap back sanctions.

# International Implementation and Compliance[62]

During 2010-2016, converging international views on Iran's expanding nuclear program produced global consensus to pressure Iran through sanctions. Some countries asserted that imposing global sanctions would head off unwanted U.S. or other military action against Iran, whereas others cooperated with sanctions primarily in order to preserve their close relationships with the United States. All the JCPOA parties publicly opposed the U.S. decision to exit the JCPOA and have sought to continue to provide its economic benefits to Iran. A comparison

---

[59] The JCPOA did commit the United States to terminate sanctions with respect to some entities designated for sanctions under INKSNA.

[60] For more information on this option, see CRS Report R44942, *U.S. Decision to Cease Implementing the Iran Nuclear Agreement*, by Kenneth Katzman, Paul K. Kerr, and Valerie Heitshusen.

[61] US to release legal opinion it can demand resumption of UN sanctions on Iran. Times of Israel, December 15, 2019.

[62] Note: CRS has no mandate or capability to "judge" compliance of any country with U.S. or other sanctions against Iran. This section is intended to analyze some major trends in third country cooperation with U.S. sanctions.

between U.S., U.N., and EU sanctions is contained in the **Appendix**. For issues of Iran's foreign policy, see CRS Report R44017, *Iran's Foreign and Defense Policies*, by Kenneth Katzman.

## European Union (EU)

After the passage of Resolution 1929 in 2010, European Union (EU) sanctions on Iran became nearly as extensive as those of the United States. This contrasted with the 1990s, when the EU countries refused to join the 1995 U.S. trade ban on Iran and they agreed to reschedule $16 billion in Iranian debt bilaterally. In July 2002, Iran's Islamic regime tapped international capital markets for the first time, selling $500 million in bonds to European banks and, during 2002-2005, there were negotiations between the EU and Iran on a "Trade and Cooperation Agreement" (TCA) that would have benefitted Iranian exports to the EU countries.[63]

Under the JCPOA, EU sanctions that were imposed in 2012 were lifted, including:

- the ban on oil and gas imports from Iran; including on insurance for shipping oil or petrochemicals from Iran and a freeze on the assets of Iranian shipping firms.

- a ban on trade with Iran in gold, precious metals, diamonds, and petrochemicals.

- a freeze of the assets of Iran's Central Bank (except for approved civilian trade).

- a ban on transactions between European and all Iranian banks and on short-term export credits, guarantees, and insurance.

- a ban on exports to Iran of graphite, semi-finished metals, industrial software, shipbuilding technology, oil storage capabilities, and flagging or classification services for Iranian tankers and cargo vessels.

- a large number of entities that had been sanctioned by EU Council decisions and regulations over the years were "delisted" by the EU on Implementation Day.

The following EU sanctions remained in place:

- an embargo on sales to Iran of arms, missile technology, other proliferation-sensitive items, and gear for internal repression.

- a ban on Iranian persons and entities designated for human rights abuses or supporting terrorism from visiting EU countries, and a freeze on their EU-based assets (see **Error! Reference source not found.** below).

### EU Divestment in Concert with Reimposition of U.S. Sanctions

Even though the EU countries have not reimposed sanctions on Iran, in order to avoid risk to their positions in the large U.S. market, many large European firms have ceased Iran-related transactions or exited the Iran market entirely as the Trump Administration reimposed all U.S. secondary sanctions on Iran, as discussed below.[64]

- *Cars.* Renault and Citroen of France suspended their post-JCPOA $1 billion investments in a joint venture with two Iranian firms to boost car production capacity in Iran to 350,000 cars per year. In August 2018, Daimler (manufacturer of Mercedes Benz autos) announced suspension of business in Iran.

---

[63] During the active period of talks, which began in December 2002, there were working groups focused not only on the TCA terms and proliferation issues but also on Iran's human rights record, Iran's efforts to derail the Middle East peace process, Iranian-sponsored terrorism, counternarcotics, refugees, migration issues, and the Iranian opposition PMOI.

[64] "Iran Nuclear Deal: The EU's Billion-Dollar Deals at Risk," BBC News, May 11, 2018.

- *Buses.* Scania of Sweden, which is owned by Volkswagen, established a factory in Iran to supply the country with 1,350 buses, but the venture apparently has stopped operating. Volvo halted truck assembly in Iran in 2018.

- *Other Industry.* German industrial giant Siemens signed an agreement in March 2016 with Iranian firm Mapna to transfer technology to produce gas turbines in Iran, and other contracts to upgrade Iran's railways. Siemens said in late 2018 that it would pursue no new Iranian business. Italy's Danieli industrial conglomerates and Gruppo Ventura have exited the Iranian market.

- *Banking.* Among the major banks exiting the Iran market are: DZ Bank and Allianz of Germany; Oberbank of Austria; and Banque Wormser Freres of France. In July 2018, at U.S. request, Germany's central bank (Deutsche Bundesbank) introduced a rule change that blocked Iran's withdrawal of $400 million in cash from the Europaische-Iranische Handelsbank (EIH), which is partly owned by Iran and has often partnered on transactions with the Bundesbank. EIH has also reportedly continued to allow Iran to conduct currency conversions Iran needs to move money around the world. (EIH was "de-listed" from sanctions by the United States to implement the JCPOA, but was relisted on November 5, 2018.)[65]

- *Energy.* No EU state has bought Iranian oil since U.S. energy sanctions went back into effect in November 2018. Total SA has exited a nearly $5 billion energy investment in South Pars gas field, transferring its stake to its joint venture partner, China National Petroleum Corporation. OMV of Austria has announced it would halt energy development work. Still active are a $3 billion deal to build solar power plants in Iran by Norway's Saga Energy (Norway is not in the EU), and Italy's FS $1.4 billion agreement to build a high speed railway between Qom and Arak.

- *Shipping.* Hapag-Lloyd of Germany and Denmark's AP Moller-Maersk have ceased shipping services to Iran.

- *Telecommunications.* Germany telecommunications firm Deutsche Telekom announced in September 2018 that it would end its business in Iran.

- *Flights.* Although air service is not subject to U.S. sanctions, Air France and British Air announced in September 2018 that they would cease service to Iran due to lack of demand. Further flights have been suspended in connection with the COVID-19 pandemic of 2020.

- *Rhum Gas Field.* One project, the Rhum gas field in the North Sea that is partly owned by Iranian Oil Company (a subsidiary of NIOC), has been able to continue operating. In part because the field supplies about 5% of Britain's demand for natural gas, in October 2018, the Trump Administration renewed the license of BP and Serica Energy to continue providing goods and services to the field, despite the Iranian involvement in the project.[66]

## European Special Purpose Vehicle/INSTEX and Credit Line Proposal

The EU countries continue to try to preserve the JCPOA in the face of the Trump Administration's maximum pressure policy on Iran, while at the same time criticizing Iran's

---

[65] Germany's Central Bank Imposes Rule to Stop Cash Delivery to Tehran. Jerusalem Post, August 6, 2018.

[66] "U.S. Grants BP, Serica License to Run Iran-Owned North Sea Field." Reuters, October 9, 2018.

reduced compliance with the terms of the deal. On August 6, 2018, a 1996 EU "blocking statute" that seeks to protect EU firms from reimposed U.S. sanctions took effect. In September 2018, EU countries announced a small amount ($20 million) of development assistance to Iran.

In September 2018, Germany, France, and Britain, joined by Russia and China, as well as Iran, endorsed the creation of a "special purpose vehicle" (SPV) that would facilitate trade with Iran by avoiding dollar-denominated transactions or other exposure to the U.S. market. In a January 31, 2019, joint statement, France, Britain, and Germany announced the registration of the SPV, named the "Instrument for Supporting Trade Exchanges" (INSTEX). It is based in France, with German governance, and financial support from the three governments. Its initial focus has been on transactions in goods not subject to sanctions, including medicines, medical devices, and food, but it might eventually expand to oil and other products.[67] U.S. officials have insisted that INSTEX remain contained to humanitarian transactions.[68] In April 2019, Iran set up the required counterparty—the "Special Trade and Finance Instrument" (STFI). Six additional countries in Europe joined the INSTEX system in December 2019 and the mechanism subsequently sought to speed up processing of medical transactions to help Iran deal with the COVID-19 pandemic. On March 31, 2020, INSTEX completed its first transaction – for about $540,000 worth of medical equipment.[69]

As a major incentive discussed publicly at the August 2019 G-7 summit in Biarritz, France, French President Emmanuel Macron proposed to provide a $15 billion credit line for Iran to purchase goods through INSTEX, with the credit line to be secured by future Iranian oil deliveries—in exchange for Iran's returning to full compliance with the JCPOA. The proposal apparently is subject to U.S. concurrence in the form of waivers of sanctions on transactions with Iran's energy sector. Although President Trump appeared open to the plan at the G-7 summit, U.S. officials later signaled opposition to the credit line proposal and it has not advanced.[70]

## EU Antiterrorism and Anti-proliferation Actions

While attempting to preserve civilian economic engagement with Iran, the European countries have sought to support U.S. efforts to counter Iran's terrorism and proliferation activities.

- In December 2018, Albania expelled Iran's ambassador and one other Iranian diplomat for involvement in a terrorism plot that was thwarted.

- In January 2019, the EU added Iran's intelligence service (MOIS) and two intelligence operatives to its terrorism-related sanctions list in response to allegations of Iranian terrorism plotting in Europe.

- Germany followed that move by denying landing rights to Iran's Mahan Air, which the United States has designated as a terrorism-supporting entity. Italy in November 2019 banned flights of Mahan Air.

---

[67] Joint Statement on the New Mechanism to Facilitate Trade with Iran. January 31, 2019.

[68] Pompeo Comes to Europe With a Tough Iran Message. Real Clear Politics, June 1, 2019.

[69] EU Ramps Up Trade System With Iran Despite U.S. Threats. Wall Street Journal, March 31, 2020.

[70] Trump Administration cool to French plan for $15 billion Iranian credit line: officials. Reuters, September 4, 2019; Press briefing by Ambassador Brian Hook. September 4, 2019.

## SWIFT Electronic Payments System

The management of the Brussels-based Swift electronic payments system has sought to balance financial risks with the policies of the EU governments. In March 2012, SWIFT acceded to an EU request to expel 14 EU-sanctioned Iranian banks.[71] Some Iranian banks were still able to conduct electronic transactions with the European Central Bank via the "Target II" system. Even though the EU has not reimposed sanctions on Iran in concert with the Trump Administration, SWIFT's board is independent and, in order to avoid risk of U.S. penalties, in late 2018, the system again disconnected the Iranian banks that were "relisted" for U.S. sanctions.

# China and Russia

Russia and China, two permanent members of the U.N. Security Council and parties to the JCPOA, historically have imposed only those sanctions required by Security Council resolutions.

## Russia

Increasingly aligned on regional issues, Iran and Russia have agreed to expand energy and more general trade, but there is little evident implementation of any agreements. The two countries reportedly agreed on $30 billion in energy development deals during President Putin's visit to Tehran in October 2017. In December 2018, Iran signed a free trade deal with the Russia-led "Eurasian Economic Union," suggesting Russian intent to potentially circumvent U.S. sanctions on Iran.

In April 2015, Russia lifted its own restriction on delivering the S-300 air defense system that it sold Iran in 2007 but refused to deliver after Resolution 1929 was adopted—even though that resolution technically did not bar supply of that defensive system. In April 2016, Russia began delivering the five S-300 batteries. Iran's Defense Minister visited Russia in February 2016 to discuss possible future purchases of major combat systems, presumably to be consummated after the U.N. arms import ban on Iran expires in October 2020.

## China

China is a major factor in the effectiveness of any sanctions regime on Iran because China remains Iran's largest oil customer. During 2012-2016, China was instrumental in reducing Iran's total oil exports because it cut its buys from Iran to about 435,000 barrels per day from its 2011 average of 600,000 barrels per day. The State Department asserted that, because China was the largest buyer of Iranian oil, percentage cuts by China had a large impact in reducing Iran's oil sales by volume and China merited an SRE. After sanctions were lifted in 2016, China increased its purchases of Iranian oil beyond 2011 levels. After the reimposition of U.S. sanctions, China reduced its oil imports from Iran (see **Table 1**), and the Administration gave China a SRE sanctions exception on November 5, 2018. China has continued to import Iranian oil despite the ending of the SRE as of May 2, 2019, although at much lower volumes than any time in the recent past. Iran's automotive sector obtains a significant proportion of its parts from China, including from China-based Geelran and Chery companies. The degree to which Iran appears economically dependent on China is perhaps evident in the fact that Iran-China air travel has not diminished significantly during the COVID-19 pandemic.[72]

---

[71] Avi Jorish, "Despite Sanctions, Iran's Money Flow Continues," *Wall Street Journal*, June 25, 2013.

[72] What Spurs Iran's Mahan Air To Continue Flights To China Despite Public Outrage? Radio Farda, March 13, 2020.

As of mid-2019, the Administration has begun to more frequently sanction Chinese economic entities for transactions with Iran. On July 23, 2019, the Administration sanctioned (under IFCA) a small Chinese firm, Zhuhai Zhenrong Company Ltd., for buying oil from Iran.[73] Prior to the expiration of the SREs, China had stockpiled 20 million barrels of Iranian oil at its Dalian port,[74] and importation of that oil apparently is not counted until it clears customs checkpoints. On September 25, 2019, the Administration designated for sanctions (under E.O. 13846) several subsidiaries and partners of China's COSCO Shipping Corporation Ltd. For involvement in shipping Iranian oil, although some of those designations were subsequently withdrawn.

China also remains a large investor in Iran. Several Chinese energy firms that invested in Iran's energy sector put those projects on hold in 2012, but resumed work after sanctions were eased in 2016 and continued that work despite the reimposition of U.S. sanctions. China's President Xi Jinping visited Iran and other Middle East countries in the immediate aftermath of the JCPOA, and he stated that Iran is a vital link in an effort to extend its economic influence westward through its "One Belt, One Road" initiative. Chinese firms and entrepreneurs are integrating Iran into this vision by modernizing Iran's rail and other infrastructure, particularly where that infrastructure links to that of neighboring countries, including the Sultanate of Oman, funded by loans from China.[75] In August 2019, Iran and China expanded their 2016 25-year deal for China investments in Iran to total $280 billion to be invested in Iran's oil, gas, and petrochemical sectors, and $120 billion in upgrading Iran's transport and manufacturing infrastructure.[76] On the other hand, perhaps calling into question that agreement, a state-owned China firm (CNPC) shortly thereafter withdrew from an investment in a major phase of Iran's South Pars gas field.

Regarding banking, China's Kunlun Bank—an affiliate of China's energy company CNPC and which was sanctioned under CISADA in 2012—reportedly stopped accepting Euro and then China currency-denominated payments from Iran in November 2018.[77] Existing Iranian accounts at the bank presumably can still be used to pay for Iranian imports from China. Iran and China also maintain a hard currency escrow account, with several billion dollars of assets, that is used to pay for China's infrastructure projects in Iran, such as the long Niayesh Tunnel.

In April 2018, the Commerce Department (Bureau of Industry and Security, BIS, which administers Export Administration Regulations) issued a denial of export privileges action against China-based ZTE Corporation and its affiliates. The action was taken on the grounds that ZTE did not uphold the terms of March 2017 settlement agreement with BIS over ZTE's shipment of prohibited U.S. telecommunications technology to Iran (and North Korea). On March 27, 2019, OFAC announced a $1.9 million settlement with a Chinese subsidiary of the U.S. Black and Decker tool company for unauthorized exports of tools and parts to Iran.[78]

## Japan/Korean Peninsula/Other East Asia

During 2010-2016, Japan and South Korea enforced sanctions on Iran similar to those imposed by the United States and the EU. Both countries cut imports of Iranian oil sharply and banks in

---

[73] "The United States to Impose Sanctions on Chinese Firm Zhuhai Zhenrong Company Limited for Purchasing Oil from Iran. Department of State. July 22, 2019.

[74] "Boxed In: $1 billion of Iranian Crude Sits at China's Dalian Port. Reuters. May 1, 2019.

[75] Thomas Erdbrink. "China's Push to Link East and West Puts Iran at 'Center of Everything.'" *New York Times*, July 25, 2017.

[76] China and Iran Flesh out Strategic Partnership. Petroleum Economist, September 3, 2019.

[77] "As U.S. Sanctions Loom, China's Bank of Kunlun to Stop Receiving Iran Payments—Sources." Reuters, October 23, 2018.

[78] OFAC Crystallizes Expectations for Sanctions Compliance. April 1, 2019.

the two countries restricted Iran's foreign exchange assets Iran held in their banks. From 2016-2018, when U.S. sanctions were suspended, both countries increased importation of Iranian oil, and eased restrictions on Iran's accounts.

Both countries—and their companies—have historically been unwilling to undertake transactions with Iran that could violate U.S. sanctions. They reduced their Iranian oil purchases and received SRE sanctions exceptions on November 5, 2018. In early 2019, Japan imported some Iranian oil, and South Korea purchased about 200,000 barrels per day of Iranian condensates. Upon expiration of their SREs in May 2019, both countries stopped energy transactions with Iran. South Korea sought, but was denied, Administration concurrence to continue to import Iranian condensates (a very light oil) on which South Korea's petrochemical sector depends. South Korea is instead importing condensates from Qatar and Australia.

Japan exports to Iran significant amounts of chemical and rubber products, as well as consumer electronics. South Korean firms have been active in energy infrastructure construction in Iran, and its exports to Iran are mainly iron, steel, consumer electronics, and appliances—meaning that South Korea could be affected significantly by the May 2019 executive order sanctioning transactions with Iran's minerals and metals sector.

The following firms have announced their postures following the U.S. exit from the JCPOA:

- Daelim of South Korea terminated a $2 billion contract to expand an Iranian oil refinery. Hyundai cancelled a $500 million contract to build a petrochemical plant in Iran, citing "financing difficulties."
- Car companies Mazda and Toyota of Japan and Hyundai of South Korea suspended joint ventures to produce cars in Iran.
- Among banks, South Korea's Woori Bank and Industrial Bank of Korea, and Nomura Holdings of Japan, are complying with U.S. sanctions, including restricting Iran's use of its Central Bank accounts held in both countries.[79]
- The South Korean conglomerate POSCO withdrew from a 2016 deal to build a steel plant in Iran's free trade zone at the port of Chahbahar.

## North Korea

North Korea, like Iran, has been subject to significant international sanctions. North Korea has never pledged to abide by international sanctions against Iran, and it reportedly cooperates with Iran on a wide range of WMD-related ventures, particularly the development of ballistic missiles. A portion of the oil that China buys from Iran (and from other suppliers) is reportedly sent to North Korea, but it is not known if North Korea buys any Iranian oil directly. The potential for North Korea to try to buy Iranian oil illicitly increased in the wake of the adoption in September 2017 of U.N. Security Council sanctions that limit North Korea's importation of oil, but there are no publicly known indications that it is doing so. While serving as Iran's president in 1989, the current Supreme Leader, Ayatollah Ali Khamene'i, visited North Korea. North Korea's then-titular head of state attended President Rouhani's second inauguration in August 2017.

## Taiwan and Singapore

Taiwan and Singapore have generally been small buyers of Iranian oil. Taiwant resumed imports of Iranian oil after sanctions were eased in 2016 and received an SRE in November 5, 2018, but

---

[79] Author conversations with South Korean officials. 2019.

has bought no Iranian oil since late 2018. Singapore has been a small buyer of Iranian oil and has not bought any Iranian oil since U.S. sanctions went back into effect in 2018.

# South Asia

Iran's economy is highly integrated into those of its immediate neighbors in South Asia.

## India

India cites U.N. Security Council resolutions as its guideline for policy toward Iran. During 2011-2016, with U.N. sanctions in force on Iran, India's private sector assessed Iran as a "controversial market"—a term describing reputational and financial risk. India's central bank ceased using a Tehran-based regional body, the Asian Clearing Union, to handle transactions with Iran, and the two countries agreed to settle half of India's oil buys from Iran in India's currency, the rupee. India reduced its imports of Iranian oil substantially after 2011, in the process incurring significant costs to retrofit refineries that were handling Iranian crude. However, after sanctions were eased in 2016, India's oil imports from Iran increased to as much as 800,000 bpd in July 2018—well above 2011 levels. Indian firms resumed work that had been ended or slowed during 2012-2016. India also paid Iran the $6.5 billion it owed for oil purchased during 2012-2016.[80]

In June 2018, after the Trump Administration's withdrawal from the JCPOA, Iran and India again agreed to use rupee accounts for their bilateral trade, indicating that India might implement its insistence that it could still buy Iranian oil. Yet, India's SRE, last granted in November 2018, expired in May 2019, and India has not imported Iranian oil since that time,

In 2015, India and Iran agreed that India would help develop Iran's Chahbahar port that would enable India to trade with Afghanistan unimpeded by Pakistan. In May 2016, Indian Prime Minister Narendra Modi visited Iran and signed an agreement to invest $500 million to develop the port and related infrastructure. As noted above, the Administration has utilized the "Afghanistan reconstruction" exception under Section 1244(f) of IFCA to allow for firms to continue developing it. Construction at the port is proceeding, but India reportedly has reduced the pace and scope of that work because of banks' reluctance to finance any work in Iran.

## Pakistan

One test of Pakistan's compliance with sanctions was a pipeline project that would carry Iranian gas to Pakistan—a project that U.S. officials on several occasions stated would be subject to ISA sanctions. Despite that threat, agreement on the $7 billion project was finalized on June 12, 2010, and construction was formally inaugurated in a ceremony attended by the Presidents of both countries on March 11, 2013. Iran reportedly completed the pipeline on its side of the border. China's announcement in April 2015 of a $3 billion investment in the project seemed to remove financial hurdles to the line's completion, and the JCPOA presumably removed sanctions impediments to the project. However, during President Hassan Rouhani's visit to Pakistan in March 2016, Pakistan still did not commit to complete the line. In 2009, India dissociated itself from the project over concerns about the security of the pipeline and financial arrangements for the gas purchases.

---

[80] "India Seeks to Pay $6.5 Billion to Iran for Oil Imports." Economic Times of India. May 16, 2016.

## Turkey/South Caucasus

Iran has substantial economic relations with Turkey and the countries of the South Caucasus.

### Turkey

During periods when U.S. sanctions did not apply, Turkey bought about 40% of its oil from Iran. Turkey reduced purchases of Iranian oil during 2012-2016, but its buys returned to 2011 levels after sanctions on Iran were eased in 2016. Turkey received an SRE sanctions exemption on November 5, 2018, and its officials strongly indicated in April 2019 that Turkey expected to receive another SRE as of the May 2, 2019, expiration. Turkey's insistence on being allowed to buy Iranian oil without fear of U.S. penalty—as well as its overall dependence on Iranian oil—underpinned statements by Turkey's leaders that the country would continue buying at least some Iranian oil despite the SRE expiration. However, Turkey has bought no Iranian oil in recent months, according to Bloomberg Tanker Tracker data sources.

Turkey buys about 6% of its total gas imports from Iran via a pipeline built in 1997, which at first was used for a swap arrangement under which gas from Turkmenistan was exported to Turkey. Direct Iranian gas exports to Turkey through the line began in 2001, but no ISA sanctions were imposed on the grounds that the gas supplies were crucial to Turkey's energy security. Prior to the October 2012 EU ban on gas purchases from Iran, this pipeline was a conduit for Iranian gas exports to Europe, primarily Bulgaria and Greece.

Pre-JCPOA, in response to press reports that Turkey's Halkbank was settling Turkey's payments to Iran for energy with gold, U.S. officials testified on May 15, 2013, that the gold going from Turkey to Iran consists mainly of Iranian private citizens' purchases of Turkish gold. U.S. prosecutions have occurred since, against Halkbank and various individuals, for alleged violations of U.S. sanctions on Iran.[81] On January 6, 2014, the Commerce Department blocked a Turkey-based firm (3K Aviation Consulting and Logistics) from reexporting two U.S.-made jet engines to Iran's Pouya Airline.[82]

### Caucasus and Caspian Sea

The rich energy reserves of the Caspian Sea create challenges for U.S. efforts to deny Iran financial resources. The Clinton and George W. Bush Administrations cited potential ISA sanctions to deter oil pipeline routes involving Iran—thereby successfully promoting an the alternate route from Azerbaijan (Baku) to Turkey (Ceyhan), which became operational in 2005. Section 6 of Executive Order 13622 exempts from sanctions any pipelines that bring gas from Azerbaijan to Europe and Turkey. Agreements reached in 2018 between Russia and the Caspian Sea states on the legal division of the sea might spawn new energy development in the Caspian. Iran's energy firms will undoubtedly become partners in eventual joint ventures to develop the Caspian's resources.

Iran and Azerbaijan have in recent years tried to downplay political differences for joint economic benefit, and they have been discussing joint energy and infrastructure projects among themselves and with other powers, including Russia. Iran and Armenia—Azerbaijan's adversary—have long enjoyed extensive economic relations: Armenia is Iran's largest gas customer, after Turkey. In

---

[81] Department of Justice. Turkish Bank Charged In Manhattan Federal Court For Its Participation In A Multibillion-Dollar Iranian Sanctions Evasion Scheme. October 15, 2019.

[82] "US Acts to Block Turkish Firm from Sending GE Engines to Iran," *Reuters*, January 6, 2014.

May 2009, Iran and Armenia inaugurated a natural gas pipeline between the two, built by Gazprom of Russia. No ISA sanctions have been imposed.

## Persian Gulf States and Iraq[83]

The Gulf Cooperation Council states (GCC: Saudi Arabia, UAE, Qatar, Kuwait, Bahrain, and Oman) are oil exporters and close allies of the United States, and they have generally supplied the global oil market with additional oil to compensate for sanctions-impinged Iranian exports. Still, the Gulf countries maintain relatively normal trade with Iran.

The UAE has attracted U.S. scrutiny because of the large presence of Iranian firms there, and several UAE-based firms have been sanctioned, as noted in the tables at the end of the report. U.S. officials praised the UAE's March 1, 2012, ban on transactions with Iran by Dubai-based Noor Islamic Bank, which Iran reportedly used to process oil payments. Some Iranian gas condensates (120,000 barrels per day) were imported by Emirates National Oil Company (ENOC) and refined mostly into jet fuel. However, in March 2020, the United States sanctioned several UAE firms for trading Iranian oil, suggesting that there is significant illicit Iran-UAE trade in key goods, as listed in the tables at the end of the report.

Iran and several of the Gulf states, including Kuwait and Bahrain, have had discussions on various energy and related projects. However, their projects have not materialized because of broad Iran-Gulf disputes. Qatar and Iran share the large gas field in the Gulf waters between them, and their economic relations have become closer in light of the isolation of Qatar by three of its GCC neighbors, Saudi Arabia, UAE, and Bahrain.

Iran and Oman have active economic relations. Iran and Oman have an active joint venture to expand Oman's Al Duqm port, which is envisioned as a major hub for regional trade. Omani banks, some of which operate in Iran, were used to implement some of the financial arrangements of the JPoA and JCPOA.[84] As a consequence, a total of $5.7 billion in Iranian funds had built up in Oman's Bank Muscat by the time of implementation of the JCPOA in January 2016. In its efforts to easily access these funds, Iran obtained from the Office of Foreign Assets Control (OFAC) of the Treasury Department a February 2016 special license to convert the funds (held as Omani *rials*) to dollars as a means of easily converting the funds into Euros. Iran ultimately used a different mechanism to access the funds as hard currency, but the special license issuance resulted in a May 2018 review by the majority of the Senate Permanent Subcommittee on Investigation to assess whether that license was consistent with U.S. regulations.[85] The new Sultan of Oman, Sayyid Haythim bin Tariq Al Said, who was named leader upon the death of Sultan Qaboos in early January 2020, appears to be continuing all of Qaboos' foreign policies.

### Iraq

Iraq's attempts to remain close to its influential neighbor, Iran, have complicated Iraq's efforts to rebuild its economy yet avoid running afoul of the United States and U.S. sanctions on Iran. As

---

[83] The CRS Report RL32048, *Iran: Internal Politics and U.S. Policy and Options*, by Kenneth Katzman, discusses the relations between Iran and other Middle Eastern states.

[84] Omani banks had a waiver from U.S. sanctions laws to permit transferring those funds to Iran's Central Bank, in accordance with Section 1245(d)(5) of the National Defense Authorization Act for Fiscal Year 2012 (P.L. 112-81). For text of the waiver, see a June 17, 2015, letter from Assistant Secretary of State for Legislative Affairs Julia Frifield to Senate Foreign Relations Committee Chairman Bob Corker, containing text of the "determination of waiver."

[85] "Obama Misled Congress, Tried and Failed to Give Iran Secret Access to US Banks Before the Deal." Business Insider, June 6, 2018; Permanent Subcommittee on Investigations of the U.S. Senate. Majority Report. "Review of U.S. Treasury Department's License to Convert Iranian Assets Using the U.S. Financial System." May 2018.

noted above, in 2012, the United States sanctioned an Iraqi bank that was a key channel for Iraqi payments to Iran, but lifted those sanctions when the bank reduced that business. Iraq presented the United States with a sanctions-related dilemma in July 2013, when it signed an agreement with Iran to buy 850 million cubic feet per day of natural gas through a joint pipeline that would supply several power plants. No sanctions were imposed on the arrangement, which was agreed while applicable sanctions were in effect.

The Trump Administration reportedly is seeking to accommodate Iraq's need for Iranian electricity supplies and other economic interactions, in part by giving Iraq waiver permission—under Section 1247 of IFCA—to buy the Iranian natural gas that runs Iraq's power plants. That section provides for waivers of up to 180 days, but press reports indicate that the Administration has limited the waiver to shorter increments, the latest of which (March 2020) was reportedly only 30 days.[86] As of October 2018, Iraq reportedly has discontinued crude oil swaps with Iran—about 50,000 barrels per day—in which Iranian oil flowed to the Kirkuk refinery and Iran supplied oil to Iraq's terminals in the Persian Gulf. Iranian arms exports to Shia militias in Iraq remain prohibited by Resolution 2231, but no U.N. sanctions on that activity have been imposed.

## Syria and Lebanon

Iran has extensive economic relations with both Syria and Lebanon, countries where Iran asserts that core interests are at stake. The compliance of Syrian or Lebanese banks and other institutions with international sanctions against Iran has always been limited, and Iran has sought to use banks in Lebanon to provide financial assistance to Hezbollah as well as to the regime of Syrian President Bashar Al Assad. To try to curb this activity, the Trump Administration has increasingly sought to sanction Lebanese banks for facilitating Iranian aid to Hezbollah, although in the process perhaps weakening the Lebanese banking system and aggravating Lebanon's economic downturn in 2019.

In January 2017, Iran and Syria signed a series of economic agreements giving Iranian firms increased access to Syria's mining, agriculture, and telecommunications sectors, as well as management of a Syrian port.[87] In July 2019, Gibraltar diverted an Iranian tanker delivering oil to Syria, a transaction that violated EU sanctions on Syria. The ship reportedly delivered the oil to Syria after its release by Gibraltar in August 2019.

## International Financial Institutions/World Bank/IMF and WTO

The United States representative to international financial institutions is required to vote against international lending, but that vote, although weighted, is not sufficient to block international lending. No new international financial institution loans have been approved to Iran since 2005, including under the World Bank's "Global Environmental Facility" (GEF) that had slated more than $7.5 million in loans for Iran to dispose of harmful chemicals.[88] However, in an effort to cope with the costs of the COVID-19 pandemic that has affected Iran significantly, in March 2020 Iran applied for a $5 billion International Monetary Fund (IMF) loan. Because of the humanitarian circumstances of the loan application, the Administration has discretion to support, or to refrain from opposing, the loan.

---

[86] Wall Street Journal, March 26, 2020.

[87] Iran Signs Phone, Gas Deals with Syria. Agence France Presse, January 17, 2017.

[88] Barbara Slavin, "Obama Administration Holds Up Environmental Grants to Iran," *Al Monitor*, June 23, 2014.

Earlier, in 1993, the United States voted its 16.5% share of the World Bank against loans to Iran of $460 million for electricity, health, and irrigation projects, but the loans were approved. To block that lending, the FY1994-FY1996 foreign aid appropriations (P.L. 103-87, P.L. 103-306, and P.L. 104-107) cut the amount appropriated for the U.S. contribution to the bank by the amount of those loans, contributing to a temporary halt in new bank lending to Iran. But, in May 2000, the United States' allies outvoted the United States to approve $232 million in loans for health and sewage projects. During April 2003-May 2005, a total of $725 million in loans were approved for environmental management, housing reform, water and sanitation projects, and land management projects, in addition to $400 million in loans for earthquake relief.

### WTO Accession

Iran has sought to join the World Trade Organization (WTO). Iran began accession talks in 2006 after the George W. Bush Administration dropped its objection to Iran's application as part of an effort to incentivize Iran to reach an interim nuclear agreement. The lifting of sanctions presumably paves the way for talks to accelerate, but the accession process generally takes many years. Accession generally takes place by consensus of existing WTO members. Iran's accession might be complicated by the requirement that existing members trade with other members; as noted above, the U.S. ban on trade with Iran remains in force. The Trump Administration does not advocate Iran's admission to that convention.

# Effectiveness of Sanctions

The claim in 2019 and 2020 by Trump Administration officials that "sanctions on Iran are working" can be analyzed based on an analysis of the goals of the sanctions. The following sections assess the effectiveness of Iran sanctions according to a number of criteria.

## Effect on Iran's Nuclear Program and Strategic Capabilities

The international sanctions regime of 2011-2015 is widely credited with increasing Iran's willingness to accept the JCPOA as well the election of Hassan Rouhani as President of Iran in June 2013. Rouhani campaigned on a stated commitment to achieving an easing of sanctions and ending Iran's international isolation. Still, the U.S. intelligence community assesses that it "does not know" whether Iran plans to eventually develop a nuclear weapon.[89]

The Trump Administration asserts that its campaign of "maximum pressure" on Iran, implemented mainly through sanctions, is intended to cause Iran to negotiate a revised JCPOA that would limit not only Iran's nuclear program but also its missile program and its regional malign activities. However, Iran has refused such negotiations with the United States, to date, insisting that the United States provide JCPOA sanctions relief before any talks can begin.

Sanctions during 2011-2015 did not prevent Iran from advancing its nuclear program. And, even though U.S. and EU sanctions remained on Iran's missile programs after the JCPOA was implemented, U.S. intelligence officials have testified that Iran continues to expand the scale, reach, and sophistication of its ballistic missile arsenal. Iran also has advanced its cruise missile and drone capabilities. These capabilities were crucial to the success of Iran's September 14, 2019, strike on critical Saudi energy infrastructure, as well as to Iran's retaliation for the killing of Qasem Soleimani in the form of a missile attack on the Ayn al-Asad base in Iraq that is used by

---

[89] "Worldwide Threat Assessment of the U.S. Intelligence Community." Testimony before the Senate Select Committee on Intelligence. May 11, 2017. This language was not contained in the 2018 version of the testimony.

U.S. military personnel. U.S. intelligence directors testified in January 2019 that Iran also continues to develop its own increasingly more advanced naval mines, small submarines, and attack craft.[90] Still, Iran's nuclear and missile programs might have advanced faster were sanctions not imposed.

Sanctions – as well as Resolution 2231 - have prevented Iran from buying significant amounts of major combat systems since the early 1990s. The U.N. ban on Iran's importation and exportation of weaponry is expires on October 18, 2020.

## Effects on Iran's Regional Influence

In explaining its decision to withdraw from the JCPOA, the Trump Administration asserted that the easing of sanctions during 2016-18 caused Iran to expand its regional activities. However, neither the imposition, lifting, nor reimposition of strict sanctions - nor the ban on Iran's transfer of arms stipulated in Resolution 2231 - has appeared to affect Iran's regional behavior. Iran intervened extensively in Syria, Iraq, and Yemen during the 2011-2015 period when sanctions had a significant adverse effect on Iran's economy. Iran has remained engaged in these regional conflicts after sanctions were eased in early 2016, and since U.S. sanctions were reimposed in late 2018. It can be argued that Iran's regional activities have varied not according to the imposition of lifting of sanctions but according to the opportunities to expand its influence that are provided by the region's conflicts.

Administration officials assert that Hezbollah's financial difficulties are evidence that its "maximum pressure" campaign on Iran is working.[91] The assertion cites recent reports that the party has had to appeal for donations, cut expenses, request donations, and delay or reduce payments to its fighters.[92] An alternate explanation is that Iran is adjusting its expenditures to the reduced activity on the Syria battlefield, where Hezbollah has been fighting on behalf of the Asad regime.

The Administration also has sought to highlight the effect of its policy on Iran's ability to project power citing fluctuations in Iran's defense budget. President Trump has stated that Iran's defense budget had increased 40% during the 2016-2018 time frame of JCPOA implementation.[93] On October 16, 2019, the State Department Special Representative on Iran, Ambassador Brian Hook, testified before the Senate Foreign Relations Committee that

> However, from 2017 to 2018, when our pressure went into effect we saw a reduction in [Iran's] military spending of nearly 10 percent. Iran's 2019 budget, which was released in March, called for even steeper cuts, including a 28 percent cut to their defense budget and a 17 percent cut for IRGC funding.[94]

*Oversight*. A provision of the Iran Nuclear Agreement Review Act (P.L. 114-17) requires that a semiannual report on Iran's compliance with the JCPOA include information on any Iranian use of funds to support acts of terrorism. However, because the United States has ceased implementing the JCPOA, the semi-annual reports apparently are not prepared any more.

---

[90] Worldwide Threat Assessment of the U.S. Intelligence Community, January 29, 2019.

[91] Testimony of Ambassador Brian Hook before the Subcommittee on the Middle East, North Africa, and International Terrorism of the House Foreign Affairs Committee. June 19, 2019.

[92] "Sanctions on Iran are Hitting Hezbollah," *Washington Post*, May 19, 2019.

[93] Statement from the President on the Reimposition of United States Sanctions with Respect to Iran. August 6, 2018.

[94] Testimony of Special Representative Brian Hook. Senate Foreign Relations Committee, October 16, 2019.

## Internal Political Effects

No U.S. Administration has publicly asserted that the goal of U.S. sanctions on Iran is to bring about the change of Iran's regime. Some assert that the sanctions are fostering the periodic unrest that has erupted in Iran since late 2017. In late 2017- early 2018 and in November 2019, unrest has broken out over economic conditions and government repression, although not at a level that appears to threaten the regime. Still, U.S. sanctions were suspended at the time of the unrest in late 2017 and there were few secondary sanctions during the large Green Movement uprising of 2009-2010, suggesting that any connection between sanctions and unrest is tenuous. Other protests occurred over flooding in the southwest in March-April 2019. Still, some protesters complain that the country's money is being spent on regional interventions rather than on the domestic economy.

Nor have U.S. sanctions necessarily always achieved favorable gradual political change. U.S. sanctions imposed by the Obama Administration might have contributed to Rouhani's election, as discussed above. However, the Trump Administration's maximum pressure campaign has arguably undermined Rouhani – and bolstered the confidence of Iranian hardliners - by illustrating that negotiations with the United States do not produce better relations with the United States. Hardliners overwhelmingly won Iran's February 2020 parliamentary elections, in part because the hardline-dominated election screening bodies were able to disqualify many moderates and reformists from running for seats.

## Economic Effects

U.S. sanctions during 2011-2015, and since 2018, have taken a substantial toll on Iran's economy.

- *GDP and Employment Trends.* During the 2011-2015 sanctions period, Iran's economy contracted approximately 20% over the period, and the unemployment rate rose to about 20% by 2014, with many Iranians working unpaid or partially paid. The 2016 lifting of sanctions enabled Iran to achieve 7% annual growth during 2016-2018.[95] The IMF estimates that Iran's economy declined by nearly 10% during March 2019-March 2020.[96] In the October 2019 testimony cited earlier, Ambassador Hook stated that "We [U.S. officials] estimate [Iran's economy] could contract by as much as 14%, sending Iran into a deep depression." These estimates predate the COVID-19 pandemic that is almost certain to drive Iran's GDP even lower than was anticipated previously, particularly insofar as oil prices have fallen dramatically as a result of the pandemic.

- *Oil Exports.* During the 2011-2015 sanctions period, Iran's crude oil sales fell from 2.5 mbd in 2011 to about 1.1 mbd by 2014. The JCPOA sanctions relief enabled Iran to increase its oil exports to 2011 levels, but the reimposition of U.S. sanctions—including termination of the SREs—has driven Iran's oil exports to about 300,000 barrels per day.

- *Banking.* Global banks mostly left the Iranian market during 2011-2016 because of international sanctions, and they hesitated to reenter the Iran market after the 2016 easing of sanctions because of (1) reported concerns that the United States

---

[95] "Foreign Investors Flock to Iran as U.S. Firms Watch on the Sidelines." *Wall Street Journal*, March 27, 2017.

[96] Forecast Says Sharp Drop in Iran's Economic Growth Rate. Radio Farda, September 2, 2018. World Bank: Iran Likely to Suffer Worse Recession Than Previously Thought. VOA News, June 2, 2019; IMF, October 2016.

might still sanction their transactions with Iran; (2) a lack of transparency in Iran's financial sector; (3) lingering concerns over past financial penalties for processing Iran-related transactions in the U.S. financial system; and (4) extra costs and procedures caused by the inability to process Iran-related transactions through the U.S. financial system and/or easily use dollars in Iran-related transactions. Those banks that did reenter the Iran market in 2016 exited again or limited their transactions with Iran after the U.S. re-imposed sanctions in 2018.

- *Shipping Insurance*. Iran was able after 2016 to obtain shipping insurance as a result of U.S. waivers given to numerous insurers, as discussed above. However, as of August 7, 2018, U.S.-based shipping reinsurers no longer have active U.S. waivers, and Iranian shippers have been compelled to self-insure.

- *Accessibility of Hard Currency Assets Held Abroad*. The 2011-2016 sanctions regime prevented Iran from accessing the hard currency in its accounts abroad. By January 2016, Iran's hard currency reserves held in foreign banks stood at about $115 billion.[97] Iranian officials stated in February 2016 that sanctions relief had allowed them to access the funds, and it could move the funds via renewed access to the SWIFT electronic payments system. Of this amount, about $60 billion was due to creditors such as China or to repay nonperforming loans to Iranian energy companies working in the Caspian and Persian Gulf. After 2016, Iran kept most of its reserves abroad for cash management and to pay for imports, but Iran's foreign reserves again became restricted by reimposed U.S. sanctions in late 2018. The current total value of Iran's hard currency assets abroad has been estimated by U.S. officials as about $85 billion, but only about 10% of that is accessible due to the U.S.-imposed restrictions.[98]

- *Currency Decline*. Sanctions caused the value of the *rial* on unofficial markets to decline about 60% from January 2012 until the 2013, when the election of Rouhani stabilized the *rial* at about 35,000 to the dollar. The reimposition of U.S. sanctions in 2018 caused the *rial*'s value to plummet to 150,000 to the dollar by the November 5, 2018. The downturn made it difficult for Iranian merchants to import goods or properly price merchandise, and the government has banned the importation of 1,400 goods to preserve hard currency. However, Central Bank governor Abdulnaser Hemmati said government measures had caused the rial to appreciate substantially in 2019.[99]

- *Inflation.* The drop in value of the currency caused inflation to accelerate during 2011-2013 to a rate of about 60%—a higher figure than that acknowledged by Iran's Central Bank. As sanctions were eased, inflation slowed to the single digits by June 2016, meeting the Central Bank's stated goal. The U.S. exit from the JCPOA caused inflation to increase to nearly 40%, by the end of 2018, but the level stabilized in 2019, according to Iran's Central Bank governor.[100]

- *Industrial/Auto Production and Sales.* Iran's light-medium manufacturing sector was expanding prior to 2011, but its dependence on imported parts left the sector vulnerable to sanctions that reduced the availability of import financing. Iran's

---

[97] CRS conversation with Department of the Treasury officials. July 2015.

[98] Iran, Cut Off From Vital Cash Reserves, Faces Deeper Economic Peril, U.S. Says. Wall Street Journal, December 3, 2019.

[99] Al Monitor. October 21, 2019.

[100] Ibid.

vehicle production fell by about 60% from 2011 to 2013. The auto sector, and manufacturing overall, rebounded after sanctions were lifted in 2016, but declined again following the U.S. exit from the JCPOA.

- ***U.S.-Iran Trade.*** U.S.-Iran trade remains minimal. In 2015, the last full year before JCPOA implementation, the United States sold $281 million in goods to Iran and imported $10 million worth of Iranian products. The slight relaxation of the U.S. import ban stemming from the JCPOA likely accounted for the significant increase in imports in 2016 to $86 million. U.S. exports to Iran remained low for all of 2016 and 2017 ($172 million and $137 million, respectively) but spiked to $440 million for 2018, primarily from a major increase in U.S. sales of soybeans to Iran that year (about $318 million of that commodity). For 2019, the first full year in which all U.S. sanctions were back into effect, U.S. exports to Iran fell to $73 million and imports from Iran were only about $1.4 million.

## Iran's Economic Coping Strategies

Iran had taken a series of steps to try to mitigate the economic effect of sanctions.

- *Export Diversification*. Over the past 10 years, Iran has promoted sales of petrochemicals and nonoil products such as minerals, cement, urea fertilizer, and other agricultural and basic industrial goods, and they constitute a growing percentage of Iran's revenue.[101] Iran's March 2020-2021 budget assumes that Iran will earn virtually nothing from oil sales during the budget year.

- *Reallocation of Investment Funds and Import Substitution*. Sanctions compelled some Iranian manufacturers to increase domestic production of some goods as substitutes for imports. This trend has been hailed by Iranian economists and Supreme Leader Khamene'i, who supports building a "resistance economy" that is less dependent on imports and foreign investment.

- *Partial Privatization/IRGC in the Economy*. Since 2010, portions of Iran's state-owned enterprises have been transferred to the control of quasi-governmental entities, including cleric-fun foundations (*bonyads*), holding companies, or investment groups. The IRGC's corporate affiliates are assessed by some experts as controlling at least 20% of Iran's economy, although there is little available information on the degree of IRGC-affiliated ownership stakes.[102] Rouhani has sought to push the IRGC out of Iran's economy through divestment, but with limited success.

- *Subsidy Reductions*. Then-President Ahmadinejad (2005-2013) reduced generous subsidies while temporarily compensating families with small cash payments. Gasoline prices were raised to levels similar to those in other regional countries. Rouhani has continued that policy, and he reportedly has improved collections of taxes.[103]

- *Import Restrictions/Currency Controls.* To conserve hard currency, Iran has at times reduced the supply of hard currency to importers of luxury goods, such as cars or cellphones, in order to maintain hard currency supplies to importers of

---

[101] Testimony of Patrick Clawson before the Senate Banking Committee. January 21, 2015.

[102] How Trump's terrorist designation of Iran's revolutionary guard impacts its economy. CNBC, April 12, 2019.

[103] Patrick Clawson testimony, January 21, 2015, op. cit.

essential goods. These restrictions eased after sanctions were lifted in 2016 but were reimposed in 2018 to deal with unrest and the falling value of the *rial*.

**Figure 1. Economic Indicators**

**Sources:** IMF 2019, U.S. Energy Information Administration, OPEC.

## Effect on Energy Sector Development

The Iran Sanctions Act (ISA) was enacted in large part to reduce Iran's oil and gas production capacity over the longer term by denying Iran the outside technology and investment to maintain or increase production. U.S. officials estimated in 2011 that Iran had lost $60 billion in investment in the sector as numerous major firms pulled out of Iran. Since international sanctions increased in 2011, there has been little development activity at Iran's various oil and gas development sites, and many foreign investors resold their equity stakes to Iranian companies that are less technically capable than international firms. The lifting of sanctions in 2016 prompted Iran to try to lure foreign investors back into the sector with more generous investment terms under a concept called the "Iran Petroleum Contract" that gives investing companies the rights to a set percentage of Iran's oil reserves for 20-25 years.[104] Iran signed a number of new agreements with international energy firms after 2016 but, as noted, major energy firms again divested in

---

[104] Thomas Erdbrink. "New Iran Battle Brews over Foreign Oil Titans." *New York Times*, February 1, 2016.

response to the U.S. exit from the JCPOA. **Error! Reference source not found.** at the end of this r eport discusses various Iranian oil and gas fields and the fate of post-1999 investments in them.

Sanctions relief also opened opportunities for Iran to resume developing its gas sector. Iran has been using its gas development primarily to reinject into its oil fields rather than to export, although Iran exports about 3.6 trillion cubic feet of gas, primarily to Turkey and Armenia. Sanctions have rendered Iran unable to develop a liquefied natural gas (LNG) export business.

With respect to gasoline, the enactment of the CISADA law targeting sales of gasoline to Iran had a measurable effect. Several suppliers stopped selling gasoline to Iran once enactment appeared likely, and others ceased supplying Iran after enactment. Gasoline deliveries to Iran fell from about 120,000 barrels per day before CISADA to about 30,000 barrels per day thereafter, although imports later increased to about 50,000 barrels per day. Iran expanded several of its refineries and, in 2017, Iranian officials said Iran had become self-sufficient in gasoline.

## Human Rights-Related Effects

It is difficult to draw any direct relationship between sanctions and Iran's human rights practices. Recent human rights reports by the State Department and the U.N. Special Rapporteur on Iran's human rights practices assess that there has been only modest improvement in Iran's practices in recent years, particularly relaxation of enforcement of the public dress code for women. The altered policies cannot necessarily be attributed to any alterations of sanctions.

Since 2012, foreign firms have generally refrained from selling the Iranian government equipment to monitor or censor social media use. Such firms include German firm Siemens, Chinese internet infrastructure firm Huawei, and South African firm MTN Group. However, the regime retains the ability to monitor and censor social media use, and it is also developing a progressively more advanced cyber capability using indigenously-upgraded technology.

## Humanitarian Effects

The COVID-19 pandemic of 2020 has put a spotlight on the extent to which sanctions - despite the fact that humanitarian items are exempt from U.S. sanctions - might be affecting Iran's response to the disease, which has expanded in Iran to a much greater degree than in any other regional country. For further analysis, see CRS Insight IN11279, *COVID-19 and U.S. Iran Policy*, by Kenneth Katzman

During 2012-2016, and since 2018, sanctions reportedly have limited Iran's ability to import expensive Western-made medicines, such as chemotherapy drugs and medicines for multiple sclerosis. [105] Other reports in 2019 indicated that Cargill, Bunge, and other global food traders halted supplying Iran because of the absence of trade financing,[106]or, alternately, their shipments have been held at Iranian docks until payments clear. Iranian officials and some international relief groups have complained that U.S. sanctions inhibited the ability to provide relief to flooding victims in southwestern Iran in March-April 2019. Some of the scarcity of medicines is caused by banks' refusal to finance such sales, even though doing so is not subject to sanctions.

---

[105] https://www.washingtonpost.com/world/middle_east/fresh-sanctions-on-iran-are-already-choking-off-medicine-imports-economists-say/2018/11/17/c94ce574-e763-11e8-8449-1ff263609a31_story.html; https://www.bloomberg.com/news/articles/2018-11-21/trump-s-sanctions-are-proving-a-bitter-pill-for-iran-s-sick; https://www.csmonitor.com/World/Middle-East/2018/1029/In-Iran-US-sanctions-are-being-felt-with-harsher-measures-to-come.

[106] "Global Traders Halt New Iran Food Deals as U.S. Sanctions Bite." Reuters, December 21, 2018.

The State Department has issued statements that the Iranian government exaggerates reports of the effects of U.S. sanctions on its medical imports in order to generate opposition to the sanctions and to justify its application for a $5 billion IMF loan.[107] Other accounts say that Iranians, particularly those with connections to the government, take advantage of medicine shortages by cornering the import market for key medicines.

Other reports say that pollution in Tehran and other big cities is made worse by sanctions because Iran produces gasoline itself with methods that cause more impurities than imported gasoline. As noted above, Iran's efforts to deal with environmental hazards and problems might be hindered by denial of World Bank lending for that purpose.

In the aviation sector, some Iranian pilots complained publicly that U.S. sanctions caused Iran's passenger airline fleet to deteriorate to the point of jeopardizing safety. Since the U.S. trade ban was imposed in 1995, 1,700 passengers and crew of Iranian aircraft have been killed in air accidents, although it is not clear how many of the crashes, if any, were due to difficultly in acquiring U.S. spare parts.[108]

## U.S. COVID Response

The Trump Administration has undertaken several steps to assist Iran's response to the COVID-19 pandemic and, in the process, perhaps parry calls in the international community to broadly ease sanctions on Iran.

- In January 2020, even before the COVID-19 pandemic had been acknowledged in Iran, the United States processed the first transactions under a "Swiss humanitarian channel" under which sales U.S. of medical equipment can be sold to buyers in Iran that are determined to using the items purely for the purposes intended. The channel was announced in October 2019, in partnership with Switzerland, which had been calling on the United States to produce a "white list" that would "give clear guidelines about what channels European banks and companies should follow to conduct legitimate [humanitarian] transactions with Iran without fear of future penalties."[109]

- In February 2020, the Treasury Department clarified that Iran's Central Bank accounts abroad could be used for humanitarian purchases without risk of U.S. sanction, and that donations could go to Iranians from U.S. donors. The steps stopped short of steps taken during the 2003 Bam Earthquake, for example, in which the Administration provided a 90 day general license for sales to Iran.

- In March 2020, the United States formally offered Iran assistance via the World Health Organization. Iran refused the aid.

- On the other hand, some press reports indicate that the Administration plans to try to persuade other members of the IMF executive board to jointly, with the United States, deny Iran the requested $5 billion loan for its COVID-19 response. Some Members of Congress have called on the Administration to support the loan and to ease sanctions at least temporarily during the COVID-19 outbreak.[110]

---

[107] State Department. Iran's Sanctions Relief Scam. April 6, 2020.

[108] Thomas Erdbink, "Iran's Aging Airliner Fleet Seen As Faltering Under U.S. Sanctions," July 14, 2012.

[109] https://www.theguardian.com/world/2018/nov/02/iran-sanctions-us-european-humanitarian-supplies.

[110] Press release from Senator Robert Menendez: Menendez & Engel Propose Policies for Addressing COVID-19 in Iran. April 3, 2020; Feinstein urges Trump to reverse plan to block Iran request for $5B in IMF aid, claims it is in 'our national interest' Fox News, April 11, 2020.

## Air Safety

Sanctions relief ameliorated at least some of the humanitarian difficulties discussed above. In the aviation sector, several sales of passenger aircraft have been announced, and licensed by the Department of the Treasury, after Implementation Day. However, as noted, the licenses were revoked as of November 2018.

- In February 2016, Iran Air—which was delisted from U.S. sanctions as of Implementation Day—announced it would purchase 118 Airbus commercial aircraft at an estimated value of $27 billion. Airbus received an OFAC license and three of the aircraft were delivered before the Treasury Department revoked its export licenses for the planes.

- In December 2016, Boeing and Iran Air finalized an agreement for Boeing to sell the airline 80 passenger aircraft and lease 29 others. Boeing received a specific license for the transaction. The deal had a total estimated value of about $17 billion, with deliveries scheduled to start in late 2018. None was delivered and the planned deliveries were cancelled after the export licenses were revoked.

- In April 2017, Iran's Aseman Airlines signed a tentative agreement to buy at least 30 Boeing MAX passenger aircraft. No U.S. license for this sale was announced prior to the U.S. exit from the JCPOA. The airline is owned by Iran's civil service pension fund but managed as a private company.

- In June 2017, Airbus agreed to tentative sales of 45 A320 aircraft to Iran's Airtour Airline, and of 28 A320 and A330 aircraft to Iran's Zagros Airlines. No U.S. license for the sale was announced prior to the U.S. exit from the JCPOA.

- ATR, owned by Airbus and Italy's Leonardo, sold 20 aircraft to Iran Air. It delivered eight aircraft by the time of the U.S. JCPOA exit and was given licenses to deliver another five by the November 2018 effective date of the export license revocation. In April 2019, as noted above, ATR was given a license to sell Iran spare parts for its ATR fleet.

# Recent Sanctions Legislation

JCPOA oversight and implications, and broader issues of Iran's behavior have been the subject of legislation. Legislation considered in the 114th and 115th Congress is provided as examples of additional sanctions provisions that have been considered.

## Key Legislation in the 114th Congress

The JCPOA states that as long as Iran complies with the JCPOA, the sanctions that were suspended or lifted shall not be reimposed on other bases. The Obama Administration asserted that some new sanctions that seek to limit Iran's military power, its human rights abuses, or its support for militant groups would not violate the JCPOA.

### Iran Nuclear Agreement Review Act (P.L. 114-17)

The Iran Nuclear Agreement Review Act of 2015 (INARA, P.L. 114-17) provided for a congressional review period after which Congress could pass legislation to disapprove of the JCPOA. No such legislation of disapproval was enacted.

There are several certification and reporting requirements under INARA, although most of them no longer apply as a result of the Trump Administration withdrawal:

- *Material Breach Report*. INARA requires the Administration to report a potentially significant Iranian breach of the agreement within 10 days of acquiring credible information of such. Within another 30 days, the President must determine whether this is a material breach and whether Iran has cured it.

- *Certification Report*. INARA requires the President to certify, every 90 days, that Iran is "transparently, verifiably, and fully implementing" the agreement, and that Iran has not taken any action to advance a nuclear weapons program. On October 13, 2017, the Administration declined to make that certification, on the grounds that continued sanctions relief is not appropriate and proportionate to Iran's measures to terminate its illicit nuclear program (Section (d)(6)(iv)(I) of INARA).

- If a breach is reported, or if the President does not certify compliance, Congress may initiate within 60 days "expedited consideration" of legislation that would reimpose any Iran sanctions that the President had suspended through use of waiver or other authority.

- *Semiannual Report*. INARA requires an Administration report every 180 days on Iran's nuclear program, including not only Iran's compliance with its nuclear commitments but also whether Iranian banks are involved in terrorism financing; Iran's ballistic missile advances; and whether Iran continues to support terrorism.

## Visa Restriction

The FY2016 Consolidated Appropriation (P.L. 114-113) contained a provision amending the Visa Waiver Program to require a visa to visit the United States for any person who has visited Iraq, Syria, or any terrorism list country (Iran and Sudan are the two aside from Syria still listed) in the previous five years. Iran argued that the provision represented a violation of at least the spirit of the JCPOA by potentially deterring European businessmen from visiting Iran. The Obama Administration issued a letter to Iran stating it would implement the provision in such a way as not to not impinge on sanctions relief, and allowances for Iranian students studying in the United States were made in the implementing regulations. Another provision of that law requires an Administration report to Congress on how Iran has used the benefits of sanctions relief.

President Trump has issued and amended executive orders that, in general, prohibit Iranian citizens (as well as citizens from several other countries) and high-ranking Iranian officials from entering the United States.

## Iran Sanctions Act Extension

The 114th Congress acted to extend ISA before its scheduled expiration on December 31, 2016. The Iran Sanctions Extension Act (H.R. 6297), which extended ISA until December 31, 2026, without any other changes, passed the House on November 15 by a vote of 419-1 and then passed the Senate by 99-0. President Obama allowed the bill to become law without signing it (P.L. 114-277), even though the Administration considered it unnecessary because the President retains authority to reimpose sanctions on Iran.

### Reporting Requirement on Iran Missile Launches

The conference report on the FY2017 National Defense Authorization Act (P.L. 114-328, Section 1226) required quarterly reports to Congress on Iran's missile launches the imposition of U.S. sanctions with respect to Iran's ballistic missile launches, until December 31, 2019. The conference report on the FY2018 NDAA (P.L. 115-91) extended the requirement until December 31, 2022. The report is to include efforts to sanction entities that assist those missile launches.

### 114th Congress Legislation not Enacted

- The Iran Policy Oversight Act (S. 2119) and the Iran Terror Finance Transparency Act (H.R. 3662) would have added certification requirements for the Administration to remove designations of Iranian entities sanctioned. The House passed the latter bill but then vacated its vote.

- The IRGC Terrorist Designation Act (H.R. 3646/S. 2094) required a report on whether the IRGC meets the criteria for designation as a Foreign Terrorist Organization (FTO). The Obama Administration argued that the law that set up the FTO designations (Section 219 of the Immigration and Nationality Act [8 U.S.C. 1189]) applies such designations only to groups, rather than armed forces of a nation-state (which the IRGC is).

- The IRGC Sanctions Act (H.R. 4257) would have required congressional action to approve an Administration request to remove a country from the terrorism list and would have required certification that any entity to be "delisted" from sanctions is not a member, agent, affiliate, or owned by the IRGC.

- The Prohibiting Assistance to Nuclear Iran Act (H.R. 3273) would have prohibited the use of U.S. funds to provide technical assistance to Iran's nuclear program.

- The Justice for Victims of Iranian Terrorism Act (H.R. 3457/S. 2086) prohibited the President from waiving U.S. sanctions until Iran completed paying judgments issued for victims of Iranian terrorism. The House passed it on October 1, 2015, by a vote of 251-173 despite Obama Administration opposition.[111]

- H.R. 3728 would have amended ITRSHRA to make mandatory sanctions against electronic payments systems such as SWIFT if they were used by Iran.

- The Iran Ballistic Missile Sanctions Act of 2016 (S. 2725) would have required that Iran's automotive, chemical, computer science, construction, electronic, energy metallurgy, mining, petrochemical, research, and telecommunications industries be subject to U.S. sanctions, if those sectors were determined to provide support for Iran's ballistic missile program. A similar bill, H.R. 5631, the Iran Accountability Act, which passed the House on July 14, 2016, by a vote of 246-179, would have removed some waiver authority for certain provisions of several Iran sanctions laws and required sanctions on sectors of Iran's civilian economy determined to have supported Iran's ballistic missile program.

- H.R. 4992, which passed the House on July 14, 2016, by a vote of 246-181, and the related Countering Iranian Threats Act of 2016 (S. 3267), would have

---

[111] For more information on the issue of judgments for victims of Iranian terrorism, see CRS Report RL31258, *Suits Against Terrorist States by Victims of Terrorism*, by Jennifer K. Elsea.

required foreign banks and dollar clearinghouses to receive a U.S. license for any dollar transactions involving Iran.

- H.R. 5119, which passed the House by a vote of 249-176, would have prohibited the U.S. government from buying additional heavy water from Iran beyond the April 2016 purchase of 32 metric tons from Iran at a cost of about $8.6 million.

- Several bills and amendments in the 114th Congress sought to block or impede the sale of the Boeing aircraft to Iran by preventing the licensing, financing, or Ex-Im Bank loan guarantees for the sale. These included H.R. 5715, H.R. 5711, and sections of the FY2017 Financial Services and General Government Appropriations Act (H.R. 5485). H.R. 5711 passed by the House on November 17, 2016, by a vote of 243-174. The Obama Administration opposed the measures as JCPOA violations.

# The Trump Administration and Major Iran Sanctions Legislation

Even before the Trump Administration withdrew the United States out of the JCPOA, Congress acted on or considered additional Iran sanctions legislation. The following Iran sanctions legislation was enacted or considered in the 115th Congress.

## The Countering America's Adversaries through Sanctions Act of 2017 (CAATSA, P.L. 115-44)

S. 722, which initially contained only Iran-related sanctions, was reported out by the Senate Foreign Relations Committee on May 25, 2017. After incorporating sanctions on Russia, the bill was passed by the Senate on June 15, 2017, by a vote of 98-2. A companion measure, H.R. 3203, was introduced in the House. Subsequently, H.R. 3364, containing additional sanctions provisions related to North Korea, passed both chambers and was signed on August 2, 2017 (P.L. 115-44).

Overall, CAATSA did not appear to conflict with the JCPOA insofar as it did not reimpose U.S. secondary sanctions on Iran's civilian economic sectors, and the JCPOA did not require the United States to refrain from imposing additional sanctions on Iranian proliferation, human rights abuses, terrorism, or the IRGC. Section 108 of CAATSA requires an Administration review of all designated entities to assess whether such entities are contributing to Iran's ballistic missile program or contributing to Iranian support for international terrorism.

## Legislation in the 115th Congress Not Enacted

- H.R. 1698. The Iran Ballistic Missiles and International Sanctions Enforcement Act, passed the House on October 26, 2017, by a vote of 423-2. It contained provisions similar to those that were incorporated into the CAATSA law, above.

- H.R. 1638. On November 14, 2017, the House Financial Services Committee ordered reported H.R. 1638, the Iranian Leadership Asset Transparency Act, which required the Treasury Secretary to report to Congress on the assets and equity interests held by named Iranian persons, including the Supreme Leader, the President, various IRGC and other security commanders, and other leaders.

- H.R. 4324. The House Financial Services Committee also ordered reported on November 14, 2017, the Strengthening Oversight of Iran's Access to Finance Act. The bill would have required Administration reports on whether financing of Iranian commercial passenger aircraft purchases posed money-laundering or terrorism risks or benefited Iranian persons involved in proliferation or terrorism.

- H.R. 5132. The Iranian Revolutionary Guard Corps Economic Exclusion Act mandated Administration reports on whether specified categories of entities are owned or controlled by the IRGC, or conduct significant transactions with it. The bill defined an entity as owned or controlled by the IRGC even if the IRGC's ownership interest is less than 50%—a departure from the usual definition of ownership as at least 50%. The bill would also have required a report on whether the Iran Airports Company violates E.O. 13224 by facilitating flight operations by Mahan Air, which is a designated as a terrorism supporting SDN.

- H.R. 6751. The Banking Transparency for Sanctioned Persons Act of 2018, would have required reporting to Congress on any license given to a bank to provide financial services to a state sponsor of terrorism.

- H.R. 4591, S. 3431, and H.R. 4238. Several bills would have essentially codified Executive Order 13438 by requiring the blocking of U.S.-based property and preventing U.S. visas for persons determined to be threatening the stability of Iraq. The latter two bills specifically mentioned the Iraqi militia groups As'aib Ahl Al Haq and Harakat Hizballah Al Nujaba as entities that the Administration should so sanction. H.R. 4591 passed the House on November 27, 2018.

## 116th Congress

Legislation introduced subsequent to the May 2018 U.S. withdrawal from the JCPOA appeared to try to support implementation of the Administration's maximum pressure campaign to compel Iran to change its behavior. The following, which pertain to sanctions and not the broader issue of U.S.-Iran military confrontation or other Iran issues, represents a sampling, but not a comprehensive list, of legislation that has been introduced to increase sanctions on Iran:

- Several bills similar or virtually identical to those introduced previously have been introduced, imposing sanctions on Iranian proxies in Iraq and elsewhere. These bills include H.R. 361, the Iranian Proxies Terrorist Sanctions Act of 2019, and H.R. 571, the Preventing Destabilization of Iraq Act of 2019.

- The Iranian Revolutionary Guard Corps Exclusion Act (S. 925), similar to H.R. 5132 in the 115th Congress, has been introduced in the Senate.

- The Iran Ballistic Missiles and International Sanctions Enforcement Act (H.R. 2118). The bill includes provisions similar to H.R. 1698 in the 115th Congress.

- The Holding Iranian Leaders Accountable Act of 2020 (H.R. 6081) requires an Administration report on the bank holdings of specified Iranian leaders.

- The Holding Iranian Leaders Accountable Act of 2020 (H.R. 6243) would prohibit any U.S. license to provide financial services to the government of Iran.

## Other Possible U.S. and International Sanctions[112]

There are a number of other possible sanctions that might receive consideration—either in a global or multilateral framework. These possibilities are analyzed in CRS In Focus IF10801, *Possible Additional Sanctions on Iran*, by Kenneth Katzman.

---

[112] See CRS In Focus IF10801, *Possible Additional Sanctions on Iran*, by Kenneth Katzman.

# Appendix A. U.S., U.N., EU and Allied Country Sanctions

| U.S. Sanctions | U.N. Sanctions | EU and Other Allied Countries |
|---|---|---|
| **General Observation:** Most sweeping sanctions on Iran of virtually any country in the world | As of 2010, U.N. sanctions were intended to give countries justification to cooperate with U.S. secondary sanctions. Post-JCPOA: Resolution 2231 is the only operative Resolution on Iran. | EU closely aligned its sanctions tightening with that of the United States. Most EU sanctions lifted in accordance with the JCPOA, although some sanctions on arms, dual-use items, and human rights remain. Japan and South Korea sanctions also became extensive but were almost entirely lifted in concert with the JCPOA. |
| **Ban on U.S. Trade with, Investment in, and Financing for Iran:** Executive Order 12959 bans (with limited exceptions) U.S. firms from exporting to Iran, importing from Iran, or investing in Iran. | U.N. sanctions did not at any time ban civilian trade with Iran or general civilian sector investment in Iran. | No comprehensive EU ban on trade in civilian goods with Iran was imposed at any time. Japan and South Korea did not ban normal civilian trade with Iran. |
| **Sanctions on Foreign Firms that Do Business with Iran's Energy Sector:** The Iran Sanctions Act, P.L. 104-172, and subsequent laws and executive orders, discussed throughout the report, mandate sanctions on virtually any type of transaction with/in Iran's energy sector. | No U.N. equivalent existed. However, Resolution 1929 "not[es] the potential connection between Iran's revenues derived from its energy sector and the funding of Iran's proliferation-sensitive nuclear activities." This wording was interpreted as providing U.N. support for countries to ban their companies from dealing with Iran's energy sector. | With certain exceptions, the EU banned almost all dealings with Iran's energy sector after 2011. These sanctions now lifted, but no oil imports from Iran since 2018. Japanese and South Korean measures banned new energy projects in Iran and called for restraint on ongoing projects. Both cut oil purchases from Iran sharply. These sanctions now lifted, but no oil being imported by either. |
| **Ban on Foreign Assistance:** U.S. foreign assistance to Iran—other than purely humanitarian aid—is banned under §620A of the Foreign Assistance Act, which bans U.S. assistance to countries on the U.S. list of "state sponsors of terrorism." Iran is also routinely denied direct U.S. foreign aid under the annual foreign operations appropriations acts (most recently in §7007 of division H of P.L. 111-8). | No U.N. equivalent | EU measures of July 27, 2010, banned grants, aid, and concessional loans to Iran. Also prohibited financing of enterprises involved in Iran's energy sector. These sanctions now lifted. Japan and South Korea did not at any time formally ban aid or lending to Iran. |

| U.S. Sanctions | U.N. Sanctions | EU and Other Allied Countries |
|---|---|---|
| **Ban on Arms Exports to Iran:** Iran is ineligible for U.S. arms exports under several laws, as discussed in the report. | As per Resolution 1929 (paragraph 8), as superseded by Resolution 2231, Security Council approval is required to sell Iran major weapons systems. | EU sanctions include a comprehensive ban on sale to Iran of all types of military equipment. Arms embargo remains post-JCPOA. No similar Japan and South Korean measures announced, but neither has exported arms to Iran. |
| **Restriction on Exports to Iran of "Dual Use Items":** Primarily under §6(j) of the Export Administration Act (P.L. 96-72) and §38 of the Arms Export Control Act, there is a denial of license applications to sell Iran goods that could have military applications. | U.N. resolutions on Iran banned the export of many dual-use items to Iran. Resolution 2231 set up a procurement network for the P5+1 to approve of all purchases for Iran's ongoing nuclear program. | EU banned the sales of dual use items to Iran, including ballistic missile technology, in line with U.N. resolutions. These restrictions remain post-JCPOA. Japan and S. Korea have announced full adherence to strict export control regimes when evaluating sales to Iran. |
| **Sanctions Against Lending to Iran:** Under §1621 of the International Financial Institutions Act (P.L. 95-118), U.S. representatives to international financial institutions, such as the World Bank, are required to vote against loans to Iran by those institutions. | Resolution 1747 (oper. paragraph 7) requested, but did not mandate, that countries and international financial institutions refrain from making grants or loans to Iran, except for development and humanitarian purposes. (No longer applicable.) | The July 27, 2010, measures prohibited EU members from providing grants, aid, and concessional loans to Iran, including through international financial institutions. Sanctions lifted post-JCPOA. Japan and South Korea banned medium- and long-term trade financing and financing guarantees. Short-term credit was still allowed. These sanctions now lifted. |
| **Sanctions Against the Sale of Weapons of Mass Destruction-Related Technology to Iran:** Several laws and regulations provide for sanctions against entities, Iranian or otherwise, that are determined to be involved in or supplying Iran's WMD programs (asset freezing, ban on transaction with the entity). | Resolution 1737 (oper. paragraph 12) imposed a worldwide freeze on the assets and property of Iranian WMD-related entities named in an Annex to the resolution. Each subsequent resolution expanded the list of Iranian entities subject to these sanctions. | The EU measures imposed July 27, 2010, commit the EU to freezing the assets of WMD-related entities named in the U.N. resolutions, as well as numerous other named Iranian entities. Most of these restrictions remain. Japan and South Korea froze assets of U.N.-sanctioned entities. Most of these restrictions have been lifted. |
| **Ban on Transactions with Terrorism Supporting Entities:** Executive Order 13224 bans transactions with entities determined by the Administration to be supporting international terrorism. Numerous entities, including some of Iranian origin, have been designated. | No direct equivalent, but Resolution 1747 (oper. paragraph 5) bans Iran from exporting any arms. Resolution 2231 continues that restriction until October 18, 2020. | No direct equivalent, but many of the Iranian entities named as blocked by the EU, Japan, and South Korea overlap or complement Iranian entities named as terrorism supporting by the United States. Japan and S. Korea did not impose specific terrorism sanctions on Iran. |

| U.S. Sanctions | U.N. Sanctions | EU and Other Allied Countries |
|---|---|---|
| **Human Rights Sanctions:** CISADA and other laws provide for a prohibition on travel to the U.S., blocking of U.S.-based property, and ban on transactions with Iranians determined to be involved in serious human rights abuses, or who sell Iran equipment to commit such abuses. | No U.N. sanctions were imposed on Iran for terrorism or human rights abuses. | The EU retains a ban on providing equipment that can be used for internal repression, and has sanctioned nearly 100 Iranians for human rights abuses. Japan and South Korea have announced bans on named Iranians involved in WMD programs. |
| **Restrictions on Iranian Shipping:** Under Executive Order 13382, the U.S. Department of the Treasury has named Islamic Republic of Iran Shipping Lines and several affiliated entities as entities whose U.S.-based property is to be frozen. | Resolution 1803 and 1929 authorize countries to inspect cargoes carried by Iran Air and Islamic Republic of Iran Shipping Lines (IRISL)—or any ships in national or international waters—if there is an indication that the shipments include goods whose export to Iran is banned. These resolutions no longer apply. | The EU measures announced July 27, 2010, banned Iran Air Cargo from access to EU airports and froze the EU-based assets of IRISL and its affiliates. Insurance and reinsurance for Iranian firms are banned. These sanctions now lifted. Japan and South Korean measures took similar action against IRISL and Iran Air. Sanctions now lifted. |
| **Banking Sanctions:** During 2006-2011, several Iranian banks have been named as proliferation or terrorism supporting entities under Executive Orders 13382 and 13224, and CISADA prohibits banking relationships with U.S. banks for any foreign bank that conducts transactions with Iran's Revolutionary Guard or with Iranian entities sanctioned under the various U.N. resolutions. FY2012 Defense Authorization (P.L. 112-81) prevents U.S. accounts with foreign banks that process transactions with Iran's Central Bank (with specified exemptions). | No direct equivalent However, two Iranian banks were named as sanctioned entities under the U.N. Security Council resolutions. U.N. restrictions on Iranian banking now lifted. | The EU froze Iran Central Bank assets January 23, 2012, and banned all transactions with Iranian banks unless authorized on October 15, 2012. Brussels-based SWIFT expelled sanctioned Iranian banks from the electronic payment transfer system. This restriction was lifted but then reimposed when the U.,S. left the JCPOA. Japan and South Korea took similar measures South Korea imposed the 40,000 Euro threshhold requiring authorization. Japan and S. Korea froze the assets of 15 Iranian banks; South Korea targeted Bank Mellat for freeze. These sanctions now lifted. |
| **Ballistic Missiles**: U.S. proliferations laws provide for sanctions against foreign entities that help Iran with its nuclear and ballistic missile programs. | Resolution 1929 (paragraph 9) prohibited Iran from undertaking "any activity" related to ballistic missiles capable of delivering a nuclear weapon. Resolution 2231 calls on Iran not to develop or launch ballistic missiles designed to be capable of carrying a nuclear weapon. Expires October 18, 2023. | EU measures on July 27, 2010, required adherence to this provision of Resolution 1929. EU has retained ban on providing ballistic missile technology to Iran in post-JCPOA period. |

# Appendix B. Post-1999 Major Investments in Iran's Energy Sector

| Date | Field/Project | Company(ies)/Status (If Known) | Value | Output/ Goal |
|---|---|---|---|---|
| Feb. 1999 | **Doroud (oil)** <br> Total and ENI received "special rule" ISA exemption | Total (France)/ENI (Italy) | $1 billion | 205,000 bpd |
| Apr. 1999 <br> Dec./May 2016 | **Balal (oil)** <br> Initial development completed in 2004 <br> Dec. 2016: Thailand PTTEP signed agreement with NIOC to study further development. | Total/ Bow Valley (Canada)/ENI <br> Thailand PTTEP | $300 million | 40,000 bpd |
| Nov. 1999 | **Soroush and Nowruz (oil)** <br> Royal Dutch received special rule ISA exemption | Royal Dutch Shell (Netherlands)/Japex (Japan) | $800 million | 190,000 bpd |
| Apr. 2000 | **Anaran bloc (oil)** <br> Lukoil and Statoil invested in 2000 but abandoned work in 2009. Lukoil considering returning. | Lukoil (Russia) and Statoil (Norway) | $105 million | 65,000 |
| Jul. 2000 | **South Pars Phases 4 and 5 (gas)** <br> On stream in 2005. ENI given special rule exemption | ENI | $1.9 billion | 2 billion cu. ft./day (cfd) |
| Mar. 2001 | **Caspian Sea oil exploration**—construction of submersible drilling rig for Iranian partner | GVA Consultants (Sweden) | $225 million | NA |
| Jun. 2001 | **Darkhovin (oil)** <br> ENI exited in 2013 and doing so enabled the firm to be exempted from U.S. sanctions | ENI <br> Field in production | $1 billion | 100,000 bpd |
| May 2002 | **Masjid-e-Soleyman (oil)** | Sheer Energy (Canada)/CNPC (China))/ Naftgaran Engineering (Iran) | $80 million | 25,000 bpd |
| Sept. 2002 | **South Pars Phases 9 and 10 (gas)** <br> On stream as of early 2009 | GS Engineering and Construction Corp. (South Korea) | $1.6 billion | 2 billion cfd |
| Oct. 2002 | **South Pars Phases 6, 7, and 8** <br> Field began producing late 2008; operational control handed to NIOC in 2009. Statoil got special rule | Statoil (Norway) | $750 million | 3 billion cfd |
| Jan. 2004 <br> Dec. 2016 | **Azadegan (oil)—South and North** <br> Inpex (Japan) sold stake in 2010 <br> CNPC (China)—N. Azadegan operator (vice Inpex) <br> Royal Dutch Shell/Petronas (Malaysia)—MoU to develop S. Azadegan | CNPC—N. Azadegan | $200 million (Inpex stake); China $2.5 billion | 260,000 bpd, of which 80,000 is from N. Azadegan. |
| Jan. 2004 | **Tusan Block** <br> Oil found in block in Feb. 2009, but not in commercial quantity, according to the firm. | Petrobras (Brazil) | $178 million | |
| Oct. 2004 | **Yadavaran (oil)** | Sinopec (China), deal finalized Dec. 9, 2007 | $2 billion | 300,000 bpd |

| Date | Field/Project | Company(ies)/Status (If Known) | Value | Output/ Goal |
|---|---|---|---|---|
| 2005 | **Saveh bloc (oil)** <br> GAO report, cited below | PTT (Thailand) | | |
| Jun. 2006 | **Garmsar bloc (oil)** <br> Deal finalized in June 2009 | Sinopec (China) | $20 million | |
| Jul. 2006 | **Arak Refinery expansion** | Sinopec (China); JGC (Japan). Work continued by Hyundai Heavy Industries (S. Korea) | $959 million (major initial expansion) | Expansion to produce 250,000 bpd |
| Sept. 2006 | **Khorramabad block (oil)** <br> Seismic data gathered, but no production is planned. (Statoil factsheet, May 2011) | Norsk Hydro and Statoil (Norway). | $49 million | no estimates |
| Dec. 2006 | **North Pars Gas Field (offshore gas).** Includes gas purchases Work suspended in 2011, resumed 2016, but current status of work unclear. | China National Offshore Oil Co. | $16 billion | 3.6 billion cfd |
| Feb. 2007 | **LNG Tanks at Tombak Port** <br> Contract to build three LNG tanks at Tombak, 30 miles north of Assaluyeh Port. | Daelim (S. Korea) | $320 million | 200,000 ton capacity |
| Feb. 2007 | **South Pars Phases 13 and 14** <br> Deadline to finalize (May 2009) not met; firms submitted revised proposals to Iran in June 2009. State Department said in September 2010, that Royal Dutch Shell and Repsol would not pursue the project. | Royal Dutch Shell, Repsol (Spain) | $4.3 billion | |
| Mar. 2007 | **Esfahan refinery upgrade** | Daelim (S. Korea) | | NA |
| Jul. 2007 | **S. Pars Phases 22, 23, and 24** <br> Pipeline to transport Iranian gas to Turkey, and on to Europe and building three power plants in Iran. | Turkish Petroleum Company (TPAO) | $12. billion | 2 billion cfd |
| Dec. 2007 | **Golshan and Ferdowsi onshore and offshore gas and oil fields and LNG plant** <br> Contract modified but reaffirmed December 2008 (GAO reports; Oil Daily, January 14, 2008.) | Petrofield Subsidiary of SKS Ventures (Malaysia) | $15 billion | 3.4 billion cfd of gas/250,000 bpd of oil |
| 2007 | **Jofeir Field (oil)** <br> GAO report cited below. Belarusneft, a subsidiary of Belneftekhim, sanctioned under ISA on March 29, 2011. Naftiran sanctioned on September 29, 2010. | Belarusneft (Belarus) under contract to Naftiran. <br> No production to date | $500 million | 40,000 bpd |
| 2008 | **Dayyer Bloc (Persian Gulf, offshore, oil)** <br> GAO reports. | Edison (Italy) | $44 million | |
| Feb. 2008 | **Lavan field (offshore natural gas)** | PGNiG (Polish Oil and Gas Company, Poland), divested to Iranian firms in 2011 | $2 billion | |
| Mar. 2008 | **Danan Field (on-shore oil)** <br> "PVEP Wins Bid to Develop Danan Field." Iran Press TV, March 11, 2008. | Petro Vietnam Exploration and Production Co. (Vietnam) | | |

| Date | Field/Project | Company(ies)/Status (If Known) | Value | Output/Goal |
|---|---|---|---|---|
| Apr. 2008 | **Iran's Kish Gas Field**<br>Includes pipeline from Iran to Oman. | Oman (cofinancing of project) | $7 billion | 1 billion cfd |
| Apr. 2008 | **Moghan 2 (onshore oil and gas, Ardebil province)** | INA (Croatia), but firm withdrew in 2014 | $40-$140 million | |
| 2008 | **Kermanshah petrochemical plant (new construction)**<br>GAO reports. | Uhde (Germany) | | 300,000 metric tons/yr |
| Jun. 2008 | **Resalat Oilfield**<br>Status of work unclear. | Amona (Malaysia). Joined in June 2009 by CNOOC and another China firm, COSL. | $1.5 billion | 47,000 bpd |
| Jan. 2009 | **Bushehr Polymer Plants**<br>Production of polyethelene at two polymer plants in Bushehr Province. Product exported | Sasol (South Africa), but firm withdrew in 2014 | | Capacity is 1 million tons per year. |
| Mar. 2009 | **Phase 12 South Pars (gas)**—Incl. LNG terminal construction and Farsi Block gas field/Farzad-B bloc. | Indian firms: Oil and Natural Gas Corp. of India (ONGC); Oil India Ltd., India Oil Corp. Ltd./minor stakes by Sonanagol (Angola) and PDVSA (Venezuela). | $8 billion | 20 million tonnes of LNG annually by 2012 |
| Aug. 2009 | **Abadan refinery**<br>Upgrade and expansion; building a new refinery at Hormuz on the Persian Gulf coast. | Sinopec | Up to $6 billion if new refinery is built | |
| Oct. 2009 | **South Pars Gas Field—Phases 6-8, Gas Sweetening Plant**<br>Contract signed but abrogated by S. Korean firm. | G and S Engineering and Construction (South Korea) | $1.4 billion | |
| Nov. 2009 | **South Pars Phase 12—Part 2 and Part 3** | Daelim (S. Korea)—Part 2; Tecnimont (Italy)—Part 3 | $4 billion ($2 bn each part) | |
| Feb. 2010/July 2017 | **South Pars Phase 11**<br>Awarded to CNPC in 2010, but in July 2017, Total took over as operator, with CNPC as minority partner (30%). In November 2018, Total exited and CNPC became operator. CNPC exited in Oct 2019. | CNPC (China), with Iran Petropars | $4.7 billion | 1.8 billion cu ft/day |
| 2011 | **Azar Gas Field**<br>Iran later cancelled Gazprom's contract due to Gazprom's failure to fulfill its commitments. | Gazprom (Russia) | | |
| Dec. 2011 | **Zagheh Oil Field**<br>Preliminary deal signed December 2011 | Tatneft (Russia) | $1 billion | 55,000 barrels per day |
| Jul. 2016 | **Aban Oil Field**<br>Zarubezhneft signed a MoU to assess the field. | Zarubezhneft (Russia) | | |
| Jul. 2016 | **Paydar Garb Oil Field** | Zarubezhneft (Russia) | | |

| Date | Field/Project | Company(ies)/Status (If Known) | Value | Output/Goal |
|---|---|---|---|---|
| | Zarubezhneft signed a MoU to assess the field. | | | |
| Nov. 2016 | **Parsi and Rag E-Sefid** <br> Schlumberger signed a MoU to assess the fields. | Schlumberger (France) | | |
| Nov. 2016 | **Sumar Oil Field** <br> PGNiG signed MoU to assess the field for six months. | PGNiG (Poland) | | |
| Nov. 2016 | **Karanj** <br> International Pergas Consortium signed a MoU to assess this field. | Pergas (consortium of firms from Norway, Britain, and Iran) | | |
| Dec. 2016 | **Changuleh Oil Field** <br> Companies signed MoU's to assess field. | Gazprom (Russia), PTTEP (Thailand), and DNO (Norway) | | |
| Dec. 2016 | **Kish Gas Field** <br> Royal Dutch Shell signed MoU to assess the field | Royal Dutch Shell | | |
| Dec. 2016 | **Chesmekosh Gas Field** <br> Gazprom signed MoU to assess the field | Gazprom (Russia) and Petronas (Malaysia) | | |
| Mar. 2017 | **Shadegan Oil Field** <br> Khuzestan province, producing about 65,000 bpd. | Tatneft (Russia) | | 500,000 bpd max. |

**Sources:** Various oil and gas journals, as well as CRS conversations with some U.S. and company officials. Some information comes from various GAO reports, the latest of which was January 13, 2015 (GAO-15-258R).

**Notes:** CRS has no mandate, authority, or means to determine violations of the Iran Sanctions Act, and no way to confirm the status of any of the reported investments. The investments are private agreements between Iran and the firms involved, which are not required to reveal the terms of their arrangements. Responsibility for a project to develop Iran's energy sector is part of ISA investment definition.

# Appendix C. Entities Sanctioned Under U.N. Resolutions and EU Decisions

**U.N. Security Council Resolutions**

Entities in italics were "delisted" on Implementation Day. Entities in standard font to remain listed until Transition Day (October 2023), unless removed earlier by Security Council. Persons listed are identified by the positions they held when designated; some have since changed.

**Entities Sanctioned by Resolution 1737 (resolution no longer active)**

- Farayand Technique (centrifuge program)

- Defense Industries Organization (DIO)
- 7th of Tir (DOI subordinate)
- Shahid Hemmat Industrial Group (SHIG)—missile program
- Shahid Bagheri Industrial Group (SBIG)—missile program
- Fajr Industrial Group—missile program

- Gen. Mohammad Mehdi Nejad Mouri (Malak Ashtar University of Defense Technology rector)
- Bahmanyar Morteza Bahmanyar (AIO official)
- Reza Gholi Esmaeli (AOI Official)
- Ahmad Vahid Dastjerdi (Head of AOI)
- Maj. Gen. Yahya Rahim Safavi (Commander in Chief, IRGC)
- Gen. Hosein Salimi (Commander, IRGC Air Force)

- *Atomic Energy Organization of Iran (AEIO)*
- *Mesbah Energy Company (Arak supplier)*
- *Mohammad Qanadi, AEIO Vice President*
- *Behman Asgarpour (Arak manager)*
- *Ehsan Monajemi (Natanz construction manager)*
- *Jafar Mohammadi (Adviser to AEIO)*
- *Dawood Agha Jani (Natanz official)*
- *Ali Hajinia Leilabadi (Director of Mesbah Energy)*

**Entities/Persons Added by Resolution 1747 (resolution no longer active)**

- Ammunition and Metallurgy Industries Group (controls 7th of Tir)
- Parchin Chemical Industries (branch of DIO)
- Sanam Industrial Group (subordinate to AIO)
- Ya Mahdi Industries Group
- Sho'a Aviation (produces IRGC light aircraft for asymmetric warfare)
- Qods Aeronautics Industries (produces UAV's, para-gliders for IRGC asymmetric warfare)
- Pars Aviation Services Company (maintains IRGC Air Force equipment)
- Gen. Mohammad Baqr Zolqadr (IRGC officer serving as deputy Interior Minister)
- Brig. Gen. Mohammad Hejazi (Basij commander)

- Brig. Gen. Qasem Soleimani (Qods Force commander)
- Fereidoun Abbasi-Davani (senior defense scientist)
- Mohasen Fakrizadeh-Mahabai (defense scientist*)*
- Mohsen Hojati (head of Fajr Industrial Group)
- Ahmad Derakshandeh (head of Bank Sepah)
- Brig. Gen. Mohammad Reza Zahedi (IRGC ground forces commander)
- Naser Maleki (head of SHIG); Brig. Gen. Morteza Reza'i (Deputy commander-in-chief, IRGC)
- Vice Admiral Ali Akbar Ahmadiyan (chief of IRGC Joint Staff)

- *Karaj Nuclear Research Center*
- *Novin Energy Company*; Cruise Missile Industry Group
- *Kavoshyar Company (subsidiary of AEIO)*
- *Bank Sepah* and *Bank Sepah International PLC* (funds AIO and subordinate entities in missile activities) **
- *Esfahan Nuclear Fuel Research and Production Center and Esfahan Nuclear Technology Center*
- *Seyed Jaber Safdari* (Natanz manager)
- *Amir Rahimi* (head of Esfahan nuclear facilities); Mehrdada Akhlaghi Ketabachi (head of SBIG)

**\*** Bank Sepah and Bank Sepah International were delisted on Implementation Day by a separate decision the Security Council. They were not named on the Resolution 2231 attachment of entities to be delisted on that day. No information has been publicized whether Ahmad Derakshandeh, the head of Bank Sepah, was also delisted.

**Entities Added by Resolution 1803 (resolution no longer active)**

Requires that countries report when the following persons enter or transit their territories:

- Amir Moayyed Alai (centrifuge program management)
- Mohammad Fedai Ashiani (Natanz complex technician)
- Abbas Rezaee Ashtiani (senior AEIO official)
- Haleh Bakhtiar
- Morteza Behzad (centrifuge component production)
- Mohammad Eslami (Defense Industries Training and Research Institute)
- Seyyed Hussein Hosseini (AEIO, involved in Arak)
- M. Javad Karimi Sabet (head of Novin Energy)
- Hamid-Reza Mohajerani (manager at Esfahan uranium conversion facility)
- Brig. Gen. Mohammad Reza Naqdi (military official, for trying to circumvent U.N. sanctions)
- Houshang Nobari (Natanz)
- Abbas Rashidi (Natanz)
- Ghasem Soleymani (Saghand uranium mine)

Travel banned for five Iranians sanctioned under Resolutions 1737 and 1747.

Adds entities to the sanctions list:

- Electro Sanam Co.
- Abzar Boresh Kaveh Co. (centrifuge production)
- Barzaganin Tejaral Tavanmad Saccal
- Jabber Ibn Hayan (AEIO laboratory)
- Khorasan Metallurgy Industries
- Niru Battery Manufacturing Co. (Makes batteries for Iranian military and missile systems)
- Ettehad Technical Group (AIO front co.)
- Industrial Factories of Precision
- Joza Industrial Co.
- *Pishgam (Pioneer) Energy Industries*
- Tamas Co. (uranium enrichment)
- Safety Equipment Procurement (AIO front, missiles)

**Entities Added by Resolution 1929 (resolution no longer active)**

Makes mandatory a previously nonbinding travel ban on most named Iranians of previous resolutions. Adds one individual banned for travel—AEIO head *Javad Rahiqi*.

- Amin Industrial Complex; Armament Industries Group
- Defense Technology and Science Research Center (owned or controlled by Ministry of Defense)
- Doostan International Company
- Farasakht Industries
- *First East Export Bank, PLC*
- Kaveh Cutting Tools Company
- M. Babaie Industries
- Shahid Karrazi Industries
- Malek Ashtar University (subordinate of Defense Technology and Science Research Center, above)
- Ministry of Defense Logistics Export (sells Iranian made arms to customers worldwide)
- Mizan Machinery Manufacturing
- Pejman Industrial Services Corp.;
- Sabalan Company; Sahand Aluminum Parts Industrial Company
- Shahid Sattari Industries
- Shahid Sayyade Shirazi Industries (acts on behalf of the DIO)
- Special Industries Group (DIO subordinate)
- Tiz Pars (cover name for SHIG)
- Yazd Metallurgy Industries
- Modern Industries Technique Company
- Nuclear Research Center for Agriculture and Medicine (research component of the AEIO)

The following IRGC-affiliated firms (several are subsidiaries of Khatam ol-Anbiya, the main Guard construction affiliate):

- Fater Institute
- Garaghe Sazendegi Ghaem
- Gorb Karbala
- Gorb Nooh
- Hara Company
- Sepasad Engineering Company
- Imensazan Consultant Engineers Institute
- Khatam ol-Anbiya
- Makin
- Omran Sahel
- Oriental Oil Kish
- Rah Sahel
- Rahab Engineering Institute
- Sahel Consultant Engineers
- Sepanir

The following entities determined to be owned or controlled by Islamic Republic of Iran Shipping Lines (IRISL): Irano Hind Shipping Company; IRISL Benelux; and South Shipping Line Iran.

**European Union Iran Designations**

**Terrorism-related**

Hamid Abdollahi

Mansoor Arbabsiar—for alleged plot to assassinate Saudi Ambassador in Washington

Assadollah Asadi—for alleged terrorist plot in Europe

Hashemi Moghadam—for alleged terrorist plot in Europe

Abdul Reza Shahlai—for alleged plot to assassinate Saudi Ambassador in Washington

Gholam Ali Shakuri—for alleged plot to assassinate Saudi Ambassador in Washington

Qasem Soleimani—IRGC-QF commander

Directorate for Internal Security of the Iranian Ministry of Intelligence and Security

Hamas

Hezbollah Military Wing

Palestinian Islamic Jihad

### Human-Rights Related

87 persons, mostly IRGC, Basij, Law Enforcement Forces commanders, as well as security militia chiefs such as Hossein Allahkaram of Ansar-e-Hezbollah. List also includes judicial officials such as Seyeed Hassan Shariati (head of Mashhad judiciary); Ghorban Ali Dorri-Najafabadi (former prosecutor-general); officials of Tehran revolutionary court; Supreme Court officials; Evin prison officials; province-level prosecutors; and others.

The full list is at link: https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:02011D0235-20180413&qid= 1555351537619&from=EN

# Appendix D. Entities Sanctioned under U.S. Laws and Executive Orders

For every table below, names in *italics* are entities and individuals that were delisted to implement the JCPOA. Under the JCPOA, entities in **boldface** were to be delisted on Transition Day (October 2023), had the United States remained in the JCPOA. Because of the U.S. withdrawal from the JCPOA in 2018, all delisted entities were relisted on November 5, 2018, and no entities are currently planned to be delisted.

### Table D-1. Entities Designated Under U.S. Executive Order 13382 (Proliferation)

(many designations coincide with EU and UN designations)

| Entity | Date Named |
|---|---|
| Shahid Hemmat Industrial Group (Iran) | June 2005, September 2007 |
| Shahid Bakeri Industrial Group (Iran) | June 2005, February 2009 |
| Atomic Energy Organization of Iran (AEOI). AEOI and 23 subsidiaries remain delisted for secondary sanctions under E.O. 13382 but are still designated as Iran-owned or controlled entities. | June 2005 |
| *Novin Energy Company* (Iran) and *Mesbah Energy Company* (Iran) | January 2006 |
| Four Chinese entities: Beijing Alite Technologies, LIMMT Economic and Trading Company, China Great Wall Industry Corp, and China National Precision Machinery Import/Export Corp. | June 2006 |
| Sanam Industrial Group (Iran) and Ya Mahdi Industries Group (Iran) | July 2006 |
| *Bank Sepah (Iran)* | January 2007 |
| **Kalaye Electic Company** | February 2007 |
| Defense Industries Organization (Iran) | March 2007 |
| *Pars Trash* (Iran, nuclear program), **Farayand Technique** (Iran, nuclear program), Fajr Industries Group (Iran, missile program), Mizan Machine Manufacturing Group (missile program). | June 2007 |
| Aerospace Industries Organization (AIO) (Iran); Korea Mining and Development Corp. (N. Korea). | September 2007 |
| Islamic Revolutionary Guard Corps (IRGC); Ministry of Defense and Armed Forces Logistics; *Bank Melli* (Iran's largest bank, widely used by Guard); Bank Melli Iran Zao (Moscow); Melli Bank PC (U.K.); *Bank Kargoshaee*; *Arian Bank* (joint venture between Melli and Bank Saderat). Based in Afghanistan; *Bank Mellat* (provides banking services to Iran's nuclear sector); *Mellat Bank SB CJSC* (Armenia). Reportedly has $1.4 billion in assets in UAE; *Persia International Bank PLC* (U.K.); Khatam ol Anbiya Gharargah Sazendegi Nooh (main IRGC construction and contracting arm); Oriental Oil Kish (Iranian oil exploration firm); Ghorb Karbala; Ghorb Nooh (synonymous with Khatam ol Anbiya); Sepasad Engineering Company (IRGC construction affiliate); Omran Sahel (IRGC construction affiliate); Sahel Consultant Engineering (IRGC construction affiliate); Hara Company; Gharargahe Sazandegi Ghaem | October 21, 2007 |
| Individuals: Bahmanyar Morteza Bahmanyar (AIO, Iran missile official, see above under Resolution 1737); Ahmad Vahid Dastjerdi (AIO head, Iran missile program); Reza Gholi Esmaeli (AIO, see under Resolution 1737); Morteza Reza'i (deputy IRGC commander); Mohammad Hejazi (Basij commander); Ali Akbar Ahmadian (Chief of IRGC Joint Staff); Hosein Salimi (IRGC Air Force commander). Resolution 1737; Qasem Soleimani (Qods Force commander). | October 21, 2007 |
| *Future Bank* (Bahrain-based but allegedly controlled by Bank Melli) | March 12, 2008 |
| Yahya Rahim Safavi (former IRGC Commander in Chief); Mohsen Fakrizadeh-Mahabadi (senior Defense Ministry scientist); *Dawood Agha-Jani* (head of Natanz facility); Mohsen Hojati (head of Fajr Industries, involved in missile program); Mehrdada Akhlaghi Ketabachi (heads Shahid Bakeri | July 8, 2008 |

| Entity | Date Named |
|---|---|
| Industrial Group); Naser Maliki (heads Shahid Hemmat Industrial Group); *Tamas Company* (involved in uranium enrichment); Shahid Sattari Industries (makes equipment for Shahid Bakeri); 7th of Tir (centrifuge technology); Ammunition and Metallurgy Industries Group (partner of 7th of Tir); Parchin Chemical Industries (deals in chemicals used in ballistic missile programs) | |
| Karaj Nuclear Research Center; *Esfahan Nuclear Fuel Research and Production Center* (NFRPC); *Jabber Ibn Hayyan* (reports to Atomic Energy Org. of Iran, AEIO); Safety Equipment Procurement Company; Joza Industrial Company (front company for Shahid Hemmat Industrial Group, SHIG) | August 12, 2008 |
| *Islamic Republic of Iran Shipping Lines* (IRISL) and 18 affiliates, including *Val Fajr 8*; *Kazar*; *Irinvestship*; *Shipping Computer Services*; *Iran o Misr Shipping*; *Iran o Hind*; *IRISL Marine Services*; *Iriatal Shipping*; *South Shipping*; IRISL Multimodal; Oasis; *IRISL Europe*; IRISL Benelux; *IRISL China*; *Asia Marine Network*; *CISCO Shipping*; and *IRISL Malta* | September 10, 2008 |
| Firms affiliated to the Ministry of Defense, including Armament Industries Group; Farasakht Industries; Iran Aircraft Manufacturing Industrial Co.; Iran Communications Industries; Iran Electronics Industries; and Shiraz Electronics Industries (SEI) | September 17, 2008 |
| *Export Development Bank of Iran* (EDBI). Provides financial services to Iran's Ministry of Defense and Armed Forces Logistics; *Banco Internacional de Desarollo, C.A.*, Venezuelan-based Iranian bank, sanctioned as an affiliate of the Export Development Bank. | October 22, 2008 |
| *Assa Corporation* (alleged front for Bank Melli in New York property management, see text) | December 17, 2008 |
| 11 Entities Tied to Bank Melli: *Bank Melli Iran Investment (BMIIC); Bank Melli Printing and Publishing*; *Melli Investment Holding; Mehr Cayman Ltd.*; *Cement Investment and Development*; *Mazandaran Cement Co.*; *Shomal Cement*; *Mazandaran Textile*; *Melli Agrochemical*; *First Persian Equity Fund*; BMIIC Intel General Trading | March 3, 2009 |
| IRGC General Rostam Qasemi, head of Khatem ol-Anbiya Construction Headquarters (main IRGC corporate arm) and several linked entities: Fater Engineering Institute, Imensazen Consultant Engineers Institute, Makin Institute, and Rahab Institute | February 10, 2010 |
| - *Post Bank of Iran;* IRGC Air Force; IRGC Missile Command; Rah Sahel and Sepanir Oil and Gas Engineering (for ties to Khatem ol-Anbiya); Mohammad Ali Jafari—IRGC Commander-in-Chief since September 2007; Mohammad Reza Naqdi (Head of the IRGC's Basij militia force that suppresses dissent); Ahmad Vahedi (Defense Minister); **Javedan Mehr Toos**, *Javad Karimi Sabet* (procurement brokers or atomic energy managers); Naval Defense Missile Industry Group (SAIG, controlled by the Aircraft Industries Org that manages Iran's missile programs); Five front companies for IRISL: *Hafiz Darya Shipping Co.*; *Soroush Sarzamin Asatir Ship Management Co.*; *Safiran Payam Darya*; and Hong Kong-based *Seibow Limited* and *Seibow Logistics*.<br><br>27 vessels linked to IRISKL and 71 new names of already designated IRISL ships.<br><br>Several Iranian entities were also designated as owned or controlled by Iran for purposes of the ban on U.S. trade with Iran. | June 16, 2010 |
| *Europaisch-Iranische Handelsbank* (EIH) for providing financial services to Bank Sepah, Mellat, EDBI, and others. | September 7, 2010 |
| *Pearl Energy Company* (formed by First East Export Bank, a subsidiary of Bank Mellat, *Pearl Energy Services, SA, Ali Afzali (*high official of First East Export Bank), IRISL front companies: *Ashtead Shipping*, *Byfleet Shipping*, *Cobham Shipping, Dorking Shipping, Effingham Shipping, Farnham Shipping, Gomshall Shipping*, and *Horsham Shipping* (all located in the Isle of Man).- IRISL and affiliate officials: *Mohammad Hosein Dajmar*, *Gholamhossein Golpavar*, *Hassan Jalil Zadeh*, and *Mohammad Haji Pajand*. | November 30, 2010 |
| Bonyad (foundation) Taavon Sepah, for providing services to the IRGC; Ansar Bank (for providing financial services to the IRGC); Mehr Bank (same justification as above); *Moallem Insurance Company* (for providing marine insurance to IRISL, Islamic Republic of Iran Shipping Lines) | December 21, 2010 |
| *Bank of Industry and Mine (BIM)* | May 17, 2011 |
| Tidewater Middle East Company; Iran Air; Mehr-e Eqtesad Iranian Investment Co. | June 23, 2011 |

| Entity | Date Named |
|---|---|
| For proscribed nuclear activities, including centrifuge development and heavy water research: By State—Nuclear Reactor Fuels Company; *Noor Afzar Gostar Company*; **Fulmen Group**; **Yasa Part**. <br><br> By Treasury—*Javad Rahiqi*; **Modern Industries Technique Company**; **Iran Centrifuge Technology Company (TESA); Neka Novin; Parto Sanat**; **Paya Partov**; **Simatic Development Co** | November 21, 2011 |
| Iran Maritime Industrial Company SADRA (owned by IRGC engineering firm Khatem-ol-Anbiya, has offices in Venezuela); Deep Offshore Technology PJS (subsidiary of the above); *Malship Shipping Agency and Modality Ltd* (both Malta-based affiliates of IRISL); *Seyed Alaeddin Sadat Rasool* (IRISL legal adviser); *Ali Ezati* (IRISL strategic planning and public affairs manager) | March 28, 2012 |
| Electronic Components Industries Co. (ECI) and Information Systems Iran (ISIRAN); Advanced Information and Communication Technology Center (AICTC) and Hamid Reza Rabiee (software engineer for AICTC); Digital Medical Lab (DML) and Value Laboratory (owned or controlled by Rabiee or AICTC); Ministry of Defense Logistics Export (MODLEX); Daniel Frosh (Austria) and International General Resourcing FZE (UAE, for supplying Iran's missile industry). | July 12, 2012 |
| *National Iranian Oil Company*; Tehran Gostaresh, company owned by Bonyad Taavon Sepah; Imam Hossein University, owned by IRGC; Baghyatollah Medical Sciences University, owned by IRGC or providing services to it. | November 8, 2012 |
| Atomic Energy Organization of Iran (AEOI) chief **Fereidoun Abbasi Davani**; *Seyed Jaber Safdari* of Novin Energy, a designated affiliate of AEOI; *Morteza Ahmadi Behzad*, provider of services to AEOI (centrifuges); **Pouya Control**—provides goods and services for uranium enrichment; **Iran Pooya**—provides materials for manufacture of IR-1 and IR-2 centrifuges; **Aria Nikan Marine Industry**—source of goods for Iranian nuclear program; **Amir Hossein Rahimyar**—procurer for Iran nuclear program; *Mohammad Reza Rezvanianzadeh*—involved in various aspects of nuclear program; **Faratech**—involved in Iran heavy water reactor project; **Neda Industrial Group**—manufacturer of equipment for Natanz enrichment facility; **Tarh O Palayesh**—designer of elements of heavy water research reactor; **Towlid Abzar Boreshi Iran**—manufacturer for entities affiliated with the nuclear program. | December 13, 2012 |
| SAD Import Export Company (also designated by U.N. Sanctions Committee a few days earlier for violating Resolution 1747 ban on Iran arms exports, along with Yas Air) for shipping arms and other goods to Syria's armed forces; Marine Industries Organization (affiliated with Iran Ministry of Defense and Armed Forces Logistics); Mustafa Esbati (acting on behalf of Marine Industries); Chemical Industries and Development of Materials Group (affiliate of Defense Industries Org); Doostan International Company (provided services to Iran Aerospace Industries Org, which oversees Iran missile industries). | December 21, 2012 |
| *Babak Morteza Zanjani*—chairmen of Sorinet Group that Iran uses to finance oil sales abroad; *International Safe Oil*—provides support to NIOC and NICO; *Sorinet Commercial Trust Bankers* (Dubai) and *First Islamic Investment Bank* (Malaysia)—finance NIOC and NICO; *Kont Kosmetik* and *Kont Investment Bank*—controlled by Babak Zanjani; *Naftiran Intertrade Company Ltd.* (owned by NIOC). | April 11, 2013 |
| *Iranian-Venezuelan Bi-National Bank (IVBB),* for activities on behalf of the Export Development Bank of Iran that was sanctioned on October 22, 2008 (see above). EDBI was sanctioned for providing financial services to Iran's Ministry of Defense. **Aluminat**, for providing centrifuge components to Kalaye Electric Co.; Pars Amayesh Sanaat Kish; **Pishro Systems Research Company** (nuclear research and development); **Taghtiran Kashan Company**; and Sambouk Shipping FZC (UAE) | May 9, 2013 |
| For supporting Iran Air, the IRGC, and NIOC: *Aban Air*; *Ali Mahdavi* (part owner of Aban Air); *DFS Worldwide*; *Everex; Bahareh Mirza Hossein Yazdi*; *Farhad Ali Parvaresh*; **Petro Green**; Hossein Vaziri. For helping Iran's nuclear program: **Farhad Bujar**; **Zolal Iran Company**; **Andisheh Zolal Co**. For helping MODAFL: Reza Mozaffarinia. | May 23, 2013 |
| *Bukovnya AE* (Ukraine) for leasing aircraft to Iran Air. | May 31, 2013 |
| Several Iranian firms and persons: **Eyvaz Technic Manufacturing Company**; The Exploration and Nuclear Raw Materials Company; **Maro Sanat Company**; Navid Composite Material Company; Negin Parto Khavar; Neka Novin officials **Iradj Mohammadi Kahvarin** and | December 12, 2013 |

| Entity | Date Named |
|---|---|
| **Mahmoud Mohammadi Dayeni**; Neka Novin alisaes including Kia Nirou; Qods Aviation Industries (operated by IRGC, produces UAVs, paragliders, etc); Iran Aviation Industries Organization; Reza Amidi; Fan Pardazan; Ertebat Gostar Novin. | |
| Ali Canko (Turkey) and Tiva Sanat Group, for procuring IRGC-Navy fast boats; **Advance Electrical and Industrial Technologies** and **Pere Punti** (Spain), for procurement for Neka Novin; *Ulrich Wipperman* and Deutsche Forfait (Germany), and Deutsche Forfait Americas (U.S.) for facilitating oil deals for NIOC. | February 6, 2014 |
| Karl Lee (aka Li Fangwei) and 8 China-based front companies: Sinotech Industry Co. Ltd.; MTTO Industry and Trade Limited; Success Move Ltd.; Sinotech Dalian Carbon and Graphite Manufacturing Corporation; Dalian Zhongchuang Char-White Co., Ltd.; Karat Industry Co., Ltd.; Dalian Zhenghua Maoyi Youxian Gongsi; and Tereal Industry and Trade Ltd. | April 29, 2014 |
| By State: **Organization of Defensive Innovation and Research** (nuclear research); Nuclear Science and Technology Research Institute (implements nuclear projects including heavy water reactor at Arak); **Jahan Tech Rooyan Pars**: and **Mandegar Baspar Kimiya Company** (latter two are involved in procuring carbon fiber for proscribed aspects of Iran's nuclear program). | April 29, 2014 (by both State and Treasury) |
| By Treasury: **Mohammad Javad Imarad** and **Arman Imanirad** (for acting on behalf of Aluminat, which procures aluminum products for Iran's nuclear program*); Nefertiti Shipping* (IRISL's agent in Egypt); Sazeh Morakab (provides services to Shahid Hemat Industrial Group, SHIG, and Iran's Aircraft Manufacturing Industrial Co., HESA); Ali Gholami and Marzieh Bozorg (officials of Sazeh Morakab). SHIG aliases identified: Sahand Aluminum Parts Co and Ardalan Machineries Co. | |
| **11 ballistic missile-related entities**: Mabrooka Trading Co LLC (UAE); Hossein Pournaghshband; Chen Mingfu; Anhui Land Group (Hong Kong); Candid General Trading; Rahim Reza Farghadani; Sayyed Javad Musavi; Seyed Mirahmad Nooshin; Sayyed Medhi Farahi (deputy director of the Ministry of Defense and Armed Forces Logistics); Seyed Mohammad Hashemi; Mehrdada Akhlaghi Ketabachi. Musavi has worked with North Korean officials on ballistic missiles. | January 17, 2016 |
| **Two Iranian entities** subordinate to SHIG: Shahid Nuri Industries and Shahid Movahed Industries. Updating of prior IRGC Missile Command designation to include IRGC Al Ghadir Missile Command (specific IRGC element with operational control of Iran's missile program). | |
| **17 ballistic missile-related Entities**. Abdollah Asgharzadeh Network (for supporting SHIG): Abdollah Asgharzadeh; Tenny Darian; East Start Company; Ofog Sabze Company; Richard Yue (China); Cosailing Business Trading Company (China); Jack Qin (China); Ningbo New Century Import and Export Co. Ltd (China); and Carol Zhou (China). Gulf-Based Rostamian Network (supporting SHIG and AIO): MKS International; Kambiz Rostamian; Royal Pearl General Trading. Iran-Based Network Working with Navid Composite and Mabrooka Trading: Ervin Danesh Aryan Company; Mostafa Zahedi; Mohammad Magham. Ghodrat Zargair and Zist Tajhiz Pooyesh Company (supporting Mabrooka Trading): Ghodrat Zargari, and Zist Tajhiz Pooyesh Company. | February 3, 2017 |
| **Ballistic missile-related entities**. Rahim Ahmadi (linked to Shahid Bakeri Industrial Group); Morteza Farasatpour (linked to Defense Industries Organization); Matin Sanat Nik Andishan (for supporting SHIG); and Ruan Ruling and three associated Chinese companies (for supporting Iran's missile guidance capabilities): Shanghai Gang Quan Trade Company, Shanghai North Begins International, and Shanghai North Transway International Trading Company. | May 17, 2017 |
| **12 IRGC/military and ballistic missile entities** designated by Treasury and two by State. By Treasury: Rayan Roshd Afzar Company for IRGC drone and censorship equipment, plus three company officials: Mohsen Parsajam, Seyyed Reza Ghasemi, and Farshad Hekemzadeh; Qeshm Madkandaloo Cooperative Co., Ramor Group (Turkey) and Resit Tavan of Ramor Group for supplying IRGC-Navy infrastructure; Emily Liu, Abascience Tech Co. Ltd, Raybeam Optronics Co. Ltd., Raytronic Corporation Ltd., and Sunway Tech Co. Ltd (all China) for supporting MODAFL subcontractor Shiraz Electronics Industries. By State: IRGC Aerospace Force Self Sufficiency Jihad Org and IRGC Research and Self Sufficiency Jihad Org—both for supporting Iran ballistic missile program. | July 18, 2017 |
| **Missile entities related to Iran Simorgh space launch on July 27**: six subordinate entities to Shahid Hemmat Industrial Group (SHIG, main Iran missile contractor) involved in making various | July 28, 2017 |

| Entity | Date Named |
|---|---|
| components of Iranian missiles: Shaid Karimi Industries; Shahid Rastegar Industries; Shahid Cheraghi Industries; Shahid Varamini Industries; Shahid Kalhor Industries; and Amir Al Mo'Menin Industries. | |
| **Suppliers to Iran's Naval Defence Missile Industry Group (SAIG):** Shahid Alamolhoda Industries; Rastafann Ertebat Engineering Company, Fanamoj. For supporting Iran's military: Wuhan Sanjiang Import and Export Company | October 13, 2017 |
| Five ballistic missile entities (owned or controlled by Shahid Bakeri Industrial Group, SBIG) : Shahid Kharrazi Industries; Shahid Sanikhani Industries; Shahid Moghaddam Industries; Shahid Eslami Research Center; and Shahid Shustari Industries. | January 4, 2018 |
| Green Wave Telecommunications (Malaysia) and Morteza Razavi (for supporting Fanamoj, designated on October 13, 2017); Iran Helicopter Support and Renewal Company (PANHA) and Iran Aircraft Industries (SAHA) (for supporting Iran's military aviation industry); Shi Yuhua (China) (for selling Iran navigation equipment); Pardazan System Namad Arman (PASNA)(for procuring lead zirconium tritanate (PZT) for Iranian military undersea and aircraft weaponry); and Bochuang Ceramic Inc. and Zhu Yuequn (China) for selling Iran PZT. | January 12, 2018 |
| Sayyed Mohammad Ali Haddadnezhad Tehrani, for supporting the IRGC Research and Self-Sufficiency Jihad Organization (see above), which is improving Houthi missile capabilities | May 22, 2018 |
| Bank Tejarat (for providing servides to support Bank Sepah); Trade Capital Bank (Belarus); Morteza Ahmadali Behzad (for acting on behalf of Pishro Company. | November 5, 2018 |
| **31 individuals/entities connected to Iran's Organization of Defense Innovation and Research (SPND),** itself designated in April 2014 (see above): Shahid Karimi Group—missiles and explosives—and four of its employees—Mohammad Reza Mehdipur, Akbar Motallebizadeh, Jalal Emami Gharah Hajjlu, and Sa'id Borji. Shahid Chamran Group—studies on electron acceleration, pulse power, wave generation—and its managing expert Sayyed Ashgar Hashemitabar. Shahid Fakhar Moghaddam Group—explosion simulators, neutron monitoring systems—and two employees Ruhollah Ghaderi Barmi, and Mohammad Javad Safari. Ten entities that research lasers, plasma technology, satellites, biotechnology, and other technologies for SPND: Sheikh Baha'i Science and Technology Research Center, Shahid Avini Group, Shahid Baba'i Group, Shahid Movahhed Danesh Group, Abu Reihan Group, Shahid Kazemi Group, Shahid Shokri Science and Technology Research Group, Heidar Karar Research Group, Shahid Zeinoddin Group, Bu Ali Group, and Sadra Research Center. Three persons acting on behalf of SPND: Gholam Reza Eta'ati, Mansur Asgari, and Reza Ebrahimi. Three SPND front companies and four of their officials: Pulse Niru and officials Mohammad Mahdi Da'emi Attaran and Mohsen Shafa'i; Kimiya Pakhsh Shargh and officials Mehdi Masoumian, and Mohammad Hossein Haghighian; and Paradise Medical Pioneers Company. | March 22, 2019 |
| **Petrochemicals Network**: Persian Gulf Petrochemical Industries Company (PGPIC), for supporting the IRGC's engineering conglomerate Khatem ol-Anbiya, and 39 PGPIC subsidiaries and sales agents: Arvand Petrochemical Co.; Bandar Imam Abniroo Petrochemical Co (PC).; Bandar Imam Besparan PC; Bandar Imam Faravaresh PC; Bandar Imam Kharazmi PC; Bandar Imam Kimiya PC; Bandar Imam PC; Bu Al Sina PC; Fajr PC; Hengam PC; Hormoz Urea Fertilizer Co.; Iranian Investment Petrochemical Group Co.; Karoun PC; Khouzestan PC; Lordegan Urea Fertilizer Co.; Mobin PC; Modabberan Eqtesad Co.; Nouri PC; Pars PC; Pazargad Non Industrial Operation Co.; Persian Gulf Apadana PC; Persian Gulf Bid Boland Gas Refinery Co.; Persian Gulf Petrochemical Industry Commercial Co.; Persian Gulf Fajr Yadavaran Gas Refinery Co.; Petrochemical Industries Development Management Co.; Rahavaran Fonoon PC; Shaid Tondgoyan PC; Urmia PC; Hemmat PC; Petrochemical Non-Industrial Operations and Services Co.; Ilam PC; Gachsaran Polymer Industries; Dah Dasht Petrochemical Industries; Broojen PC; NPC International (UK); NPC Alliance Corp. (Philippines); Atlas Ocean and Petrochemical (UAE); and Naghmeh FZE (UAE). | June 7, 2019 |
| **Missile Proliferation Entities**: Hamid Dehghan, Pishtazan Kavosh Gostar Boshra LLC (PKGB), Ebtekar Sanat Ilya, Hadi Dehghan, Shaghayegh Akhaei, Mahdi Ebrahimzadeh, Shafagh Senobar Yazd, and Green Industries (Hong Kong). Also designated: Asre Sanat Eshragh Company and Seyed Hossein Shariat for procuring aluminum alloy for Iran. | August 28, 2019 |

| Entity | Date Named |
|---|---|
| **Iranian Space Entities**: Astronautics Research Institute, Iran Space Agency, Iran Space Research Center. | September 3, 2019 |

## Table D-2. Iran-Related Entities Sanctioned Under Executive Order 13224 (Terrorism Entities)

| Entity | Date Named |
|---|---|
| Martyr's Foundation (Bonyad Shahid), a major Iranian foundation (bonyad)—for providing financial support to Hezbollah and PIJ; Goodwill Charitable Organization, a Martyr's Foundation office in Dearborn, Michigan; Al Qard Al Hassan—part of Hezbollah's financial infrastructure (and associated with previously designated Hezbollah entities Husayn al-Shami, Bayt al-Mal, and Yousser Company for Finance and Investment); Qasem Aliq—Hezbollah official, director of Martyr's Foundation Lebanon branch, and head of Jihad al-Bina, a previously designated Lebanese construction company run by Hezbollah; Ahmad al-Shami—financial liaison between Hezbollah in Lebanon and Martyr's Foundation chapter in Michigan. | July 25, 2007 |
| IRGC-Qods Force and Bank Saderat (allegedly used to funnel Iranian money to Hezbollah, Hamas, PIJ, and other Iranian supported terrorist groups) | October 21, 2007 |
| Al Qaeda Operatives in Iran: Saad bin Laden; Mustafa Hamid; Muhammad Rab'a al-Bahtiyti; Alis Saleh Husain. | January 16, 2009 |
| Qods Force senior officers: Hushang Allahdad, Hossein Musavi,Hasan Mortezavi, and Mohammad Reza Zahedi; Iranian Committee for the Reconstruction of Lebanon, and its director Hesam Khoshnevis, for supporting Lebanese Hezbollah; Imam Khomeini Relief Committee Lebanon branch, and its director Ali Zuraik, for providing support to Hezbollah; Razi Musavi, a Syrian based Iranian official allegedly providing support to Hezbollah. | August 3, 2010 |
| Liner Transport Kish (for providing shipping services to transport weapons to Lebanese Hezbollah) | December 21, 2010 |
| Qasem Soleimani (Qods Force commander); Hamid Abdollahi (Qods force); Abdul Reza Shahlai (Qods Force); Ali Gholam Shakuri (Qods Force); Manssor Arbabsiar (alleged plotter) | October 11, 2011 |
| Mahan Air (for transportation services to Qods Force) | October 12, 2011 |
| Ministry of Intelligence and Security of Iran (MOIS) | February 16, 2012 |
| Five entities/persons for weapons shipments to Syria and an October 2011 shipment to Gambia, intercepted in Nigeria: Yas Air (successor to Pars Air); Behineh Air (Iranian trading company); Ali Abbas Usman Jega (Nigerian shipping agent); Qods Force officers: Esmail Ghani, Sayyid Ali Tabatabaei, and Hosein Aghajani. | March 27, 2012 |
| Mohammad Minai, senior Qods Force member involved in Iraq; Karim Muhsin al-Ghanimi, leader of Kata'ib Hezbollah (KH) militia in Iraq; Sayiid Salah Hantush al-Maksusi, senior KH member; and Riyad Jasim al-Hamidawi, Iran based KH member. | November 8, 2012 |
| Ukraine-Mediterranean Airlines (Um Air, Ukraine) for helping Mahan Air and Iran Air conduct illicit activities; Rodrigue Elias Merhej (owner of Um Air); Kyrgyz Trans Avia (KTA, Kyrgyzstan) for leasing aircraft to Mahan Air; Lidia Kim, director of KTA; Sirjanco (UAE) for serving as a front for Mahan Air acquisition of aircraft; Hamid Arabnejad, managing director of Mahan Air. | May 31, 2013 |
| Several persons/entities in UAE aiding Mahan Air (see above): Blue Sky Aviation FZE; Avia Trust FZE; Hamidreza Malekouti Pour; Pejman Mahmood Kosrayanifard; and Gholamreza Mahmoudi. Several IRGC-Qods Force offices or facilitators involved in Iran's efforts in Afghanistan: Sayyed Kamal Musavi; Alireza Hemmati; Akbar Seyed Alhosseini; and Mahmud Afkhami Rashidi. One Iran-based Al Qaeda facilitator (supporting movement of Al Qaeda affiliated fightes to Syria): Olimzhon Adkhamovich Sadikov (aka Jafar al-Uzbeki or Jafar Muidinov). | February 6, 2014 |

| Entity | Date Named |
|---|---|
| Meraj Air (for delivering weapons to Syria from Iran); Caspian Air (supports IRGC by transporting personnel and weapons to Syria); Sayyed Jabar Hosseini (manager of Liner Transport Kish which IRGC uses to support terrorist activities outside Iran); Pioneer Logistics (Turkey, helps Mahan Air evade sanctions); Asian Aviation Logistics (Thailand, helps Mahan Air evade sanctions). Pouya Air designated as alias of Yas Air. | August 29, 2014 |
| Al Naser Airlines (Iraq) for transferring nine aircraft to Mahan Air, which is a 13224 designee: Issam Shamout, a Syrian businessman, and his company Sky Blue Bird Aviation, for the same transaction. | May 21, 2015 |
| Four U.K.-based and two UAE-based entities for supporting Mahan Air. U.K.: Jeffrey John James Ashfield; Aviation Capital Solutions; Aircraft, Avionics, Parts and Support Ltd (AAPS); John Edward Meadows (for acting on behalf of AAPS). UAE: Grandeur General Trading FZE and HSI Trading FZE. | March 24, 2016 |
| **Eight IRGC-QF and Hezbollah-related entities**. Lebanon-Based IRGC-QF Network: Hasan Dehghan Ebrahimi (IRGC-QF operative in Beirut supporting Hezbollah); Muhammad Abd-al-Amir Farhat; Yahya al-hajj; Maher Trading and Construction Company (laundering funds and smuggling goods to Hezbollah); Reem Phamaceutical; Mirage for Engineering and Trading; Mirage for Waste Management and Environmental Services. Ali Sharifi (for procuring aviation spare parts for the IRGC-QF). | February 3, 2017 |
| Islamic Revolutionary Guard Corps (IRGC) | October 13, 2017 |
| Six entities involved in IRGC-QF counterfeiting: Reza Heidari; Pardazesh Tasvir Rayan Co. (Rayan Printing); ForEnt Technik and Printing Trade Center GmbH (Germany); Mahmoud Seif; Tejarat Almas Mobin Holding (parent of Rayan Printing). | November 20, 2017 |
| **Nine individuals and entities, disrupted by U.S.-UAE joint action, attempting to acquire dollars in UAE to provide to the IRGC-QF**: Individuals: Mas'ud Nikbakht, Sa'id Najafpur, and Mohammad Khoda'i, for financial activities on behalf of the IRGC-QF; Mohammadreza Valadzaghard, Meghdad Amini, and Foad Salehi, for providing material support, including illicit financial assistance, to the IRGC-QF. Entities: Jahan Aras Kish, a front company involved in transferring and converting funds for the IRGC-QF, Rashed Exchange, for converting currency for the IRGC-QF, and Khedmati and Company Joint Partnership, for being owned by Khedmati and Khoda'i. | May 10, 2018 |
| **Persons and entities providing funds to Hezbollah on behalf of the IRGC-QF**: Central Bank Governor Valiollah Seif; Aras Habib and his Iraq-based Al Bilad Islamic Bank; and Muhammad Qasir | May 15, 2018 |
| Four persons for helping the Houthi missile program through the IRGC Aerospace Forces Al Ghadir Missile Command: Mahmud Bagheri Kazemabad; Mohammad Agha Ja'fari; Javad Bordbar Shir Amin; and Mehdi Azarpisheh (IRGC-QF affiliate) | May 22, 2018 |
| **Twenty-one entities linked to the Basij security force**, including firms it owns or controls that provide it revenue to send child soldiers to fight in Syria: Bonyad Taavon Basij (economic conglomerate giving financial support to Basij members); Mehr Eqtesad Bank; Bank Mellat; Mehr Eqtesad Iranian Investment Company; Tadbirgaran Atiyeh Investment Company; Negin Sahel Royal Company; Mehr Eqtesad Financial Group; Technotar Engineering Company; Iran Tractor Manufacturing Company (owned by Mehr Investment and Negin above); Taktar Investment Company; Iran's Zinc Mines Development Company; Calcimin (owned by Iran Zinc Mines above); Bandar Abbas Zinc Production Company; Qeshm Zinc Smelting and Reduction Company; Zanjan Acid Production Company; Parsian Catalyst Chemical Company; Esfehan's Mobarakeh Steel Company (largest steel maker in Middle East and North Africa); Andisheh Mehvaran Investment Company; Parsian Bank; Sina Bank; and Bahman Group. | October 16,2018 |
| IRGC-QF personnel supporting the Taliban in Afghanistan (in conjunction with U.S.-GCC Terrorist Financing Targeting Center): Mohammad Ebrahim Owhadi and Esma'il Razavi | October 23, 2018 |
| **Banks and other Entities newly designated**. Many of these entities are also being redesignated under EO13382, but their designations below under 13224 is new. Aircraft and vessels are not included: Bank Melli; Arian Bank; Bank Kargoshaee; Melli Bank PLC; Tose-E Develoment Company; Behshahr Industrial Development Corp.; Cement Industry and Development Company; Melli International Building and Industry Company; BMIIC International General Trading LLC; Shomal Cement Company; Persian Gulf Sabz Karafarinan; Mir Business Bank; Export Development Bank of | November 5, 2018 (in concert with reimposition of JCPOA-related sanctions) |

| Entity | Date Named |
|---|---|
| Iran (EDBI); EDBIStock Exchange; EDBI Exchange Brokerage; Banco Internacional de Desarrollo, C.A.; Iran-Venezuela Bi-National Bank; Day Bank and subsidiaries—Atieh Sazan Day; Buali Investment Company; Tejarat Gostar Fardad; Day Exchange Company; Day Leasing Co.; Day Brokerage Co.; Tose-e Didar Iran Holding Co.; Royay-e Roz Kish Investment Co; Day E-Commerce; Tose-e Donya Shahr Kohan Co.; Damavand Power Generation Co,; Omid Bonyan Day Insurance Services; Omran Va Maskan Abad Day Co.; Day Iranian Financial and Accounting Services Co.; Persian International Bank PLC; First East Export Bank PLC; Mellat Bank Close Joint-Stock Co.; Bank Tejarat; and Trade Capital Bank (Belarus). | |
| Four Hezbollah and IRGC-QF-related individuals who operate in Iraq : Shibl Mushin 'Ubayd Al-Zaydi; Yusuf Hashim; Adnan Hussein Kawtharani; Muhammad 'Abd-Al-Hadi Farhat | November 13, 2018 |
| **Individuals involved in a network through which Iran provides oil to Syria's government and transfer funds to Iranian proxies including Hezbollah and Hamas**: Mohamed Amer Alchwiki (also designated under E.O. 13582 for providing financial support to the government of Syria); Global Vision Group (also designated under E.O. 13582); Rasul Sajjad and Hossein Yaghoobi (for assisting the IRGC-QF); and Muhammad Qasim al-Bazzal (for assisting Hezbollah).<br><br>Also designated under E.O. 13582 as part of the network: Promsyrioimport; Andrey Dogaev; Mir Business Bank; and Tadbir Kish Medical and Pharmaceutical Company | November 20, 2018 |
| **Two Iran-recruited Afghan and Pakistani-staffed militia entities fighting in Syria**: Fatemiyoun Division and Zaynabiyoun Brigade. Qeshm Fars Air and Flight Travel LLC—Mahan Air affiliates—for weapons deliveries into Syria. | January 24, 2019 |
| **Iraq-related entities**: Harakat al-Nujaba (HAN), Iraqi Shia militia; and HAN leader Akram Abbas al-Kabi (previously sanctioned in 2008 when he headed a Mahdi Army "special group" militia) | March 5, 2019 |
| **25 individuals and entities that illicitly moved more $1 billion+ to the IRGC via the IRGC-controlled Ansar Bank and Ansar Exchange**: (Iran) Ministry of Defense and Armed Forces Logistics (MODAFL); Ansar Bank, its managing director Ayatollah Ebrahimi, and affiliates Iranian Atlas Company, Ansar Bank Brokerage Company, and Ansar Information Technology; Ansar Exchange, its managing director Alireza Atabaki, and UAE-based facilitators Reza Sakan, Mohammad Vakili and the Vakili-owned Atlas Exchange; Zagros Pardis Kish for helping MODAFL acquire vehicles in UAE, and its manager Iman Sedaghat; Sakan General Trading (UAE), its owner, Rez Sakan and Iran-based affiliate Sakan Exchange; Hital Exchange and its owner Seyyed Mohammad Reza Ale Ali; Golden Commodities General Trading (UAE), its owner Assadolah Seifi, and another Seifi-owned UAE firm The Best Leader General Trading; Sulayman Sakan and his firm Atlas Doviz Ticaret A.S. (Turkey) for assisting Atlas Exchange; Ali Shams Mulavi—Turkey-based financial facilitator for Ansar Exchange and his UAE-based firm Naria General Trading; Lebra Moon General Trading (UAE). | March 26, 2019 |
| **Iraq-based entities facilitating IRGC-QF access to Iraq's financial system**: South Wealth Resources Company (aka Manabea Tharwat al-Janoob General Trading Co.); Makki Kazim 'Abd l Hamid Al Asadi; and Muhammed Husayn Salih al-Hasani | June 12, 2019 |
| **Eight IRGC Commanders**: IRGC Navy Commander Ali Reza Tangsiri; IRGC Aerospace Commander Amirali Hajizadeh; IRGC Ground Forces Commander Mohammad Pakpour; and five IRGC Navy district commaners: Abbas Gholamshahi (district 1); Ramezan Zirahi (district 2); Yadollah Badin (district 3); Mansur Ravankar (district 4); and Ali Ozma'l (district 5) | June 24, 2019 |
| **Hezbollah Parliamentarians**: Two Hezbollah parliamentarians for using their parliamentary positions to advance Hezbollah objectives and "bolstering Iran's malign activities": Amin Sherri and Muhammad Hasan Ra'd (who is also a member of Hezbollah's Shura Council). Also designated: head of Hezbollah security and liaison to Lebanon's security services Wafiq Safa. | July 9, 2019 |
| **Financial Institutions used by Hezbollah (all in Lebanon):** Jammal Trust Bank SAL; Trust Insurance SAL; Trust Insurance Services SAL; Trust Life Insurance Company SAL | August 29, 2019 |
| **Financial Facilitators Moving Funds from IRGC-QF to Hamas**: Muahmmad Sarur; Kamal Abdelrahman Aref Awad; Fawaz Mahmud Ali Nasser; Muhammad Al-Ayy. Designations made in partnership with the Sultanate of Oman | August 29, 2019 |

| Entity | Date Named |
|---|---|
| **Oil Tanker Seized and Released by Gibraltar**: Adrian Darya 1 and Akhilesh Kumar (ship and captain, for carrying oil to Syria) | August 30, 2019 |
| **Iran Oil Shipping Network**: 16 entities and 10 persons, including: Rostam Qasemi (former Oil Minister, now head of Iranian-Syrian Economic Relations Development Committee); Mehdi Group and subsidiaries (India)—Bushra Ship Management Private Limited, Khadija Ship Management Private Limited, Vaniya Ship Management. Kish P and I Club shipping insurer (Iran). Hokoul SAL Offshore, Talaqi Group, Nagham Al Hayat, Tawafuk, ALUMIX (Lebanon) for supplying Syrian state owned Sytrol oil company under IRGC-QF auspices. | September 4, 2019 |
| **Persons and Entities Facilitating Funding from IRGC-QF** Muhammad Sa'id Izadi (head of Palestinian Office of the IRGC-QF contingent in Lebanon); Zaher Jabarin (Turkey-based Hamas liaison with the IRGC-QF); Redin Exchange (Turkey-based financial channel for IRGC-QF funding of Hamas and Hezbollah); Marwan Mahdi Salah Al Rawi (CEO of Redin Exchange); Ismael Tash (deputy CEO of Redin and facilitator of money transfers from Iran to Hamas); SMART (Ithalat Ihracat Dis Ticaret Limited Sirketi, import-export company associated with Redin) | September 10, 2019 |
| **Central Bank.** Central Bank of Iran, National Development Fund of Iran, and Etemad Tejarate Pars Co. All sanctioned for funneling funds to the IRGC. MODAFL, and Lebanese Hezbollah. National Development Fund, a sovereign wealth fund, is primarily involved in rural electrification and development. | September 20, 2019 |
| **IRGC-QF Shipping Network to Yemen**: Abdolhossein Khedri; Khedri Jahan Darya Co; Maritime Silk Road LLC. Mahan Air Sales Agents: Gatewick LLC (Dubai); Jahan Destination Travel and Tourism LLC (Dubai); and Gomei Ai Services Co. (Hong Kong) | December 11, 2019 |
| **Hezbollah Individuals and Entities**:  Three individuals and 12 entities linked to the Martyr's Foundation, which is part of Hezbollah's support network. Entities sanctioned included Atlas Holdings and its affiliates involved in medical equipment, pharmaceuticals, paints, and tourism | February 26, 2020 |
| **Iran and Iraq-based front companies controlled or supporting the IRGC-QF**   Individuals and entities including: Reconstruction Organization of the Holy Shrines in Iraq; Kosar Company; Alireza Fadakar (IRGC-QF commander in Najaf); Al Khamael Maritime Services (partly owned by QF); Mada'in Novin Traders; Sayyed Yaser Musavir (QF official helping Iraqi Shia militias); Shaykh Adnan al-Hamidawi (special operations commander for Kata'ib Hezbollah militia); | March 26, 2020 |

## Table D-3. Determinations and Sanctions under the Iran Sanctions Act

| Entity | Date Named |
|---|---|
| Total SA (France); Gazprom (Russia); and Petronas (Malaysia)—$2 billion project to develop South Pars gas field. ISA violation determined but sanctions waived in line with U.S.-EU agreement for EU to cooperate on antiterrorism and antiproliferation issues and not file a complaint at the WTO. Then-Secretary of State Albright, in the May 18, 1998, waiver announcement indicated that similar future such projects by EU firms in Iran would not be sanctioned. (http://www.parstimes.com/law/albright_southpars.html). *Violation determined but sanctions waived.* | May 18, 1998 |
| Naftiran Intertrade Co. (NICO), Iran and Switzerland. Sanctioned for activities to develop Iran's energy sector. *Sanctions lifted under JCPOA.* | Sept. 30, 2010 |
| Total (France); Statoil (Norway); ENI (Italy); and Royal Dutch Shell. *Exempted under ISA "special rule" for pledging to wind down work on Iran energy fields.* | Sept. 30, 2010 |
| Inpex (Japan) *Exempted under the Special rule for divesting its remaining 10% stake in Azadegan oil field.* | Nov. 17, 2010 |
| Belarusneft (Belarus, subsidiary of Belneftekhim) Sanctioned for $500 million contract with NICO (see above) to develop Jofeir oil field. Other subsidiaries of Belneftekhim were sanctioned in 2007 under E.O. 13405 (Belarus sanctions). *Sanctions remain.* | March 29, 2011 |

| Entity | Date Named |
| --- | --- |
| Petrochemical Commercial Company International (PCCI) of Bailiwick of Jersey and Iran; Royal Oyster Group (UAE); Tanker Pacific (Singapore); Allvale Maritime (Liberia); Societie Anonyme Monegasque Et Aerienne (SAMAMA, Monaco); Speedy Ship (UAE/Iran); Associated Shipbroking (Monaco); and Petroleos de Venezuela (PDVSA, Venezuela).<br><br>Sanctioned under CISADA amendment to ISA imposing sanctions for selling gasoline to Iran or helping Iran import gasoline. Allvale Maritime and SAMAMA determinations were issued on September 13, 2011, to "clarify" the May 24 determinations that had named Ofer Brothers Group. The two, as well as Tanker Pacific, are affiliated with a Europe-based trust linked to deceased Ofer brother Sami Ofer, and not Ofer Brothers Group based in Israel. Firms named subjected primarily to the financial sanctions provided in ISA. U.S.-based subsidiaries of PDVSA, such as Citgo, were not sanctioned. *Sanctions lifted under JCPOA.* | May 24, 2011 |
| Zhuhai Zhenrong Co. (China); Kuo Oil Pte Ltd. (Singapore); FAL Oil Co. (UAE)<br>Sanctioned for brokering sales or making sales to Iran of gasoline. *Sanctions lifted under JCPOA.* | January 12, 2012 |
| Sytrol (Syria), for sales of gasoline to Iran. *Sanctions remain.* | August 12, 2012 |
| Dr. Dimitris Cambis; Impire Shipping; Kish Protection and Indemnity (Iran); and Bimeh Markasi-Central Insurance of Iran (CII, Iran)<br>Sanctioned under ISA provision on owning vessels that transport Iranian oil or providing insurance for the shipments. Treasury sanctions also imposed on eight UAE-based oil traders that concealed the transactions. *Sanctions lifted under JCPOA.* | March 14, 2013 |
| Tanker Pacific; SAMAMA; and Allvale Maritime<br>Sanctions lifted. *Special rule applied after "reliable assurances" they will not engage in similar activity in the future.* | April 12, 2013 |
| Ferland Co. Ltd. (Cyprus and Ukraine)<br>Sanctioned for cooperating with National Iranian Tanker Co. to illicitly sell Iranian crude oil. *Sanctions lifted under JCPOA.* | May 31, 2013 |
| Dettin SPA Italy-based company sanctioned for providing goods and services to Iran's petrochemical industry. *Sanctions lifted under JCPOA.* | August 29, 2014 |

## Table D-4. Entities Sanctioned Under the Iran North Korea Syria Nonproliferation Act or Executive Order 12938 for Iran-Specific Violations

These designations expire after two years, unless redesignated. The designations included in this table are those that were applied specifically for proliferation activity involving Iran.

| Entity | Date Named |
| --- | --- |
| Baltic State Technical University and Glavkosmos, both of Russia.<br>(both designations revoked in 2010) | July 30, 1998 |
| D. Mendeleyev University of Chemical Technology of Russia and Moscow Aviation Institute (both removed on May 21, 2010) | January 8, 1999 |
| Changgwang Sinyong Corp. (North Korea) | January 2, 2001 |
| Changgwang Sinyong Corp. (North Korea) and Jiangsu Yongli Chemicals and Technology Import-Export (China) | June 14, 2001 |
| Three entities from China for proliferation to Iran | January 16, 2002 |
| Armen Sargsian and Lizen Open Joint Stock Co. (Armenia); Cuanta SA and Mikhail Pavlovich Vladov (Moldova); and eight China entities for proliferation involving Iran | May 9, 2002 |
| Norinco (China). For alleged missile technology sale to Iran. | May 2003 |
| Taiwan Foreign Trade General Corporation (Taiwan) | July 4, 2003 |

| Entity | Date Named |
|---|---|
| Tula Instrument Design Bureau (Russia). For alleged sales of laser-guided artillery shells to Iran. (Also designated under Executive Order 12938) | September 17, 2003 |
| 13 entities from Russia, China, Belarus, Macedonia, North Korea, UAE, and Taiwan. | April 1, 2004 |
| 14 entities from China, North Korea, Belarus, India (two nuclear scientists, Dr. Surendar and Dr. Y.S.R. Prasad), Russia, Spain, and Ukraine. | September 23, 2004 |
| 14 entities, mostly from China, for supplying of Iran's missile program. Designations included North Korea's Changgwang Sinyong and China's Norinco and Great Wall Industry Corp, have been sanctioned several times previously. Others sanctioned included North Korea's Paeksan Associated Corporation, and Taiwan's Ecoma Enterprise Co. | December 2004 and January 2005 |
| Nine entities, including from China (Norinco, Hondu Aviation, Dalian Sunny Industries, Zibo Chemet Equipment); India (Sabero Organicx Chemicals and Sandhya Organic Chemicals); and Austria (Steyr Mannlicher Gmbh). Sanctions against Dr. Surendar of India (see September 29, 2004) were ended because of information exonerating him. | December 23, 2005 |
| Two Indian chemical companies (Balaji Amines and Prachi Poly Products); two Russian firms (Rosobornexport and aircraft manufacturer Sukhoi); two North Korean entities (Korean Mining and Industrial Development, and Korea Pugang Trading); and one Cuban entity (Center for Genetic Engineering and Biotechnology). | July 28, 2006 |
| Abu Hamadi (Iraq); Aerospace Logistics Services (Mexico); Al Zargaa Optical and Electronics (Sudan); Alexey Safonov (Russia); Arif Durrani (Pakistan)China National Aero Technology Import-Export (China); China National Electronic Import Export (China); Defense Industries Org. (Iran); Giad Industrial Complex (Sudan); Iran Electronics Industry (Iran); Kal al-Zuhiry (Iraq); Kolomna Design Bureau of Machine Building (Russia); NAB Export Co. (Iran); Rosoboronexport (Russia); Sanam Industrial Group (Iran); Target Airfreight (Malaysia); Tula Design Bureau of Instrument Building (Russia); Yarmouk Industrial Complex (Sudan) Zibo Chemet Equipment Co. (China) | December 28, 2006 |
| Rosobornexport, Tula Design, and Komna Design Office of Machine Building, and Alexei Safonov (Russia); Zibo Chemical, China National Aerotechnology, and China National Electrical (China). Korean Mining and Industrial Development (North Korea) for WMD/advanced weapons sales to Iran and Syria. | January 2007 (see below for Tula and Rosoboronexport removal) |
| 14 entities, including Lebanese Hezbollah. Some were penalized for transactions with Syria. Among the new entities sanctioned for assisting Iran were Shanghai Non-Ferrous Metals Pudong Development Trade Company (China); Iran's Defense Industries Organization; Sokkia Company (Singapore); Challenger Corporation (Malaysia); Target Airfreight (Malaysia); Aerospace Logistics Services (Mexico); and Arif Durrani (Pakistani national). | April 17, 2007 |
| China Xinshidai Co.; China Shipbuilding and Offshore International Corp.; Huazhong CNC (China); IRGC; Korea Mining Development Corp. (North Korea); Korea Taesong Trading Co. (NK); Yolin/Yullin Tech, Inc. (South Korea); Rosoboronexport (Russia sate arms export agency); Sudan Master Technology; Sudan Technical Center Co; Army Supply Bureau (Syria); R and M International FZCO (UAE); Venezuelan Military Industries Co. (CAVIM). (Rosoboronexport removed May 21, 2010.) | October 23, 2008 |
| BelTechExport (Belarus); Dalian Sunny Industries (China); Defense Industries Organization (Iran); Karl Lee; Shahid Bakeri Industries Group (SBIG); Shanghai Technical By-Products International (China); Zibo Chemet Equipment (China) | July 14, 2010 |
| 16 entities: Belarus: Belarusian Optical Mechanical Association; Beltech Export; China: Karl Lee; Dalian Sunny Industries; Dalian Zhongbang Chemical Industries Co.; Xian Junyun Electronic; Iran: Milad Jafari; DIO; IRISL; IRGC Qods Force; SAD Import-Export; SBIG; North Korea: Tangun Trading; Syria: Industrial Establishment of Defense; Scientific Studies and Research Center; Venezuela: CAVIM. | May 23, 2011 |
| Belvneshpromservice (Belarus); Dalian Sunny Industries (China); Defense Industries Organization (Iran); Karl Lee (China); SAD Import-Export (Iran); Zibo Chemet Equipment Co. (Iran); F | December 20, 2011 |
| Al Zargaa Engineering Complex (Sudan); BST Technology and Trade Co. (China); China Precision Machinery Import and Export Co. (China); Dalian Sunny Industries (China); Iran Electronics Industries (Iran); Karl Lee (China); Marine Industries Organization (Iran); Milad Jafari (Iran); Poly Technologies (China); Scientific and | February 5, 2013 (these designations, and prior |

| Entity | Date Named |
|---|---|
| Industrial Republic Unitary Enterprise (Belarus); SMT Engineering (Sudan); TM Services Ltd. (Belarus); Venezuelan Military Industry Co. (CAVIM, Venezuela). | designations above, have expired) |
| Al Zargaa Engineering Complex (Sudan); Belvneshpromservice (Belarus); HSC Mic NPO Mashinostroyenia (Russia); Russian Aircraft Corporation (MiG); Giad Heavy Industries Complex (Sudan); Sudan Master Technologies (Sudan); Military Industrial Corps. (Sudan); Yarmouk Industrial Complex (Sudan); Venezuelan Military Industry Co. (CAVIM, Venezula) | December 19, 2014. Sanctions still active. Syria designations not included |
| BST Technology and Trade Co. (China); Dalian Sunny Industries (China); Li Fang Wei (China); Tianjin Flourish Chemical Co. (China); Qods Force Commander Qasem Soleimani; IRGC; Rock Chemie (Iran); Polestar Trading Co. Ltd. (North Korean entity in China); RyonHap-2 (North Korea) Tula Instrument Design Bureau (Russia); Joint Stock Co. Katod (Russia); JSC Mic NPO Mashinostroyenia (Russia); Rosoboronexport (Russia) Russian Aircraft Corp. MiG (Russia); Sudanese Armed Forces (Sudan); Vega Aeronautics (Sudan); Yarmouk Complex (Sudan); Hezbollah; Eliya General Trading (UAE). (Designations that applied to Syria or North Korea not included.) | August 28, 2015 |
| Asaib Ahl Haq (Iraqi Shiite militia); Katai'b Hezbollah (Iraqi militia); IRGC; Shahid Moghadam-Yazd Marine Industries (Iran); Shiraz Electronic Industries (Iran); Hezbollah; Military Industrial Corp. (Sudan); Khartoum Industrial Complex (Sudan); Khartoum Military Industrial Complex (Sudan); Luwero Industries (Uganda) | June 28, 2016  Sanctions still active. |
| 11 entities sanctions for transfers of sensitive items to Iran's ballistic missile program (all China except as specified: Beijing Zhong Ke Electric Co.; Dalian Zenghua Maoyi Youxian Gongsi; Jack Qin; Jack Wang; Karl Lee; Ningbo New Century Import and Export Co.; Shenzhen Yataida High-Tech Company; Sinotech Dalian Carbon and Graphite Corp.; Sky Rise Technology (aka Reekay); Saeng Pil Trading Corp. (North Korea); Mabrooka Trading (UAE) | March 21, 2017 |

### Table D-5. Entities Designated under the Iran-Iraq Arms Non-Proliferation Act of 1992

(all designations have expired or were lifted)

| Entity | Date Named |
|---|---|
| Mohammad al-Khatib (Jordan); Protech Consultants Private (India) | December 13, 2003 |
| China Machinery and Electric Equipment Import and Export Corp. (China); China Machinery and Equipment Import-Export Co. (China); China National Machinery and Equipment Import-Export Co. (China); China Shipbuilding Trading Co. (China); CMEC Machinery (China); Hans Raj Shiv (India); Jiangsu Youngli Chemicals and Technology Import-Export Co. (China); Q.C. Chen (China); Wha Cheong Tai Co. Ltd. (China). | July 9, 2002 |

### Table D-6. Entities Designated as Threats to Iraqi Stability under Executive Order 13438 (July 17, 2007)

| Entity | Date Named |
|---|---|
| Ahmad Forouzandeh. Commander of the Qods Force Ramazan Headquarters, accused of fomenting sectarian violence in Iraq and of organizing training in Iran for Iraqi Shiite militia fighters; Abu Mustafa al-Sheibani. Iran based leader of network that funnels Iranian arms to Shiite militias in Iraq; Isma'il al-Lami (Abu Dura). Shiite militia leader, breakaway from Sadr Mahdi Army, alleged to have committed mass kidnapings and planned assassination attempts against Iraqi Sunni politicians; Mishan al-Jabburi. Financier of Sunni insurgents, owner of pro-insurgent Al-Zawra television; Al Zawra Television Station. | January 8, 2008 |
| Abdul Reza Shahlai, a deputy commander of the Qods Force; Akram Abbas Al Kabi, leader of Mahdi Army "Special Groups"; Harith Al Dari, Sunnis Islamist leader (Secretary General of the Muslim Scholars' Association; Ahmad Hassan Kaka Al Ubaydi, ex-Baathist leader of Sunni insurgents based in Iraq's Kirkuk Province; and three person/entities designated for | September 16, 2008 |

| Entity | Date Named |
|---|---|
| operating Syria-based media that support Iraqi Sunni insurgents: Al Ray Satellite TV Channel, and Suraqiya for Media and Broadcasting, owned by Mish'an Al Jabburi (see above), and Raw'a Al Usta (wife of Al Jabburi). | |
| Khata'ib Hezbollah (pro-Iranian Mahdi splinter group); Abu Mahdi al-Muhandis. (Muhandis was killed in the U.S. strike of January 2, 2020, that killed Qods Force commander Qasem Soleimani.) | July 2, 2009 |

### Table D-7. Iranians Designated Under Executive Order 13553 on Human Rights Abusers (September 29, 2010)

These persons are named in a semiannual report to Congress, required under CISADA. Virtually all of the persons on this list, and those listed under Executive order 13628 (below) are designated as human rights abusers by the European Union, whose list contains 87 individuals, including several province-level prosecutors

| Entity | Date Named |
|---|---|
| Eight persons: IRGC Commander Mohammad Ali Jafari; Minister of Interior at time of June 2009 elections Sadeq Mahsouli; Minister of Intelligence at time of elections Qolam Hossein Mohseni-Ejei; Tehran Prosecutor General at time of elections Saeed Mortazavi; Minister of Intelligence Heydar Moslehi; Former Defense Minister Mostafa Mohammad Najjar; Deputy National Police Chief Ahmad Reza Radan; Basij (security militia) Commander at time of elections Hossein Taeb | September 29, 2010 |
| Two persons: Tehran Prosecutor General Abbas Dowlatabadi (appointed August 2009), for indicting large numbers of protesters; Basij forces commander Mohammad Reza Naqdi (headed Basij intelligence during 2009 protests) | February 23, 2011 |
| Four entities: Islamic Revolutionary Guard Corps (IRGC); Basij Resistance Force; Law Enforcement Forces (LEF); LEF Commander Ismail Ahmad Moghadam | June 9, 2011 |
| Two persons: Chairman of the Joint Chiefs of Staff Hassan Firouzabadi; Deputy IRGC Commander Abdollah Araghi | December 13, 2011 |
| One entity: Ministry of Intelligence and Security of Iran (MOIS) | February 16, 2012 |
| One person: Ashgar Mir-Hejazi for human rights abuses on/after June 12, 2009, and for providing material support to the IRGC and MOIS. | May 30, 2013 |
| One entity: Abyssec, for training the IRGC in cyber tradecraft and supporting its development of offensive information operations capabilities. | December 30, 2014 |
| One entity and One person: Tehran Prisons Organization. For severe beating of prisoners at Evin Prison in April 2014; Sohrab Soleimani (brother of IRGC-QF commander) as head of Tehran Prisoners Organization at the time of the attack above. Heads State Prisons Organization. | April 13, 2017 |
| Persons and entities designated following repression of December 2017-January 2018 protests: Judiciary head Sadeq Amoli Larijani (highest-ranking Iranian official sanctioned by the United States); Rajaee Shahr Prison; and Gholmreza Ziaei | January 12, 2018 |
| Ansar-e Hezbollah internal security militia designations: Ansar-e Hezbollah; Ansar leaders Abdolhamid Mohtasham; Hossein Allahkaram; and Hamid Ostad. Evin Prison. | May 30, 3018 |
| Ghavamin Bank (for assisting Iran's Law Enforcement Forces, LEF) | November 5, 2018 |
| Fatemiyoun Division and Zaynabiyoun Brigade | January 24, 2019 |

### Table D-8. Iranian Entities Sanctioned Under Executive Order 13572 for Repression of the Syrian People
### (April 29, 2011)

| Entity | Date Named |
| --- | --- |
| Revolutionary Guard—Qods Force (IRGC-QF) | April 29, 2011 |
| Qasem Soleimani (Qods Force Commander); Mohsen Chizari (Commander of Qods Force operations and training) | May 18, 2011 |
| Ministry of Intelligence and Security (MOIS) | February 16, 2012 |

### Table D-9. Iranian Entities Sanctioned Under Executive Order 13606 (GHRAVITY, April 23, 2012))

| Entity | Date Named |
| --- | --- |
| Ministry of Intelligence and Security (MOIS); IRGC (Guard Cyber Defense Command); Law Enforcement Forces; Datak Telecom | April 23, 2012 |
| IRGC Electronic Warfare and Cyber Defense Organization | January 12, 2018 |
| Hanista Programming Group. For operating technology that monitors or tracks computers | May 30, 2018 |

### Table D-10. Entities Sanctioned Under Executive Order 13608 Targeting Sanctions Evaders (May 1, 2012)

| Entity | Date Named |
| --- | --- |
| *Ferland Company Ltd.* for helping NITC deceptively sell Iranian crude oil | May 31, 2013 |
| *Three persons based in the Republic of Georgia: Pourya Nayebi, Houshang Hosseinpour, and Houshang Farsoudeh.* | February 6, 2014 |
| *Eight firms owned or controlled by the three: Caucasus Energy (Georgia); Orchidea Gulf Trading (UAE and/or Turkey); Georgian Business Development (Georgia and/or UAE); Great Business Deals (Georgia and/or UAE); KSN Foundation (Lichtenstein); New York General Trading (UAE); New York Money Exchange (UAE and/or Georgia); and European Oil Traders (Switzerland).* | |
| Evren Kayakiran (Turkey) for directing employees to provide U.S. products and services to Iran | February 7, 2019 |

### Table D-11. Entities Named as Iranian Government Entities Under Executive Order 13599 (February 5, 2012)

Hundreds of entities—many of which are names and numbers of individual ships and aircraft—were designated under this order to implement the JCPOA, and removed from the list of SDNs, in order that secondary sanctions not apply. Those entities are in italics. Others were designated as owned or controlled by the government of Iran before the JCPOA. As of November 5, 2018, all the entities designated under E.O. 13599 are subject to secondary sanctions.

| Entity | Date Named |
| --- | --- |
| Two insurance companies: *Bimeh Iran Insurance Company (U.K.) Ltd.* and *Iran Insurance Company*. | June 16, 2010 |

| Entity | Date Named |
|---|---|
| 20 Petroleum and Petrochemical Entities: *MSP Kala Naft Co. Tehran*; *Kala Limited*; *Kala Pension Trust Limited*; *National Iranian Oil Company PTE Ltd*; *Iranian Oil Company (U.K.) Ltd.*; *NIOC International Affairs (London) Ltd.*; *Naftiran Trading Services Co. (NTS) Ltd.*; *NICO Engineering Ltd.*; *National Petrochemical Company*; *Iran Petrochemical Commercial Company*; *NPC International Ltd.*; *Intra Chem Trading Gmbh*; *Petrochemical Commercial Company International Ltd.*; *P.C.C. (Singapore) Private Ltd.*; *Petrochemical Commercial Company FZE*; *Petrochemical Commercial Company (U.K.) Ltd.*; *PetroIran Development Company (PEDCO) Ltd.*; *Petropars Ltd.*; *Petropars International FZE*; *Petropars U.K. Ltd.* | |
| *Central Bank of Iran* (aka Bank Markazi) | February 12, 2012 |
| Shipping Companies*: Arash Shipping Enterprises Ltd.; Arta Shipping Enterprises Ltd.; Asan Shipping Enterprise Ltd.; Caspian Maritime Ltd.; Danesh Shipping Co. Ltd.; Davar Shipping Co. Ltd.; Dena Tankers FZE; Good Luck Shipping LLC; Hadi Shipping Company Ltd.; Haraz Shipping Company Ltd.; Hatef Shipping Company Ltd.; Hirmand Shipping Company Ltd,; Hoda Shipping Company Ltd.; Homa Shipping Company Ltd.; Honar Shipping Company Ltd.; Mehran Shipping Company Ltd.; Mersad Shipping Company Ltd.; Minab Shipping Company Ltd.; Pars Petrochemical Shipping Company; Proton Petrochemicals Shipping Ltd; Saman Shipping Company Ltd.; Sarv Shipping Company Ltd.; Sepid Shipping Company Ltd.; Sima Shipping Company Ltd.; Sina Shipping Company Ltd.; TC Shipping Company Ltd.* | July 12, 2012 |
| Energy Firms*: Petro Suisse Intertrade Company* (Switzerland); *Hong Kong Intertrade Company* (Hong Kong); *Noor Energy* (Malaysia); *Petro Energy Intertrade* (Dubai, UAE) (all four named as front companies for NIOC, *Naftiran Intertrade Company, Ltd* (NICO), or *NICO Sarl*) | |
| *58 vessels of National Iranian Tanker Company (NITC)* | |
| Banks: Ansar Bank; *Future Bank B.S.C*; *Post Bank of Iran*; *Dey Bank*; *Eghtesad Novin Bank*; *Hekmat Iranian Bank*; *Iran Zamin Bank*; *Islamic Regional Cooperation Bank*; Joint Iran-Venezuela Bank; *Karafarin Bank*; *Mehr Iran Credit Union Bank*; *Parsian Bank*; *Pasargad Bank*; *Saman Bank*; *Sarmayeh Bank*; *Tat Bank; Tosee Taavon Bank; Tourism Bank; Bank-e Shahr; Credit Institution for Development* | |
| Entities and persons helping Iran evade oil shipping sanctions: *Dimitris Cambis*; *Impire Shipping Co.*; Libra Shipping SA; *Monsoon Shipping Ltd.*; *Koning Marine Ltd.*; *Blue Tanker Shipping SA*; *Jupiter Seaways Shipping*; *Hercules International Ship*; *Hermis Shipping SA*; *Garbin Navigation Ltd.*; *Grace Bay Shipping Inc*; *Sima General Trading Co. FZE*; *Polinex General Trading LLC*; *Asia Energy General Trading*; *Synergy General Trading FZE.* | March 14, 2013 |
| *Sambouk Shipping FZC*, which is tied to Dr. Dimitris Cambis and his network of front companies. | May 9, 2013 |
| Eight petrochemicals companies: *Bandar Imam; Bou Ali Sina; Mobin; Nouri; Pars; Shahid Tondgooyan; Shazand;* and *Tabriz.* | May 31, 2013 |
| Six individuals including *Seyed Nasser Mohammad Seyyedi*, director of Sima General Trading who is also associated with NIOC and NICO. The other 5 persons sanctioned manage firms associated with NIOC and NICO. | September 6, 2013 |
| Four businesses used by Seyyedi to assist NIOC and NICO front companies: *AA Energy FZCO*; *Petro Royal FZE*; and *KASB International LLC (all in UAE); and Swiss Management Services Sarl.* | |
| *Execution of Imam's Order (EIKO)* and entities under its umbrella, designated for hiding assets on behalf of the government of Iran's leadership: *Tosee e Eqtesad Ayandehsazan Company* (TEACO); *Tadbir Economic Development Company* (Tadbir Group); *Tadbir Investment Company*; *Modaber*; *Tadbir Construction Development Company*; *Tadbir Energy Development Group*; *Amin Investment Bank*; *Pardis Investment Company*; *Mellat Insurance Company*; *Rey Investment Company*; *Reyco GmbH*; *MCS International GmbH* (Mannesman Cylinder Systems); *MCS Engineering* (Efficient Provider Services GmbH); *Golden Resources Trading Company L.L.C.* (GRTC); *Cylinder System Ltd.* (Cylinder System DDO); *One Vision Investments 5 (Pty) Ltd.*; *One Class Properties (Pty) Ltd.; Iran and Shargh Company; Iran and Shargh Leasing Company; Tadbir Brokerage Company*; Rafsanjan Cement Company; *Rishmak Productive and Exports Company*; *Omid Rey Civil and Construction Company*; *Behsaz Kashane Tehran Construction Compan*y; *Royal* | January 4, 2013 |

| Entity | Date Named |
|---|---|
| *Arya Company*; *Hormuz Oil Refining Company*; *Ghaed Bassir Petrochemical Products Company*; *Persia Oil and Gas Industry Development Company*; *Pars Oil Company*; *Commercial Pars Oil Company*; *Marjan Petrochemical Company*; *Ghadir Investment Company*; *Sadaf Petrochemical Assaluyeh Company*; *Polynar Company*; *Pars MCS*; Arman Pajouh Sabzevaran Mining Company; *Oil industry Investment Company*; *Rey Niru Engineering Company*. | |
| Five Iranian banks: *Khavarmianeh Bank*, *Ghavamin Bank*, *Gharzolhasaneh Bank*, *Kish International Bank*, and *Kafolatbank* (Tajikistan). | August 29, 2014 |
| Numerous Iranian aircraft and vessels were designated under this order, in keeping with the reimposition of U.S. secondary sanctions. | November 5, 2018 |

### Table D-12. Entities Sanctioned Under Executive Order 13622 for Oil and Petrochemical Purchases from Iran and Precious Metal Transactions with Iran (July 30, 2012)

| Entity | Date Named |
|---|---|
| *Jam Petrochemical Company* (for purchasing petrochemical products from Iran); *Niksima Food and Beverage JLT* (for receiving payments on behalf of Jam Petrochemical). | May 31, 2013 |
| *Asia Bank* (for delivering from Moscow to Tehran of $13 million in U.S. bank notes paid to representatives of the Iranian government). | August 29, 2014 |
| Five individuals and one company for helping Iran acquire U.S. banknotes: *Hossein Zeidi*, *Seyed Kamal Yasini*, *Azizullah Qulandary*, *Asadollah Seifi*, *Teymour Ameri*, and *Belfast General Trading*. | December 30, 2014 |
| *Anahita Nasirbeik*—Asia Bank official (see above). | |

### Table D-13. Entities Sanctioned under the Iran Freedom and Counter-Proliferation Act (IFCA, P.L. 112-239)

| Entity | Date Named |
|---|---|
| *Goldentex FZE (UAE)* | August 29, 2014 |
| Zhuhai Zhenrong (China) for purchasing oil from Iran | July 22, 2019 |

### Table D-14. Entities Designated as Human Rights Abusers or Limiting Free Expression under Executive Order 13628 (October 9, 2012, E.O pursuant to Iran Threat Reduction and Syria Human Rights Act)

| Entity | Date Named |
|---|---|
| Ali Fazli, deputy commander of the Basij; Reza Taghipour, Minister of Communications and Information Technology; LEF Commander Moghaddam (see above); Center to Investigate Organized Crime (established by the IRGC to protect the government from cyberattacks; Press Supervisory Board, established in 1986 to issue licenses to publications and oversee news agencies; Ministry of Culture and Islamic Guidance; Rasool Jalili, active in assisting the government's internet censorship activities; Anm Afzar Goster-e-Sharif, company owned by Jalili, above, to provide web monitoring and censorship gear; PekyAsa, another company owned by Jalili, to develop telecom software. | November 8, 2012 |

| Entity | Date Named |
|---|---|
| Islamic Republic of Iran Broadcasting (IRIB) and Ezzatollah Zarghami (director and head of IRIB); Iranian Cyber Police (filters websites and hacks email accounts of political activists); Iranian Communications Regulatory Authority (filters internet content); Iran Electronics Industries (producer of electronic systems and products including those for jamming, eavesdropping | February 6, 2013 |
| Committee to Determine Instances of Criminal Content for engaging in censorship activities on/after June 12, 2009; Ofogh Saberin Engineering Development Company for providing services to the IRGC and Ministry of Communications to override Western satellite communications. | May 30, 2013 |
| Morteza Tamaddon for cutting mobile phone communications and harassing opposition leaders Mir Hosein Musavi and Mehdi Karrubi when Tamaddon was governor-general of Tehran Province in 2009. | May 23, 2014 |
| Douran Software Technologies, for acting on behalf of the Committee to Determine Instances of Criminal Content (see above). | December 30, 2014 |
| Two entities that blocked social media sites and websites: Supreme Council for Cyberspace, and National Cyberspace Center | January 12, 2018 |
| IRIB Director General Abdulali Ali-Asgari (see above); Abolhassan Firouzabadi (Secretary of the Supreme Council of Cyberspace); and Abdolsamad Khoramabadi (Secreary of the Committee to Determine Instances of Criminal Conduct, which oversees the censorship of the internet) | May 30, 3018 |

### Table D-15. Entities Designated under E.O. 13645 on Auto production, *Rial* Trading, Precious Stones, and Support to NITC (June 3, 2013)

| Entity | Date Named |
|---|---|
| Five entities/persons supporting NITC: *Mid Oil Asia* (Singapore); *Singa Tankers* (Singapore); *Siqiriya Maritime* (Philippines); *Ferland Company Limited* (previously designated under other E.O.); *Vitaly Sokolenko* (general manager of Ferland). | December 12, 2012 |
| Three entities/persons for deceptive Iran oil dealings: *Saeed Al Aqili* (co-owner of Al Aqili Group LLC); *Al Aqili Group LLC*; *Anwar Kamal Nizami* (Dubai-based Pakistani facilitator, manages bank relations for affilates of Al Aqili and Al Aqili Group. Also works for *Sima General Trading*, sanctioned under E.O. 13599). | April 29, 2014 |
| *Faylaca Petroleum* (for obscuring the origin of Iranian sales of gas condensates); *Lissome Marine Services LLC* and six of its vessels (for supporting NITC with ship-to-ship transfers); *Abdelhak Kaddouri* (manages Iranian front companies on behalf of NICO); *Mussafer Polat* (for obscuring origin of Iran's gas condensate sales); *Seyedeh Hanje Seyed Nasser Seyyedi* (managing director of Faylaca). | August 29, 2014 |

### Table D-16. Entities Designated under Executive Order 13581 on Transnational Criminal Organizations (July 24, 2011)

| Entity | Date Named |
|---|---|
| Four individuals/entities: Ajily Software Procurement Group, Andisheh Vesal Middle East Company, Mohammed Saeed Ajily, and Mohammed Reza Rezkhah. For stealing engineering software programs from U.S. and other Western firms and selling them to Iranian military and government entities. | July 18, 2017 |

### Table D-17. Entities Designated under Executive Order 13694 on Malicious Cyber Activities (April 1, 2015)

| Entity | Date Named |
|---|---|
| Eight individuals/entities: ITSec Team, for 2011-12 distributed denial of services attacks on U.S. banks, acting on behalf of the IRGC; and Ahmad Fathi, Amin Shokohi, and Hamid Firoozi (for working for or with ITSec). Four persons working for or with Mersad Co, an IRGC-affiliate firm indicted in 2016 for computer disruption/botnet/malware activities in 2012-13 targeting 24 U.S. financial sector companies: Sadegh Ahmazadegand; Sina Keissar; Omid Ghaffarinia; and Nader Saedi. | September 14, 2017 |
| Ten individuals and one entity, for theft of data from U.S. and third-country universities: Mabna Institute, Gholamreza Rafatnejad, Ehsan Mohammadi, Seyed Ali Mirkarimi, Mostafa Sadeghi, Sajjad Tamasebi, Abdollah Karima, Abuzr Gohair Moqadam. Roozbeh Sabahi, Mohammed Reza Sabai, Behzad Mesri. | March 23, 2018 |
| Ali Khorashadizadeh and Mohammad Ghorbaniyan. For helping exchange bitcoin digital currency into Iranian rials on behalf of Iranian cyber actors involved with a "SamSam" ransomware scheme. | November 28, 2018 |

### Table D-18. Entities Designated under Executive Order 13846 Reimposing Sanctions (August 6, 2018)

| Entity | Date Named |
|---|---|
| Ayandeh Bank (for materially assisting IRIB). | November 5, 2018 |
| **Subsidiaries of China's COSCO Shipping Corp. Ltd and persons for involvement in oil shipments from Iran**: China Concord Petroleum Ltd.; COSCO Shipping Tanker (Dalian) Ltd.; COSCO Shipping Tanker (Dalian) Seaman and Ship Management Co. Ltd.; Kunlun Holding Co Ltd.; Kunlun Shipping Co. Ltd; Pegasus 88 Ltd.; Yi Li; Yu Hua Mao; Luqian Shen; Bin Xu; Yazhou Xu. | September 25, 2019 |
| Under Section 7 of the E.O. (Human Rights related provision sanctioning persons who limit freedom of expression in Iran): Abolghassem Salavati, Mohammad Moghisseh (judges presiding over branches of the regime's Revolutionary Court) | December 19, 2019 |
| **Several petrochemical companies for brokering sales of Iranian oil and other petroleum products to China and UAE**: Sanctioned by Treasury: Triliance Petrochemical Co. Ltd (Hong Kong); Sage Energy HK Limited (Hong Kong); Peakview Industry Co. Ltd (Shanghai); and Beneathco DMCC (Dubai). Sanctioned by State Dept.: Shandong Qiwangda Petrochemical Co. Ltd (China); Jiaxing Industry Hong Kong Ltd.; Ali Bayandarian; and Zhiqing Wang | January 23, 2020 |
| **Entities involved in petrochemical transactions with Iran**   SPI International Proprietary Ltd.  and Main Street 1095 (South Africa).  McFly Plastic HK Ltd.; Saturn Oasis Co.; and Sea Charming Shipping Co. Ltd (Hong Kong).  Dalian Golden Sun Import and Export Co. and Tianyin International Co. Ltd (Dalian, China).  Aoxing Ship Management Ltd. (Shanghai).  Armed Forces Social Security Investment Company (Iran).  Mohammad Hassan Toulai (managing director of Armed Forces Social Security Investment Company); Hossein Tavakkoli; and Rea Ebadzadeh Semnani. | March 18, 2020 |
| **UAE Companies facilitating Iran petrochemical and oil sales**   Petro Grand FZE; Alphabet International DMCC; Swissol Trade DMCC; Alam Althrwa General Trading LLC; and Alwaneo LLC Co. | March 19, 2020 |
| **For facilitating Iran petrochemical transactions**: Triliance Petrochemical Co. Ltd (Hong Kong); Sage Energy HK Limited (Hong Kong); Peakview Industry Co. Limited (Shanghai); and Beneathco DMCC (UAE) | January 23, 2020 |

### Table D-19. Executive Order 13871 on Metals and Minerals (May 8, 2019)

| Entity | Date Named |
|---|---|
| Pamchel Trading Beijing Ltd; Power Anchor Ltd (Seychelles); Hongyuan Marine Co.; Mobarakeh Steel Company (Iran, previously designated under E.O 13224); Saba Steel; Hormozgan Steel Co.; Esfahan Steel Co.; Oxin Steel Co.; Khorasan Steel Co.; South Kaveh Steel Co.; Iran Alloy Steel Co; Golgohar Mining and Industrial Co,; Chadormalu Mining and Industrial Co.; Arfa Iron and Steel Co.; Khouzestan Steel Co.; Iranian Ghadir Iron and Steel Co.; Reputable Trading Source LLC (Oman); Iran Aluminum Co.; Al Mahdi Aluminum Co.; National Iranian Copper Industries; and Khalagh Tadbir Pars Co. | January 10. 2020 |

### Table D-20. Entities Designated as Gross Human Rights Violators under Section 7031(c) of Foreign Aid Appropriations

| Entity | Date Named |
|---|---|
| Two Iranian prisons: Great Tehran Penitentiary; Qarchak Prison | December 5, 2019 |
| Hassan Shahvarpour - IRGC commander of Vali Asr unit | January 18, 2020 |

### Table D-21. Entities Designated under E.O. 13876 on the Supreme Leader and his Office (June 24, 2019)

| Entity | Date Named |
|---|---|
| Foreign Minister Mohammad Javad Zarif | July 31, 2019 |
| Ten High-Ranking Officials/Personalities and One Major Entity: Ebrahim Raisi (head of the judiciary); Mojtaba Khamene'i (second son of the Supreme Leader, and liaison with the IRGC-QF and Basij); Mohammad Mohammadi Golpayegani (chief of staff to the Supreme Leader); Vahid Haghanian (top aide to the Supreme Leader); Ali Akbar Velayati (former Foreign Minister and top foreign policy adviser to the Supreme Leader); Gholam-Ali Hadad-Adel (former Majles Speaker, adviser to the Supreme Leader); Mohammad Bagheri (head of the Armed Forces General Staff); Iran Armed Forces General Staff; Hossein Dehghan (military aide to the Supreme Leader, former Defense Minister, and former commander of the IRGC-QF contingent in Lebanon); Gholam Ali Rashid (head of Khatem ol-Anbiya Central Headquarters, a major military headquarters). | November 4, 2019 |
| Ali Shamkhani—Secretary General of Iran Supreme National Security Council; Gholamreza Soleimani—commander of the Basij; Mohsen Reza'i—Expediency Council member and IRGC commander-in-chief 1981-1997; Mohammad Reza Naqdi—former Basij commander; Mohammad Reza Ashtiani—deputy chief of staff of the Armed Forces; IRGC Brig. Gen. Ali Abdollahi—coordination deputy for the Armed Forces General Staff; Ali Asghar Hejazi—chief of Supreme Leader security; Mohsen Qomi—advisor to the Supreme Leader on international communications | January 10, 2020 |
| **Members of Council of Guardians and Elections Supervision Committee** (for manipulating Iran's parliamentary elections):   Ahmad Jannati (head of the Council of Guardians); Mohammad Yazdi; Siamak Rahpeyk; Abbas Ali Kadkhodaie (Council speaker); and Mohammad Hasan Sadeghi Moghadam | February 20, 2020 |

**Table D-22. Executive Order 13818 Implementing the Global Magnitsky Act (December 20, 2017)**

| Entity | Date Named |
|---|---|
| Iran-backed Iraqi militia figures: Qais al-Khazali (head of Asa'ib Ahl Al Haq militia); Laith al-Khazali; Husayn Falih al-Lami | December 6, 2019 |

# Author Information

Kenneth Katzman
Specialist in Middle Eastern Affairs

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.