# EXHIBIT 7.01

## VIETNAM

## EXECUTIVE SUMMARY

The Socialist Republic of Vietnam is an authoritarian state ruled by a single party, the Communist Party of Vietnam (CPV) led by General Secretary Nguyen Phu Trong, Prime Minister Nguyen Tan Dung, and President Truong Tan Sang.  The most recent National Assembly elections, held in May, were neither free nor fair, since the CPV's Vietnam Fatherland Front (VFF), an umbrella group that monitors the country's mass organizations, vetted all candidates.  Security forces reported to civilian authorities.

The most significant human rights problems in the country were severe government restrictions on citizens' political rights, particularly their right to change their government; increased measures to limit citizens' civil liberties; and corruption in the judicial system and police.

Specific human rights abuses included continued police mistreatment of suspects during arrest and detention, including the use of lethal force, as well as austere prison conditions, arbitrary arrest and detention for political activities, and denial of the right to fair and expeditious trial.  Political influence, endemic corruption, and inefficiency strongly distorted the judicial system.  The government increasingly limited privacy rights and freedoms of the press, speech, assembly, movement, and association; increasingly suppressed dissent; further restricted Internet freedom; reportedly was involved in attacks against critical Web sites; and spied on dissident bloggers.  Freedom of religion continued to be subject to uneven interpretation and protection, with significant problems continuing, especially at provincial and village levels.  Police corruption persisted at various levels.  The government maintained its prohibition of independent human rights organizations.  Violence and discrimination against women as well as trafficking in persons continued, as did sexual exploitation of children and some societal discrimination based on ethnicity, sexual orientation and gender identity, and HIV/AIDS status.  The government limited workers' rights to form and join independent unions and inadequately enforced safe and healthy working conditions.

The government inconsistently took steps to prosecute and punish officials who committed abuses, and members of the police sometimes acted with impunity.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

## a. Arbitrary or Unlawful Deprivation of Life

There were no reports that the government or its agents committed arbitrary or unlawful killings, but there were reports of 19 deaths of persons in custody during the year as well as abuses of lethal force.

For example, in March Trinh Xuan Tung died in custody in Hanoi after Lieutenant Colonel Nguyen Van Ninh beat him while in detention for a traffic violation. Authorities suspended Ninh pending investigation, and at year's end the scheduling of a trial was expected in early 2012.

In April in Dong Nai Province, local police officers beat Nguyen Cong Nhut to death after detaining him for five days for allegedly stealing tires.  The case was reported to the Supreme People's Court and at year's end remained under investigation.

In March a court convicted police officer Nguyen The Nghiep of excessive use of force and sentenced him to seven years in prison for the death by beating of Nguyen Van Khuong, who was arrested for a traffic violation in Bac Giang Province in July 2010.  Authorities also banned Nghiep for life from the police force and ordered him to pay 155 million Vietnamese dong (VND) (approximately $7,380) to the deceased's family, which his family did.

In September authorities charged four former prison guards (Hoang Dinh Nam, Nguyen Van Tho, Le Huu Thiet, and Tran Van Phuc) in the Central Highlands with using plastic batons to beat to death inmate Truong Thanh Tuan in September 2010.  A court directed the four to pay VND 129 million (approximately $6,140) to the victim's family.

## b. Disappearance

There were no reports of politically motivated disappearances.

There continued to be no information on the whereabouts of Thich Tri Khai, a monk from the unregistered Unified Buddhist Church of Vietnam whom authorities arrested in 2008, and Le Tri Tue, a founder of the Independent Workers' Union whom authorities placed in custody in 2007.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

**VIETNAM**                                                                   3

The law prohibits physical abuse, but police commonly mistreated suspects during arrest or detention.  Incidents of physical harassment, intimidation, and the questioning of family members were reported in several locations, including but not limited to Hanoi, Ho Chi Minh City, and Bac Giang and Dong Nai provinces.

For example, in April local police arrested and beat Tran Van Du from Soc Trang Province while interrogating him in custody.  In October the Soc Trang People's Court sentenced the following police officers for "intentionally inflicting injury": Vo Van Ut Deo to two years' imprisonment; Danh Nhan, eight years; Tran Tuan Khai, four years; and Nguyen Quoc Thang, two years.

In August Hanoi police officials opened an investigation into an alleged "deliberate physical assault"  by police Captain Minh after Internet footage showed him stomping on a detained protester during a demonstration over Chinese sovereignty claims in the South China Sea (East Sea) in July.  Authorities placed Minh on administrative leave but later cleared and reinstated him.

Land-rights protesters in Hanoi, Ho Chi Minh City, Danang, and several provinces in the Mekong Delta continued to report instances of physical harassment and intimidation by local authorities.  Most incidents between local authorities and ethnic minorities involved land, money, or domestic disputes.  For example, the People's Court of Gia Lai Province convicted nine Montagnards  of "undermining unity policy" and sentenced them to prison for what human rights groups reported were advocacy activities related to Montagnard rights or land disputes.  The sentences handed down in April were as follows:  Siu Hlom, 12 years; Siu Nheo and Siu Brom, 10 years each; Rah Lan Mlih, Ro Mah Pro, and Rah Lan Blom, nine years each; and Kpa Sin and Ro Man Klit, eight years each.  In December the court also sentenced Siu Thai (Ama Thuong), arrested in April, to 10 years' imprisonment.

The government reported in September that more than 32,300 drug users--the large majority of whom were administratively sentenced to forced detoxification without judicial review--were living in the 121 drug-detention centers countrywide.  According to the government, the stated population did not exceed the intended capacity of the centers, which had separate facilities for women.  At these centers, according to a September report from a nongovernmental organization (NGO), authorities allegedly forced individuals to perform menial work under harsh conditions and mistreated them (see section 7.b.).  After his November visit, the

UN special rapporteur on health criticized these centers as ineffective and counterproductive.

**Prison and Detention Center Conditions**

Prison conditions were austere but generally not life threatening.  Overcrowding, insufficient diet, lack of access to potable water, and poor sanitation remained serious problems.  Prisoners generally were required to work but received no wages.  Authorities sometimes placed prisoners in solitary confinement, thus depriving them of reading and writing materials for periods of up to several months.  Family members continued to make credible claims that prisoners received benefits by paying bribes to prison officials or undertaking hunger strikes.

Prisoners had access to basic health care, although in many cases officials prevented family members from providing medication to prisoners.  Family members of imprisoned activists who experienced health problems claimed medical treatment was inadequate and resulted in greater long-term health complications.  In July and September, respectively, two long-term prisoners convicted and jailed for attempting to overthrow the government (Nguyen Van Trai, a member of the People's Action Party of Vietnam, and Truong Van Suong) died in prison from liver cancer and heart disease, respectively.

The total number of prisoners and detainees was not publicly available.  Pretrial detainees were held separately from convicted prisoners.  Juveniles generally were held in prison separately from adults, but on rare occasions, they were held in detention with adults for short periods due to the unavailability of space.  Men and women were held separately but treated equally.  Political prisoners were typically sent to specially designated prisons that also held other regular criminals, and in most cases, political prisoners were kept separate from nonpolitical prisoners.  Authorities completely isolated some high-profile political prisoners from all others.  While prison sentences could be extremely lengthy, prisoners were not forced to serve beyond the maximum sentence for their charged offense.

Authorities limited prisoners to one 30-minute family visit per month and generally permitted family members to give supplemental food and bedding to prisoners.  Prisoners did not have the right to practice their religion in public, nor to have access to religious books and scriptures, although authorities allowed Roman Catholic priest and democracy activist Thaddeus Nguyen Van Ly (rearrested in July) to keep a Bible, pray, and give communion.  Prisoners were allowed to

submit complaints to prison management and judicial authorities, but their complaints were routinely ignored.

Previously, authorities had permitted the International Committee of the Red Cross to visit prisons, but no such visits occurred during the year.  Authorities allowed foreign diplomats to make one limited prison visit and meet with a prominent prisoner.  State control of the media restricted reporting on living conditions. There were no prison ombudsmen, and no individuals were allowed to serve on behalf of prisoners and detainees to consider such matters as alternatives to incarceration for nonviolent offenders.

### d. Arbitrary Arrest or Detention

The law allows the government to detain persons without charges indefinitely under vague "national security" provisions.  The government also arrested and indefinitely detained individuals under other legal provisions and subjected several dissidents throughout the country to administrative detention or house arrest.

### Role of the Police and Security Apparatus

Internal security is the responsibility of the Ministry of Public Security, although in some remote areas, the military is the primary government agency and performs public safety functions, including maintaining public order in the event of civil unrest.  The ministry controls the police, a special national security investigative agency, and other internal security units.  It also maintains a system of household registration and block wardens to monitor the population.  While this system was less intrusive than in the past, it continued to monitor individuals suspected of engaging, or being likely to engage, in unauthorized political activities.  Credible reports suggested that local police used "contract thugs" and "citizen brigades" to harass and beat political activists and others, including religious worshippers, perceived as undesirable or a threat to public security.

Police organizations exist at the provincial, district, and local levels and are subject to the authority of people's committees at each level.  At the commune level, it is common for guard forces composed of residents to assist the police.  The police were generally effective at maintaining public order, but police capabilities, especially investigative, were generally very limited, and training and resources were inadequate.  Several foreign governments assisted in training provincial police and prison management officials to improve their professionalism.

**VIETNAM** 6

## Arrest Procedures and Treatment While in Detention

The law outlines the process by which individuals are taken into custody and treated until authorities adjudicate their cases.  The Supreme People's Procuracy (Public Prosecutor's Office) issues arrest warrants, generally at the request of police.  However, police may make an arrest without a warrant based on a complaint filed by any person.  The procuracy issues retroactive warrants in such cases.  The procuracy must issue a decision to initiate a formal criminal investigation of a detainee within nine days; otherwise, police must release the suspect.  In practice the nine-day regulation was often circumvented.

Arbitrary Arrest:  Arbitrary arrest and detention, particularly for political activists, remained a problem.  According to activist groups and diplomatic sources, the government sentenced at least 29 arrested activists during the year to a total of 165 years in jail and 70 years of probation for exercising their rights.  Authorities also increasingly charged political dissidents with "attempting to overthrow the state" due to their alleged membership in political parties other than the CPV.  While violators of this legal provision had the possibility of receiving the death penalty, they typically received prison sentences of up to seven years.  The government also used decrees, ordinances, and other measures to detain activists for the peaceful expression of opposing political views (see section 2.a.).

For example, in February police in Ho Chi Minh City detained Nguyen Dan Que for allegedly urging individuals to take part in mass protests demanding political reforms but released him after three days of questioning.  Local police continued to monitor him closely throughout the year.

In April police detained political dissidents Pham Hong Son and Le Quoc Quan for "causing public disorder" in an attempt to attend the open trial of fellow political activist Cu Huy Ha Vu but released them nine days later.

Peaceful protests during the year in Ho Chi Minh City and Hanoi over Chinese sovereignty claims in the South China Sea (East Sea) resulted in the temporary detention and surveillance of several protest organizers, and there were reports that local security officials prevented individuals from leaving their homes to take part in the demonstrations.  Moreover, on November 27, authorities detained activist Bui Thi Minh Hang in Ho Chi Minh City for participating in one such "illegal" protest and previously participating in related protests in July and August in Hanoi.  In December authorities sentenced her without due process to two years at a reeducation camp near Hanoi.

Authorities also subjected religious and political activists to varying degrees of informal detention in their residences.  For example, Ho Chi Minh City local police continued to monitor prominent activists Nguyen Dan Que and Do Nam Hai closely.

Pretrial Detention:  The investigative period typically lasted from three months for less serious offenses (punishable by up to three years' imprisonment) to 16 months for exceptionally serious offenses (punishable by more than 15 years' imprisonment or capital punishment) or more than two years for national security cases.  However, at times investigations lasted indefinitely.  By law the procuracy may also request additional two-month periods of detention after an investigation to consider whether to prosecute a detainee or ask police to investigate further.  Investigators sometimes used physical abuse, isolation, excessively lengthy interrogation sessions, and sleep deprivation to compel detainees to confess.

By law detainees are permitted access to lawyers from the time of their detention; however, authorities used bureaucratic delays to deny access to legal counsel.  In cases investigated under national security laws, authorities prohibited defense lawyers' access to clients until after an investigation had ended and the suspect had been formally charged with a crime, most often after approximately four months.  Under regulations, investigations may be continued and access to counsel denied for more than two years.  In addition a scarcity of trained lawyers and insufficient protection of defendant rights made prompt detainee access to an attorney rare.  In practice only juveniles and persons formally charged with capital crimes were assigned lawyers.

Attorneys must be informed of and allowed to attend interrogations of their clients.  However, a defendant first must request the presence of a lawyer, and it was unclear whether authorities always informed defendants of this right.  Attorneys also must be given access to case files and be permitted to make copies of documents.  Attorneys were sometimes able to exercise these rights.

Police generally informed families of detainees' whereabouts, but family members could visit a detainee only with the permission of the investigator, and this permission was not regularly granted.  During the investigative period, authorities routinely denied detainees access to family members, especially in national security cases.  Before a formal indictment, detainees also have the right to notify family members, although a number of detainees suspected of national security violations were held incommunicado.  There is no functioning bail system or

equivalent system of conditional release.  Time spent in pretrial detention counts toward time served upon conviction and sentencing.

Courts may sentence persons to administrative detention of up to five years after completion of a sentence.  In addition police or mass organizations can propose that one of five "administrative measures" be imposed by people's committee chairpersons at district and provincial levels without a trial.  The measures include terms ranging from six to 24 months in either juvenile reformatories or adult detention centers and generally were applied to repeat offenders with a record of minor offenses, such as committing petty theft or "humiliating other persons."  Terms of 24 months were standard for drug users and prostitutes.  Individuals sentenced to detention facilities were forced to meet work quotas to pay for services and detention costs.  Chairpersons may also impose terms of "administrative probation," which generally took the form of restriction on movement and travel.  Authorities continued to punish some individuals using vaguely worded national security provisions of the law.

Amnesty:  In honor of National Day, the government amnestied approximately 10,535 prisoners on August 29, the overwhelming majority of whom had ordinary criminal convictions.  Among those released were the following five individuals convicted of committing national security crimes:  three ethnic Montagnards from Dak Lak Province (Y Dhiam Eban, Y Bien Nie, and Y Kim Kbuor) charged with "undermining national unity," as well as Nguyen Van Tinh from Haiphong and Tran Duc Thach from Nghe An Province, both charged with antistate propagandizing.

**e. Denial of Fair Public Trial**

The law provides for the independence of judges and lay assessors, but in practice they were not independent.  The CPV controlled the courts at all levels through its effective control over judicial appointments and other mechanisms, and in many cases it determined verdicts.  As in past years, political influence, endemic corruption, and inefficiency strongly distorted the judicial system.  Most, if not all, judges were members of the CPV and chosen at least in part for their political views.  The party's influence was particularly notable in high-profile cases and other instances in which authorities charged a person with challenging or harming the party or state.

There continued to be a shortage of trained lawyers and judges.  The Vietnam Bar Federation falls under the supervision of the VFF and is closely coordinated with

the Ministry of Justice and the Vietnam Lawyers Association.  The federation, which oversees local bar association functions, continued during the year to develop a professional code of conduct for lawyers.

## Trial Procedures

The constitution provides that citizens are innocent until proven guilty, although many lawyers complained that judges generally presumed guilt.  Trials generally were open to the public, but in sensitive cases judges closed trials or strictly limited attendance.  Juries are not used.

The public prosecutor brings charges against an accused person and serves as prosecutor during trials.  Defendants have the right to be present and have a lawyer at trial, although not necessarily the lawyer of their choice, and this right was generally upheld in practice.  Defendants unable to afford a lawyer generally were provided one only in cases involving a juvenile offender or with possible sentences of life imprisonment or capital punishment.  The defendant or defense lawyer has the right to cross-examine witnesses, but there were cases in which neither defendants nor their lawyers were allowed to have access to government evidence in advance of the trial, cross-examine witnesses, or challenge statements.  Defense lawyers commonly had little time before trials to examine evidence against their clients.  In national security cases, judges occasionally silenced defense lawyers who were making arguments on behalf of their clients in court because the judges deemed the arguments reactionary.  Convicted persons have the right to appeal.  District and provincial courts did not publish their proceedings, but the Supreme People's Court continued to publish the proceedings of all cases it reviewed.

There continued to be credible reports that authorities pressured defense lawyers not to take as clients any religious or democracy activists facing trial.  Human rights lawyers were restricted, harassed, arrested, disbarred, and in some cases detained for representing political activists.  For example, on August 12, the Dak Lak Bar Association dismissed Huynh Van Dong for serving as a defense lawyer in May for two defendants charged with subversive acts against the state.  Additionally, given their previous convictions, lawyers Le Tran Luat, Le Thi Cong Nhan, and Le Quoc Quan were not permitted to practice law.  During the April trial of activist Cu Huy Ha Vu, one of his attorneys (Tran Vu Hai) accused the Hanoi People's Court of violating criminal procedure by refusing to publicize the documents by which the court made its accusation.  When the court refused to drop the charges and declare a mistrial, activist Vu sent his lawyers away in protest; the court found him guilty and sentenced him to seven years in prison.

**Political Prisoners and Detainees**

There continued to be no precise estimates of the number of political prisoners. The government reportedly held more than 100 political detainees at year's end, although some international observers claimed there were more (see also section 1.d., Arbitrary Arrest). Diplomatic sources reported the existence of four reeducation centers in the country holding approximately 4,000 prisoners.

For example, on February 8, authorities arrested Vu Quang Thuan, democracy activist and chairperson of the Vietnam Restoration Movement, upon arrival at Tan Son Nhat airport in Ho Chi Minh City for propagandizing against the state. He awaited trial at year's end.

On December 23, authorities arrested and detained Viet Khang (also known as Vo Minh Tri) after he composed and sang two songs to express his view on the government's handling of the dispute with China regarding sovereignty in the South China Sea (East Sea). At year's end his detention reportedly continued in Ho Chi Minh City.

At year's end dissident Nguyen Ba Dang, a member of the People's Democratic Party, awaited trial. Police had arrested him in January 2010 in Hai Duong Province for distributing antistate propaganda.

In March the Tra Vinh Province Appeals Court upheld the original sentences of three members of the United Workers-Farmers Organization--nine years' imprisonment for Nguyen Hoang Quoc Hung and seven years' imprisonment for Do Thi Minh Hanh and Doan Huy Chuong--whose convictions were for causing public disorder to oppose the government. Police had arrested them for distributing pamphlets in February 2010 that called on citizens to advocate for democracy and freedom of assembly and to fight attempted invasions from China.

In September the Dong Nai Province People's Court sentenced Pham Thi Phuong, a member of the Vietnam Populist Party, to 11 years in prison for activities to overthrow the government. Authorities had arrested her and her husband, Pham Ba Huy, in Ho Chi Minh City in April 2010 for reportedly planning a campaign to bomb statues throughout the city. At year's end Pham Ba Huy continued to await trial.

In January Binh Phuoc People's Court convicted Phung Lam from Binh Phuoc Province of propagandizing against the state and sentenced him to seven years in prison. Police had arrested him in June 2010 for alleged ties to the Democratic Party of Vietnam (DPV) and DPV chairman Nguyen Sy Binh, claiming that Lam posted articles opposing the government on the Internet. Lam had fled to Cambodia in May 2010, but police arrested him when he attempted to return to visit his family.

During a one-day closed trial in May, the Ben Tre People's Court convicted several defendants of attempting to overthrow the government and sentenced them as follows: Tran Thi Thuy from Dong Thap Province, eight years' imprisonment and five years' probation; Pham Van Thong, Ben Tre Province, seven years' imprisonment and five years' probation; Pastor Duong Kim Khai, Ho Chi Minh City, six years' imprisonment and five years' probation; and Cao Van Tinh, Con Tho Province, five years' imprisonment and five years' probation. The other three (congregant Pham Ngoc Hoa, Nguyen Thanh Tam, and lay pastor Nguyen Chi Thanh) were each sentenced to two years' imprisonment and three years' probation. In August Thuy, Thong, Khai, and Tinh appealed; the court reduced Khai's sentence to five years' imprisonment and Tinh's sentence to four years' imprisonment, and denied the appeals of Thuy and Thong. Police had arrested Thuy, Thong, Khai, and Tam in July-August 2010 for alleged ties to a banned, foreign-based, prodemocracy group and for organizing and advocating on behalf of land-rights claimants in Ben Tre and Dong Thap provinces. Police had also arrested Hoa and Thanh, affiliated with Khai and the unrecognized Mennonite Church, in November 2010 for their alleged ties to the same prodemocracy group and their work with Khai.

On March 22, authorities deported foreign citizen Le Kin, whom they had arrested in October 2010 in Ho Chi Minh City for attempting to overthrow the government through his alleged involvement with overseas political organizations critical of the government.

In August an appeals court upheld the Hanoi People's Court sentence in April of attorney Cu Huy Ha Vu to seven years in jail for antistate propagandizing. Police had arrested him in November 2010 for his Internet articles and interviews with foreign media criticizing the prime minister. In November Vu's appeal of his sentence was unsuccessful.

In February the Hanoi People's Court convicted Vu Duc Trung and Le Van Thanh, affiliated with the Falun Gong movement, of "illegally broadcasting information

[into China] and operating information networks without a license" and sentenced them to three and two years' imprisonment, respectively.  Police had arrested them in Hanoi in November 2010 for broadcasting Falun Gong radio programs.

In March the People's Court of Tri Ton District, An Giang Province, sentenced Chau Heng, a Khmer Krom land-rights activist to two years' imprisonment for "deliberately destroying property and creating social disorder."  Police had arrested Heng in December 2010 as he reentered Vietnam after being denied political refugee status by the Office of the UN High Commissioner for Refugees (UNHCR) in Thailand.  Heng had led protests in 2007 and 2008 against local government land seizures.

Also in August the Ho Chi Minh City People's Court sentenced Pham Minh Hoang, a dual national and professor at the Ho Chi Minh City University of Technology, to three years' imprisonment followed by three years' house arrest for alleged ties to a foreign-based prodemocracy group, posting critical comments online against the government under a pseudonym in 2010, and activities aimed at overthrowing the government.  Hoang admitted guilt and asked to return to a foreign country.  An appeals court in Ho Chi Minh City in November reduced the imprisonment from three years to 17 months, and Hoang continued to serve his sentence at year's end.

In March the appellate division of the Ho Chi Minh City People's Court reduced Le Thang Long's original sentence from five years' imprisonment to three-and-a-half years.  In May the Ho Chi Minh City People's Court denied the appeal of businessman and blogger Tran Huynh Duy Thuc and upheld his original sentence of 16 years' imprisonment.  Long and Thuc--as well as prominent attorney Le Cong Dinh and DPV leader and Viet Youth for Democracy cofounder Nguyen Tien Trung--had all been arrested in 2009 and tried jointly in Ho Chi Minh City in January 2010 for involvement in a plot to create new political parties and overthrow the government.  Dinh and Trung had pleaded guilty to joining political parties other than the CPV but had denied attempting to overthrow the government.  During the year there were no developments in the cases of Dinh and Trung.

On August 29, the government amnestied and released Bloc 8406 member Tran Duc Thach (see section 1.d., Amnesty).  Authorities had arrested Thach plus Bloc 8406 members Vu Van Hung and Pham Van Troi in 2008, convicted them in 2009 of antistate propagandizing for displaying banners that criticized the CPV and advocated multiparty democracy, and sentenced them to prison (Thach and Hung, three years' imprisonment; Troi, four years).  In January 2010 the Hanoi Appellate

Court--with foreign diplomats and journalists excluded--had upheld the prison sentences.

In July authorities returned Roman Catholic priest and activist Thaddeus Nguyen Van Ly to prison to complete the remainder of his eight-year prison term for propagandizing against the state.  Authorities had arrested him in 2007 in connection with his role in cofounding the Bloc 8406 movement and the Vietnam Progressive Party but had granted him a one-year humanitarian release in March 2010 to seek treatment for a brain tumor following two strokes in 2009 (see also section 1.c.).

Several other political dissidents affiliated with outlawed political organizations--including the People's Democratic Party, People's Action Party, Free Vietnam Organization, DPV, United Workers and Farmers Organization, Bloc 8406, and others--remained in prison or under house arrest in various locations.

Authorities also continued to detain and imprison other individuals who used the Internet to publish ideas on human rights, government policies, and political pluralism (see section 2.a., Internet Freedom).

Authorities released several persons, including political activists and religious leaders, during the year, including the following:

In June authorities released activist and dissident author Tran Khai Thanh Thuy from prison, and she resettled abroad.  A Hanoi court had convicted Thuy and her husband, Do Ba Tan, in February 2010 of assault and had sentenced her to three-and-one-half years in prison and him to two years' probation following a 2009 incident in which unidentified individuals attacked them.

On July 1, authorities released democracy activist Ngo Quynh, who had been convicted and imprisoned for antistate propagandizing in 2009.

In March activist lawyer Nguyen Van Dai completed his 2007 sentence of four years in prison for posting appeals for a multiparty state on the Internet, and authorities released him to begin his sentence of four years' house arrest.

In September Pham Ba Hai, leader of the Bach Dang Giang Foundation and a Bloc 8406 member, completed his 2006 sentence of five years in prison for antistate propaganda.  At year's end he was serving two years' house arrest.

In February authorities released political activist and former police officer Tran Van Thieng, age 75. A court in Ho Chi Minh City had convicted him in 1991 of attempting to overthrow the government by "trying to publish a book that distorted historical information" about Vietnam and had sentenced him to 20 years' imprisonment.

In October 2010 the Can Tho Police Security Investigation Agency and the People's Procuracy of Can Tho released Doan Van Chac from any wrongdoing and declined any further investigation into his case. Police had arrested him in June 2010 after he had evaded arrest since participating as a juvenile in a 1983 campaign against the government that resulted in the deaths of three officials.

**Civil Judicial Procedures and Remedies**

There is no clear or effective mechanism for pursuing a civil action to redress or remedy abuses committed by authorities. Civil suits are heard by administrative, civil, and criminal courts, all of which follow the same procedures as in criminal cases and are adjudicated by members of the same body of judges and lay assessors. All three levels were subject to corruption, lack of independence, and inexperience.

By law a citizen seeking to press a complaint regarding a human rights violation by a civil servant is required first to petition the officer accused of committing the violation for permission to refer the complaint to the administrative courts. If a petition is refused, the citizen may refer it to the officer's superior. If the officer or his superior agrees to allow the complaint to be heard, the matter is taken up by the administrative courts. If the administrative courts agree that the case should be pursued, it is referred either to the civil courts for suits involving physical injury seeking redress of less than 20 percent of health-care costs resulting from the alleged abuse, or to the criminal courts for redress of more than 20 percent of such costs. In practice this elaborate system of referral and permission ensured that citizens had little effective recourse to civil or criminal judicial procedures to remedy human rights abuses, and few legal experts had experience with the system. The government continued to disallow the use of class action lawsuits against government ministries, thus limiting land rights petitioners from sending joint complaints to numerous government agencies.

**Property Restitution**

A 2009 decree offers compensation, housing, and job training for individuals displaced by development projects.  However, there were widespread complaints, including from the National Assembly, that compensation was inadequate or delayed.  There were also widespread reports of official corruption and a general lack of transparency in the government's process of confiscating land and moving citizens to make way for infrastructure projects.  Some members of ethnic minority groups in the Central and Northwest Highlands continued to complain that they had not received proper compensation for land the government confiscated to develop large-scale, state-owned enterprises.

For example, in February Pham Thanh Son self-immolated on the sidewalk outside the Danang City People's Committee building to protest the confiscation of his family's property by local officials and their refusal to hear his appeal.

On November 3, 50 to 70 police officers tried to remove an "illegal" sign, posted weeks earlier on the roof of the Thai Ha church in Hanoi, which called on the government to return land the church once owned.  Security officials reportedly injured one church member while attempting to crash through the front gate.  On December 2, security officials detained 30 parishioners and two clergy members, including the head Thai Ha priest, after 150-200 parishioners peacefully protested for the land's return.  By year's end all detainees were released.

In January, upon appeal, the Danang City People's Court commuted the sentences of all the remaining defendants in a land-rights protest that led to police clashes with Roman Catholic parishioners in a funeral procession in Con Dau Village in May 2010 and set them free.  Police had arrested six parishioners accused of starting the altercation and damaging a police vehicle.  The court initially tried them in October 2010 for public disorder and denied three of them legal representation; four individuals received nine- and 12-month jail sentences, and the remaining two defendants received suspended sentences.

### f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, but the government did not respect these prohibitions in practice.  Household registration and block warden systems existed for the surveillance of all citizens.  Authorities focused particular attention on persons suspected of being involved in unauthorized political or religious activities.

The government pursued a population and reproductive health strategy that set a target average number of children per couple (see section 6, Women).

Forced entry into homes is not permitted without orders from the public prosecutor, although security forces seldom followed these procedures and instead asked permission to enter homes with an implied threat of repercussions for failure to cooperate.  During the year police forcibly entered homes of a number of prominent dissidents--such as Pham Hong Son, Nguyen Thanh Giang, Le Quoc Quan, and Le Tran Luat--and removed personal computers, cell phones, and other material.

Government authorities continued to open and censor targeted persons' mail; confiscate packages and letters; and monitor telephone conversations, e-mail, text messages, and fax transmissions.  The government cut the telephone lines and interrupted the cell phone and Internet service of a number of political activists and their family members.

CPV membership remained a prerequisite to career advancement for all government and government-linked organizations and businesses.  However, economic diversification continued to make membership in the CPV and CPV-controlled mass organizations less essential to financial and social advancement.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Speech and Press**

**Status of Freedom of Speech and Press**

Although the constitution and law provide for freedom of speech, including for members of the press, the government continued to use broad national security and antidefamation provisions to restrict these freedoms.  The law defines the crimes of "sabotaging the infrastructure of socialism," "sowing divisions between religious and nonreligious people," and "conducting propaganda against the Socialist Republic of Vietnam" as serious offenses against national security.  It also expressly forbids "taking advantage of democratic freedoms and rights to violate the interests of the state and social organizations."

Freedom of Speech:  The government continued to restrict speech that criticized individual government leaders; promoted political pluralism or multiparty

democracy; or questioned policies on sensitive matters such as human rights, religious freedom, or sovereignty disputes with China.

Freedom of Press:  The CPV, government, and party-controlled mass organizations controlled all print, broadcast, and electronic media.  The government exercised oversight through the Ministry of Information and Communication, under the overall guidance of the CPV Propaganda and Education Commission.  Private ownership of any media outlet continued to be prohibited.

Foreign journalists must be approved by the Foreign Ministry's press center and based in Hanoi, with the exception during the year of one correspondent reporting solely on economic matters who lived in and worked from Ho Chi Minh City while accredited to Hanoi.  Foreign journalists are required to renew their visas every three to six months.  The allowed number of foreign media employees was limited, and Vietnamese employees working for foreign media are required to register with the Foreign Ministry.

The procedure for foreign media outlets to hire local reporters and photographers and receive accreditation approval continued to be cumbersome.  The press center nominally monitored journalists' activities and approved, on a case-by-case basis, requests for interviews, photographs, filming, or travel, which must be submitted at least five days in advance.  Reporters temporarily on assignment in the country are typically assigned a Foreign Ministry minder--with the cost paid by the news organization.  By law foreign journalists are required to address all questions to government agencies through the Foreign Ministry, although this procedure often was ignored in practice.  Foreign journalists noted that they notified authorities about their travel outside Hanoi when it involved a story that the government would consider sensitive or where the travel was in an area considered sensitive, such as the Northwest or Central Highlands.

Violence and Harassment:  During the year security officials attacked or threatened several journalists reportedly because of their coverage of sensitive stories.  For example, in February Ho Chi Minh City police detained freelance reporter Ta Phong Tan, a member of the Free Journalists Club, for 24 hours and allegedly beat him for writing articles critical of government policies.

In April police arrested publisher Bui Chat after he returned from overseas where the NGO International Publishers Association had given him their Freedom to Publish Award.  Police held Chat for four days and later summoned him for further questioning by security officials.  Several days later police detained blogger Ngo

Thanh Tu (also known as Thien Sau) in Ho Chi Minh City, as he tried to depart on an international flight, and questioned him about his affiliation with Bui Chat.  In June authorities detained Chat overnight in Ho Chi Minh City and prevented his attendance at a foreign embassy ceremony in Hanoi.

In August a court sentenced Phan Ha Binh, deputy managing editor of *Tien Phong*, to seven years in prison for extortion.  Authorities had arrested Binh in October 2010 and accused him of soliciting a VND 220 million (approximately $10,500) bribe from a cement company and threatening to write negative articles.

Multiple reporters for foreign news organizations reported harassment by security officials, including threats not to renew their visas if they continued to publish stories on sensitive topics.

Censorship or Content Restrictions:  The Ministry of Information and Communication and the Propaganda and Education Commission frequently intervened directly to dictate or censor a story.  More often, however, the party and government maintained control over media content through pervasive self-censorship, backed by the threat of dismissal and possible arrest.  As long as the government did not deem their content to have been "sensitive," authorities permitted some private investors to operate television channels and news-aggregator Web sites and publish certain pages in newspapers.

Despite the continued growth of Internet blogs, the party and government increased efforts to suppress press freedom, continuing a three-year-old "rectification" campaign.  In February Prime Ministerial Decree Number 2, "Sanctions for Administrative Violations in Journalism and Publishing" went into effect.  It stipulates fines between VND one million and 42 million (approximately $50-2,100) for journalists, newspapers, and online media which fail to comply with broad, vague provisions that require "providing honest domestic and international news in accordance with the interests of the country and the people."  The decree--which officials described as "simply an administrative act"--authorizes branches of the government to impose fines on journalists and newspapers at any time, based on arbitrary determinations by ministries and officials at various levels about what constitutes "the interests of the country and the people."  Article 7 of the decree imposes fines of VND 10.5 million to 21 million ($500-1,000) on journalists who fail to publish their sources of information and similar fines on journalists and newspapers that "use documents and materials from organizations and personal letters and materials from individuals."

**VIETNAM**                                                    19

In January the editor in chief of the Saigon Tiep Thi Web site was forced from his position following the publication in late 2010 of sensitive articles.

In February Nguyen Anh Tuan, the founder and editor in chief of the news Web site VietnamNet--whom the ministry reprimanded in December 2010 for publishing an international NGO's annual corruption survey--was pressured to resign.  Authorities also refused to renew the press card issued by the government to the author of the offending article.

Libel Laws/National Security:  The law requires journalists to pay monetary damages to individuals or organizations whose reputations were harmed as a result of reporting, even if the reports were accurate.  Independent observers noted that the law severely limited investigative reporting.  There were some press reports on topics that generally were considered sensitive, such as the prosecution on corruption charges of high-ranking CPV and government officials, as well as occasional criticism of officials and official associations.  Nonetheless, the freedom to criticize the CPV and its senior leadership remained restricted.

Publishing Restrictions:  Under government regulations the Ministry of Information and Communication has the authority to revoke licenses for foreign publishers, and each foreign publisher must reapply annually to maintain its license.  Foreign-language editions of some banned books were sold openly by street peddlers and in shops oriented to tourists.  Foreign-language periodicals were widely available in cities, although the government occasionally censored articles.

In October the Ministry of Culture's state-owned Fine Arts Publishing House recalled all first-edition copies of *Killer with a Festering Head*, a cartoon book by Nguyen Thanh Phong, two weeks after its release.  According to media reports, the ban occurred because government censors deemed some of the book's illustrations--which satirized contemporary Vietnamese life and social issues--to be violent, politically sensitive, or broaching sensitive topics.

Nongovernmental Impact:  The law limits satellite television access to senior officials, foreigners, luxury hotels, and the press, but in practice persons throughout the country were able to access foreign programming via home satellite equipment or cable.  Cable television, including foreign-origin channels, was widely available to urban-area subscribers.  Television providers are required to register with the Ministry of Information and Communication, and edit and translate foreign programming before it is broadcast.  Regulations stipulate that

movies and programming on science, education, sports, entertainment, and music be translated in advance and that all news programs (CNN and BBC, for example) provide brief translations in advance of broadcasting.

**Internet Freedom**

The government allows access to the Internet through a limited number of service providers (ISPs), all of which were state-owned, joint-stock companies.

The government forbids direct access to the Internet through foreign ISPs, requires domestic ISPs to store information transmitted on the Internet for at least 15 days, and requires ISPs to provide technical assistance and workspace to public security agents to allow them to monitor Internet activities. The government requires cybercafes to register the personal information of their customers and store records of Internet sites visited by customers. ISP compliance with these government regulations was unclear. Although citizens enjoyed increasing access to the Internet, the government monitored e-mail, searched for sensitive key words, and regulated Internet content. In March the NGO Reporters Without Borders strongly criticized the government for continued regulation of Internet content and monitoring of individual use.

City and provincial authorities issue additional local regulations to control online access. In compliance, Internet cafes continued to install and use government-approved software to monitor customers' online activities. Location of Internet cafes within 220 yards of a school continued to require a curfew on operations, and ISPs were obliged to cut online access to Internet cafes between 11 p.m. and 6 a.m. to curb online gaming.

Ministry of Information and Communication regulations require Internet companies, social networking sites, and Web sites that provide information in the areas of "politics, economics, culture, and society" to continue to register and obtain a government license before operation.

From May to July, the blocks on Facebook appeared to weaken, with two of the three major ISPs allowing access to the site. Subscribers of other ISPs often used workarounds such as virtual private networks to access the site.

Provisions of law and regulation, such as the prohibition of antistate propagandizing, prohibit bloggers from posting material that the government believes would undermine national security, disclose state secrets, or incite

violence or crimes.  Consequently, these provisions prohibit individuals from downloading and disseminating documents the government deems offensive. Regulations also require global Internet companies with blogging platforms operating in the country to report to the government every six months and, if requested, to provide information about individual bloggers.  A number of prominent print and online news journalists maintained their own professional blogs, several of which were considered far more controversial than their mainstream writing.  In a few instances, the government fined or punished these individuals for the content of their blogs.

Authorities detained and imprisoned dissidents who used the Internet to criticize the government and publish ideas on human rights and political pluralism.  Prime Ministerial Decree Number 2 heralded an increase in the number of bloggers arrested for online expression, totaling at least nine individuals during the year. The majority of bloggers arrested were charged with propagandizing against the state or attempting to overthrow the government.

For example, in July police detained Dang Xuan Dieu, Ho Duc Hoa, and Nguyen Van Oai at Tan Son Nhat airport in Ho Chi Minh City after they returned from Thailand where they had attended an Internet/blogger training course organized by a foreign NGO.  Police also arrested Redemptorist follower Le Van Son, who also attended the course, on August 3 in Hanoi.  That same day, authorities arrested three more Roman Catholic bloggers (Tran Huu Duc, Dau Van Duong, and Dang Xuan Tuong) in Vinh City, Nghe An Province, for participating in the same training.  In September police arrested Ta Phong Tam after she posted an analysis of the arbitrary nature of Le Van Son's arrest.

On August 18, local authorities arrested Nguyen Xuan Anh, Repemptorist member and resident of Vinh City, and charged him with participating in a banned, foreign-based, prodemocracy group and attempting to overthrow the government.  By year's end the Vinh Diocese reported that authorities had arrested 16 individuals (15 Roman Catholics and one Protestant).

On April 19, authorities dropped an investigation and all charges against Le Nguyen Huong Tra (also known as Co Gai Do Long) and stated that her behavior "was less serious than previously thought."  Security officials had accused her of abusing democratic freedoms and had arrested her in October 2010, nine days after she had posted commentaries critical of Vice Minister of Public Security Nguyen Khanh Toan's son.

**VIETNAM** 22

On the day of his scheduled release in October 2010 from a 30-month sentence for alleged tax evasion, authorities rearrested Nguyen Van Hai (also known as Dieu Cay) for antistate propagandizing, allegedly based on three-year-old blog postings. There were unconfirmed reports during the year that he lost his arm while in custody.

In January the People's Court of Lang Son Province convicted Vi Duc Hoi, a former CPV official from the province, of antistate propagandizing after his online postings in 2007-09 of prodemocracy articles criticized the CPV. The court sentenced him to eight years in prison followed by five years' house arrest (reduced on appeal in April to five years' imprisonment and three years' house arrest). Hoi, a CPV member beginning in 1980, had been removed from the CPV in 2007 after he authored online articles disparaging corruption in the party.

Web sites critical of the government that were hosted overseas were continually targeted throughout the year by distributed denial-of-service attacks. A majority of the targeted Web sites were news-aggregator sites that regularly republished postings by high-profile dissidents critical of the government. Hackers rendered several other Web sites inoperable. In June and July the popular news portal VietnamNet was hacked multiple times and rendered inaccessible. An investigation into these attacks continued at year's end. In August a botnet attacked a Web site belonging to a foreign-based prodemocracy group using an estimated 77,000 Internet Protocol addresses located in Vietnam, which suggested government involvement, according to *Access Contested: Security, Identity, and Resistance in Asian Cyberspace*.

Political dissidents and bloggers routinely reported having their home Internet connections disconnected on orders from the security services.

The government used firewalls to block some Web sites that it deemed politically or culturally inappropriate, including sites operated by overseas Vietnamese political groups. The government appeared to have lifted most of its restrictions on access to the Voice of America Web site, although it continued to block Radio Free Asia most of the time. BBC online in Vietnamese and English was blocked at times during the year.

The Ministry of Information and Communication requires owners of domestic Web sites, including those operated by foreign entities, to register their sites with the government and submit their planned content and scope to the government for approval. Enforcement remained selective.

**Academic Freedom and Cultural Events**

The government asserted the right to restrict academic freedom, and authorities sometimes questioned and monitored foreign field researchers. Foreign academic professionals temporarily working at universities in the country were allowed to discuss nonpolitical topics widely and freely in classes, but government observers regularly attended classes taught by both foreigners and nationals. Academic publications usually reflected the views of the CPV and government.

In May the National Assembly distributed a draft law on higher education for public comment. Critics publicly voiced concerns that the draft included an extensive list of administrative constraints but did not provide universities with autonomy to make basic decisions, such as what to teach and how many students to admit.

The government continued to restrict the ability of some international and domestic organizations to host conferences with international sponsorship or participation by requiring government approval at least 20 days in advance.

The government continued to prohibit independent scientific and technical organizations from publicly criticizing party and state policy. In July Thai Nguyen Medical University permanently dismissed Tu Anh Tu, a medical student, for engaging in activities advocating for democracy, which included reading online prodemocracy articles and participating in activist movements.

Although the government controlled art exhibits, music, and other cultural activities, artists were allowed broader latitude than in past years to choose themes for their works. The government also allowed universities more autonomy over international exchanges and cooperation programs.

**b. Freedom of Peaceful Assembly and Association**

**Freedom of Assembly**

The law limits freedom of assembly, and the government restricted and monitored all forms of public protest or gathering. Law and regulation require persons wishing to gather in a group to apply for a permit, which local authorities may issue or deny arbitrarily. In practice only those arranging publicized gatherings to discuss sensitive matters appeared to require permits, and persons routinely

gathered in informal groups without government interference.  The government generally did not permit demonstrations that could be seen to have a political purpose.  The government also restricted the right of several unregistered religious groups to gather in worship.

On June 5, approximately 300 individuals gathered in front of the Chinese embassy in Hanoi to protest news reports that Chinese patrol ships harassed a Vietnamese seismic survey ship and Chinese violations of Vietnamese sovereignty continued in the disputed South China Sea (East Sea).  More than 1,000 individuals joined a similar protest in Ho Chi Minh City.  Similar public demonstrations took place once a week for 11 consecutive weeks in Hanoi but were censored shortly thereafter in Ho Chi Minh City.  During the July 10 protest in Hanoi, police detained at least 20 individuals.  One week later authorities temporarily suspended Hanoi Police Captain Pham Hai Minh from duty when he was photographed trampling the face of one of the protesters.  On August 18, the Hanoi People's Committee issued a decree "banning all spontaneous gatherings, demonstrations, and parades."  On August 22, police arrested 50 individuals for protesting in violation of that decree; authorities released all 50 five days later, but protest leaders and fellow demonstrators thereafter remained under investigation and reported being monitored by police.  On September 5, a group of 10 persons filed a lawsuit against state-controlled media for claiming that hostile forces incited the protesters.

On November 8, plainclothes security officials beat and detained approximately 30 Falun Gong practitioners who demonstrated outside the Chinese embassy in Hanoi in support of Vu Duc Trung and Le Van Thanh, whom authorities had arrested in 2010 and charged with broadcasting illegally into China (see also section 1.e., Political Prisoners and Detainees).

**Freedom of Association**

The government severely restricted freedom of association and neither permitted nor tolerated opposition political parties.  The government prohibited the establishment of private, independent organizations, insisting that persons work within established, party-controlled mass organizations, usually under the aegis of the VFF.  However, some entities, including unregistered religious groups, were able to operate outside of this framework with little or no government interference.

Authorities occasionally physically prevented political activists and family members of political prisoners from meeting with foreign diplomats.  Tactics

included setting up barriers or guards outside diplomats' residences or calling individuals into local police stations for random and repetitive questioning.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at www.state.gov/j/drl/irf/rpt.

## d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The constitution provides for freedom of movement within the country, foreign travel, emigration, and repatriation, but the government imposed some limits on freedom of movement for certain individuals.  The government generally cooperated with the UNHCR and other humanitarian organizations in providing protection and assistance to internally displaced persons, refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern.

Local government authorities observed but did not hinder the UNHCR and foreign diplomatic fact-finding and monitoring visits to the Central Highlands.  The UNHCR reported that it was able to meet with returnees in private.  Foreign diplomats experienced some resistance from lower-level officials in permitting private interviews of returnees.  As in previous years, local police officials sometimes were present during foreign diplomat interviews with returnees but left when asked.  Provincial governments generally continued to honor their obligations to reintegrate peacefully ethnic minority returnees from Cambodia.

In February, 55 Montagnards who fled the Central Highlands for Cambodia were resettled in third countries.  The UNHCR, which conducted several monitoring trips during the year, reported that there was "no perceptible evidence of mistreatment" of any of the ethnic minority individuals it monitored in the Central Highlands.

In-country Movement:  Several political dissidents, amnestied with probation or under house arrest, were subject to official restrictions on their movements.

A government restriction regarding travel to certain areas remained in effect.  It requires citizens and resident foreigners to obtain a permit to visit border areas; defense facilities; industrial zones involved in national defense; areas of "national

strategic storage;" and "works of extreme importance for political, economic, cultural, and social purposes."

Local police require citizens to register when staying overnight in any location outside of their own homes; the government appeared to enforce these requirements more strictly in some Central and Northern Highlands districts. Foreign passport holders must also register to stay in private homes, although there were no known cases of local authorities refusing to allow foreign visitors to stay with friends and family.

The law on residence was not broadly implemented, and migration from rural areas to cities continued unabated. However, moving without permission hampered persons seeking legal residence permits, public education, and health-care benefits.

Foreign Travel: Officials occasionally delayed citizens' access to passports in order to extort bribes, and prospective emigrants occasionally encountered difficulties obtaining a passport.

For example, in July authorities stopped Father Dinh Huu Thoai, chief of office of the Redemptorist Church of Vietnam, at the Moc Bai border gate (Tay Ninh Province) and prevented him from leaving the country. In September security forces prevented human rights lawyer Huynh Van Dong from leaving the country.

Although their probation ended years earlier, the government continued to prohibit dissidents Nguyen Khac Toan, Pham Hong Son, Le Thi Kim Thu, and others from receiving a passport and traveling overseas during the year. Authorities continued to allow attorney Le Quoc Quan, attorney Le Tran Luat, and journalist Nguyen Vu Binh to travel within the country but prohibited them from traveling overseas.

Emigration and Repatriation: The government generally permitted citizens who had emigrated to return to visit, although it refused to allow certain activists or other individuals living abroad to return. Known Vietnamese political activists overseas were denied entry visas or were detained and deported after entering the country. For example, on August 1, authorities denied Radio Free Asia reporter Tuong Anh entry after he arrived at Tan Son Nhat airport, Ho Chi Minh City, from abroad.

The government continued to honor a tripartite memorandum of understanding signed with Cambodia and the UNHCR to facilitate the return from Cambodia of all ethnic Vietnamese who did not qualify for third-country resettlement.

Citizenship:  By law the government considers anyone born to at least one Vietnamese-citizen parent to be a citizen.  There are also provisions for persons who do not have a Vietnamese-citizen parent to acquire citizenship under certain conditions.  Emigrants who acquire another country's citizenship generally are considered still to be Vietnamese citizens unless they formally renounce their Vietnamese citizenship.  However, in practice the government treated overseas Vietnamese as citizens of their adopted country.  Legislation seeks to clarify this apparent discrepancy by allowing for dual citizenship.  The government generally encouraged visits and investment by such persons but sometimes monitored them carefully.  The government continued to liberalize travel restrictions for overseas Vietnamese, including permitting visa-free travel and permitting individuals to petition to receive Vietnamese passports.

**Protection of Refugees**

The law does not provide for the granting of refugee status, and the government has not established a system for providing protection to refugees.

Access to Asylum:  The law does not provide for the granting of asylum.

Safe Country of Origin/Transit:  Government regulations and policy do not explicitly provide protection against the expulsion or return of persons where their lives or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group, or political opinion.  No such cases were reported during the year.

**Stateless Persons**

The country's largest stateless group consisted of approximately 9,500 Cambodian residents who sought refuge in Vietnam in the 1970s and were denied the right to return by the government of Cambodia, which asserted no proof existed that these individuals had ever possessed Cambodian citizenship.  Almost all were ethnic Chinese or Vietnamese whom authorities initially settled in four refugee camps in and around Ho Chi Minh City.  When humanitarian assistance in these camps ceased in 1994, an estimated 7,000 refugees left the camps in search of work and opportunities in Ho Chi Minh City and the surrounding area.  An additional 2,100 remained in four villages in which the camps once operated.  Many had children and grandchildren born in Vietnam, but neither the original refugees nor their children enjoy the same rights as Vietnamese citizens, including the right to

Country Reports on Human Rights Practices for 2011
United States Department of State  •  Bureau of Democracy, Human Rights and Labor

property ownership, comparable access to education, and public medical care.  In July 2010 the first group of 287 individuals received Vietnamese citizenship as part of a joint UNHCR-government effort to survey and naturalize these stateless individuals.  The naturalization applications for the approximately 1,800 remaining were submitted to the president's office for final approval, but no action was reported at year's end.

The Women's Union continued to work with the government of South Korea to address international marriage brokering and premarriage counseling, including education on immigration and citizenship regulations.  Some domestic and international NGOs provided assistance.

**Section 3. Respect for Political Rights: The Right of Citizens to Change Their Government**

The constitution does not provide for the right of citizens to change their government peacefully, and citizens could not freely choose the officials that govern them.

**Elections and Political Participation**

Recent Elections:  The most recent elections, in May to select members of the National Assembly, were neither free nor fair, since the VFF chose and vetted all candidates.  Despite the CPV's announcement that a greater number of "independent" candidates (those not linked to a certain organization or group) would run in the elections, the ratio of independents to other candidates was lower than that of the 2007 election.  The CPV approved 15 "self-nominated" candidates who did not have official government backing but were allowed to run for office.  There were credible reports that party officials pressured many self-nominated candidates to withdraw or found such candidates "ineligible" to run.

According to the government, more than 99 percent of the 62 million eligible voters cast ballots in the May election, a figure that international observers considered improbably high.  (Voters are permitted to cast ballots by proxy, and local authorities are charged with assuring that all eligible voters cast ballots by organizing group voting and all voters within their jurisdiction are recorded as having voted.)  CPV candidates won 458 of the 500 seats.  Only four of the 15 self-nominated candidates won.

The National Assembly, although subject to the control of the CPV (all of its senior leaders and more than 90 percent of its members are party members), continued to take incremental steps to assert itself as a legislative body. A majority of National Assembly committees increased the number of members on the committees in an attempt to exert more influence over budgetary matters and to review and provide recommendations on policy matters. For example, the number of members on the External Relations Committee increased from 30 to 36, the Committee on Social Issues increased its membership from 40 to 50 members, and the committees on legal affairs and defense increased the number of vice chairs. In August the National Assembly appointed a Constitutional Amendment Drafting Committee and adopted a statement by its Standing Committee giving guidance on the scope and timetable of the drafting process.

Political Parties: The constitution vests all authority and political power in one party, the CPV, and recognizes the leadership of the CPV. The CPV Politburo functions as the supreme decision-making body in the country, although technically it reports to the CPV Central Committee. Political opposition movements and other political parties are illegal.

The government continued to restrict public debate and criticism severely. No public challenge to the legitimacy of the one-party state was permitted, although there were instances of unsanctioned letters critical of government policy from private citizens. For example, former government officials and leading academicians criticized the government's decision to allow substantial foreign investment in bauxite mining and its handling of sovereignty claims in the South China Sea (East Sea). The government continued to crack down on the small, opposition political groups established in 2006, and group members faced arrests and arbitrary detentions.

Members of Bloc 8406 and other political activist groups that call for the creation of a multiparty state continued to face harassment and imprisonment.

Participation of Women and Minorities: The law provides the opportunity for equal participation in politics by women and minority groups. There were 122 women in the National Assembly, or approximately 24 percent--a slightly lower percentage than in the previous assembly.

Ethnic minorities held 78 seats, or approximately 16 percent, in the National Assembly--a decline from the previous assembly.

**Section 4. Official Corruption and Government Transparency**

The law provides criminal penalties for official corruption; however, the government did not always implement the law effectively, and officials sometimes engaged in corrupt practices with impunity.  Corruption continued to be a major problem.  The government persisted in efforts to fight corruption, including publicizing budgets of different government levels, continuing to streamline inspection measures, and occasionally widely publicizing cases of officials accused of corruption.

The anticorruption law allows citizens to complain openly about inefficient government, administrative procedures, corruption, and economic policy.  However, the government continued to consider public political criticism a crime unless the criticism was controlled by authorities.  Attempts to organize those with complaints to facilitate action are considered proscribed political activities and subject to arrest.  Senior government and party leaders traveled to many provinces, reportedly to try to resolve citizen complaints.  Corruption related to land use was widely publicized in the press, apparently in an officially orchestrated effort to bring pressure on local officials to reduce abuses.

Corruption among police remained a significant problem at all levels, and members of the police sometimes acted with impunity.  Internal police oversight structures existed but were subject to political influence.

Foreign aid donors conducted an annual anticorruption dialogue as part of consultative group meetings with the government.  Previous dialogues focused on corruption in the education, health, and construction sectors.

According to an annual report by the government's Anticorruption Steering Committee released in June, state agencies initiated preliminary investigations into 100 cases of corruption-related crimes, an increase of approximately 5 percent compared with the same period during the previous year.  There were 185 suspects, an increase of 3 percent, and authorities brought 97 cases to the court of first instance.  According to the annual report of the Office of the Inspectorate General, it investigated 220 cases of corruption/fraud involving 449 individuals during the year, a majority of which continued under investigation at year's end.

In June authorities charged Pham Thanh Hai, an accountant in the government's department of cinematography, with embezzling VND 42 million (approximately $2,100) from the department's annual budget.

In September the Supreme People's Court in Hanoi concluded its investigation into the August 2010 allegations of misappropriation in the shipbuilding conglomerate Vinashin and found that nearly VND 900 billion (approximately $43 million) had been misappropriated.  The court charged Chief Executive Officer Pham Thanh Binh and eight others--board members Tran Quang Vu and Tran Van Liem, former subsidiary general directors Nguyen Van Tuyen and Nguyen Tuan Duong plus To Nghiem, Trinh Thi Hau, Hoang Gia Hiep, and Do Dinh Con--with "deliberately acting against state regulations and economic mismanagement, causing serious consequences."  These offenses are punishable by up to 12 years in prison.  At year's end the accused awaited trial as well as additional investigation on other, related charges.

In June a court convicted Tran Van Khanh, the former director general of Vietnam General Corporation of Agriculture Materials, of "abusing powers while performing official duties" and sentenced him to five years' imprisonment.  Specifically, in 2003-04 Khanh illegally sold company fertilizer to individuals outside of working hours and rented company vehicles to private individuals, from which he pocketed more than VND 3 billion (approximately $140,000).

In May the former governor of the State Bank of Vietnam, Le Duc Thuy, retired from his position after coming under investigation for allegedly taking bribes from the Reserve Bank of Australia currency supplier (Securency).  It was claimed that, for the exchange of an undisclosed amount of money, Thuy helped Securency win banknote supply contracts during the period 2002-09 and that Securency deposited funds for Thuy into an overseas account belonging to a member of the government's public security bureau, Colonel Luong Ngoc Anh.  An investigation continued at year's end.

By government decree various government officials must annually report by November 30 the real estate, precious metals, and "valuable papers" they own; money they hold in overseas and domestic bank accounts; and their taxable income.  The government must publicize these asset declarations only if a government employee is found "unusually wealthy" and investigation or legal proceedings are needed.  In addition to senior government and party officials, the decree applies to prosecutors, judges, and those at and above the rank of deputy provincial party chief, deputy provincial party chairperson, deputy faculty head at public hospitals, and deputy battalion chief.  Due to a lack of transparency, it was not known how widely the decree was enforced.

The Ministry of Public Security is responsible for investigating corruption charges brought forward by anticorruption offices in the Ministry of Home Affairs and the Office of the Inspectorate General.  Additionally, the Central Steering Committee on Anticorruption reports directly to the Office of the Prime Minister and has the responsibility to direct, coordinate, inspect, and formulate countrywide anticorruption activities.  This committee periodically provides reports on anticorruption activities to the CPV Central Committee, National Assembly, and Office of the State President.  It is also responsible for suspending and/or dismissing senior officials appointed by the prime minister who are convicted of corrupt practices.

The law does not provide for public access to government information, and the government usually did not grant such access to citizens or noncitizens, including foreign media.  In accordance with the law, the *Official Gazette* published most government legal documents in its daily edition but not party documents such as Politburo decrees.  The government maintained a Web site in both Vietnamese and English, as did the National Assembly.  In addition decisions made by the Supreme People's Court Council of Judges were accessible a majority of the time through the court's Web site.  During his March visit, the UN independent expert on foreign debt and human rights called on the government to make information on debt and development assistance broadly available to enhance transparency and accountability in the management and use of public resources.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The government does not permit private, local human rights organizations to form or operate, nor does it tolerate attempts by organizations or individuals to comment publicly on its human rights practices.  The government used a wide variety of methods to suppress domestic criticism of its human rights policies, including surveillance, limits on freedom of the press and assembly, interference with personal communications, and detention.

UN and Other International Bodies:  The government generally prohibited private citizens from contacting international human rights organizations, although several activists did so.  The government usually did not permit visits by international NGO human rights monitors, although it allowed representatives from the UNHCR, press, foreign governments, and international development and relief NGOs to visit the Central Highlands.  The government criticized almost all public

statements on human rights and religious matters by international NGOs and foreign governments.

Government Human Rights Bodies:  The government discussed human rights matters bilaterally with several foreign governments and continued to hold official talks concerning human rights, typically through annual human rights dialogues.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination based on race, gender, disability, language, or social status, but enforcement of these prohibitions was uneven.

## Women

Rape and Domestic Violence:  The law prohibits using or threatening violence against women or taking advantage of a person who cannot act in self-defense.  It also criminalizes rape, including spousal rape.  Rapists are subject to two to seven years' imprisonment.  In severe cases of rape, including organized rape, a repeat offense, or extreme harm to the victim, sentences may range from seven to 15 years in prison.  Authorities reportedly prosecuted rape cases to the full extent of the law, but the government did not make arrest, prosecution, conviction, and punishment statistics available.

Domestic violence against women was common.  A 2010 UN report found that 58 percent of married women had been victims of physical, sexual, or emotional domestic violence.  Domestic violence cases were treated as civil ones, unless the victim suffered injuries involving more than 11 percent of her body.

The law specifies acts constituting domestic violence, assigns specific portfolio responsibilities to different government agencies and ministries, and stipulates punishments for perpetrators ranging from warnings, through probation for up to three years, to imprisonment for three months to three years.  However, NGO and survivor advocates considered many of the provisions to be weak, and the government did not make arrest, prosecution, conviction, and punishment statistics available.  Officials acknowledged domestic violence as a significant social concern, and the media discussed it more openly during the year.  While the police and legal system generally remained unequipped to deal with cases of domestic violence, the government, with the help of international and domestic NGOs, continued to train police, lawyers, and legal system officials in the law.

Several domestic and international NGOs worked to address domestic violence. Hotlines for victims operated by domestic NGOs existed in major cities. The Center for Women and Development, supported by the Women's Union, also operated a nationwide hotline, although it was not widely advertised in rural areas. It conducted 2,161 consultations regarding 1,858 cases during the year. While rural areas often lacked the financial resources to provide crisis centers and hotlines, a law establishes "reliable residences" to allow women to turn to another family while local authorities and community leaders attempt to confront the abuser and resolve complaints. Many women remained in abusive marriages rather than confront social and family stigma as well as economic uncertainty.

The government, with the help of international NGOs, supported workshops and seminars aimed at educating women and men about domestic violence and women's rights in general and highlighted the problem through public awareness campaigns. Local NGOs affiliated with the Women's Union remained engaged in women's issues, particularly violence against women and trafficking of women and children.

Sexual Harassment: According to the government, sexual harassment of adults is not illegal, and there is no legal requirement to prevent it. There also is no law to protect employees from sexual harassment in the workplace. However, the law prohibits employers from discriminating against female workers or offending their dignity and honor, although there were no known prosecutions during the year. Publications and training on ethical regulations for government and other public servants do not mention the problem, although it existed.

Victims of sexual harassment may contact social associations such as the Women's Union to request their involvement. If the victim has access to a labor union representative, complaints can also be lodged with union officers. In serious cases victims may sue offenders under a provision that deals with "humiliating other persons" and specifies punishments that include a warning, noncustodial reform for up to two years, or a prison term ranging from three months to two years. Nevertheless, sexual harassment lawsuits continued to be unheard of, and most victims were unwilling to denounce offenders publicly.

Reproductive Rights: The law affirms an individual's right to choose contraceptive methods; access gynecological diagnosis, treatment, and health check-ups during pregnancy; and obtain medical services when giving birth at health facilities, and the government generally enforced the law. Nonetheless, unmarried women of reproductive ages had limited or no access to subsidized

contraceptives due to government policy and lack of access in rural areas.  Women and men were equally diagnosed and treated for sexually transmitted infections.

Although the Population and Reproductive Health Strategy for 2011-20--applicable to all citizens--no longer specifically referred to the number of children per couple, it set a target of maintaining the average number of children per reproductive-age couple at 1.8.  The government, primarily through media campaigns, strongly encouraged individuals to practice family planning.  There was also anecdotal information that authorities would not promote government officials if they had more than two children.

Discrimination:  The law provides for gender equality in all aspects of life, but women continued to face societal discrimination.  Despite the large body of law and regulation devoted to the protection of women's rights in marriage and the workplace, as well as provisions that call for preferential treatment, women did not always receive equal treatment.  They experienced economic discrimination since they cannot work in all the same industries as men and are not allowed to work the same hours as men (due to pregnancy or nursing).  Moreover, no laws prohibit employers from asking about family status during job interviews.

Although the law provides for equal inheritance rights for men and women, in practice women faced cultural discrimination:  A son was more likely to inherit property than a daughter, unless specified by a legal document.  Laws prohibit gender-based preferential hiring for jobs, and while NGOs assumed that such discrimination occurred, allegations were hard to prove.

The CPV-affiliated Women's Union and the government's National Committee for the Advancement of Women continued to promote women's rights, including political, economic, and legal equality, and protection from spousal abuse.  The Women's Union also operated microcredit consumer-finance programs and other programs to promote the advancement of women.  In April the National Strategy Plan for Gender Equality replaced the National Plan of Action for the Advancement of Women.  Key areas of the strategy were similar to plan goals but also moved beyond advancement to recognize broader inequities in access to social services and focus on developing indicators; placing more women in senior ministry positions and the legislature; and increasing literacy rates, access to education, and health care.

According to a 2010 UN Population Fund report, the national average male-female sex ratio at birth was 111 to 100.  The imbalanced ratio of newborn boys to girls

continued to increase, particularly in some wealthier areas of Hanoi and Ho Chi Minh City. The government acknowledged the issue and was taking steps to address it.

## Children

Birth Registration: By law the government considers anyone born to at least one Vietnamese citizen parent to be a citizen, although persons born to non-Vietnamese parents may also acquire citizenship under certain circumstances. Not all births were registered immediately, sometimes due to a lack of knowledge among the populace. A birth certificate is required for public services, such as education and health care, and the choice by some parents, especially ethnic minorities, not to register their children affected the ability to enroll them in school and receive government-sponsored health care.

Education: Education is compulsory, free, and universal through the age of 14. Nevertheless, authorities did not always enforce the requirement, especially in rural areas, where government and family budgets for education were strained and children's contributions as agricultural laborers were valued.

Child Abuse: The UN and the General Statistics Office found that 25 percent of children were victims of child abuse as reported by their mothers during a study on domestic violence. The government did not make information available on the extent of the problem or its efforts to combat it.

Sexual Exploitation of Children: Sexual harassment of children under age 16 is illegal. The law criminalizes all acts of sale, fraudulent exchange, or control of children as well as all acts related to child prostitution and forced child labor. Sentences range from three years' to life imprisonment, and fines range from VND five million to VND 50 million (approximately $240 to $2,400). The law also specifies prison sentences for acts related to child prostitution, including harboring prostitution (12 to 20 years), brokering prostitution (seven to 15 years), and buying sex with minors (three to 15 years). Similarly, the law prohibits all acts of cruel treatment, humiliation, abduction, sale, and coercion of children into any activities harmful to their healthy development and provides for the protection and care of disadvantaged children.

The minimum age of consensual sex is 18. Statutory rape is illegal and may result in life imprisonment or capital punishment. Penalties for sex with minors between the ages of 16 and 18, depending upon the circumstances, vary from five to 10

years in prison.  The production, distribution, dissemination, or selling of child pornography is illegal and carries a sentence of three to 10 years' imprisonment.

According to preliminary findings released in July of a 2010 survey conducted by UNICEF and the Ministry of Labor, Invalids, and Social Affairs (MOLISA), child prostitution, child trafficking for sexual purposes, child sex tourism, and child pornography occurred in Vietnam.  The report showed that children as young as age 12 worked as prostitutes, with the most commonly observed age being 14-15.  Some minors entered into prostitution for economic reasons.

Displaced Children:  Independent NGOs estimated that 23,000-25,000 children lived on the streets and were sometimes abused or harassed by police.

Institutionalized Children:  There were no shelters designed specifically for child victims of trafficking or abuse.  Instead, authorities placed them in facilities with survivors of domestic violence or adult trafficking.  The government allocated VND 1.25 trillion (approximately $59.5 million) for the draft National Program of Action for Children for 2011-20.  The new program's focus is assistance for disadvantaged children with priority for the 12 poorest provinces.  The government also promulgated the National Program on Child Protection 2011-15, which was approved in February.

International Child Abductions:  The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.

**Anti-Semitism**

There were small expatriate Jewish communities in Hanoi and Ho Chi Minh City, and there were no reports of anti-Semitic acts.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip.

**Persons with Disabilities**

The constitution provides for the protection of persons with physical disabilities.  The law prohibits discrimination against or maltreatment of persons with disabilities; encourages their employment; and requires equality for them in

accommodation, access to education, employment, health care, rehabilitation, transportation, and vocational training.

The provision of services to persons with disabilities, although limited, improved during the year. The Ministry of Transportation implemented accessibility codes for public transportation facilities, trained transportation agency officials and students on the use of the codes, and developed training materials for bus drivers to assist individuals on and off buses. The government also put in place four accessible bus routes in Ho Chi Minh City and Danang with accessible buses and distributed free bus tickets (or reduced the fares for) 26,000 individuals in Hanoi and Ho Chi Minh City.

Construction and major renovations of new government and large public buildings are required to include access for persons with disabilities, but enforcement was sporadic. New buildings and facilities in larger urban cities were built with ramps and accessible entries. The Ministry of Construction maintained enforcement units in the cities of Hanoi, Ho Chi Minh, Danang, Quang Nam, and Ninh Binh to enforce barrier-free codes and provided training on construction codes for inspectors and architectural companies in more than 20 provinces during the year.

Access to education for children with disabilities, including blindness, deafness, and mobility restrictions, was extremely limited. The law provides for preferential treatment for firms that recruit persons with disabilities and for fines on firms that do not meet minimum quotas that reserve 2 to 3 percent of their workforce for workers with disabilities, but the government enforced these provisions unevenly. Firms that have 51 percent of their employees with disabilities may qualify for special government-subsidized loans.

The government respected the political and civil rights of persons with disabilities. For example, by law ballot boxes may be and were brought to the homes of individuals unable to go to a polling station.

The government supported the establishment of organizations aiding persons with disabilities. Such persons were consulted in the development or review of national programs, such as the national poverty reduction program, vocational laws, and various educational policies. The National Coordination Committee on Disabilities and its ministry members worked with domestic and foreign organizations to provide protection, support, physical access, education, and employment. The government operated a small network of rehabilitation centers

to provide long-term, inpatient physical therapy.  Several provinces, government agencies, and universities had specific programs for persons with disabilities.

**National/Racial/Ethnic Minorities**

Although the government officially prohibits discrimination against ethnic minorities, longstanding societal discrimination against ethnic minorities persisted. Despite the country's significant economic growth, some ethnic minority communities benefited little from improved economic conditions.  In certain areas, including the Northwest and Central Highlands and portions of the Mekong Delta, ethnic minority groups made up the majority of the population.

Some members of ethnic minority groups continued to leave for Cambodia and Thailand, reportedly to seek greater economic opportunity or shortcuts to migration to other countries.  The government monitored certain highland minorities closely, particularly several ethnic groups in the Central and Northwest Highlands, where it continued to be concerned that the religion they practice encouraged ethnic minority separatism.

The government imposed increased security measures in the Central and Northwest Highlands in response to concerns over possible ethnic minority separatist activity.  There were reports that ethnic minority individuals who telephoned ethnic minority community members abroad were a special target of police attention.  Authorities arrested and convicted several individuals connected to overseas separatist organizations and sentenced them to lengthy prison terms in 2011.  During the period around sensitive occasions and holidays, an increased security presence was reported throughout the region.  There were a few reports that Vietnamese police operating on both sides of the border returned members of ethnic minorities seeking to enter Cambodia and sometimes beat and detained them.

In late April and early May, 5,000 ethnic Hmong in Dien Bien Province gathered in Muong Nhe District as part of a millennium movement.  Security personnel dispersed the crowd and arrested 150 individuals.  According to the government, seven detainees (among them were Thao A Lao, Mu A Thang, Trang A Do, and Giang A Xi from Dien Bien Province) remained in police custody at year's end, charged with preventing government officials from performing official duties, and an investigation continued.

The government continued to address the causes of ethnic minority discontent through special programs to improve education and health facilities and expand road access and electrification of rural communities and villages.  The government continued to allocate land to ethnic minorities in the Central Highlands through a special program, but there were valid complaints that implementation was uneven.

The government maintained a program to conduct classes in some local ethnic minority languages in elementary and secondary schools.  The government also worked with local officials to develop local language curricula, but it appeared to implement this program more comprehensively in the Central Highlands and the Mekong Delta, and only in limited areas of the Northwest Highlands.  The law provides for universal education for children regardless of religion or ethnicity, and ethnic minorities are not required to pay regular school fees.  The government operated special schools for ethnic minority children, and there were 223 boarding schools for them in the Northwest and Central Highlands and the Mekong Delta, including at middle- and high-school levels plus special admission and preparatory programs as well as scholarships and preferential admissions at the university level.  There were also a few government-subsidized technical and vocational schools for ethnic minorities.  Nonetheless, there were some credible cases of discrimination against ethnic minorities.

The government broadcast radio and television programs in ethnic minority languages in some areas.  The government also instructed ethnic-majority (Kinh) officials to learn the language of the locality in which they worked.  Provincial governments continued initiatives designed to increase employment, reduce the income gap between ethnic minorities and ethnic Kinh, and make officials sensitive and receptive to ethnic minority culture and traditions.  Nonetheless, local security officials detained Tang Thuy, an ethnic Khmer Krom minority group member from Soc Trang Province, for two days in March for questioning about his participation in a meeting that called for the government to respect the rights of all ethnic minorities.

The government granted preferential treatment to domestic and foreign companies that invested in highland areas populated predominantly by ethnic minorities.  The government also maintained infrastructure development programs that targeted poor, largely ethnic-minority areas and established agricultural extension programs for remote rural areas.

The National Assembly's Ethnic Minority Council, along with provincial Ethnic Minority Steering Committees, supported infrastructure development and

addressed some issues related to poverty reduction and an increase in literacy rates during the year.

## Societal Abuses, Discrimination, and Acts of Violence Based on Sexual Orientation and Gender Identity

Consensual same-sex sexual activity is not criminalized, although by decree, individuals may not change their gender.  There was no reported official discrimination based on sexual orientation or gender identity, but societal discrimination and stigma were pervasive.  A lesbian, gay, bisexual, and transgender (LGBT) community existed but was largely underground.

A 2009 survey of more than 3,200 LGBT individuals by the Institute for Studies of Society, Economy, and the Environment reported that 4.5 percent claimed they were victims of assault or physical abuse by homophobic individuals and 6.5 percent claimed they lost jobs because of their sexual orientation.  The institute also reported that government officials, the Women's Union, and the Lawyers Association participated in sensitivity training during the year.  Most LGBT persons chose not to tell family of their sexual orientation for fear of being disowned, and a 2011 online survey, conducted by the Information Sharing and Connecting Group with more than one thousand LGBT respondents, noted that more than 20 percent were forced into counseling by their families.

## Other Societal Violence or Discrimination

There was no evidence of official discrimination against persons with HIV/AIDS, but societal discrimination against such persons existed.  Individuals who tested positive for HIV reported latent social stigma and discrimination, although not in receiving medical treatment for their condition.  The law states that employers cannot fire individuals for having HIV/AIDS and doctors cannot refuse to treat persons with HIV/AIDS.  However, there were credible reports that persons with HIV/AIDS lost jobs or suffered from discrimination in the workplace or in finding housing, although the number of such reports decreased.  The government reported approximately 5,100 school-age children with HIV/AIDS.  In several cases HIV/AIDS-positive children or orphans were barred from schools due to pressure from other parents.  With the assistance of foreign donors, the national government and provincial authorities took steps to treat, assist, and accommodate persons with HIV/AIDS and thereby decrease societal stigma and discrimination, but these measures were not consistently applied.  Faith-based charities were sometimes

permitted to provide HIV prevention and home-based care services to persons with or affected by HIV/AIDS.

## Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law does not allow workers to organize and join independent unions of their choice.  While workers may choose whether to join a union and at which level (local, provincial, or national) they wish to participate, every union must be affiliated with the country's only trade union confederation, the Vietnam General Confederation of Labor (VGCL).  The VGCL, a union umbrella organization controlled by the CPV, approves and manages a range of subsidiary labor unions organized according to location and industry.  By law the provincial or metropolitan branch of the VGCL is responsible for organizing a union within six months of the establishment of any new enterprise, and management is required to cooperate with the union.

The law outlines mandatory union dues for union members and domestic and foreign employers.  While these dues were intended to support workers and union activities, neither the VGCL nor the government, which is responsible for dues collection, provided transparent information regarding their use.  Although the law does not allow for independent unions, it permits the negotiation of disputes to be led and organized by "relevant entities," which may be composed of worker representatives when the enterprise in question does not have a union, i.e., during the first six months after an enterprise is established.  The law allows for "union activities" during this period, especially during emergencies such as a strike.

The law permits strikes under certain prescribed circumstances and stipulates an extensive and cumbersome process of mediation and arbitration that must be followed before a lawful strike may occur.

The law prohibits strikes in businesses that serve the public or that the government considers essential to the national economy and defense.  The law also grants the prime minister the right to suspend a strike considered detrimental to the national economy or public safety.  The law defines "essential services" more broadly than in International Labor Organization (ILO) criteria.  A decree defines these enterprises as ones involved in electricity production; post and telecommunications; maritime and air transportation, navigation, and management;

public works; and oil and gas. The essential services list was reduced by nearly 60 percent in April (effective June 1), from 142 firms to 58.

Strikes that do not arise from a collective labor dispute or do not adhere to the process outlined by law are illegal. Before workers may hold a strike, they must take their claims through a process involving a conciliation council (or a district-level labor conciliator where no union is present). If the two parties cannot reach a resolution, the claims must be submitted to a provincial arbitration council. Unions (or workers' representatives where no union is present) have the right either to appeal decisions of provincial arbitration councils to provincial people's courts or to go on strike. Individual workers may take cases directly to the people's court system, but in most cases they may do so only after conciliation has been attempted and failed. The law also stipulates that workers on strike will not be paid wages while they are not at work.

The law prohibits retribution against strikers, and there were some anecdotal reports of employer retaliation against strike participants by limiting future employment prospects. For example, MOLISA's Center for Industrial Relations reported the case of a company photographing workers on strike and sending the photographs to other companies within their business association. Local news reported that employees at a Panasonic factory accused the company of creating a list of striking workers. By law individuals participating in strikes declared illegal by a people's court and found to have caused damage to their employer are liable for damages.

The law provides VGCL-affiliated unions the right to bargain collectively on behalf of workers. Collective labor disputes over rights must be routed through a conciliation council and, if the council cannot resolve the matter, to the chairperson of the district-level people's committee.

In practice VGCL leaders influenced key decisions by drafting, amending, or commenting on labor legislation; developing social safety nets; and setting health, safety, and minimum wage standards. Labor activists and representatives of independent (non-VGCL) workers' organizations faced antiunion discrimination (see section 1.e., Political Prisoners and Detainees).

There was little evidence that leaders or organizations active during the first six months' window after an enterprise was established continued to be active or recognized thereafter.

**VIETNAM** 44

The VGCL reported 981 strikes during the year. The main reason for the high number of strikes--more than double the number in 2010--was reportedly the negative impact of high inflation on workers' living conditions. The majority of these strikes occurred in Ho Chi Minh City and surrounding provinces in foreign-invested enterprises (mainly South Korean and Taiwanese companies). None of the strikes followed the authorized conciliation and arbitration process and thus were considered illegal, "wildcat" strikes. The government tolerated these strikes and not only took no action against the strikers but on occasion also actively mediated agreements in the workers' favor. In some cases the government disciplined employers, especially with foreign-owned companies, for the illegal practices that led to strikes.

There were credible reports that employers tended to use short-term or probationary contracts to avoid certain legally mandated worker benefits, such as unemployment insurance, or to inhibit workers from joining unions.

**b. Prohibition of Forced or Compulsory Labor**

The law prohibits forced and compulsory labor, except as defined by administrative or criminal penalties. Nonetheless, according to government and NGO reports, forced labor of adults and children occurred (see section7.c.).

There were reports from credible NGOs that the government, especially the Ministry of Public Security, increased efforts to prevent forced labor, and the government reported criminal prosecutions for forced labor during the reporting period. In response to reports of forced labor on domestic coffee plantations, Lam Dong Province authorities issued a directive in November calling for increased inspections and stricter punishments against illegal labor brokers who offered jobs on coffee plantations.

Prisoners convicted by courts routinely were required to work for little or no pay. Authorities routinely required individuals, detained under administrative decree in reeducation centers and detention centers for sex workers and drug users, to work for little or no pay under administrative and legislative regulations. They produced food and other goods used directly in prisons or sold on local markets, reportedly to purchase items for their personal use. There were credible reports that private companies hired individuals in drug detention centers.

There was also information that suggested workers in centers for social and educational rehabilitation were engaged in agriculture (growing rice and

## VIETNAM                                                        45

vegetables; raising poultry, fish, and other livestock; and shelling cashews or other nuts), manufacturing (producing bicycle tires, mosquito nets, false eye-lashes, pottery, bamboo or rattan products, and shoes and apparel), and construction work.

In September an international human rights organization reported that authorities forced individuals in the detention centers for drug users to engage in unpaid or underpaid work as part of their treatment.  In response, MOLISA officials confirmed that "therapeutic labor" was one part of the treatment for individuals in these centers but asserted that it was not required of all individuals and was remunerated.  The officials also reported providing orders to provincial officials to halt construction of any new drug detention centers and cease all actions that violated labor regulations.

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits most child labor but allows exceptions for certain types of work.  The law sets the minimum age for employment at 18 years, but enterprises may hire children between ages 15 and 18 if the firm obtains permission from parents and MOLISA.  Enterprises hiring young labor (ages 15-18) have to provide them with special considerations concerning working hours, annual leave, and working environment.  Children ages 15-18 may work a maximum of seven hours per day and 42 hours per week and must receive special health care.

The law permits children to register at trade training centers, a form of vocational training, from age 13.  By law an employer must ensure that workers under age 18 do not undertake hazardous work or work that would harm their physical or mental development.  Prohibited occupations are specified in law and include those requiring compressed working posture, direct contact with harmful chemicals, contact with radioactive substances, work with various types of furnaces or hot metal, driving motor vehicles, operating stone grinding machines, and operating machines for starching cloth and cotton yarns, among others.

MOLISA is responsible for enforcing child labor laws and policies.  Government officials may fine and, in cases of criminal violations, prosecute employers who violate child labor laws.  Generally the government committed insufficient resources to enforce effectively laws providing for children's safety, especially for children working in mines and as domestic servants.  However, there were several

reports that the government detected some cases of child exploitation, removed children from exploitative situations, and prosecuted/fined employers during the year.  In April Lam Dong Province authorities closed and burned illegal tin mining sites where children were employed.  In September authorities rescued two dozen children from "slave labor" in a private garment factory; at year's end the factory owners awaited trial.

A 2011 investigation by the Ho Chi Minh City Department of Labor, Invalids, and Social Affairs showed that child labor appeared in seven of 24 districts and approximately 90 percent of establishments using child labor did not have business licenses.  MOLISA maintained that more than 25,000 children worked in hazardous conditions countrywide, a statistic that international observers continued to believe was actually higher.

The government approved in February its first five-year National Program on Child Protection and committed approximately VND 1.75 trillion ($83.3 million) toward implementation from both central and local government budgets.  The government also continued programs to eliminate persistent child labor, with a particular focus on needy families and orphans.  A joint project with the ILO to eliminate the worst forms of child labor continued.

In practice child labor remained a problem, particularly in rural areas, where two-thirds of the population resided.  In rural areas children worked primarily on family farms, in other agricultural activities and household responsibilities, or in mines.  In some cases they began work as young as age six and were expected to do the work of adults by the time they reached age 15.  Especially during harvest and planting seasons, some parents did not permit children to attend school.

Migration from rural to urban settings exacerbated the child labor problem, because unauthorized migrants were unable to register their households in urban areas.  Consequently, their children could not attend public schools, and families had less access to credit.  Officials stated that juveniles in education and nourishment centers, which functioned similarly to reform schools or juvenile detention centers, were commonly assigned work for "educational purposes."

In urban areas children worked in family-owned small businesses, including small, privately owned garment factories, or on the street shining shoes or selling articles such as lottery tickets and newspapers.  For example, in September Ministry of Public Security officials initiated the rescue of 19 ethnic minority children from Dien Bien Province who had been trafficked for the purpose of forced labor to

family-owned garment workshops near Ho Chi Minh City.  One shelter reported that some children were drugged during the year to keep them awake and working longer hours.

**d. Acceptable Conditions of Work**

The law requires the government to set a minimum wage and adjust it based on consumer price index changes.  New minimum wages took effect on October 1, as follows:  the monthly minimum for unskilled laborers at private enterprises was between VND 1.78 million (approximately $85) and VND 2 million ($95) in urban areas, and VND 1.4 million ($67) and 1.55 million ($74) in rural areas.  For employees working for the state sector, the monthly minimum was VND 830,000 ($40).  The government defined the poverty line for the period 2011-15 as VND 400,000 ($19) per month for rural households and VND 500,000 ($24) for urban households.

The government set the workweek for government employees and employees of companies in the state sector at 40 hours and encouraged the private business sector and foreign and international organizations that employed local workers to reduce the number of hours in the workweek to 40 hours, but it did not make compliance mandatory.

The law sets normal working hours at eight hours per day, with a mandatory 24-hour break each week.  Additional hours require overtime pay at one-and-one-half times the regular wage, two times the regular wage for weekdays off, and three times the regular wage for holidays and paid leave days.  The law limits compulsory overtime to 16 hours per week and 200 hours per year but provides for an exception in special cases, with a maximum of 300 overtime hours worked annually, subject to stipulation by the government after consulting with VGCL and employer representatives.  The law also prescribes annual leave with full pay for the public and private sectors.

The law requires the government to promulgate rules and regulations that provide for worker safety and provides that workers may remove themselves from hazardous conditions without risking loss of employment.

By law a female employee who is engaged to be married, pregnant, on maternity leave, or caring for a child under one year of age may not be dismissed unless the enterprise closes.  Female employees who are at least seven months' pregnant or

are caring for a child under one year of age may not be compelled to work overtime, at night, or in locations distant from their homes.

It was unclear how strictly the government enforced provisions for wages, hours, and benefits or the exceptions for certain female employees.  MOLISA, in coordination with local people's committees and labor unions, is charged with enforcing the law, but enforcement was inadequate for many reasons, including low funding and a shortage of trained enforcement personnel.  The VGCL asserted that authorities did not always prosecute violations.  MOLISA acknowledged shortcomings in its labor inspection system, emphasizing that the country had an insufficient number of labor inspectors.  There were approximately 140 general labor inspectors plus small numbers of additional inspectors focused on persons with disabilities, social insurance, export recruiting companies, etc.  The VGCL stated, and MOLISA acknowledged, that low fines on firms for labor violations failed to act as an effective deterrent against violations.

There were credible reports that factories exceeded the legal overtime thresholds and did not meet legal requirements for rest days.  A September ILO report noted that 66 of 78 apparel factories did not comply with legal overtime limits.

On-the-job injuries due to poor health and safety conditions and inadequate employee training in the workplace remained a problem.  The mining and construction sectors reported the greatest number of occupational injuries.  In the first six months of the year, there were 3,531 occupational accidents and 273 deaths.  For example, in April a stone mining accident killed 18 workers in Nghe An Province.  The company had been fined twice in the previous year for poor safety standards, and authorities arrested the owner after the April incident for violating safety regulations.  At year's end prosecution proceedings had begun against the owner.