<span style="color:red">**EXHIBIT 7.02**</span>

# VIETNAM 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

The Socialist Republic of Vietnam is an authoritarian state ruled by a single party, the Communist Party of Vietnam, led by General Secretary Nguyen Phu Trong, President Nguyen Xuan Phuc, Prime Minister Pham Minh Chinh, and Chairman of the National Assembly Vuong Dinh Hue.  National Assembly elections in May 2021 were neither free nor fair; there was limited competition among Communist Party-vetted candidates.

The Ministry of Public Security is responsible for internal security and controls the national police, a special national security investigative agency, and other internal security units.  Civilian authorities maintained effective control over the security forces.  There were credible reports that members of the security forces committed numerous abuses.

Significant human rights issues included credible reports of:  unlawful or arbitrary killings by the government; torture and cruel, inhuman, or degrading treatment and punishment by government agents; arbitrary arrest and detention; political prisoners; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; serious restrictions on free expression and media, including arbitrary arrest and prosecution of government critics, censorship, and the use of criminal libel laws; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association; restrictions on freedom of movement, including exit bans on activists; inability of citizens to change their government peacefully through free and fair elections; serious restrictions on political participation; serious government corruption; trafficking in persons; significant restrictions on workers' freedom of association; and use of compulsory child labor.

The government occasionally took corrective action, including prosecutions against officials who abused human rights or engaged in corruption, but police officers and state officials frequently acted with impunity.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings.  Media reported at least six deaths in custody, but authorities attributed these deaths to suicide or medical problems.

Unlike in previous years there were no reports that authorities harassed and intimidated families who questioned the police determination of cause of death.

On March 29, Nguyen Danh Thi died in police custody in Dong Hung District, Thai Binh Province, after being arrested on suspicion of transporting drugs illegally.

On July 1, Nguyen Ngoc Diep died in police custody in Nhon My Commune, Ke Sach District, Soc Trang Province, after being detained and questioned for 10 hours on suspicion of gambling.  Diep's family said police ignored their warning about his gastrointestinal diseases.  The autopsy showed bruises around Diep's lungs and heart.

On October 10, Nguyen Phuong Hong, an assistant at Van Thinh Phat Corporation, died two days after being arrested in connection with an investigation of the corporation's leaders.  State media first reported the "sudden death" of Hong, but later removed all articles on Hong's death.

On October 18, Dao Ba Phi died after two days of detention at Dong Hoa Township, Phu Yen Province.  Phi was arrested after allegedly stealing motorcycles.  Police claimed Phi committed suicide.

## b. Disappearance

There were no reports of disappearances by or on behalf of government authorities.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or

## Punishment, and Other Related Abuses

The constitution and law prohibit torture, violence, coercion, corporal punishment, or any form of treatment harming the body and health, or the honor and dignity of persons detained or incarcerated.  Nevertheless, detainees commonly reported mistreatment and torture by police or plainclothes security officials during arrest, interrogation, and detention.

Activists reported Ministry of Public Security officials assaulted political prisoners to extract confessions or used other means to induce written confessions, including instructing fellow prisoners to assault them in exchange for promises of better treatment.  Abusive treatment was not limited to activists or persons involved in politics.  Human rights monitoring groups issued multiple reports of police using excessive force while on duty and investigators allegedly torturing detainees.

On January 14, Le Chi Thanh was sentenced to two years in prison for "resisting those on public duties."  At the trial, he said that during pretrial detention police hung him upside down and subjected him to extended solitary confinement.

On May 14, at least four traffic police officers reportedly beat truck driver Le Huu Hieu when he refused to cooperate with police inspecting his identification documents and truck at the Hai Lang traffic police station in Quang Tri Province.  Hieu's family told the media that they filed a complaint alleging a police officer injured him, including breaking a rib.  On June 29, Quang Tri police announced that they investigated the incident and decided against initiating a criminal case.

Although impunity in the security forces was a significant problem, and police, prosecutors, and government oversight agencies seldom investigated specific reports of mistreatment, authorities did punish or prosecute some police officers for abuse of authority.  On May 10, Cao Bang police dismissed lieutenant colonel Dang Dinh Doan and expelled him from the police force following reports widely shared online that he broke into a private property and slapped two individuals in late April.  In a small number of cases in prior years, the government held police officials responsible for a death in custody, typically several years after the death.  Despite guidance from the Supreme People's Court to charge police officers responsible for deaths in custody with murder, officers who were held responsible

typically faced lesser charges. Police conducted their own internal affairs investigations under the supervision of prosecutors to determine whether police were responsible for deaths in custody.

Since joining the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (UNCAT) in 2015, the government has made efforts to sensitize government officials on the prohibition against torture, including through workshops and publications.

**Prison and Detention Center Conditions**

Prison conditions varied substantially from province to province and by prison. Former convicts, family members, and lawyers report that most had austere conditions but were generally not life threatening.

**Abusive Physical Conditions:** Insufficient and unclean food, inadequate health care, overcrowding, lack of access to potable water, poor sanitation, and excessive heat during the summer remained serious problems. Despite the law mandating that pretrial detainees be held separately from convicted prisoners, media and activists reported there were cases in which detainees were held in the same cells with convicted prisoners.

Prison officials failed to prevent prisoner-on-prisoner violence. At Gia Trung Prison, officials reportedly encouraged violence between prisoners.

There were no reliable data on causes of deaths in prisons or overall death rates.

Some former and serving prisoners and their families reported prisoners received insufficient, poor-quality food. Family members continued to make credible claims that prisoners received extra food or other preferential treatment by bribing prison officials.

An Diem Prison in Quang Nam Province reportedly failed to provide enough food to accommodate Nguyen Bac Truyen's religiously mandated vegetarian diet. There were reports many prisoners, such as Le Huu Minh Tuan and Nguyen Tuong Thuy (see below), suffered from deteriorating health due to psychological abuse, poor diet, and denial of medical treatment. Many followers of spiritual leader

Duong Van Minh, who were detained in Tuyen Quang in December 2021, claimed they did not receive food and other supplies delivered by their families while in pretrial detention to supplement the inadequate and sometimes unsanitary food provided by authorities.

Authorities placed prisoners in solitary confinement for standard periods of three months, reportedly only after less rigorous punishments had been imposed.

Families of many political prisoners expressed concerns regarding poor detention conditions and health-care services for aged and weak prisoners.  Authorities often delayed or denied requests for medical care outside the prison system.  There were reports of inmates dying in custody or shortly after release due to the poor prison conditions and lack of access to adequate medical care.

Approximately 30 families of political prisoners called on the government to allow sick inmates to be hospitalized after two allegedly died from lack of timely care.  The call came after the August 2 death of Do Cong Duong at a hospital in Thanh Chuong District, Nghe An Province, while in custody at Detention Center Number 6.  Duong was an independent journalist jailed for "disturbing public order" and "abusing the rights to freedom and democracy."  According to Duong's family, prison officials did not provide appropriate treatment for several medical conditions and only approved their request to take him to a hospital when his condition was severe and no longer treatable.  Duong's death was the second among political prisoners at the detention facility since 2019.

Le Huu Minh Tuan's family reported his health deteriorated drastically during his two years of imprisonment, saying he suffered from hemorrhoids, deafness, scabies, hepatitis, and malnutrition.

**Administration:**  There was no system by which prisoners could file uncensored complaints.  The Ministry of Public Security reported that prisoners may file formal complaints with a prosecutor's office.  These, however, must go through the same prison officials who were often the focus of the complaint.

The law allows prisoners' family members to visit for one to three hours per month and for prisoners to make up to four 10-minute telephone calls per month.  Authorities, however, generally limited prisoners to one family visit of no longer

than an hour per month and at times offered fewer than four monthly telephone calls.  According to family members, prison guards only allowed activist Huynh Thuc Vy to meet with her age three child once, citing COVID-19 restrictions. Officials monitored and censored calls, abruptly ending them if the conversations addressed disapproved topics, such as detention conditions.

While prisoners' families reported improved prisoner access to religious texts such as the Bible, some family members and lawyers reported authorities at times restricted or hindered access to such publications, although the law provides for it.

An Diem prison guards reportedly refused Bac Truyen's request for access to the original Hoa Hao sacred texts, instead providing him the edited version by the state-sponsored Hoa Hao Buddhist group.

**Independent Monitoring:**  The Ministry of Public Security, the government entity that manages prisons, did not allow access to international monitors.

## d. Arbitrary Arrest or Detention

The constitution prohibits arbitrary arrest and detention.  The law allows the government to arrest and detain persons "until the investigation finishes" for particularly serious crimes, including national security cases.  Detainees or their representatives have no right to challenge the lawfulness of an arrest before a court.

**Arrest Procedures and Treatment of Detainees**

By law police generally require a warrant approved by a prosecutor to arrest a suspect, although in some cases a decision from a court is required.  The law also allows police to hold an individual without a warrant in "urgent circumstances," such as when evidence existed a person was preparing to commit a crime or when police caught a person in the act of committing a crime.  Human rights lawyers, however, claimed that detention without warrants was a common practice.  There were numerous instances where activists were taken into custody without an arrest warrant.

In addition to actual arrest, lawyers and human rights nongovernmental

organizations (NGOs) reported that, in many cases, police officers "invited" individuals to present themselves at police stations without being given a clear reason. These individuals might be held for hours, questioned, or pressured to write or sign statements.

According to law, the investigating agency may hold a suspect for 72 hours without an arrest warrant. The investigating agency must issue an emergency custody order within 12 hours of the arrest. The investigating agency must then notify the prosecutors within 12 hours of issuing the emergency custody order. The prosecutor must approve or disapprove the arrest within 12 hours of receiving notice from the investigating agency. The investigating agency may extend custody twice, each time for three days, with the approval of the prosecutors. Especially in politically motivated cases, these procedures were not applied consistently or strictly.

Although the criminal procedure code sets time limits for detention while under investigation, the law allows the Procurator General of the Supreme People's Procuracy (prosecutor) to decide on temporary detention of an individual "until the investigation finishes" in cases of particularly serious crimes, including national security cases.

While a suspect is detained during investigation, authorities may deny family visits; they routinely denied such visits to those arrested on national security charges or in other politically motivated cases.

The law allows for bail in the form of money or property as a measure to replace pretrial detention, but it was seldom granted.

The law requires authorities to inform persons held in custody or accused of or charged with a crime, of their legal rights, including the right to an attorney within three days of arrest. By law the government is required to assign a lawyer to a criminal defendant in cases in which the defendant is charged with offenses punishable by death, is a minor or person with physical disabilities, or is deemed mentally incompetent, or if the defendant (or their lawful representative) does not seek legal assistance.

Despite the law affording detainees access to counsel from the time of detention,

authorities used bureaucratic delays to deny timely access to legal counsel.  In politically sensitive national security cases, the government routinely prohibited defense lawyers' access to their clients until after officials completed their investigations and formally charged the suspect.  Activists such as Bui Tuan Lam were not allowed to meet their lawyers during their investigations.  At times authorities only permitted attorneys access to their clients or the evidence against them immediately before the case went to trial, denying them adequate time to prepare a defense.  Investigators reportedly coerced detainees to not hire certain lawyers or to accept lawyers assigned by authorities.  There were also reports of authorities forcing lawyers not to defend activists or to refrain from providing substantive arguments and evidence in court in favor of activist clients.

Detainees have an undefined right to notify family members of their arrest.  Although police generally informed families of detainees' whereabouts, the Ministry of Public Security often held incommunicado bloggers, activists, and others suspected of political or national security offenses, such as Nguyen Thai Hung and Vu Thi Kim Hoang.

**Arbitrary Arrest:**  Arbitrary arrest and detention, particularly for political activists and individuals protesting land seizures or other matters deemed politically sensitive, remained a serious problem.

Authorities subjected activists and civil society organizers to varying degrees of arbitrary detention in their residences, in vehicles, at local police stations, at "social protection centers," or at local government offices.

**Pretrial Detention:**  The maximum pretrial detention is nominally 21 months in cases of "especially serious offenses."  Authorities, however, ignored requirements governing pretrial detention with impunity, and police and prosecutors used lengthy pretrial detention to punish or pressure human rights defenders to confess to crimes, activists said.

On August 30, political activist Le Anh Hung was sentenced to five years' imprisonment "for abusing democratic freedoms," after being held in pretrial detention for four years.

## e. Denial of Fair Public Trial

The law provides for an independent judiciary, but the judiciary was effectively under the control of the Communist Party of Vietnam (CPV).  There were credible reports of political influence, endemic corruption, bribery, and judicial inefficiency that significantly compromised the independence of the judicial system.

Most, if not all, judges were members of the CPV and were screened by it and local officials during their selection process to determine their suitability for the bench.  The party's authority was particularly notable in high-profile cases and when authorities charged a person with corruption or challenging or harming the party or state.  Defense lawyers routinely complained that, in many cases, it appeared judges determined the guilt of defendants prior to the trial.

Human rights lawyers reported that authorities also restricted, harassed, and threatened attorneys for representing political activists.  The law required attorneys to violate attorney-client privilege in national security cases or other serious crimes by revealing the content of attorney-client discussions to investigators and in court.

### Trial Procedures

While the constitution provides for the right to a fair and public trial, this right was not evenly enforced.  Judges presiding over politically sensitive trials generally did not permit the defense to exercise their legal rights.

The law states that defendants are innocent until proven guilty.  Defendants' right to prompt, detailed information concerning the charges against them was rarely respected.  Defendants' right to a timely trial was ignored with impunity, and although trials generally were open to the public, judges closed trials or strictly limited attendance in sensitive cases.  There were several cases, particularly of political activists, in which authorities denied requests for relatives or other observers to attend trials despite the trials being ostensibly open to the public.

The court sometimes denied suspects the right to their own choice of attorney and assigned one.  Defendants' right to communicate with a lawyer when on trial for a criminal charge that could result in a 15-year or longer sentence, including capital cases, was often not respected.

Although the defense has the right to cross-examine witnesses, there were multiple instances in which the defense did not know which prosecution witnesses would be called and were not allowed to cross-examine those witnesses or otherwise challenge witness' statements. In many political trials, the defense was not allowed to examine or review prosecution evidence. A defendant has the right to present a defense, but the law does not expressly state the defendant has the right to call witnesses.

Defendants have the right to not be compelled to testify or confess guilt, but this right was not observed. The law requires video or audio recording of interrogations during the investigation, prosecution, and sentencing phases of cases. In multiple criminal trials, such videos were used by authorities to manipulate the court and public perception of the suspect and the case, according to human rights activists. During her December 2021 trial, prodemocracy author and journalist Pham Doan Trang claimed documentation of her confession was made under duress and therefore should not be admissible as evidence.

In most trials defense attorneys were given time to address the court and question their clients, but they could not call witnesses or examine prosecutors' evidence. In other trials involving individuals charged under national security articles, judges occasionally silenced defense lawyers who were making arguments on behalf of their clients.

**Political Prisoners and Detainees**

Based on reports by media, NGOs, and observers, authorities as of September 16 held at least 173 persons for political or human rights activism, including 143 convicts and 24 under pretrial detention. According to media and reports from human rights groups, from January 1 to September 16, authorities detained 19 and convicted 26 persons who were exercising internationally recognized human rights, such as the freedoms of expression, peaceful assembly, and association. Most of these arrests and convictions were linked to online blogging, and defendants were charged with "making, storing, spreading, or propagating information, materials, or items" for the purpose of "opposing" the state and "abusing democratic freedom."

NGOs said authorities at times subjected political detainees to examination and treatment of mental illness.  In May the family of activist Nguyen Thuy Hanh said that authorities transferred Hanh, detained in April for allegedly founding and running a fund to support families of imprisoned activists, to a mental hospital.

According to family members of prisoners, prison officials often held political prisoners in small groups separate from the general inmate population and treated them differently.  In many cases political prisoners' daily schedules were different from those of the general inmate population, and they were not afforded the opportunity to leave their cells for work or interaction with the general prison population.  Some political prisoners enjoyed better material conditions than nonpolitical prisoners, but were subjected to more psychological harassment.  In other cases, political prisoners were subject to harassment by prison authorities and other inmates, the latter sometimes at the instigation of officials.  Officials in some cases subjected political prisoners to longer periods of solitary confinement than the three months given to other prisoners.

In some cases, rations appeared to be more limited for political prisoners than others.  Former political prisoners reported they received only two small bowls of rice and vegetables daily, often mixed with foreign matter such as insects or stones.  Some complained that the prisoners who were on a diet for medical reasons could not get enough suitable food.  Family members of many imprisoned activists who were ill claimed medical treatment was inadequate and resulted in long-term health complications.

Political prisoners and their family members reported that prison authorities at times revoked, reduced, denied, or delayed visitation rights and did not allow visitors to provide items to family members.  Family members of political prisoners reported authorities frequently limited them to two telephone calls per month, each normally five to seven minutes in length.  Prison authorities often held political prisoners far from their homes, making family visits difficult, and routinely did not inform family members of prison transfers.  Authorities often did not allow political prisoners in pretrial detention to meet their families and lawyers until the investigation finished, and in some cases political prisoners could not meet family members until after their appellate hearings.  On August 31, Pham Doan Trang met her mother and brother for the first time since her 2020 arrest.  In

November authorities permitted a visit by diplomats to the Nam Ha Prison in Ha Nam Province to meet with political prisoner Pham Chi Thanh.

Courts routinely handed down severe sentences to the most prominent activists or those linked to overseas groups. At least 19 individuals associated with the Provisional National Government of Vietnam, an overseas group that the Ministry of Public Security designated as a terrorist organization in 2018, were sentenced to five to 16 years in prison for "activities against the people's government."

**Transnational Repression**

**Threats, Harassment, Surveillance, and Coercion:**  Unlike prior years there were no reports of authorities harassing exiled individuals or their families.

**Bilateral Pressure:**  In prior years, human rights groups reported the government pressured Cambodia and Thailand to deny refugee or temporary asylum-seeker status to members of ethnic and religious minorities from the Central and Northwest Highlands, including Christian H'mong, and to return them to Vietnam. The government claimed these individuals were illegal migrants who left the country in pursuit of economic opportunities.

**Civil Judicial Procedures and Remedies**

The constitution provides that any person illegally arrested and detained, charged with a criminal offense, investigated, prosecuted, brought to trial, or subjected to judgment enforcement illegally has the right to compensation for material and mental damages and restoration of honor.  Very few victims of government abuse, however, sought or successfully received redress or compensation through the court system.  Courts hearing civil cases were as vulnerable to corruption and outside influence, lack of independence, and inexperience as those hearing criminal cases.

**Property Seizure and Restitution**

By law all land belongs to the government ("all the people of Vietnam"), which granted considerable decision-making authority for land pricing, allocation, and reclamation to local people's committees and people's councils, whose decisions

regarding land often lacked transparency and due process.

Disputes over land expropriations for development projects remained a significant source of public grievance.  Many individuals whose land the government forcibly seized protested at government offices for unaddressed complaints.

The government prohibits class action lawsuits against government ministries, thus rendering ineffective joint complaints in land rights disputes.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibits arbitrary or unlawful interference with privacy, home, or correspondence, but the government did not consistently protect these rights and at times violated them.

By law security forces need warrants to enter homes forcibly, but Ministry of Public Security officers regularly entered or surveilled homes, particularly of activists, without legal authority.  They often intimidated residents with threats of repercussions for failure to allow entry.

Without legal warrants authorities regularly opened and censored targeted private mail; confiscated packages and letters; and monitored telephone conversations, email, text messages, blogs, and fax transmissions.  The government cut telephone lines and interrupted the cell phone and internet service of several political activists and their family members.

After returning from a trip on February 17, activist Bui Thi Minh Hang discovered her house in Vung Tau had been broken into and doors unlocked.  Hang found nothing valuable was taken, causing her to suspect police searched her house while she was away.

The Ministry of Public Security maintained a system of household registration and block wardens to monitor unlawful activity.  The ministry closely monitored individuals engaged in or suspected of engaging in unauthorized political activities.

Activists and their family members reported harassment by provincial authorities.  On August 10, for example, Thanh Hoa Province security officials "invited"

Nguyen Thi Lanh, wife of imprisoned pastor Nguyen Trung Ton, to a local police station to question her about a visit to her imprisoned husband.

In May, Hoa Binh Province security officials summoned Trinh Ba Khiem, husband of imprisoned activist Can Thi Thue and father of imprisoned activists Trinh Ba Phuong and Trinh Ba Tu, several times for questioning about his Facebook posts relating to the imprisonment of his wife and sons.  The husband reported that security officials threatened him with arrest.

The law limits satellite television access to senior officials, foreigners, luxury hotels, and some members of the press, but persons throughout the country accessed foreign programming via home satellite equipment or cable.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution and law provide for freedom of expression, including for members of the press and other media; however, the government did not respect these rights, and several laws specifically encroach on freedom of expression.  The government also continued to use broad national security and antidefamation provisions in the law to restrict freedom of expression.  Such provisions establish crimes such as "sabotaging the infrastructure of socialism," "sowing divisions between religious and nonreligious people," and "propagandizing against the state" as serious offenses against national security.  The law also expressly forbids "taking advantage of democratic freedoms and rights to violate the interests of the state or lawful rights and interests of organizations or individuals."

**Freedom of Expression:**  The government continued to restrict speech that criticized individual government leaders or the party, promoted political pluralism or multiparty democracy, or questioned policies on sensitive matters, such as human rights, religious freedom, or sovereignty disputes with the People's Republic of China.

Representatives from state-run organizations and progovernment groups visited activists' residences and attempted to propagandize or intimidate them into

supporting government policies, according to social media and activists' reports. Family members of activists also reported numerous incidents of physical harassment, intimidation, and questioning by Ministry of Public Security officials.

On April 26, Lam Dong People's Court sentenced Dinh Van Hai to five years in prison and three years' probation for "spreading information, materials, items for the purpose of opposing the state," according to *Radio Free Asia*. In October 2021 the *People's Police* newspaper reported police arrested Hai for articles and videos that "criticized the socialist construction, distorted the past and denied revolutionary achievement" and "insulted Ho Chi Minh and discredited leadership of the Party and the state." According to *Radio Free Asia*, authorities did not notify Hai's family of his trial; they learned of it through a legal representative.

On June 9, the Ben Tre People's Court sentenced Nguyen Duy Linh to five years in prison and five years' probation for "spreading information, materials, items for the purpose of opposing the state." Local media reported his arrest in September 2021 and alleged that since 2017, Linh created social media content "with defaming content, slandering [the] people's government, caus(ing) public confusion and offending Party and state leadership comrades." Media reported that Linh was critical of the government's COVID-19 policies and police questioned and fined him for his social media posts prior to his arrest.

**Violence and Harassment:** Independent journalists faced restrictions on freedom of movement, other forms of harassment, and physical attacks if they reported on sensitive topics. The government also monitored journalists' meetings and communications. The government punished journalists for failing to self-censor, including by revoking journalists' press credentials.

On April 5, the Ho Chi Minh City People's Court sentenced journalist Nguyen Hoai Nam to three years and six months in prison for "abusing democratic freedoms." Earlier Nam exposed a corruption scandal at the Vietnam Inland Waterways Agency. This led to a criminal investigation, which concluded that 14 individuals, including government officials, had committed bribery totaling over five billion dong ($201,000) between 2015 and 2016; however, no indictments, arrests, or other legal action followed. Nam criticized the investigation until his arrest in April 2021.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** The CPV, government, and party-controlled mass media organizations exercised legal authority over all print, broadcast, online, and electronic media, primarily through the Ministry of Information and Communications under the overall guidance of the CPV Publicity and Education Commission. This includes requiring media outlets to be affiliated with a government body. The law requires editors-in-chief to be CPV members.

The government may fine journalists and newspapers for failing to cite their sources of information or for using "documents and materials from organizations and personal letters and materials from individuals, without clearly stating the sources of such information." The law allows the government to punish publishers if they publish false information or content the government deems objectionable.

Authorities frequently intervened directly with media to dictate or censor a story, and only permitted media outlets to report on predetermined topics; the Ministry of Information and Communication fined outlets that reported unapproved political and socioeconomic news. Pervasive self-censorship, including among independent journalists and bloggers, due to the threat of dismissal and possible arrest, assisted the party and government to control media content.

Media independent of government authority operated on a limited basis online, primarily via blogs and social media, but independent journalists faced government harassment.

Journalists employed by foreign-based media outlets operated under significant restrictions. For example foreign journalists required formal permission to travel outside Hanoi, and "live" foreign television programming must run on a 30- to 60-minute delay to enable content monitoring.

On July 7, the Ministry of Information and Communications imposed a 325 million dong ($13,100) fine on the *Vietnam Law Newspaper* and suspended the license for its online news site for three months after the press authority deemed it had published "false information" and "sensational" and "deductive and unfounded" content that showed a "lack of professionalism."

**Libel/Slander Laws:** Defamation is a criminal offense, and the laws were

enforced, especially against critics of the Communist Party and government.

On January 17, the People's Court in Dak Lak sentenced Pham Dinh Quy, a lecturer at Ton Duc Thang University, to 33 months in prison for "slandering" the former secretary of the Dak Lak Party Committee, Bui Van Cuong.  In 2019 Quy filed a complaint accusing Cuong of plagiarizing major portions of his doctoral thesis.  Authorities held Quy under "urgent arrest" since 2020.  The Dak Lak court also sentenced former police officer Hoang Minh Tuan to 30 months in prison.  Tuan received and signed Quy's complaints before sending them to Party and government agencies, including the Central Inspection Committee, which concluded that the complaints were unfounded.

**National Security:**  The law provides for significant fines against journalists, newspapers, and online media that publish or broadcast information deemed harmful to national interests or for disseminating information considered to distort history and the revolution's achievements.  In some cases, these "violations" may lead to criminal proceedings.  No such cases were reported in the year to October, but editors noted that publications and journalists must be careful of national security laws, contributing to self-censorship.

Citing laws protecting national security, police arrested and ordered journalists to restrict criticism of government policies or officials in prior years.

**Internet Freedom**

The law allows the government to restrict and disrupt access to the internet, censor online content, impose criminal sentences for online expression, and routinely monitor private online communications.  The limited number of licensed internet service providers were fully or substantially state-controlled companies.  The government monitored Facebook and other social media and punished those who used the internet to organize protests or publish content critical of the government.

On January 5, Dong Nai police arrested blogger Nguyen Thai Hung and his wife Vu Thi Kim Hoang for "abusing democratic freedoms."  Hung operated the "Speak by Truth TV" YouTube channel that often shared content critical of the government and had nearly 40,000 followers.  Police arrested Hung while he was live streaming on YouTube.

In September several prominent social media critics of the state were fined or arrested in a three-day period.  On September 6, Thai Binh police fined game streamer Nguyen Thi Thanh Loan 10 million dong ($422) after she made a comment while live streaming that was construed as insulting the president.  Loan was fined for spreading inaccurate information and slandering and defaming individuals.  On September 7, Danang City police arrested Bui Tuan Lam for "spreading information against the state."  Lam in November 2021 posted a video of himself on social media imitating the Turkish chef, Salt Bae, who appeared in a separate video handfeeding a gold-coated steak to Minister of Public Security To Lam in London.  On September 8, Dak Lak Province police arrested Dang Dang Phuoc for "spreading information against the State," according to state media.  The *Ho Chi Minh City Law Newspaper* alleged that since 2019, Phuoc had posted slanderous articles and videos against the government.  Phuoc was a vocal critic of the government with a large following on social media.

The government sometimes blocked websites it deemed politically or culturally inappropriate, including sites operated by overseas Vietnamese political groups in addition to the websites of *Radio Free Asia*, *Voice of America*, and the *BBC* Vietnamese news service.  State-owned internet service providers routinely blocked domestic Vietnamese-language websites that contained content criticizing the CPV or promoted political reform.

An administrative regulation compels owners of all websites and social networking sites to cooperate with the Ministry of Information and Communications to prevent the spread of "bad, toxic news."

Another rule requires all companies and organizations operating websites providing content on "politics, economics, culture, and society" or operating social networks, including blogging platforms, to register with the government.  Such companies and organizations must locate at least one server in the country to facilitate government requests for information and must store posted information for 90 days and certain metadata for up to two years.

The government forbids direct access to the internet through foreign internet service providers and requires internet service providers to provide technical assistance and workspace to public security agents to allow them to monitor

internet activities.  The Ministry of Public Security required "internet agents," including cybercafes, to register the personal information of their customers, store records of internet sites visited by customers, and participate in government investigations of online activity.  Internet cafes continued to use government-approved software to monitor customers' online activities.  The Ministry of Public Security enforced these and other requirements and monitored the internet selectively.

The government pressured firms such as Facebook and Google to eliminate "fake accounts" and content deemed "toxic," including "antistate" materials.  The Ministry of Information and Communications pressured social media platforms to comply with political-speech takedown requests, especially for posts critical of senior CPV officials.

Authorities also suppressed online political expression by direct action against bloggers, such as arrests, short-term detentions, surveillance, intimidation, and the illegal confiscation of computers and cell phones from activists and their family members.  The government continued to use national security and other vague provisions of the penal code against activists who peacefully expressed their political views online.  Political dissidents and bloggers reported the Ministry of Public Security periodically ordered the disconnection of their home internet service.

Users of state-sponsored social networks and blogs were required to provide their full name, national identification number, and address before creating an account.  In-country website and social network operators must allow authorities to inspect local servers upon request and must have a mechanism to remove prohibited content within three hours of detection or notification by authorities.

**Restrictions on Academic Freedom and Cultural Events**

The government restricted academic freedom and cultural events.  Foreign academic professionals temporarily working at universities in the country could generally discuss nonpolitical topics widely and freely in classes, but government observers regularly attended classes taught by both foreigners and nationals.  The government continued to require international and domestic organizations to obtain

advance approval for conferences involving international sponsorship or participation.  Police sometimes attended these events as uninvited observers.  The government allowed universities more autonomy over international exchanges and cooperation programs, but provincial and central authorities occasionally refused university requests to host foreign scholars and exchange participants.  Visa requirements for visiting scholars and students remained onerous and fees and conditions were applied inconsistently.

Viewers reported interruption of coverage of various commentaries, documentaries, and movies on human rights incidents in the country, the Vietnam War, the Cold War, the Soviet era, or reports involving trade tensions.  For example, in November viewers reported a cable network stopped international news coverage of COVID-related protests in China, citing problems with the satellite signal.

The Ministry of Information and Communications may revoke the licenses of foreign publishers; foreign publishers must renew their licenses annually.

The government continued to prohibit any public criticism of the CPV and state policy, including by independent scientific and technical organizations, even when the criticism was presented to a purely academic audience.

State-run media reported private entities produced more than 90 percent of all publications in the country, although outright private ownership or operation of any media outlet or publishing house was prohibited.  Many nongovernmental entities, however, produced and distributed publications by subcontracting, joint publishing, or buying permits from government or other public publishing entities.

The government exerted influence over art exhibits, music, and other cultural activities by requiring numerous authorizations.

On July 16, authorities disrupted a workshop on Ukrainian culture held at the Southeast and North Asia Institute of Technology and Development Research (SENA) in Hanoi with the participation of many academics and Ukrainian diplomats.  Police prevented some participants from leaving home to attend the workshop and cut off the institute's power during it.

On July 27, the Ministry of Public Security charged Nguyen Son Lo, former president of SENA, with "abusing democratic freedom." Lo had written several books and articles calling for CPV and government reforms and circulated his writings among CPV members. In January 2021 a Bach Thong District, Bac Kan Province government's website stated that his writings instilled "reactionary thoughts into the minds of government officials, party members and the public."

On August 17, the Ho Chi Minh City Department for Culture and Sports fined artist Bui Quang Vien 25 million dong ($1,050) for organizing a painting exhibition without a permit and demanded he destroy all the exhibited paintings. After a public backlash against the government's actions, authorities rescinded the requirement that the artist destroy his paintings.

## b. Freedoms of Peaceful Assembly and Association

The government restricted the freedoms of peaceful assembly and association.

**Freedom of Peaceful Assembly**

Although permitted by the constitution, the government restricted freedom of peaceful assembly. Laws and regulations require permits for group gatherings, which local authorities issued or denied without explanation. Only those arranging publicized gatherings to discuss matters the government considered "sensitive" appeared to require permits. The government generally did not permit any demonstrations that could be perceived as political. The law permits security forces to detain individuals gathering or protesting outside of courthouses during trials. Persons routinely gathered in informal groups without government interference so long as the gathering was not perceived as political or a threat to the state. For example the government permitted small groups of individuals to protest land rights concerns for short periods in Hanoi and Ho Chi Minh City.

In prior years police and plainclothes authorities routinely mistreated, harassed, and assaulted activists and those demonstrating against the government. No major demonstrations against the government were permitted during the year.

**Freedom of Association**

The constitution affords individuals the right of association, but the government severely restricted the establishment of associations involved in what the government considered "sensitive" fields such as politics, religion, and labor rights.  The country's legal and regulatory framework includes mechanisms particularly aimed at restricting the freedom of NGOs, including religious organizations, to organize and act.  The government generally prohibited the establishment of private, independent organizations, insisting that persons work within established, party-controlled mass organizations, usually under the aegis of the CPV's Vietnam Fatherland Front (VFF).

Laws and regulations governing NGOs restrict their ability to engage in policy advocacy or conduct research outside of state-sanctioned topics and prohibit organizations focused on social science and technology from operating in fields such as economic policy, public policy, political matters, and a range of other areas considered sensitive.  Authorities also did not permit NGOs generally to publicly advocate specific policy positions.

According to some recognized groups and others attempting to register, implementation of the law varied from province to province.  They reported that the process was burdensome, lengthy, and that authorities often did not respond to their applications.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation, but the government regularly imposed limits on the movement of individuals, especially those released after serving sentences under national security or related charges or outspoken critics of the government.

**In-Country Movement:**  Government restrictions required citizens and resident

foreigners to obtain a permit to visit border areas, defense facilities, industrial zones involved in national defense, areas of "national strategic storage," and "works of extreme importance for political, economic, cultural, and social purposes."

Citizens (or their hosts) must register with local police when staying overnight in any location outside their own homes. Foreign passport holders must also register to stay in private homes, although there were no known cases of local authorities refusing to allow foreign visitors to stay with friends or family.

Authorities did not strictly enforce residency laws for the general population, and migration from rural areas to cities continued unabated. Moving without permission, however, hampered persons from accessing public education, health care, and other government services.

Authorities restricted the movements of several political activists on probation or under house arrest, along with others not facing such legal restrictions. Authorities also continued to monitor and selectively restrict the movement of prominent activists and religious leaders. Authorities continued to prevent activists from leaving their houses during events that might draw public attention.

Several activists, such as Nguyen Tien Trung, Pham Thanh Nghien, and Bui Thi Minh Hang, reported plainclothes police prevented them from leaving their houses, especially during holidays or visits by senior foreign diplomats.

**Foreign Travel:** Prospective emigrants occasionally encountered difficulties obtaining a passport or exit permission, and authorities regularly confiscated passports of activists and government critics, at times indefinitely. The law allows authorities to postpone the departure of any person on various broad grounds, including for national security and defense. There were multiple reports of individuals crossing the land borders with Laos or Cambodia illegally because they were unable to obtain passports or exit permission; in some cases this included persons wanted for crimes and political or other disapproved activities.

The Ministry of Public Security continued to use foreign travel prohibitions against certain activists and religious leaders. Authorities banned and prevented dozens of individuals from traveling overseas, withheld their passports on vague charges, or

refused to issue passports to certain activists or religious leaders without clear explanation.  Activists believed they were not authorized to travel abroad to reduce their opportunities to speak out against the government.  Authorities also refused to issue passports to the family members of certain activists.

On April 9, customs officers at Ho Chi Minh City's Tan Son Nhat airport prevented Pastor A Dao from leaving for an international religious freedom conference and told him that he had a travel ban.  Upon his return to Kon Tum Province, A Dao was detained and interrogated for two days.  After his release, plainclothes police continued monitoring and harassing him.

Many ethnic minority Christians in the Central Highlands reported local authorities denied their passport applications.

## e. Protection of Refugees

The government generally did not cooperate with the Office of the UN High Commissioner for Refugees (UNHCR) and other organizations regarding treatment of refugees, returning refugees, or asylum seekers, as well as other persons of concern.

**Access to Asylum:**  The law does not provide for granting asylum or refugee status, and the government has not established a system for providing protection to refugees.

## f. Status and Treatment of Internally Displaced Persons

Not applicable.

## g. Stateless Persons

According to 2021 statistics from UNHCR, there were 35,475 recognized stateless persons and persons of undetermined nationality in the country.  This was a substantial increase from the estimated 11,000 stateless persons acknowledged in 2016, reflecting increased government efforts to identify such persons.  The bulk of this population were ethnic H'mong living in border areas, but it also included women who lost their Vietnamese citizenship after marrying a foreign national but

then lost their foreign citizenship due to divorce.

# Section 3. Freedom to Participate in the Political Process

Citizens could not choose their government through free and fair elections based on universal and equal suffrage and conducted by a secret ballot that guaranteed free expression and the will of the people. Although the constitution provides the ability to elect representatives to the National Assembly, people's councils, and other state agencies directly, constitutional and legal provisions established a monopoly on political power for the CPV, and the CPV oversaw all elections.

## Elections and Political Participation

**Recent Elections:** The most recent National Assembly elections held in May 2021 allowed limited competition among CPV-vetted candidates but were neither free nor fair, and the government did not allow NGO monitoring. The CPV's VFF chose and vetted all candidates through an opaque, multistage process. CPV candidates won 485 of the 499 seats. The remaining 14 were non-CPV candidates unaffiliated with any party; nine of the 14 were self-nominated. There were no candidates from a party other than the CPV.

According to the government, 99 percent of eligible voters cast ballots in the May 2021 election, a figure activists and international observers considered improbably high. Voters may cast ballots by proxy, and officials charged local authorities with ensuring that all eligible voters cast ballots by organizing group voting and verifying that all voters within their jurisdiction had voted.

The law allows citizens to "self-nominate" as National Assembly candidates and submit applications for the VFF election-vetting process. A total of 74 non-CPV, self-nominated candidates received VFF approval and ran in the May 2021 National Assembly elections, down from 97 in the 2016 election. The independent candidates consisted of legal reformers, journalists, academics, activists, and human rights defenders, and included the country's first openly lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) candidate, who ran unsuccessfully in Hanoi. In contrast to the party's candidates, these candidates actively used Facebook and social media to advertise their policy platforms.

On February 17, a court in Ninh Binh upheld the 6.5-year prison sentence against Tran Quoc Khanh for "conducting antistate propaganda" in a brief appellate hearing without lawyer. Khanh previously announced through social media his intention to run for a seat in the National Assembly as an independent candidate. Before this arrest local police questioned Khanh on multiple occasions regarding his blogging, his announced candidacy for the National Assembly, and his application to a prodemocracy civil society organization called Democracy Association.

On April 19, a court in Hanoi upheld the sentence of five years' imprisonment and five years' probation against self-nominated National Assembly candidate Le Trong Hung for "conducting antistate propaganda." At the time of his arrest, Hung had submitted preliminary paperwork to run in the May elections but had not yet been formally screened by the VFF. Hung was a long-time human rights advocate who focused his civil rights advocacy on social injustice by distributing copies of the country's constitution. He was also critical of many incumbent legislators and other state and party leaders on his Facebook page.

**Political Parties and Political Participation:** Political opposition movements and other political parties are illegal. Although the constitution states that "all Party organizations and members of the CPV operate within the framework of the constitution and the laws," the CPV politburo in fact functioned as the supreme national decision-making body, although technically it reported to the CPV Central Committee.

On September 8, Phan Son Tung, a YouTuber with hundreds of thousands of subscribers, was arrested and charged with "spreading information against the state." He was in the process of launching a new political party at the time of his arrest.

**Participation of Women and Members of Minority Groups:** No laws limit participation of women or members of historically marginalized groups in the political process, and they did participate. The law sets a target of 35 percent of final candidates for the National Assembly and provincial people's councils to be women and 18 percent to be from minority groups. The 151 women in the National Assembly comprised 30 percent of the body; the 89 ethnic minority

delegates comprised 18 percent of the assembly.

# Section 4. Corruption and Lack of Transparency in Government

Although the law provides criminal penalties for corruption by officials and there were multiple arrests and convictions for corruption, the government did not implement the law effectively, and officials frequently engaged in corrupt practices.  This included existing and retired officials from the politburo, central party, military, and public security services.

**Corruption:**  The lack of public consultation on land-use plans and government land compensation frameworks was a driver of corrupt land transfers.  Corruption in financial, banking, natural resource mining, and public investment sectors was a significant political and social problem.

On April 14, police arrested Deputy Minister of Foreign Affairs To Anh Dung for allegedly soliciting bribes from Vietnamese nationals abroad seeking to be repatriated during the COVID-19 pandemic.

On June 7, the Ministry of Public Security arrested Minister of Health Nguyen Thanh Long and Hanoi People's Committee Chairperson Chu Ngoc Anh for mismanagement and involvement in a scheme to sell COVID-19 test kits at inflated prices.

On August 22 during its midyear review, the Central Steering Committee for Anti-Corruption reported that nearly 295 Communist Party members were disciplined during the first six months of the year for corruption and deliberate mismanagement.  A separate anticorruption report prepared by the government for the National Assembly's Standing Committee in September stated that 74 officials were found in violation of regulations on asset and income declaration during the year.

On August 30, the People's Court in Hanoi sentenced former party secretary of Binh Duong Province, Tran Van Nam, to seven years in prison.  Nam was found guilty of "violating regulations on the management and use of state assets" for allowing private investors to take over state-owned land in 2012.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

The government did not permit independent, local human rights organizations to form or operate, nor did it tolerate attempts by organizations or individuals to criticize its human rights practices publicly.  Authorities often asserted that human rights and democracy advocacy were acts against the Communist Party and state.

**Retribution against Human Rights Defenders:**  In January four individuals who ran registered NGOs (Nguy Thi Khanh, Dang Dinh Bach, Mai Phan Loi, and Bach Hung Duong) were convicted of tax evasion.  Human rights organizations believed that these charges were tied to the individuals' social or environmental activism.

On May 20, the People's Court of Cu Kuin District, Dak Lak Province sentenced Y Wo Nie, a member of the Ede ethnic group, to four years in prison for "abusing democratic freedoms."  State media reported he attended online courses on religious freedom, domestic civic laws, international covenants, and reporting human rights abuses.  The indictment stated that in 2020 Y Wo Nie reported "falsified" human rights violations to "reactionary overseas subjects" through messaging applications and met with diplomats.  Those actions "affected political security, social order and safety," "undermined public confidence in the regime," and "hurt the images of the state and the credibility of the party in diplomatic relations."

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law prohibits using or threatening gender-based violence, including rape, spousal rape, "other sexual contacts," and "forced sex crimes."  It also criminalizes the rape of men.  Conviction for rape is punishable by imprisonment of up to 15 years, depending on the severity of the case.

Authorities treated domestic violence cases as civil cases unless the survivor

suffered injuries to more than 11 percent of the body.  The law specifies acts constituting domestic violence and stipulates punishments for convicted perpetrators ranging from warnings to imprisonment for up to three years.

The government did not enforce laws on rape and domestic violence effectively.

Domestic violence was common.  The Women's Union reported in 2019 (latest data available) that at least 58 percent of married women worried about domestic violence and that 87 percent did not seek help.  Officials acknowledged domestic violence was a significant social concern, and media discussed it openly.  Social stigma prevented many survivors from coming forward due to fear of harassment from their spouses or family.

While police and the legal system generally remained unequipped to deal with cases of domestic violence, the government, with the help of international and domestic NGOs, continued to train police, lawyers, community advocates, and judicial officials in the law; supported workshops and seminars that aimed to educate women and men regarding domestic violence and women's rights; and highlighted the problem through public-awareness campaigns.

**Sexual Harassment:**  The law specifically prohibits sexual harassment only in the workplace; the government did not enforce the law effectively.  The Labor Code that came into effect in January 2021 allows workers to terminate a labor contract immediately without prior notice if the worker is sexually harassed in the workplace.  The new Labor Code also requires employers to include sexual harassment in their "labor regulations."  Perpetrators of sexual harassment outside of the workplace may be fined.  A decree provides for administrative penalties for sexual harassment in public.

In serious cases survivors may sue offenders under a law that deals with "humiliating other persons" and specifies punishments for conviction that include a warning, noncustodial reform for up to two years, or a prison term ranging from three months to two years.

**Reproductive Rights:**  Coercive population policies restricted reproductive rights. The constitution stipulates that society, families, and all citizens implement "the population and family planning program."  By law couples or individuals are

limited to giving birth to one or two children, with exceptions based on government decree. Regulatory penalties apply to CPV members and public-sector officials.

The CPV, certain ministries, and some localities issued their own regulations, applicable only to party members and government officials, regarding family size. A politburo decree subjects party members to reprimand if they have three children, removes them from a ranking position if they have four, and expels them from the CPV if they have five. Violating the decree also decreases the likelihood of promotion and may lead to job termination. The CPV did not enforce these provisions consistently.

Access to sexual and reproductive health services was provided to all persons, including survivors of sexual violence, and included emergency contraception as part of the clinical management of rape.

According to the United Nations Population Fund (UNFPA), although the country made substantial progress in improving the sexual and reproductive health status of the population, disparities existed. The maternal mortality rate declined from 233 per 100,000 live births in the 1990s to 46 per 100,000 live births in 2019, but the rate was two to three times higher among ethnic minorities. UNFPA assessed that the higher rate of maternal deaths among ethnic minority women was due to poor quality health-care access for both family planning and maternal health services, geographic isolation, limited education on reproductive health, and socioeconomic factors that limit the utilization of sexual and reproductive health services in ethnic minority localities.

Young persons were particularly vulnerable, with unmet need for modern contraceptives at 29.6 percent, and the adolescent birth rate at 11 per 1,000. According to UNFPA, they lacked adequate and comprehensive information and services about contraception.

**Discrimination:** The law provides for gender equality, but women continued to face societal discrimination. Despite the large body of law and regulation devoted to protecting women's rights in marriage and the workplace as well as provisions that call for equitable treatment, women did not always receive equal treatment in

employment (see section 7.d.), education, or housing, particularly in rural areas.

Although the law provides for equal inheritance rights for men and women, a son was more likely to inherit property than a daughter, unless otherwise specified by a legal document such as a will, according to observers.

**Gender-biased Sex Selection:**  According to 2019 data (the latest available) from the Ministry of Health, the average male to female sex ratio at birth was 111.5 boys to 100 girls, far greater than the natural norm of 104-106 boys to 100 girls.  To address the topic of gender-biased sex selection, the government prohibits gender identification prior to birth and prohibits gender-based violence and discrimination. Abuses of these provisions were subject to fines or imprisonment.  At the local or provincial level, some authorities awarded cash incentives for giving birth to girls.

## Systemic Racial or Ethnic Violence and Discrimination

The law prohibits violence and discrimination against ethnic minorities, but societal discrimination was longstanding and persistent.  The government did not enforce the law effectively.

Ethnic minority group members constituted a sizable percentage of the population in certain areas, including the northwest, the Central Highlands, and portions of the Mekong Delta.  The constitution recognizes the rights of members of ethnic minorities to use their languages and protect and nurture their traditions and cultures.  There were reports, however, that not all members of ethnic minorities were able to engage in decisions affecting their lands, cultures, and traditions.

International human rights organizations and refugees continued to allege that authorities monitored, harassed, and intimidated members of certain ethnic minority groups, particularly ethnoreligious minorities in the Central and Northwest Highlands, including Christian H'mong.

Authorities used national security laws to impose lengthy prison sentences on members of ethnic minorities for their connections to overseas organizations the government claimed espoused separatist aims.

According to community organizers, on February 4, police in Soc Trang

summoned Duong Khai, a member of the Khmer Krom ethnic group, and interrogated and abused him for two days.  This was done after Khai distributed a United Nations publication on ethnic minority rights and participated in several online classes on domestic and international law on ethnic minority rights hosted by the Khmer Krom Foundation, an international NGO.

Although the government previously allocated land to ethnic minorities in the Central Highlands, land expropriation in these areas was common.  Preferential government treatment for domestic and foreign companies that invested in highland areas populated predominantly by ethnic minorities as well as government-supported infrastructure and agricultural development programs in those areas tended to benefit nonindigenous residents.

## Children

**Birth Registration:**  By law the government considers anyone born to a citizen parent to be a citizen.  Persons born to noncitizen parents may also acquire citizenship in certain circumstances.

Children born to stateless parents or to a stateless mother and unknown father may acquire citizenship only if the parents or mother are permanent residents, making the process difficult in most cases.

The law requires a birth certificate to access public services, such as education and health care.  Nonetheless, some parents, especially from ethnic minorities, chose not to register their children.  Local authorities, moreover, prevented some parents from registering children to discourage internal migration, according to observers.

**Education:**  By law education is free, compulsory, and universal through age 14, but school fees were common.  Under a government subsidy program, ethnic-minority students were exempt from paying school fees.  Authorities did not always enforce required attendance laws or enforce them equally for boys and girls, especially in rural areas, where government and family budgets for education were limited and children's labor in agriculture was valuable.

A gender gap in education remained.  For example, there were substantial differences in the education profile of men and women at the postsecondary level,

with men predominating, notably in applied technology programs.

The government sometimes denied education to children from families not registered in their locality, especially with H'mong communities in the Central Highlands, and on the children of some political and religious activists.

**Child Abuse:**  The government did not effectively enforce existing laws on child abuse, and physical and emotional abuse were common.

Observers concurred that violence against children occurred in many settings including schools and homes and was usually inflicted by someone known to the child.  The most common types of school violence were bullying and corporal punishment by teachers.  The number of reported cases of child abuse, especially child sexual abuse, was increasing.  The National Hotline for Child Protection reported large increases (150 percent) in calls involving violence and abuse against children between May and August compared with the first three months of the year.

UNICEF stated in 2019 there were no effective interdisciplinary child- and gender-sensitive procedures or processes for handling child-abuse reports and that the responsibilities of government agencies were unclear.  The child protection workforce, from social workers to relevant professionals such as police, judges, prosecutors, teachers, and medical experts, was poorly trained, uninformed, and generally insufficient to address the problem, especially at local levels.

**Child, Early, and Forced Marriage:**  The legal minimum age of marriage is 18 for girls and 20 for boys, and the law criminalizes organizing or entering an underage marriage.

**Sexual Exploitation of Children:**  The law criminalizes the sale, deprivation of liberty, and all acts related to the commercial sexual exploitation of children younger than 16.  The commercial sexual exploitation of children ages 16 and 17 is not fully criminalized.  The law also prohibits all acts of cruel treatment, humiliation, abduction, sale, and coercion of children into any activities harmful to their healthy development.

Punishment for sexual exploitation crimes ranges from three years' to life

imprisonment and may include significant fines.  The law specifies prison sentences for conviction for acts related to the exploitation of children in commercial sex, including harboring commercial sex or commercial sexual exploitation of minors (12 to 20 years' imprisonment), brokering commercial sex (seven to 15 years'), and paying for sex with minors (three to 15 years').  The production, distribution, dissemination, or sale of child pornography is illegal, and a conviction carries a sentence of three to 10 years' imprisonment; the government did not effectively enforce the law.  The country is a destination for child sex tourism.

The minimum age for consensual sex is 18.  Conviction for statutory rape may result in life imprisonment or capital punishment.  Penalties for sex with minors between the ages of 16 and 18 vary from five to 10 years in prison, depending upon the circumstances.  The penalty for rape of a child between the ages of 13 and 16 is seven to 15 years' imprisonment.  If the survivor becomes pregnant, the rape is incestuous, or the offender is in a guardianship position to the survivor, the penalty increases to 12 to 20 years' imprisonment.  The law considers all cases of sexual intercourse with children younger than 13 to be child rape, with sentences ranging from 12 years' imprisonment to death.  The government enforced the law and convicted child rapists received harsh sentences.

## Antisemitism

There were small communities of Jewish foreigners in Hanoi and Ho Chi Minh City.  There were no reports of antisemitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuse Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No law criminalizes consensual same-sex sexual conduct between adults.

**Violence against LGBTQI+ Persons:**  There were no reports of the government inciting, perpetrating, condoning, or tolerating violence against LGBTQI+ persons.

**Discrimination:**  The law does not prohibit discrimination against LGBTQI+ persons in housing, employment, nationality laws, or access to most government services.  According to LGBTQI+ activists and NGOs, inaccurate information regarding sexual orientation and gender identity remained pervasive and there was widespread social stigma and discrimination associated with being LGBTQI+, including in schools where LGBTQI+ students often experienced bullying.

**Availability of Legal Gender Recognition:**  The civil code gives individuals who have undergone gender-affirming surgery the right to register their new status, although regulations to implement this were pending as of December.

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:**  The belief that same-sex attraction is a diagnosable and curable mental health condition was common, and some lesbians reported "corrective" rape and forced marriages.  In August the Ministry of Health issued an official dispatch to the medical system (provincial health departments and medical institutions nationwide) instructing that LGBTQI+ identities are not a disease to be cured, prohibiting involuntary treatments, stating that mental health services could only be provided by experts on sexual orientation and gender identity, and stipulating the ministry's policy opposing "conversion therapy."  The ministry also stated that education should be strengthened so that all medical providers have correct knowledge concerning LGBTQI+ persons, and that they must be treated equally in medical environments.  According to LGBTQI+ activists and NGOs, medically unnecessary "gender normalization" surgeries were performed on intersex children.

**Restrictions on Freedom of Expression, Association, or Peaceful Assembly:**  The country's broad limits on freedom of expression, association, or peaceful assembly also applied to LGBTQI+ groups and topics, although there were no reports of them being targeted like other advocacy groups.

## Persons with Disabilities

Although the law protects the rights of persons with disabilities to access

education, employment, health services, information, communications, buildings, transport, the judicial system, and other state services, most persons with disabilities were not able to access education, health services, public buildings, and transportation on an equal basis with others.  For example while the law requires new construction or major renovations of government and large public buildings to include access for persons with disabilities, enforcement was sporadic, particularly outside major cities.

Persons with disabilities faced widespread social stigmatization.

Access to education for children with disabilities, particularly deaf children and those with intellectual disabilities, remained limited.  More than 90 percent of elementary and secondary schools did not have appropriate infrastructure for persons with disabilities.  The education system also lacked sufficient trained teaching professionals for persons with disabilities.  According to a 2018 study, the literacy rate of persons with disabilities 16 years and older was 76 percent, compared to a 95 percent literacy rate for persons without disabilities of the same age group.  According to data from UNICEF and Vietnam's *National Survey on People with Disabilities 2016-2017*, the school attendance rate for children with disabilities was 82 percent at the primary level, 68 percent at the lower secondary level, and 34 percent at the upper secondary level.

There is no legal restriction on the right of persons with disabilities to vote, but many polling stations were inaccessible to persons with physical disabilities.

NGOs reported they continued to face challenges applying for funding and offering training for disability-related programs from certain provincial governments, which hampered access for international experts to conduct training.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of workers who are citizens to form and join unions under the Vietnam General Confederation of Labor (VGCL), a CPV-run organization.  The VGCL, however, answered directly to the VFF, which did not protect trade unions from government interference in or control over union

activity.  The labor code allows workers to form or join an independent employee representative organization of their choosing (workers' representative organization) that does not have to be affiliated with the VGCL.  The labor code defines "employment relationship" such that a legally valid relationship exists when two parties agree to a document that includes a description of the job, salary, management, and supervision conditions.  This may include a contract with an "independent contractor," "service provider," "freelancer," or other informal agreement with employment-like terms.  The labor code also limits the repeated use of limited-term contracts.  The law extends protection to part-time and domestic workers.

The law limits freedom of association by not allowing trade unions full autonomy in administering their affairs.  All unions must follow the organizational and operational guidelines prescribed by the CPV and law.  The law confers on the VGCL ownership of all trade-union property and gives it the right to represent lower-level unions.  By law trade union leaders and officials are appointed rather than elected by union members.  Implementing decrees needed to operationalize the labor code's section on workers' representative organizations were not yet in force as of November.

The law requires that if a workplace trade union does not exist, the next level "trade union" organization must perform the tasks of a grassroots union, even where workers have not so requested or have voluntarily elected not to organize. The labor code includes provisions for collective bargaining on any matter of concern to both parties to regulate working conditions and relationships between the parties and to develop progressive, harmonious, and stable labor relations.  The law requires bargaining to commence within seven days of a party's request and provides 90 days to reach an agreement.

Collective bargaining is allowed at the enterprise, multi-enterprise, and sectoral levels but has additional requirements, such as establishment of a collective bargaining council by the people's committee of the province where the headquarters of the enterprise is located.  Under the labor code, parties involved in multi-enterprise collective bargaining may request such a collective bargaining council, which comprises representatives nominated by each party as well as representatives from the provincial people's committee; the council disbands after

a collective bargaining agreement is signed.

The law prohibits strikes by workers in businesses the government considers essential to the national economy, defense, or public order. "Essential services" include electricity production; post and telecommunications; maritime and air transportation; navigation; public works; and oil and gas production. The law also grants the chairmen of provincial people's committees the right to suspend a strike considered detrimental to the national economy or public safety. Workers must also provide five days' prior notification to the employer and the provincial and district level people's committee labor agents before a strike. Strikes that do not adhere to the process outlined by law are illegal.

The law states the executive committee of a trade union may issue a decision to strike only when at least 50 percent of workers support it. Workers must request and exhaust an extensive and cumbersome process of mediation and arbitration before a lawful strike may occur. Unions or workers' representatives may either appeal decisions of provincial arbitration councils to provincial people's courts or strike. The law stipulates strikers may not be paid wages while they are not at work. The law prohibits retribution against legal strikers. By law individuals participating in strikes declared illegal by a people's court and found to have caused damage to their employer are liable for damages, although this has never been enforced. The law limits legal strikes to cases that arise from a collective labor dispute, and cases in which collective bargaining is not undertaken within the legal timeframes, or when a labor arbitration board has not been established.

The law includes provisions that prohibit antiunion discrimination and imposes administrative sanctions and fines for violations. The law does not distinguish between workers and managers, however, and fails to prohibit employers' agents, such as managers, from participating as union leadership or interfering in union activity. The International Labor Organization (ILO)-International Finance Corporation (IFC) Better Work project, which monitors workers' rights and working conditions in some apparel and footwear factories, reported that management participation in trade union activities was a significant concern.

The government did not effectively enforce applicable laws providing for freedom of association and collective bargaining. Penalties were not commensurate with

similar laws.

There were strikes, particularly during the period around the Lunar New Year celebration.  Strikes did not follow the authorized conciliation and arbitration process and thus authorities considered them illegal "wildcat" strikes.  The government, however, took no action against the strikers.

There were no registered domestic NGOs involved in labor organizing.  Local, unregistered labor NGOs, however, supported efforts to raise awareness of worker rights and occupational safety and health (OSH) matters and to support Vietnamese and foreign migrant workers.  Multiple international labor NGOs collaborated with the VGCL to train VGCL-affiliated union representatives in labor organizing, collective bargaining, and other trade union matters.

## b. Prohibition of Forced or Compulsory Labor

The constitution and law prohibit forced or compulsory labor.  The labor code's definition of forced labor, however, does not explicitly include debt bondage.  The law criminalizes all forms of labor trafficking.  The government does not effectively enforce the law.  The law does not provide any penalty for violating provisions prohibiting forced labor.  NGOs continued to report the occurrence of forced labor of men, women, and children (see also section 7.c.).

Labor recruitment firms, most affiliated with state-owned enterprises, and unlicensed brokers reportedly charged workers seeking overseas employment higher fees than the law allows.  In 2021 the Ministry of Labor inspected 16 enterprises sending workers abroad and fined 12 for administrative violations.  Despite these actions and ministry awareness-raising workshops, problems continued and workers seeking overseas employment incurred high debts and were thus more vulnerable to forced labor, including debt bondage, in the receiving countries.  In addition there continued to be reports indicating forced labor in the informal apparel industry.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law does not prohibit all the worst forms of child labor. Deficiencies include the lack of a law proscribing slavery. The new labor code states a worker older than 14 and younger than 18 shall not perform work that might damage the physical or intellectual development and dignity of the minor, such as lifting heavy objects or dealing with alcohol or dangerous chemicals or gases. A minor worker aged 13 to 14 may perform light jobs included in a list from the Ministry of Labor, War Invalids, and Social Affairs. Children younger than age 13 may work in art and sports in certain circumstances for no more than 20 hours per week. Minor workers must have the permission of their parents.

Illegal child labor was reported in labor-intensive sectors, such as construction, garments and textiles, bricks, fish, furniture, footwear, and leather goods, agriculture, and some other manufacturing. Local media also reported children working as beggars in gangs whose leaders abused the children and took most of their income. Some children started work as young as age five, and nearly 49 percent of child workers did not attend school.

In the informal garment sector, children as young as age six reportedly worked in conditions of forced labor. The most recently available information from government raids, NGOs, and media reports indicated this was most common in small, privately owned informal garment factories and workshops.

The Ministry of Labor is responsible for enforcing child labor laws and policies. Government officials may fine and, in cases of criminal violations, prosecute employers who violate child labor laws.

The government did not effectively enforce the law, and penalties were not commensurate with those for analogous serious crimes. Penalties were sometimes applied against violators.

Also see the Department of Labor's *List of Goods Produced by Child Labor or Forced Labor* at https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods.

# d. Discrimination with Respect to Employment and Occupation

The law prohibits discrimination based on gender, race, disability, color, social class, marital status, belief, religion, HIV status, and membership in a trade union or participation in trade union activities.  The law does not prohibit discrimination based on political opinion, age, language, national origin, sexual orientation, or gender identity.  Companies with a workforce composed of at least 51 percent employees with disabilities may qualify for special government-subsidized loans.  No laws prohibit employers from asking about family or marital status during job interviews.

The labor code includes a definition of sexual harassment and assigns employer responsibility for its prevention.  Employers must implement regulations against sexual harassment in the workplace and include it as possible grounds for dismissal.

Discriminatory hiring practices existed, including discrimination related to gender, age, disability, and marital status (see section 6).  Under the labor code, the retirement age for most employees is 60 years and three months for men, and 55 years and four months for women; the labor code improved but did not eliminate this disparity, as it would gradually increase the retirement ages to 62 for men and 60 for women.  The labor code includes a chapter on gender equality, which provides paternity leave for male workers and job security for women workers who take maternity leave.

Enterprises led by women had limited access to credit and international markets.  Female workers earned, per year, an average of one month's income less than male workers.  Many women older than 35 found it difficult to find a job, and there were reports of women, such as factory workers in garments and electronics, receiving termination letters at the age of 35.  Legal restrictions exist against women in certain occupations and tasks considered to be harmful for their reproductive health, including jobs deemed "hazardous" in industries such as mining, construction, and transportation.

Social barriers and the limited accessibility of many workplaces remained problems in the employment of persons with disabilities.

Penalties for discrimination were less than those under laws related to civil rights. The government did not effectively enforce the laws. Penalties were rarely applied against violators.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The minimum wage varies by region.  In all regions the minimum wage exceeds the World Bank official poverty income level.

The law provides for a 48-hour regular workweek, with overtime pay for additional hours.  The labor code limits overtime to 40 hours per month, and 200 hours per year, but provides for an exception in special cases, with a maximum of 300 overtime hours annually, subject to advance approval by the government after consultations with the VGCL and employer representatives.

Credible reports, including the ILO-IFC *Better Work 2020 Annual Report*, indicated many apparel and footwear factories exceeded legal overtime thresholds. The ILO-IFC report stated that, while a majority of factories in the program complied with the daily limit of four hours overtime, 76 percent still failed to enforce monthly limits (40 hours).

**Occupational Safety and Health:**  The law provides for OSH standards, describes procedures for persons who are victims of labor accidents and occupational diseases, and delineates the responsibilities of organizations and individuals regarding OSH.  The law provides for the right of workers to remove themselves from situations that endanger health or safety without jeopardy to their employment.  Migrant workers, including internal economic migrants, and workers without contracts were among the most vulnerable workers, and employers routinely subjected them to hazardous working conditions.

On-the-job injuries due to poor OSH practices and conditions and inadequate employee training remained a problem.  In 2021 the government reported 6,504 occupational accidents and 786 fatalities, fewer than in 2020.  These figures likely understated the problem, due to the lack of inspection.  Migrant workers and workers without contracts remained most vulnerable to occupational injuries and fatalities.

**Wage, Hour, and OSH Enforcement:**  The Ministry of Labor, War Invalids, and Social Affairs is the principal labor authority.  The Labor Inspections Department is responsible for workplace inspections to confirm compliance with labor laws, including OSH standards.

Inspectors have the authority to make unannounced inspections and initiate sanctions.  Inspectors may use sanctions, fines, withdrawal of operating licenses or registrations, closures of enterprises, and mandatory training in response to labor law violations.  Inspectors may take immediate measures where they have reason to believe there is imminent danger to the health or safety of workers, and can temporarily suspend operations, although such measures were rarely used.

The government did not effectively enforce labor laws, particularly in the informal economy.  The number of inspectors was not sufficient to enforce compliance. Labor inspectors accounted for fewer than one third of the labor inspectorate's staff, and of these, only a small number were OSH specialists.  Most worksites went uninspected for years at a time.  Penalties for wage, hour and occupational safety and health violations were commensurate with those for similar crimes, such as fraud, but penalties were rarely applied against violators.

**Informal Sector:**  The informal sector includes small household businesses; individual vendors in traditional markets, street side, or online; and gig workers for transportation and delivery.  Fifty-five percent of the country's workforce worked in the informal economy.

Members of ethnic minority groups often worked in the informal economy and, according to the ILO, informal workers typically had low and irregular incomes, endured long working hours, and lacked protection by labor market institutions. Additionally, workers in the informal sector were only eligible to pay into a voluntary social insurance fund covering only retirement and survivors' allowances.  Workers in the formal sector and their employers contributed to a system that covers sickness, maternity, labor accidents, and occupational disease as well as retirement and survivors' allowances.