EXHIBIT 7.03

# Vietnam 2024 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Vietnam during the year.

Significant human rights issues included credible reports of:  arbitrary or unlawful killings; torture or cruel, inhuman, or degrading treatment and punishment; involuntary or coercive medical or psychological practices; arbitrary arrest or detention; transnational repression against individuals in another country; serious restrictions on freedom of expression and media freedom, including unjustified arrests or prosecutions of journalists and censorship; restrictions of religious freedom; and systematic restrictions on workers' freedom of association.

The government occasionally took corrective action, including prosecutions against officials who committed human rights abuses, but security authorities and other state officials frequently acted with impunity.

## Section 1. Life

### a. Extrajudicial Killings

There were reports the government or its agents committed arbitrary or

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor

unlawful killings.  Media reported at least two detainee deaths under suspicious circumstances.  Authorities reported one person died on March 22 of injuries after interrogation and the other reportedly drowned in the prison's reservoir on May 21.

On March 22 in Dong Nai Province, Long Thanh district authorities summoned Vu Minh Duc for questioning on suspicion of "disturbing public order," according to the *Ho Chi Minh City Legal News*.  That same day authorities transferred Duc to a hospital after he fainted during questioning.  Duc died later in the day of cardiac arrest, acute kidney damage, acute liver failure, and soft tissue damage to the legs, according to the hospital-issued death certificate as reported by the same newspaper.  The family reported Duc's body had dried blood and bruising on the chest and thighs.  According to media reports, in November authorities arrested a Long Thanh district police investigator on charges of "using corporal punishment" in connection with Duc's death.

Authorities held officers accountable for the deaths of pretrial detainees through suspensions, fines, and imprisonment; however, these corrective actions were not consistently applied.  In a few cases, the government held police and other security officials responsible for a death in custody, although typically several years after the death.  Despite guidance from the Supreme People's Court to charge police and other security officers responsible for deaths in custody with murder, officers who were held

responsible typically faced lesser charges.  Public security authorities conducted their own internal affairs investigations under the supervision of prosecutors to determine whether police and other security officers were responsible for deaths in custody.

## b. Coercion in Population Control

Coercive population policies restricted reproductive rights.  The constitution stipulated that society, families, and all citizens implement "the population and family planning program."  By law, couples or individuals were limited to giving birth to one or two children, with exceptions based on government decree.  Regulatory penalties applied to Communist Party of Vietnam (CPV) members and public-sector officials.  In 2022 the CPV abolished punishments against party members who had three or more children; party members would only be subjected to reprimand.

The CPV, certain ministries, and some localities issued their own regulations, applicable only to party members and government officials, regarding family size.  A Politburo decree subjected party members to reprimand if they had three children, removed them from a ranking position if they had four, and expelled them from the CPV if they had five.  Violating the decree also decreased the likelihood of promotion and could lead to job termination.  The CPV did not enforce these provisions consistently.

## Section 2. Liberty

## a. Freedom of the Press

The constitution and law provided for freedom of expression, including for members of the press and other media; however, the government did not respect these rights, and some laws specifically encroached on freedom of expression.  The government also continued to use broad national security and antidefamation provisions in the law to restrict freedom of expression.  Such provisions established crimes such as "sabotaging the infrastructure of socialism," "sowing divisions between religious and nonreligious people," and "propagandizing against the state" as serious offenses against national security.  The law also expressly forbade "taking advantage of democratic freedoms and rights to violate the interests of the state or lawful rights and interests of organizations or individuals."

The government restricted speech that criticized individual government leaders or the party, promoted political pluralism or multiparty democracy, or questioned policies on sensitive matters such as human rights, religious freedom, sovereignty disputes with the People's Republic of China, or coercive land seizure.  Authorities regularly questioned, imposed fines, and prosecuted individuals for speech deemed unacceptable.

On April 24, the Lam Dong People's Court sentenced Duong Tuan Ngoc to seven years in prison and three years of probation for "antistate

propaganda." Authorities accused the teacher of posting and sharing articles and videos on his social media accounts that mocked, defamed, and criticized the government and the CPV's policies, and defamed senior party and state leaders, according to media reports.

Authorities prevented the display of the flag of the Republic of Vietnam, the former government in southern Vietnam.

Foreign academic professionals temporarily working at universities in the country could generally discuss nonpolitical topics widely and freely in classes, but government observers regularly attended classes taught by both foreigners and nationals.

The government prohibited any public criticism of the CPV and state policy, including by independent scientific and technical organizations, even when the criticism was presented to a purely academic audience. The government exerted influence over exhibits, music, and other cultural activities by requiring numerous authorizations.

## Physical Attacks, Imprisonment, and Pressure

Independent journalists faced restrictions on freedom of movement and other forms of harassment if they reported on sensitive topics. The government also monitored journalists' meetings and communications. The government punished journalists for failing to self-censor, including by revoking journalists' press credentials.

## Censorship by Governments, Military, Intelligence, or Police Forces, Criminal Groups, or Armed Extremist or Rebel Groups

Although the law allowed organizations to run their own media outlets, government- and CPV-controlled mass media organizations exercised legal authority over all major print, broadcast, online, and electronic media, primarily through the Ministry of Information and Communications under the overall guidance of the CPV Information and Education Commission.

The government could fine journalists and newspapers for failing to cite their sources of information or for using "documents and materials from organizations and personal letters and materials from individuals, without clearly stating the sources of such information."  The law allowed the government to punish publishers if they published false information or content the government deemed objectionable.  The law enabled the Ministry of Information and Communications and provincial information and communications authorities to fine media outlets and reporters for covering news beyond their approved mandate, particularly political and foreign affairs news.  In addition to fines, authorities could also suspend the operation of media outlets for up to 12 months.

On April 1, the ministry's inspectorate fined the *Vietnam Business and Border Trade Magazine* 50 million dong ($1,990) for articles and investigations inconsistent with its license, which the ministry claimed

damaged the country's reputation.  Also in April, the ministry issued 26 decisions sanctioning major violators with total fines of 818 million dong ($32,600) for violations related to information dissemination including text-message spamming, broadcasting unapproved content, operating an unlicensed website, operating without permit, or other irregularities.

Authorities frequently intervened directly with media to dictate or censor a story and permitted media outlets to report only on predetermined topics. Pervasive self-censorship, including among independent journalists and bloggers, due to the threat of dismissal and possible arrest, resulted in effective party and government control of most media content.

Media independent of government authority operated on a limited basis online, primarily via blogs and social media, but independent journalists faced government harassment.

Journalists employed by foreign-based media outlets operated under significant restrictions.  For example, foreign journalists required formal permission to travel outside Hanoi, and live foreign television programming was required to run on a 10- to 60-minute delay to enable content monitoring.  Journalists employed by foreign-based media outlets were reportedly called in by authorities and warned regarding articles that appeared critical of the government.

The law limited satellite television access to senior officials, foreigners,

luxury hotels, and some members of the press, but persons throughout the country accessed foreign programming via home satellite equipment or cable.

Viewers reported interruption of coverage of various commentaries, documentaries, and movies on human rights incidents in the country, the Vietnam War, the Cold War, the Soviet era, or reports involving trade tensions.  On May 9, the director of the Cinema Department refused a distribution license for the film *Viet and Nam* without citing a rationale.  According to foreign media outlets, authorities expressed concern that the movie, which followed a romance between two male miners, portrayed a negative image of Vietnam.

There were reports of local business leaders pressuring state media outlets and journalists to remove negative media reports regarding them and their businesses.  There were reports of business owners or unidentified assailants assumed to be working for businesses assaulting reporters and preventing them from doing their jobs.  In April, for example, unidentified assailants beat and injured reporters of the major online newspaper *VnExpress* and National Television VTV who were investigating a fire in Hanoi.

# b. Worker Rights

## Freedom of Association and Collective Bargaining

The law provided for the right of workers who were citizens to form and join unions under the Vietnam General Confederation of Labor (VGCL), a CPV-run organization.  The VGCL, however, answered directly to the Vietnam Fatherland Front, which did not protect trade unions from government interference in or control over union activity.  Although the labor code allowed workers to form and join a workers' representative organization of their choice that did not have to be affiliated with the VGCL, the government did not issue an implementing decree necessary for their establishment or operation.

The law limited freedom of association by not allowing trade unions full autonomy in administering their affairs.  All unions had to follow organizational and operational guidelines prescribed by the CPV and law.  The law conferred on the VGCL ownership of all trade union property and gave it the right to represent lower-level unions.  By law, trade union leaders and officials were appointed rather than elected by union members.

The law required that if a workplace trade union did not exist, the next level trade union organization had to perform the tasks of a grassroots union, even when workers did not request or voluntarily elect to organize.  The labor code included provisions for collective bargaining on any matter of

concern to both parties to regulate working conditions and relationships between the parties and to develop progressive, harmonious, and stable labor relations.  The law required bargaining to commence within seven working days of a party's request and provided 90 days to reach an agreement.

Collective bargaining was allowed at the enterprise, multienterprise, and sectoral levels.  Under the labor code, parties involved in multienterprise collective bargaining could request such a collective bargaining council, which comprised representatives nominated by each party as well as representatives from the provincial people's committee; such councils were to disband after a collective bargaining agreement was signed.

The law prohibited strikes by workers in sectors the government considered essential to national defense or security, public order, or human health.  Essential services included electricity production, post and telecommunications, maritime and air transportation, navigation, public works, and oil and gas exploration and production.

Workers had to request and exhaust a process of mediation before a lawful strike could occur.  The law stated the executive committee of a trade union could issue a decision to strike only when at least 50 percent of workers supported it.  Workers also had to provide five working days' prior written notice to the employer and the district and provincial people's committees before a strike.  Strikes that did not adhere to the process outlined by law

were illegal.  The law granted the leaders of provincial people's committees the right to suspend a strike if they deemed it presented a risk of serious damage to the national economy, public interest, national defense and security, public order, or human health.

The law prohibited retribution against legal strikers.  By law, individuals participating in strikes declared illegal by a people's court and found to have caused damage to their employer were liable for damages, although this was never enforced.  As in previous years, there were no legal strikes.  The government recorded, but did not publish, the number of illegal "wildcat" strikes initiated without union authorization.  There were no public reports of government action against strikers.

The law included provisions that prohibited antiunion discrimination and imposed administrative sanctions and fines for violations.  The law did not distinguish between workers and managers, however, and failed to prohibit employers' agents, such as managers, from acting as union leaders or interfering in union activity.  The International Labor Organization-International Finance Corporation Better Work project, which monitored workers' rights and working conditions in some apparel and footwear factories, reported that management participation in trade union activities was a significant concern.

VGCL officials reported union leaders were subjected to physical assaults, unlawful dismissals, and interference in union activities, during a workshop

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor

on legal reforms during the year.

The government did not effectively enforce applicable laws providing for freedom of association and collective bargaining.  Penalties for violations were not commensurate with those for similar crimes.  There were no registered domestic nongovernmental organizations (NGOs) involved in labor organizing.  Local, unregistered labor NGOs, however, supported efforts to raise awareness of worker rights under threat of harassment and detention.

## Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acceptable Work Conditions

### Wage and Hour Laws

The minimum wage varied by region.  In all regions the minimum wage exceeded the World Bank official poverty income level.

The law provided for a 48-hour regular workweek, with overtime pay for additional hours.  The labor code limited overtime to 40 hours per month and 200 hours per year, but it provided for an exception in special cases, with a maximum of 300 overtime hours annually, subject to advance approval by the government after consultations with the VGCL and

employer representatives.

Credible reports, including the *Better Work 2020 Annual Report*, indicated many apparel and footwear factories exceeded legal overtime thresholds. The *Better Work* report stated that, while a majority of factories in the program complied with the daily limit of four hours of overtime, 76 percent failed to enforce monthly limits (40 hours).  Alleged wage, hour, and overtime violations were reportedly common in footwear and garment manufacturing.  Similar abuses occurred in the construction and agricultural sectors, according to state media reports and researchers.

**Occupational Safety and Health**

The law provided for occupational safety and health (OSH) standards, described procedures for persons who were victims of labor accidents and occupational diseases, and delineated the OSH responsibilities of organizations and individuals.  The law provided for the right of workers to remove themselves from situations that endangered health or safety without jeopardy to their employment.

On-the-job injuries due to poor OSH practices and conditions and inadequate employee training remained a problem.  Migrant workers and workers without contracts remained most vulnerable to occupational injuries and fatalities.

## Wage, Hour, and OSH Enforcement

The Ministry of Labor was the principal labor authority, and its Labor Inspections Department was responsible for workplace inspections to confirm compliance with labor laws, including OSH standards.

Inspectors had the authority to make unannounced inspections and initiate sanctions.  Inspectors could use sanctions, fines, withdrawal of operating licenses or registrations, closures of enterprises, and mandatory training in response to labor law violations.  Inspectors could take immediate measures when they had reason to believe there was imminent danger to the health or safety of workers, and they could temporarily suspend operations, although such measures were rarely used.

The government did not effectively enforce labor laws.  The number of inspectors was not sufficient to enforce compliance.  Labor inspectors accounted for fewer than one third of the labor inspectorate's staff, and of these, only a small number were OSH specialists.  Most worksites went uninspected for years at a time.  Penalties for wage, hour, and OSH violations were commensurate with those for similar crimes, such as fraud, but penalties were rarely applied against violators.

The informal sector included small household businesses; individual vendors in traditional markets, street side, or online; and gig workers for transportation and delivery.  The General Statistics Office of Vietnam

estimated 69 percent of the country's workforce worked in the informal economy.

The government did not effectively enforce labor laws in the informal sector. Informal workers typically had low and irregular incomes, endured long working hours, and were not protected by labor market institutions. Additionally, workers in the informal sector were only eligible to pay into a voluntary social insurance fund covering only retirement and survivors' allowances. Workers in the formal sector and their employers contributed to a system that also covered sickness, maternity, labor accidents, and occupational disease.

## c. Disappearance and Abduction

### Disappearance

There were no reports of enforced disappearances by or on behalf of government authorities.

### Prolonged Detention without Charges

The constitution prohibited arbitrary arrest and detention, but authorities did not respect this prohibition. The law allowed the government to arrest and detain persons "until the investigation finishes" for particularly serious crimes, including national security cases. Detainees or their representatives had no right to challenge the lawfulness of an arrest before a court.

Arbitrary arrest and detention, particularly for political activists and individuals protesting land seizures or other matters deemed politically sensitive, remained a serious problem.

Authorities subjected activists and civil society organizers to varying degrees of arbitrary detention in their residences, in vehicles, at public security offices, at "social protection centers," or at local government offices.

On September 5, a human rights NGO reported security officers searched the home of ethnic minority religious leader Y Thinh Nie in Dak Lak Province and seized cell phones and religious documents without a warrant.  As of November, authorities detained Nie two months without charges.

The maximum pretrial detention was nominally 23 months in cases of "particularly serious offenses."  Authorities, however, ignored requirements governing pretrial detention with impunity, and police and prosecutors used lengthy pretrial detention to punish or pressure suspects, including human rights defenders, to confess to crimes, activists claimed.

As of November, authorities held Nguyen Duy Huong in pretrial detention since his 2021 arrest for "disseminating antistate propaganda" well beyond the maximum pretrial detention period authorized by law.

## d. Violations in Religious Freedom

See the Department of State's annual *International Religious Freedom*

*Report* at https://www.state.gov/religiousfreedomreport/.  Local police and government officers closely monitored individuals engaged in or suspected of engaging in unauthorized religious activities.

## e. Trafficking in Persons

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

# Section 3. Security of the Person

## a. Torture and Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution and law prohibited torture, violence, coercion, corporal punishment, or any form of treatment harming the body and health, or the honor and dignity of persons detained or incarcerated.  Nevertheless, detainees commonly reported mistreatment and torture by security officers during arrest, interrogation, and detention.

Activists reported Ministry of Public Security officials assaulted political prisoners to extract confessions or used other means to induce written confessions, including instructing fellow prisoners to assault them.  Abusive treatment was not limited to activists or persons involved in politics.  Human rights monitoring groups issued multiple reports of security forces using

excessive force while on duty and investigators allegedly torturing detainees.

Authorities conducted forced mental health evaluations on at least one activist and forcibly detained individuals in mental health institutions as a form of punishment or coercion, according to human rights groups. Authorities subjected Nguyen Thuy Hanh to compulsory treatment for depression at the National Institute of Forensic Psychiatry from April 2023 to March, according to Hanh's family.  Before her hospitalization, authorities held Hanh in pretrial detention from 2021 until her trial on July 31. Authorities granted Hanh early medical release in October due to a serious medical condition.

Family members of prisoners and former prisoners also reported officials of medical institutes performed unnecessary medical procedures on prisoners and detainees.

Although impunity in the security forces was a significant problem, and police, prosecutors, and government oversight agencies seldom investigated specific reports of mistreatment, authorities punished or prosecuted some police and security officers for abuse of authority.  On June 27, the People's Court of Ho Chi Minh City tried a former district-level police lieutenant and two prisoners for a beating that led to the death of another prisoner.  The court returned the case to police for further investigation.  On November 20, the People's Court of Ho Chi Minh City sentenced former police officer

Vo Thanh Dat to 13 years' imprisonment for torture and negligence related to the death of a pretrial detainee in 2022.  Authorities accused Dat and two convicted detainees of beating Trieu Quang Binh, resulting in his subsequent death due to respiratory failure, acute pulmonary edema, and multiple body injuries.

# b. Protection of Children

## Child Labor

The law did not prohibit all the worst forms of child labor.  Deficiencies included the lack of a law proscribing slavery.  The labor code stated a worker older than 14 and younger than 18 was not permitted to perform work that might damage the physical or intellectual development and dignity of the child, such as lifting heavy objects or dealing with alcohol or dangerous chemicals or gases.  A worker age 13 to 14 could perform light jobs included in a list from the Ministry of Labor, War Invalids, and Social Affairs (Ministry of Labor).  Children younger than 13 could work in art and sports in certain circumstances for no more than 20 hours per week.  Child workers had to have the permission of their parents.

The Ministry of Labor was responsible for enforcing child labor laws and policies.  Government officials could fine and, in cases of criminal violations, prosecute employers who violated child labor laws.  The government did not effectively enforce the law, and penalties were not commensurate with

those for analogous serious crimes.  Penalties were sometimes applied against violators.

Child labor remained prevalent.  Authorities estimated more than one million children between the ages of 15 and 17 worked; approximately 20 percent of them worked more than 40 hours per week, and nearly 50 percent of them worked in a hazardous environment.

Illegal child labor was reported in labor-intensive industries, such as brickmaking, agriculture, construction, fishing, forestry, and the manufacture of footwear, furniture, garments, textiles, and leather.  Local media also reported children working as beggars in gangs whose leaders abused the children and took most of their income.  Some children started work as young as age five, and nearly 49 percent of child workers did not attend school.  There were reports during the year of the worst forms of child labor.

## Child Marriage

The legal minimum age of marriage was 18 for girls and 20 for boys, and the law criminalized organizing or entering an early marriage.  According to UNICEF, early marriage remained prevalent in many remote areas where there were high concentrations of ethnic minorities, due to poverty, limited access to education, and cultural norms.  According to the most recent national survey conducted in 2019, early marriage among ethnic minorities

was nearly 22 percent.  The rate in certain ethnic minority communities was particularly high:  H'mong, 51 percent; Clao, 48 percent; Mang, 47 percent; Xinh Mun, 45 percent; and Ma, 39 percent.  Rates were highest in the northwest highlands, Central Highlands, and central coastal provinces. Authorities conducted communication campaigns against underage marriage and fined those who organized early marriages.

## c. Protection to Refugees

The government sometimes cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other organizations regarding treatment of refugees, returning refugees, or asylum seekers, as well as other persons of concern.

### Provision of First Asylum

The law did not provide for granting asylum or refugee status, and the government had no system for providing protection to refugees.

## d. Acts of Antisemitism and Antisemitic Incitement

There were small communities of Jewish foreigners in Hanoi and Ho Chi Minh City.  There was a report of a coffee shop owner in Hanoi denying service to a Jewish couple with their two children in June.  The coffee shop owner reportedly shouted and cursed at the family.

## e. Instances of Transnational Repression

The government engaged in acts of transnational repression.

## Extraterritorial Killing, Kidnapping, or Violence or Threats of Violence

On October 30, a Hanoi court sentenced political blogger Duong Van Thai (also known as Thai Van Duong), a UNHCR-recognized refugee, to 12 years in prison and three years of probation for "disseminating antistate propaganda."  Human rights groups reported Vietnamese authorities forced him to return to Vietnam from Bangkok, Thailand, in April 2023 to face charges related to his political gossip YouTube channel.  At the time of his arrest, state media reported Duong was detained for illegally entering the country.

## Threats, Harassment, Surveillance, or Coercion

Activists reported the government intimidated and harassed family members in Vietnam of exiled activists, pressuring them to dissuade their relatives from engaging in political activities abroad.

According to NGO and media reports, Ministry of Public Security officers, including the director of the Gia Lai Provincial Security Department, visited ethnic minority refugee communities in Thailand, accompanied by Thai police and staff from the Vietnamese embassy in Bangkok.  The reports

indicated the officers "interrogated and pressured them to return to Vietnam."  The Vietnamese delegation accused the refugees of leaving Vietnam illegally but promised leniency and support for their repatriation. They also threatened to arrest them and take other punitive measures if they refused to return, according to the NGO reports.